1

**FOLEY & LARDNER LLP**
ONE MARITIME PLAZA, SIXTH FLOOR
SAN FRANCISCO, CA 94111-3409
TELEPHONE:    415.434.4484
FACSIMILE:    415.434.4507

2

3

LAURENCE R. ARNOLD, CA BAR NO. 133715
EILEEN R. RIDLEY, CA BAR NO. 151735
SCOTT P. INCIARDI, CA BAR NO. 228814

4

Attorneys for STANFORD HOSPITAL & CLINICS and

5

LUCILE PACKARD CHILDREN'S HOSPITAL

6

7

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

11

STANFORD HOSPITAL & CLINICS and
LUCILE PACKARD CHILDREN'S
HOSPITAL,

12

13

Petitioners,

14

vs.

15

SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL 715,

16

Respondent.

17

18

19

20

SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL 715

21

22

Petitioner and Counter-
Respondent,

23

vs.

24

STANFORD HOSPITAL & CLINICS and
LUCILE PACKARD CHILDREN'S
HOSPITAL

25

26

Respondents and Counter-
Petitioners.

27

28

Case No:  5:07-CV-05158-JF

DECLARATION OF LAURIE J.
QUINTEL IN SUPPORT OF STANFORD
HOSPITAL AND CLINICS' AND
LUCILE PACKARD CHILDREN'S
HOSPITAL'S MOTIONS FOR
SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, SUMMARY
ADJUDICATION OF CLAIMS OR
DEFENSES

Date:         August 29, 2008
Time:         9:00 A.M.
Dept:         Ctrm. 3, 5th Floor

Judge:        Hon. Jeremy Fogel

Case No:  5:08-CV-00213-JF

Judge:        Hon. Jeremy Fogel

---

QUINTEL DECLARATION IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT/ADJUDICATION
CASE NOS. 5:07-CV-05158-JF, 5:08-CV-00213-JF, 5:08-CV-00215-JF;
5:08-CV-00216-JF; 5:08-CV-01726-JF; 5:08-CV-01727-JF

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 | Case No: 5:08-CV-00215-JF |
| Petitioner, | |
| vs. | |
| STANFORD HOSPITAL & CLINICS and LUCILE PACKARD CHILDREN'S HOSPITAL | |
| Respondents. | Judge:        Hon. Jeremy Fogel |

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 | Case No: 5:08-CV-00216-JF |
| Petitioner, | |
| vs. | |
| STANFORD HOSPITAL & CLINICS and LUCILE PACKARD CHILDREN'S HOSPITAL | |
| Respondents. | Judge:        Hon. Jeremy Fogel |

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 | Case No: 5:08-CV-01726-JF |
| Petitioner, | |
| vs. | |
| STANFORD HOSPITAL & CLINICS and LUCILE PACKARD CHILDREN'S HOSPITAL | |
| Respondents. | Judge:        Hon. Jeremy Fogel |

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 | Case No: 5:08-CV-01727-JF |
| Petitioner, | |
| vs. | |
| STANFORD HOSPITAL & CLINICS and LUCILE PACKARD CHILDREN'S HOSPITAL | |
| Respondents. | Judge:        Hon. Jeremy Fogel |

I, Laurie J. Quintel, declare as follows:

1.    I am employed by Stanford Hospital & Clinics and Lucile Packard Children's Hospital (the "Hospitals").  I was hired in July of 2001 as the Hospitals' Manager of Employee and Labor Relations.  About two (2) years ago, I assumed the position of Director of Employee and Labor Relations.  I have personal knowledge of the following facts.  If called as a witness I could and would competently testify as follows.

2.    The Hospitals operate two acute care hospitals located in Stanford, California.

3.    In my capacity as Director of Employee and Labor Relations, I manage day-to-day employee and labor relations matters, including oversight of the Hospitals' collective bargaining agreements with labor unions representing Hospital employees.  Among these collective bargaining agreements is an agreement between the Hospitals and Service Employees International Union, Local 715 ("Local 715"), a union that, at the time the agreement was signed represented a unit of Hospital employees (the "Bargaining Unit").  This agreement will be referred to herein as the "CBA".

## Anesthesia Techs Grievance And Arbitration

4.    The Hospitals employ persons in a job category known as "Anesthesia Technician" or "Anesthesia Tech."  Anesthesia Techs are within the Bargaining Unit governing by the collective bargaining agreement.  Anesthesia techs work in various parts of the Hospitals, including in an area known as the "Main Operating Room" or "Main O.R."  Anesthesia techs are sometimes asked to carry communication devices called "Spectralink telephones" ("Spectralinks").

5.    Under Article 9 of the CBA, Bargaining Unit employees may become entitled to premium payments known as "relief in higher classification pay" or "RHC pay" under certain circumstances set forth in Article 9.  Under the CBA, anesthesia techs do not become entitled to RHC pay by virtue of being assigned to carry a Spectralink.

6.    On or around April 25, 2006, I received a document titled "SEIU Grievance Form" setting forth a grievance (the "Grievance") filed on behalf of "All Affected Anesthesia Techs" and alleging that the Hospitals violated "Article 9 and the contract as a whole" on the

1

1    grounds that "Employer not paying 5% Relief in Higher Classification Differential to Anesthesia

2    Techs carrying the Spectra-Link Phone."

3          7.      After holding a "Second Step Grievance Hearing" on the matter on July 21, 2006,

4    the Hospitals determined that the Grievance was without merit and notified Local 715 that they

5    were denying the Grievance.

6          8.      On or around September 19, 2006, the grievance was moved to arbitration.

7    **Local 715 Status**

8          9.      In early 2006, Greg Pullman, Local 715's Staff Director, informed me that I

9    should work with a woman named Ella Hereth on matters relating to Local 715's representation

10   of the Bargaining Unit.  When I received written correspondence from Ms. Hereth, I noticed that

11   she identified her position as "Field Representative, SEIU United Healthcare Workers West."  I

12   am aware that Service Employees International Union, United Healthcare Workers – West

13   ("UHW") is a labor organization.  However, UHW does not represent any employees of the

14   Hospital.

15         10.      In late February, 2006, Ms. Hereth brought to my office a woman named Rachel

16   Deutsch.  Ms. Deutsch informed me that she was a representative of UHW.  She told me that

17   UHW was now representing the Hospital employees who had hitherto been represented by Local

18   715.  I responded that the employees in question were represented by Local 715 and that, as Ms.

19   Deutsch was a representative of UHW, she and I had nothing to discuss.

20         11.      The events referenced above left me unsure as to the status of Local 715.

21   Therefore, on March 1, 2006, I sent an e-mail to Mr. Pullman referencing Ms. Hereth's

22   identification of herself as an employee of UHW and my conversation with Ms. Deutsch and

23   requesting clarification.  A true and correct copy of this e-mail is attached hereto as Exhibit A.

24         12.      Mr. Pullman responded to my e-mail on March 1, 2006.  In his e-mail he stated

25   that Local 715 represented the employees covered by the CBA, but that Local 715 had entered

26   into an agreement with UHW "to help service the Local 715 members at the Hospital" and that

27   "Local 715 has asked SEIU UHW to service this unit in many ways on a day to day basis."  He

28   specifically identified Ms. Hereth and Ms. Deutsch as among the "individuals from SEIU UHW

2

providing these services."  A true and correct copy of the e-mail I received is attached hereto as Exhibit B.

13.     The Hospitals initially accepted Mr. Pullman's representation that Local 715 remained the entity representing Bargaining Unit employees at face value.  However, in the following months, I became aware of various facts causing me to doubt that Local 715 continued to act as the representative of the Bargaining Unit, and that Local 715 continued to exist at all.

14.     Around March 10, 2006, I received a letter from Ms. Hereth on UHW stationery. The letter requested that I direct "all SEIU correspondence" to "Ella Hereth and Rachel Deutsch, SEIU United Healthcare Workers – West."  A true and correct copy of the letter I received is attached hereto as Exhibit C.

15.     In April and May, 2006, I received notices of grievances and information requests filed on behalf of Bargaining Unit employees pursuant to the CBA.  Although the employees in question were purportedly represented by Local 715, the notices were printed on UHW letterhead, submitted by UHW employees, and, in some cases, were expressly filed "on behalf of SEIU-UHW" or referred to the employees as members of UHW.  Copies of notices relating to nine (9) grievances and two (2) information requests are attached hereto as Exhibit D.

16.     In or around early April, 2006, I received a telephone call from Phyllis Willett, who identified herself as an employee of UHW.  Ms. Willett told me that when the Hospitals remitted union dues, they needed to provide the social security numbers for the employees because, due to the large number of employees represented by UHW, the employees sometimes could not be distinguished by name alone.  I responded that UHW did not represent any of the Hospitals' employees.

17.     Around April 17, 2006, I received a letter from William A. Sokol of the law firm Weinberg Roger & Rosenfeld (the "Weinberg Firm").  The Weinberg Firm had represented Local 715 ever since it was certified in 1998.  However, Mr. Sokol stated in the letter that he was writing "on behalf of SEIU United Healthcare Workers West" with respect to a request that the Hospitals provide information to UHW on dues deducted from employees of the Hospitals "represented by UHW," including the social security numbers of bargaining unit employees.

3

The letter referred to the Hospitals as "Stanford University Medical Center," a frequently used, but incorrect, name for the Hospitals.. A true and correct copy of the letter that I received is attached hereto as Exhibit E.

18.    On or around May 1, 2006, I received a letter from Mr. Pullman in which he stated that, pursuant to a "service agreement," UHW was handling "all representational matters at Stanford and Lucille (sic) Packard Hospitals," including approval of contract language and the handling of grievances. He also stated that, in addition to Ms. Deutsch and Ms. Hereth, Jocelyn Olick was also assigned to the Hospitals pursuant to the service agreement. A true and correct copy of the above-referenced letter is attached hereto as Exhibit F.

19.    By mid-May, 2006 I observed that nearly all written union correspondence regarding the Bargaining Unit was issued by UHW employees and printed on UHW letterhead. On May 24, 2008, I e-mailed a letter to Mr. Pullman dated May 18, 2006. The letter informed Mr. Pullman that the Hospitals "[did] not recognize UHW as having any relationship with the Hospitals" and that, accordingly, all correspondence relating to representational issues at the Hospitals would be directed to Local 715, but not to UHW. A true and correct copy of the e-mail I sent and the attached letter is attached hereto as Exhibit G.

20.    In late May, 2006 I received a copy of an e-mail string from May Sun-Young, one of the Hospitals' Senior Employee and Labor Relations Specialists. The string contained a May 22, 2006 e-mail from Ms. Olick written to Ms. Sun-Young. In that e-mail, Ms. Olick wrote, "I and Ella Hereth do not work for SEIU Local 715. SEIU-UHW is doing the representation work at Stanford Hospital." The string also contained a May 22, 2006 e-mail from Mr. Pullman to Ms. Sun-Young in which he stated that "Jocelyn Olick, Rachel Deutch (sic) and Ella Hereth out of the SEIU UHW San Francisco office are handling all representation matters for SEIU Local 715." A true and correct copy of the e-mail string I received is attached hereto as Exhibit H.

21.    On May 26, 2006, I received an e-mail from Ms. Olick in which she purported to accept a revision to Article 5 of the CBA. On May 30, 2006 I informed Mr. Pullman that Ms. Olick was not an appropriate person to make a decision regarding revisions to the CBA. A true and correct copy of the above-referenced e-mails is attached hereto as Exhibit I.

4

22.     On June 14, 2006, I used the internet browser on my computer to access the website of Service Employees International Union, Local 707, a then-existing SEIU local.  On the website I located a link to a document dated June 9, 2006 and titled "HEARING OFFICERS' JOINT REPORT AND RECOMMENDATIONS."  On page 16, the report states that "UHW is actually servicing employees in these facilities represented by Locals 707, 715, and 2028 pursuant to servicing agreements."  The report also detailed a plan to reorganize California SEIU local unions by, among other things, merging Local 715 into other locals, including UHW.  A true and correct copy of the report is attached hereto as Exhibit J.

23.     While on the Local 707 website I also located a link to memorandum dated June 11, 2006 from Andrew L. Stern, President of the Service Employees International Union (the "International") to "Affected SEIU Local Unions in California."  The memorandum announced the approval of a "jurisdictional plan" for California SEIU Locals.  On its fourth page, the memorandum states, "**Private Sector Hospital units** currently represented by Local 535,707, 715, 2028 and 4988 will merge into UHW.  (Emphasis in original.)  A true and correct copy of the memorandum is attached hereto as Exhibit K.

24.     On August 15, 2006, I received a fax transmission from "Greg P." who I believed to be Greg Pullman.  The fax cover-sheet was printed on Local 715 stationery.  However, I noted that the fax information line printed at the top of the document indicated that the fax originated from "Local 250 San Francisco."  Service Employees International Union Local 250 was the predecessor organization to UHW.  To my knowledge, Local 715 has never had a San Francisco office.  Behind the fax cover sheet was a three (3) page document titled "SERVICING AGREEMENT."  The Servicing Agreement was signed by Sal Roselli, the president of UHW, and Kristy Sermersheim, the executive secretary of Local 715.  Ms. Sermersheim's signature was dated February 20, 2006.  The Servicing Agreement, whose effective date is March 1, 2006, provides that UHW will provide "professional services" to Local 715 including representation in grievances and arbitrations, representation at labor-management meetings, and assistance appearing before the NLRB.  The Servicing Agreement further provides that, in the event that it is challenged or rejected by the Hospitals, Local 715 and UHW will process legal actions

5

1    necessary to its enforcement, including by filing unfair labor practice charges with the NLRB.  A

2    true and correct copy of the above-referenced document is attached hereto as Exhibit L.

3         25.    After reviewing the Servicing Agreement, the Hospitals concluded that it was

4    invalid, and informed Local 715 that the Hospitals rejected the Servicing Agreement.  Thereafter,

5    the Hospitals refused to deal with UHW employees acting pursuant to the Servicing Agreement.

6    The Hospital employees who had been appointed shop stewards prior to March 1, 2007 became

7    the principal point of contact between the Hospitals and the purported Local 715 after that point.

8         26.    On or around September 25, 2006, a Hospital employee who was a member of the

9    Bargaining Unit faxed me a four (4) page document.  The first page of the document contained

10   voting and mailing instructions for a vote on the "SEIU California Unite To Win Reorganization

11   Plan."  The second page of the document contained a summary of the plan, which stated in part,

12   "Hospital workers at . . . Stanford/Lucille (sic) Packard Children's Hospital . . . will change their

13   affiliation to United Healthcare Workers – West."  The third page of the document contained a

14   "Local Union Assignment Chart" stating "Stanford/Lucille (sic) Packard Hospitals workers to

15   UHW."  The fourth page of the document contained the ballot.  A true and correct copy of the

16   above-described document is attached as Exhibit M.

17        27.    On or around June 10, 2006, I used my computer's internet browser to access a

18   website at http://www.caunitetowin.org.  On that website, I located a page containing a report

19   stating "Unite to Win Plan wins by 88% margin."  I printed a copy of this web page, a true and

20   correct copy of which is attached hereto as Exhibit N.

21        28.    On January 31, 2007, I was copied on an e-mail from Robert W. Rutledge, Chief

22   Steward for the Bargaining Unit to Valerie Jeffries, a Senior Employee and Labor Relations

23   Specialist.  In the course of the e-mail, Mr. Rutledge stated, "SEIU 715 no longer exists and a

24   service agreement between the former 715 and UHW has been in place since March first of

25   2006."  A true and correct copy of the e-mail I received is attached hereto as Exhibit O.  The e-

26   mail was also sent to Ms. Olick, and Kim Tavaglione, at that time an employee of UHW.  To my

27   knowledge, neither Ms. Olick nor Ms. Tavaglione responded to contradict Mr. Rutledge's

28   statement that Local 715 had ceased to exist.

29.    On February 2, 2007, I attended a meeting with Mr. Rutledge.  The purpose of the meeting was to follow up on an earlier meeting regarding planned layoffs at Lucile Packard Children's Hospital.  During the meeting, Mr. Rutledge informed me that he wanted to bargain over the layoffs.  I told Mr. Rutledge that the purpose of the meeting was not to bargain over the layoffs, but rather for the Hospitals to give notice of the layoffs and discuss them, pursuant to the CBA with Local 715.  Mr. Rutledge responded that Local 715 no longer represented employees at the Hospitals, that Local 715 had ceased to exist, and that UHW now represented the Bargaining Unit.  I told Mr. Rutledge that the CBA was with Local 715, and that Local 715 was the only representative with whom the Hospitals would discuss the layoffs.

30.    In late January and early February, 2007, I used my computer's internet browser to access Local 715's website at http://www.SEIU715.org.  When I did so, I observed a statement on the website that read, "We are in the process of transitioning to our new Local 521. This web site will be taken down on Feb. 28.  On March 1, our new Local's web site www.seiu521.org will have your chapter pages and other information."  The web page continued numerous other references to "our new local" and a reference to the "California Unite To Win Plan."  On February 12, 2007, I used my e-mail program to e-mail a copy of the web page containing the above-described statements to various Hospital employees.  A true and correct copy of the e-mail containing the image of the web page is attached hereto as Exhibit P.

31.    On February 19, 2007 I sent a letter to Ms. Sermersheim.  I described Mr. Rutledge's January 31 and February 2, 2007 statements regarding the existence of Local 715, as well as the statement on the Local 715 website.  I informed Ms. Sermersheim that these statements raised questions concerning the representation of the Bargaining Unit that required clarification.  I requested that Ms. Sermersheim provide such clarification.  A true and correct copy of the letter that I sent is attached hereto as Exhibit Q.

32.    Starting on March 1, 2007, I began regularly accessing the website of Local 715 at http://www.SEIU715.org in an effort to gain information as to the status of the local.  I discovered that when I entered the above-referenced address into my internet browser, I was automatically redirected to the homepage of Local 521 at http://www.SEIU521.org.  In browsing

7

the Local 521 website, I located a web page stating that five local unions, including Local 715 "have come together . . . by forming one larger, more powerful local." Another web page referenced benefits available to "former SEIU Local 715 members." On March 2, 2007, I printed copies of web pages from the Local 521 website, true and correct copies of which are attached hereto as Exhibit R.

33.    I regularly continued to attempt to access the Local 715 website after March 1, 2007, and I continued to be redirected to the Local 521 website. However, in or around mid-May, 2007, I was once again able to access the Local 715 website without being redirected to the Local 521 website. However, I observed that the Local 715 website was now largely devoid of content.

34.    On March 2, 2007. I accessed the website of UHW at http://www.SEIU-UHW.org. On the website, I located a page that allowed users to search the facilities that UHW claimed to represent. I typed "Stanford" into the search field. The search results listed "Stanford University Medical Center." I printed a copy of the search result, a true and correct copy of which is attached hereto as Exhibit S.

35.    Bargaining Unit employees authorize deduction of union by means of a written authorization form. A true and correct copy of the form used for the Local 715 dues deductions is attached hereto as Exhibit T.

36.    By March 2, 2007 I had not received any response from Ms. Sermersheim, or anyone else, regarding my February 19, 2007 request for clarification. Therefore, On March 2, 2007, I sent a second letter to Ms. Sermersheim. I reiterated my request for clarification of the status of Local 715. Additionally, I informed Ms. Sermersheim that, in light of the evidence that Local 715 had formally or effectively ceased to exist, the Hospitals, could no longer remit union dues absent clarification as to Local 715's status or as to what entity, if any, was purportedly representing the Bargaining Unit. A true and correct copy of the letter that I sent is attached hereto as Exhibit U.

37.    Effective March 1, 2007, the Hospitals ceased remitting the dues they formerly remitted to Local 715. The Hospitals continued to deduct union dues from Bargaining Unit

1   employees pursuant to the CBA.  Those funds were held in a separate bank account established

2   for that purpose.  The Hospitals have continued this procedure to this date.

3        38.     In December, 2007, I requested a report from Jackie Villa, the Hospitals'

4   Manager of payroll, showing the date and amount of the last remittance of dues made by the

5   Hospitals to Local 715.  Ms. Villa sent me a Bank of America report.  The third entry on the

6   report (reference number 13940541) shows a payment wired on March 8, 2007 in the amount of

7   $21,949.35, which represents the last remittance of dues to Local 715 to date, which was for dues

8   deducted in February, 2007.  A true and correct copy of the report is attached hereto as Exhibit

9   V.

10        39.     On March 5, 2007, I received a letter from Mr. Sokol responding to my March 2,

11   2007 letter to Ms. Sermersheim.  Mr. Sokol stated that Local 715 "continues to exist" and that

12   there "has been no change in Local 715's status."  A true and correct copy of the above-

13   referenced letter is attached hereto as Exhibit W.

14        40.     On March 5, 2007, I again accessed the Local 521 website.  On the website I

15   located a web page containing the statement, "Five locals (415, 535, 700, 715, and 817) have

16   come together to cover the North Central region by forming one larger, more powerful local.  On

17   January 2, 2007, our new local received its charter.  On March 1, 2007, the resources of all five

18   locals were transferred to Local 521."  I printed a copy of the above-referenced web page, a true

19   and correct copy of which is attached hereto as Exhibit X.

20        41.     On March 6, 2007, I sent a letter responding to Mr. Sokol's letter of the previous

21   day.  I informed Mr. Sokol that, in light of the mounting evidence regarding the changes to Local

22   715, the Hospitals required more than Mr. Sokol's assurance regarding its continued existence.  I

23   requested that Mr. Sokol provide more detailed information regarding Local 715's status, as

24   stated in my March 2, 2007 letter to Ms. Sermersheim.  A true and correct copy of the above-

25   referenced letter is attached hereto as Exhibit Y.

26        42.     On March 14, 2007, I received a letter from Mr. Sokol bearing that date.  Mr.

27   Sokol did not provide detailed information as I had requested, but continued to assert that "Local

28   715 continues to exist, it continues to have assets, and it continues to operate as a labor

9

QUINTEL DECLARATION IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT/ADJUDICATION
CASE NOS. 5:07-CV-05158-JF; 5:08-CV-00213-JF; 5:08-CV-00215-JF;
5:08-CV-00216-JF; 5:08-CV-01726-JF; 5:08-CV-01727-JF

1   organization." A true and correct copy of the above-referenced letter is attached hereto as
2   Exhibit Z.

3          43.    On March 29, 2007, I sent a letter to Ms. Sermersheim formally requesting
4   information concerning the status of Local 715, and the extent of any changes to its employees,
5   officers, assets, and corporate structure in light of its announced affiliation with Local 521. The
6   letter requested a response by April 9, 2007. A true and correct copy of the letter is attached
7   hereto as Exhibit AA.

8          44.    On or around April 9, 2007, I received a letter from Bruce A. Harland, an attorney
9   with the Weinberg Firm, stating on behalf of Local 715 that none of the information requested in
10  My March 29, 2007 information request would be provided. A true and correct copy of the letter
11  I received is attached hereto as Exhibit BB.

12         45.    Also on April 9, 2007, I again accessed the Local 521 website. On the website I
13  located a web page containing the statement, "Five locals (415, 535, 700, 715, and 817) have
14  come together to cover the North Central region by forming one larger, more powerful local. On
15  January 2, 2007, our new local received its charter. On March 1, 2007, the resources of all five
16  locals were transferred to Local 521." I printed a copy of the above-referenced web page, a true
17  and correct copy of which is attached hereto as Exhibit CC.

18         46.    On or around April 16, 2007, I executed an unfair labor practice charge against
19  Local 715. The charge alleges that Local 715 violated Section 8(b)(3) of the NLRA by refusing
20  to provide the Hospitals with the information they requested regarding the status of Local 715. I
21  caused the charge to be filed with Region 32 of the NLRB. The charge was designated Case
22  Number 32-CB-6273. A true and correct copy of the Charge is attached hereto as Exhibit DD.

23         47.    On May 15, 2007, I sent a letter to Mr. Harland responding to his letter of April 9,
24  2007. I reiterated my request for information on the status of Local 715 and the reasons why the
25  Hospitals believed that Local 715 was legally required to provide the information. A true and
26  correct copy of the letter that I sent is attached hereto as Exhibit EE.

27         48.    On June 14, 2007, I received a letter from a person named Bruce W. ("Rusty")
28  Smith (sometimes referred to herein as the "Trustee"). In the letter, Mr. Smith stated that

International President, Andrew Stern took control of all operations of Local 715 on June 8, 2007.  He further stated that all officers of Local 715 had been removed and that he (Mr. Smith) had been appointed as "Trustee with full authority to act on behalf of Local 715."  Mr. Smith indicated that all servicing agreements remained in effect and that Ms. Tavaglione, Ms. Olick, and Ms. Hereth would "continue to be the representative responsible for servicing your facility."  Attached to Mr. Smith's letter was a copy of a June 8, 2007 letter from Mr. Stern announcing the appointment of Mr. Smith as trustee.  I received the above-referenced letter by fax.  I noted that the fax information line indicated that the fax originated from "SEIU 521."  A true and correct copy of the letter I received is attached hereto as Exhibit FF.

49.    Between January 31, 2007, when Mr. Rutledge informed me that Local 715 no longer existed, and June 14, 2007, when I received Mr. Smith's letter, I did not receive any communications from, or otherwise have any discussions with, any person representing him or herself as an employee of Local 715.

50.    Around June 18, 2007 I received a letter from Mr. Smith in the mail.  The content of the letter was substantially similar to the content of the June 14, 2007 letter.  However, this letter was printed on Local 715 stationery.  A true and correct copy of the letter I received is attached hereto as Exhibit GG.

51.    In mid-June, 2007, I learned that Barbara J. Chisholm of the law firm of Altshuler Berzon LLP (the "Altshuler Firm") was now representing Local 715 through its trustee, Mr. Smith.  On or around June 18, 2007, I received a letter from Ms. Chisholm reiterating Local 715's refusal to provide the information originally requested in my letter of March 29, 2007.  A true and correct copy of the letter is attached hereto as Exhibit HH.

52.    On or around July 26, 2007, I received a letter from Mr. Smith requesting to add Michelle ("Chelli") Guzman to "the list of authorized representatives of Local 715 pursuant to the servicing agreement with United Healthcare Workers – West.  A true and correct copy of the letter I received is attached hereto as Exhibit II.

53.    On August 1, 2007, I sent a letter to Mr. Smith responding to his letters of June 14 and July 26, 2007.  I informed Mr. Smith that the Hospitals had not received information

1   sufficient to assure them, contrary to known evidence to the contrary, that Local 715 continued

2   to exist.  I further informed him that his appointment as trustee did not change the Hospitals'

3   rejection of the Local 715 / UHW Servicing Agreement.  A true and correct copy of the letter I

4   sent is attached hereto as Exhibit JJ.

5         54.    On or around August 22, 2007, I received a letter from Vincent A. Harrington, Jr.,

6   an attorney with the Weinberg Firm, in which Mr. Harrington requested to bargain with the

7   Hospitals over a Hospital substance abuse policy on behalf of Local 715.  A true and correct

8   copy of the letter that I received is attached hereto as Exhibit KK.

9         55.    On November 5, 2007, I received a letter from Mr. Sokol dated November 1,

10  2007.  Mr. Sokol objected on behalf of Local 715 to the Hospitals' refusal to remit dues and

11  threatened to "report this to the proper authorities."  A true and correct copy of the above-

12  referenced letter is attached hereto as Exhibit LL.

13        56.    On or around December 14, 2007, I received a letter from Mr. Smith.  In the

14  letter, Mr. Smith stated that, as trustee, he was confirming that "Local 715 authorizes the law

15  firm of Weinberg, Roger & Rosenfeld to represent the Union all (sic) aspects of the arbitration

16  process."  The letter did not state, however, whether the Weinberg Firm was authorized to

17  represent Local 715 directly, or whether its authorization was pursuant to the Servicing

18  Agreement, which the Hospitals had rejected.  A true and correct copy of the above-referenced

19  letter is attached hereto as Exhibit MM.

20        57.    To date, I have never been informed that the Altshuler Firm no longer represents

21  Local 715.

22        58.    In or around late November, 2007, I received a video recording of a November

23  26, 2007 meeting of the Palo Alto City Council from Adam Alberti, an employee of a company

24  known as "Singer & Associates" ("Singer"), which has contracted with the Hospitals to gather

25  and provide information to the Hospitals on various issues.  When I reviewed the video

26  recording, I observed that Hospital employee Chuck Fonseca, a union steward and former

27  member of the Executive Board of Local 715, spoke on the record at the meeting.  In the course

28  of his statement to the Council, Mr. Fonseca said that the Hospitals' employees were represented

by SEIU-UHW.

59.    After reviewing the video recording, I asked Mr. Alberti to create a transcript of the City Council meeting.  Mr. Alberti created the transcript and sent it to me.  I reviewed the portions of the transcript reflecting Mr. Fonseca's statement to the Council, and the transcript accurately reflects the content of the video recording that I viewed.  A true and correct copy of the above-referenced transcript is attached hereto as Exhibit NN.  Mr. Fonseca's statement appears at pages 36-38 of the transcript.

60.    The Hospitals have continued to receive correspondence relating to grievances printed on UHW stationery.  In some cases, the Hospitals have received letters on UHW stationery and later received identical letters on Local 715 stationery.  Attached hereto as Exhibit OO are three (3) letters received by the Hospitals in early January, 2008 on UHW stationery and/or accompanied by UHW fax cover pages.

61.    On December 27, 2007, I received a letter dated December 19, 2007 from Mr. Smith in which Mr. Smith stated that he was appointing a person named Myriam Escamilla as "an Assistant to the Trustee of Local 715 with the authority to represent bargaining unit members at Stanford Hospital and Lucile Packard Children's Hospital."  A true and correct copy of the above-referenced letter is attached hereto as Exhibit PP.

### Simien, Dues, Satuito, Acosta And Andrade Grievances

62.    On or around March 9, 2007, the Hospitals received a grievance filed on behalf of a former Bargaining Unit employee named James Satuito (herein the "Satuito Grievance").  The Satuito Grievance alleged that Mr. Satuito was terminated in violation of the CBA.  A true and correct copy of the above-referenced grievance is attached hereto as Exhibit QQ.

63.    The Hospitals denied the Satuito Grievance, and have refused to arbitrate it insofar as Local 715 has ceased to exist and/or has invalidly attempted to transfer its representational rights to UHW.

64.    On or around March 17, 2007, the Hospitals received a grievance filed on behalf of a former Bargaining Unit employee named Victor Acosta (the "Acosta Grievance").  The Acosta Grievance alleged that Mr. Acosta's termination violated the Agreement CBA.  A true

13

and correct copy of the above-referenced grievance is attached hereto as Exhibit RR.

65.     The Hospitals denied the Acosta Grievance.  On or around April 16, 2007, I received a letter from Jesus Andrade demanding that the Acosta Grievance be moved to binding arbitration.  A true and correct copy of the above-referenced letter is attached hereto as Exhibit SS.

66.     On or around April 2, 2007 the Hospitals received a grievance filed on behalf of a Bargaining Unit employee named John Simien (the "Simien Grievance").  The Simien Grievance alleged that Mr. Simien received a warning and was forced to change his shift in violation of the CBA.  A true and correct copy of the above-referenced grievance is attached hereto as Exhibit TT.

67.     The Hospitals denied the Simien Grievance, and have refused to arbitrate it insofar as Local 715 has ceased to exist and/or has invalidly attempted to transfer its representational rights to UHW.

68.     On or around May 22, 2007, the Hospitals received a grievance filed on behalf of "all affected" employees in the Bargaining Unit.  The grievance alleged that the Hospitals violated the CBA by failing to remit dues to Local 715 (herein the "Dues Grievance").  A true and correct copy of the grievance is attached hereto as Exhibit UU.

69.     On May 30, 2007, I sent a letter to Chief Steward Jesus Andrade by fax and mail informing him that the Hospitals did not intend to process the Dues Grievance.  A true and correct copy of the above-referenced letter is attached hereto as Exhibit VV.

70.     On or around November 6, 2007, the Hospitals received a grievance filed on behalf of a former Bargaining Unit employee named Jesus Andrade (the "Andrade Grievance").  The Andrade Grievance alleged that Mr. Andrade was terminated in violation of the CBA.  A true and correct copy of the above-referenced grievance and a cover letter to which the grievance was attached is attached hereto as Exhibit WW.

71.     The Hospitals denied the Andrade Grievance, and have refused to arbitrate it insofar as Local 715 has ceased to exist and/or has invalidly attempted to transfer its representational rights to UHW.

1    I declare under penalty of perjury under the laws of the State of California and the United

2    States of America that the foregoing is true and correct.

3    Executed on this _____ day of July 2008 at Palo Alto, California.

4

5

6

7    _____

     LAURIE J. QUINTEL

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUINTEL DECLARATION IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT/ADJUDICATION
CASE NOS. 5:07-CV-05158-JF, 5:08-CV-00213-JF, 5:08-CV-00215-JF;
5:08-CV-00216-JF; 5:08-CV-01726-JF; 5:08-CV-01727-JF

**EXHIBIT A**

## Quintel, Laurie

**From:**      Quintel, Laurie
**Sent:**       Wednesday, March 01, 2006 8:26 AM
**To:**         'Greg Pullman'
**Subject:**    Clarification regarding SEIU representation


Greg:

Thank you for your reply.  Your response does raise a question.  The collective bargaining
agreement we have with SEIU is between the Hospitals and SEIU Local 715.  You have told me
that I should be working with Ella Hereth.

On her correspondence, Ms. Hereth identifies herself as follows:

Ella Hereth
Field Representative
SEIU United Healthcare Workers West
1338 Mission St.
San Francisco, CA 94103
phone (415)503-5740
fax (415)563-9914
ehereth@seiu-uhw.org

Additionally, last week Ms. Hereth brought Rachel Deutsch to my office.  Ms. Deutsch
indicated that UHW would be taking over representation for the hospital.  The Hospitals
have not received any such notification.

I would like to receive clarification.


Regards,


Laurie J. Quintel
Manager - Employee Labor Relations
*-lquintel@stanfordmed.org
*Ph: 650-725-2770
7Fax: 650-723-2370
mailing address: 300 Pasteur Drive
                        Stanford, CA 94305-5513 office location at 1510 Page Mill Drive
-----Original Message-----
From: Greg Pullman [mailto:gpullman@seiu715.org]
Sent: Tuesday, February 28, 2006 11:16 AM
To: Quintel, Laurie
Cc: Ella Hereth
Subject: RE: Contract Books and other issues

Laurie,

I got your correspondence.  We are working on the dues forms.  Ella will be in touch with
you about the grievances/ULP settlement.

Greg

1

**EXHIBIT B**

## Quintel, Laurie

**From:** Greg Pullman [gpullman@seiu715.org]
**Sent:** Wednesday, March 01, 2006 11:10 PM
**To:** Quintel, Laurie
**Cc:** rdeutsch@seiu-uhw.org; ehereth@seiu-uhw.org
**Subject:** RE: Contract Books and other issues

Laurie,

I am writing in response to your request for clarification. I want to confirm that SEIU Local 715 represents the workers covered by our agreement at Stanford Hospital and Clinics, that they are members of Local 715, and that the contract is with Local 715. This will further confirm that Local 715 has entered into an agreement with SEIU UHW to help service the Local 715 members at the Hospital.  Local 715 will still have ultimate responsibility for the contractual and representational relationship, but Local 715 has asked SEIU UHW to service this unit in many ways on a day-to-day basis.

Therefore, the representatives you will see representing Local 715's members in the unit will be individuals from SEIU UHW providing these services. You should expect to see Local 715's members serviced by UHW representatives including Ella Hereth and Rachel Deutch. If you have any need for further clarification, please do not hesitate to contact me.

Greg Pullman
Staff Director
SEIU Local 715

-----Original Message-----
From: Quintel, Laurie [mailto:LQuintel@stanfordmed.org]
Sent: Tuesday, February 28, 2006 10:34 AM
To: Greg Pullman
Subject: FW: Contract Books and other issues

Greg:

I understand that you were out of your office last week.   I sent you several pieces of correspondence during that time.  I wanted to confirm the message you sent me previously, February 6, that you remain the primary contact and will respond to my letters.

Thank you,


Laurie J. Quintel
Manager - Employee Labor Relations
*-lquintel@stanfordmed.org
*Ph: 650-725-2770
7Fax: 650-723-2370
mailing address: 300 Pasteur Drive
                    Stanford, CA 94305-5513 office location at 1510 Page Mill Drive

-----Original Message-----
From: Greg Pullman [mailto:gpullman@seiu715.org]
Sent: Monday, February 06, 2006 12:54 PM
To: Quintel, Laurie
Cc: Ella Hereth; Ricardo Ramirez
Subject: RE: Contract Books

Laurie,

I will be your primary contact on the new agreement.  Ella Hereth and Richard Ramirez remain worksite organizers for now.  I will get you a steward list later in the week.

It would be helpful to have the following information:

1)  Process and timeline for getting agreement printed.
2)  Date for raise implementation in payroll and any retro pay owed.
3)  Confirmation that the hospital has resumed dues deductions as of the ratification date.
4)  Whether or not the hospital is interested in meeting to try to work out resolutions to the ULPs and grievances filed during the last few months.

Thanks,

Greg


        -----Original Message-----
        From: Quintel, Laurie [mailto:LQuintel@stanfordmed.org]
        Sent: Mon 2/6/2006 8:10 AM
        To: Greg Pullman
        Cc:
        Subject: FW: Contract Books


        Greg:


        Now that we have successfully completed negotiations, I will be working on
coordinating publishing the new agreement.  Can you tell me who will be my primary
contact?  I ask as Ella copied you on her inquiry to me.  Will it be you?


        Also, to assist me and the Employee Relations Team in working with the SEIU would
you please confirm the following:

        *        The current SEIU staff assigned to work with employees
at SHC and LPCH

        *        Current list of stewards, including the chief steward
for each hospital


        Thank you in advance for you assistance,


        Regards,


        Laurie


        Laurie J. Quintel
        Manager - Employee Labor Relations
        *-lquintel@stanfordmed.org <mailto:lquintel@stanfordmed.org>
        *Ph: 650-725-2770
        7Fax: 650-723-2370
        mailing address: 300 Pasteur Drive
                        Stanford, CA 94305-5513
                                2

office location at 1510 Page Mill Drive


-----Original Message-----
From: Ella Hereth [mailto:ehereth@seiu715.org]
Sent: Friday, February 03, 2006 5:30 PM
To: Quintel, Laurie
Cc: Greg Pullman
Subject: Contract Books


Dear Laurie,


    What is the status of printing the contract books? Please let me know what you need from us to do this. Thank you.


Sincerely,


Ella Hereth

WorksiteOrganizer

SEIU 715

(650)723-3644

**EXHIBIT C**



560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680

5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

March 10, 2006                          **Via Fax 650-723-2370 & U.S. Mail**

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Dear Ms. Quintel:

Please direct all SEIU correspondence to the following people at the address below:

**Ella Hereth and Rachel Deutsch**
**SEIU United Healthcare Workers - West**
**1338 Mission Street**
**San Francisco, CA 94103**
**Phone: (415) 441-2500**
**Fax: (415) 563-9914**

In addition we are requesting an electronic version of the following information for all bargaining unit employees: names, addresses, phone numbers, benefited status, social security numbers, department, worksite, shift and classification.

Please contact me if you have any questions.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

SJHW/Letterhead 03-10-06 paDopens ) afl-cio (13)

**EXHIBIT D**





560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

April 25, 2006                                    Via Fax 650-723-2370 & Certified Mail

Ms. Laurie Quintel                          *All Affected Anesthesia Techs*
Employee/Labor Relations                          *4/26/06*
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Re:    All Affected Anesthesia Techs Grievance

Dear Ms. Quintel:

Enclosed you will find a grievance filed on behalf of SEIU-UHW.

Please call me at 415-503-5740 to set up a mutually acceptable date and time to meet.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

EH/lc/Lstanford 04-25-03-06.psf/opeiu 3 afl-cio (12)





560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680

5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

April 26, 2006                                    Via Fax 650-723-2370 & Certified Mail

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Re:     1. Zenaida Nugue and Beverly Smith Grievance
        2. Julio Andrade Grievance

Dear Ms. Quintel:

Enclosed you will find two grievances filed on behalf of SEIU-UHW for our above-mentioned members.

Please call me at 510-773-7102 to set up a mutually acceptable date and time to meet.

Sincerely,

*Jocelyn Olick*

Jocelyn Olick
Union Representative/Organizer

cc:     Zenaida Nuque
        Beverly Smith
        Susan Dancel
        Lydia Trujillo
        Bridget White
        Julio Andrade

JC/lc/L:stanford 04-26-06.psf/opeiu 3 afl-cio (12)



560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 3, 2006                              Via Fax 650-723-2370 & Certified Mail

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Re:   Raj Sharma Grievance – Unjust Termination

Dear Ms. Quintel:

Enclosed you will find a grievance filed on behalf of SEIU-UHW for our above mentioned
member.

Please call me at 415-503-5740 to set up a mutually acceptable date and time to meet.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

cc:   Raj Sharma
      Jesus Andrade

BH/le/Lstanford 05-03-03-02-06.p&open 3 afl-cio (12)

MAY-10-06   12:31   FROM-LOCAL 250 SF        415 563 9914        T-581   P.001/002   F-629



560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 10, 2006                           Via Fax 650-723-2370 & Certified Mail

                              RECEIVED MAY 1 0 2006

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Re:    Barbara Witherspoon Grievance

Dear Ms. Quintel:

Enclosed you will find a grievance filed on behalf of SEIU-UHW for our above mentioned
member.

Please call me at 415-503-5740 to set up a mutually acceptable date and time to meet.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

cc:    Barbara Witherspoon
       Robert Valenzuela

EH/se/L3166 05-10-06.prflopeiu 3 afl-cio (12)

Sal Rosselli, *President*        Jorge Rodriguez, *Executive Vice President*        Joan Emslic, *Secretary-Treasurer*

MAY-10-06   12:31   FROM-LOCAL 250 SF          415 563 9814        T-581  P.002/002  F-628

 # SEIU GRIEVANCE FORM

**Instructions:** This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU. Please attach additional sheets to the form if needed.

RECEIVED MAY 1 0 2006

Grievant's Name: Barbara Witherspoon

Home Address: 1377 12th St., Oakland, CA 94607

Home Phone: 510-238-8494                    Work Phone:          Ext.

Employer: Stanford Hospital

Department: Nurse Float Pool          Job Classification: Unit Secretary

Dept. Mgr.: Geoffrey A Pridham          Immediate Supervisor: Geoffrey A. Pridham

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): Ms. Witherspoon is placed at the wrong step on the wage scale. When she returned to a Unit Secretary position in 2005, she was not appropriately credited for her years of service.

1. **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** Article 5 and the contract as a whole.

2. **WHO IS THE GRIEVANCE BROUGHT AGAINST?** The Employer

3. **WHEN DID THE INCIDENT OCCUR?** (date and, if appropriate, time or if ongoing): Ongoing

4. **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION:** Employer did not credit Ms. Witherspoon with the appropriate years of service when she returned to a Unit Secretary Position

5. **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANCE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:** Barbara raised the concern to Mr. Pridham and he responded on or about May 4th, 2006, by sharing a copy of an email from HR with Ms. Witherspoon.

6. **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make whole, including but not limited to: Place Ms. Witherspoon on the appropriate step on the wage scale and pay 6 months of back pay.

7. **ADDITIONAL COMMENTS:**

GRIEVANT: Barbara Witherspoon

STEWARD: Robert Valenzuela                    DATE: 5/9/06

WORKSITE ORGANIZER: Ella Hereth             DATE: 5/9/06

EMPLOYER SIGNATURE:                              DATE:

Please send this completed form and any supporting documentation to Employee/Labor Relations (Room HG005), 300 Pasteur Drive, Stanford, CA 94305.

eh/usw/seiu-shw/ctw

**SEIU**
# UHW
United Healthcare Workers
**WEST**

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 10, 2006

Via Fax 650-723-2370 & U.S. Mail

RECEIVED MAY 1 0 2006

RECEIVED MAY 1 0 2006

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Dear Ms. Quintel:

In relation to the grievance filed on behalf of Barbara Witherspoon, I am requesting the following information. I will provide written consent from the grievant for any requested information from her personnel file.

1. Barbara Witherspoon's evaluations from 1992-2000 and from 2004-2006.

2. Information relevant to Barbara Witherspoon's demotion in 2004 or 2005.

3. Evidence that the hospital is using to justify their contention that Barbara Witherspoon is at the appropriate place in the wage scale.

Please call me at 415-503-5740 if you have any questions.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

BJU/lc/Lstanford 05-10-02-06.ptffopeiu 3 afl-cio (12)

Sal Rosselli, *President*        Jorge Rodriguez, *Executive Vice President*        Joan Emslie, *Secretary-Treasurer*



**SEIU UHW**
United Healthcare Workers WEST

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 12, 2006                                          Via Fax 650-723-2370 & U.S. Mail

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics              RECEIVED MAY 1 6 2006
300 Pasteur Drive, MC 5513                  *fax received 5/12/06*
Palo Alto, CA 94305

Re:     Information Request

Dear Ms. Quintel:

In relation to our grievance filed on behalf of all affected employees regarding health insurance
deductions, the Union is requesting the number of bargaining unit employees who had spouses
enrolled in one of the Employer HMO plans on the date of ratification of the contract.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

EH/lc/L3166 05-12-06.psf/opeiu 3 afl-cio (12)

www.seiu-uhw.org

Sal Rosselli, *President*          Jorge Rodriguez, *Executive Vice President*          Joan Emslie, *Secretary-Treasurer*



**SEIU UHW**
United Healthcare Workers
**WEST**

560 Thomas L. Berkley-Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 17, 2006                          Via Fax 650-723-2370 & U.S. Mail

Ms. Laurie Quintel                          **RECEIVED MAY 2 3 2006**
Employee/Labor Relations
Stanford Hospitals and Clinics                 *Sterile Processing Techs*
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

**RE:    Grievance – Leon Makashini, Jonathan Raguini, Dawit Getasew, Britukam Haile,
Moses Amagu**

Dear Ms. Quintel,

Enclosed is a grievance filed on behalf of SEIU-UHW for our above-mentioned members.

Please call me at 510-773-7102 to set up a mutually acceptable date and time to meet.

Sincerely,

*Jocelyn Olick/*sr

Jocelyn Olick
Union Representative /Organizer

Cc:    Grievants:  Jonathan Raguini, Leon Makashini, Dawot Getasew, Moses Amogu, and
Britukan Haile
File

JC/sr/G3166001.sf2006/opeiu 29 afl-cio (12)



# SEIU GRIEVANCE FORM

**Instructions:** This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU. Please attach additional sheets to the form if needed.

Makashini

Grievant's Name: _Leon Makasin, Jonathan Raguini, Dawit Getasew, Britukam Haile, Moses Amogu_

Home Address: _n/a_

Home Phone: _____     Work Phone: _____ Ext. _____

Employer (County, School District, City, etc): _Stanford Hospital and Clinics_

Department: _Sterile Processing_     Job Classification: _Sterile Processing Techs_

Dept. Mgr.: _Edward Sandards_     Immediate Supervisor: _Dennis Silva_

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): _Employees unjustly forced to take an administrative leave_

1. **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** Just cause and the contract as a whole.

2. **WHO IS THE GRIEVANCE BROUGHT AGAINST?** The Employer

3. **WHEN DID THE INCIDENT OCCUR? (date and, if appropriate, time or if ongoing):** On or about May 8, 2006

4. **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION** Employees unjustly forced to take an administrative leave

5. **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:** Informal grievance meeting held on Thursday May 11, 2006. Grievance was denied May 16, 2006

6. **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make whole, including but not limited to: Reinstate employees with back pay.

7. **ADDITIONAL COMMENTS:**

GRIEVANT: _Leon Makasin, Jonathan Raguini, Dawit Getasew, Britukam Haile, Moses Amogu_

STEWARD: _Mary Garica_     DATE: _5/17/06_

WORKSITE ORGANIZER: _Jocelyn Olick_     DATE: _5/17/06_

EMPLOYER SIGNATURE: _____     DATE: _____

Please send this completed form and any supporting documentation to Employee/Labor Relations (Room HG005), 300 Pasteur Drive, Stanford, CA 94305.

sw/seiu-uhw/ctw1



560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 18, 2006                                                  Via Fax 650-723-2370 & Certified Mail

RECEIVED MAY 2 3 2006

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Re:    Veverly Velasco Grievance – Unjust Termination

Dear Ms. Quintel:

Enclosed you will find a grievance filed on behalf of SEIU-UHW for our above mentioned
member.

Please call me at 415-503-5740 to set up a mutually acceptable date and time to meet.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

cc:    Veverly Velasco
       Ed Lucero

EH/le/L3166 05-18-05-06.psf/opeiu 3 afl-cio (12)

Sal Rosselli, *President*          Jorge Rodriguez, *Executive Vice President*          Joan Emslie, *Secretary-T...*

May 18, 2006


Greg Pullman, Staff Director
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

*Sent via e-mail ,FAX and certified U. S. mail*

RE:    Correspondence to SEIU Local 715

Dear Greg:

In an e-mail message sent to me March 1, 2006, you confirmed "that SEIU Local 715 represents the workers covered by our agreement at Stanford Hospital and Clinics and that they are members of Local 715, and that the contract is with Local 715."

You stated that you had "contracted with UHW to "help service the Local 715 membership at the hospital" and that "Local 715 will still have ultimate responsibility for the contractual and representational relationship."

You can designate persons to act as your representatives, but we do not recognize UHW as having any relationship with the Hospitals, and, accordingly, any correspondence that we have regarding representational issues at the hospital will be sent to either the Zanker Road Address or the P.O. Box address of SEIU Local 715 has on the University Campus.

Correspondence by fax will be sent to an SEIU Local 715 fax number.  You, of course, may send it on to a representative you have authorized to act on behalf of SEIU Local 715.


Sincerely,


Laurie J. Quintel
Manager, Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital



**SEIU UHW**
United Healthcare Workers
**WEST**

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 25, 2006                          Via Fax 650-723-2370 & Certified Mail

**RECEIVED MAY 3 1 2006**

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513
Palo Alto, CA 94305

Re:    Linda Cornell Grievance – Unjust Discipline

Dear Ms. Quintel:

Enclosed you will find a grievance filed on behalf of SEIU-UHW for our above mentioned member.

Please call me at 415-503-5740 to set up a mutually acceptable date and time to meet.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

cc:    Linda Cornell
       Chuck Fonseca

EH/lc/L3166 05-25-02-06.psf/opeiu 3 afl-cio (12)



**SEIU UHW**
United Healthcare Workers
**WEST**

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

May 31, 2006                                   Via Fax 650-723-2370 & Certified Mail

Ms. Laurie Quintel                          **RECEIVED** JUN 0 6 2006
Employee/Labor Relations
Stanford Hospitals and Clinics
300 Pasteur Drive, MC 5513                   *All Affected*
Palo Alto, CA 94305                          *Ong, Cornell, Perez*
                                             *5/31/06*
Re:     All Affected Workers Grievance – Unjust Discipline

Dear Ms. Quintel:

Enclosed you will find a grievance filed on behalf of SEIU-UHW for our affected members.

Please call me at 415-503-5740 to set up a mutually acceptable date and time to meet.

Sincerely,

*Ella Hereth*

Ella Hereth
Union Representative/Organizer

cc:     Caroldeen Tinay
        Chuck Fonseca
        Linda Cornell
        Jose Perez
        Indra Ong

EH/lc/L3166 05-31-02-06.psf/opeiu 3 afl-cio (12)

al Rosselli, *President*        Jorge Rodriguez, *Executive Vice President*        Joan Fr...

**EXHIBIT E**

**WEINBERG, ROGER & ROSENFELD**

A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510 337 1001
FAX 510.337 1023

April 17, 2006

Laurie Quintel
Manager, Employee & Labor Relations
Stanford University Medical Center
300 Pasteur Drive
Stanford, CA 94305-5513

Re:     SEIU United Healthcare Workers-West
        Stanford University Medical Center
        Dues Deduction - Information Request

Dear Ms. Quintel:

I am writing on behalf of SEIU United Healthcare Workers West, with respect to UHW's request that Stanford University Medical Center provide certain information to the Union on a regular basis when SUMC submits dues deducted for SUMC employees represented by UHW.

UHW has requested electronic submission of a list of bargaining unit employees each month, when dues are submitted by SUMC, which includes social security numbers, full names, gender, race/ethnicity, home addresses, home telephone numbers, work locations, work telephone numbers, departments, job classifications, job statuses (e.g., full-time, part-time, temporary, per diem, casual, etc.), and shifts.

I have been advised that SUMC has certain internal restrictions with respect to providing some of this information. It is my understanding that social security numbers are your chief concern.

I am not sure whether the Union has advised you that all of the more than 300 employers who have executed collective bargaining agreements with UHW covering more than 140,000 Union members, submit this information to the Union each month. There is obviously no legal problem with providing this information to the Union, as all these employers have agreed to submit and do submit this information to the Union. Therefore, I assume SUMC has objected to providing at least some of this information based on the Medical Center's internal procedures and/or policies, rather than because of legal considerations.

The Union needs this information in order to fully serve the Medical Center's employees, including, but not limited to, insuring that the correct individuals are credited with the dues payments you send in each month on their behalf.

PASADENA OFFICE
301 North Lake Avenue Suite 310
Pasadena CA 91101 5172
TEL 626 795 8231 FAX 626 795 8696

SACRAMENTO OFFICE
428 J Street Suite 520
Sacramento CA 95814 2341
TEL 916 443 6600 FAX 916 442 0244

HONOLULU OFFICE
1099 Alakea Street Suite 1602
Honolulu HI 96813 4500

April 17, 2006
Page 2

Therefore, the Union looks forward to working with you to implement procedures which will allow SUMC to comply with the Union's legal right to this information, as detailed in decisions of the National Labor Relations Board, and will work with you to make this as seamlessly efficient for both parties as may be possible.

I have been asked to advise you that there are several ways in which the Union can accommodate the security requests of employers in transmitting bargaining unit lists and dues deduction files.

1. The Union has an FTP site where an employer can log in and put files in a secure folder established solely for their use. The Union requires that any files on the FTP site be encrypted or password protected (even though the site has security for access purposes).
2. With some employers the Union uses encryption software called PGP, a very robust enterprise security software that addresses any concerns that a facility may have.
3. Some employers zip up their files and password protect them. Then they either email them to the Union or send them to the Union on a CD by regular mail.

I trust that through our mutual cooperation, this issue can be addressed and resolved quickly and effectively.

Please feel free to contact Phyllis Willett, at UHW, at (510) 587-4522, to implement a mutually acceptable solution, as soon as possible.

I am at your disposal if I may be of aid with this matter. We look forward to your prompt and cooperative response.

Sincerely,

William A. Sokol

WAS/rfb
opeiu 3 afl-cio(1)

1/417795

**EXHIBIT F**



**LOCAL 715**
www.seiu715.org

# LOCAL 715

*SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO/CLC*

May 1, 2006

Laurie J. Quintel
Manager, Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive
Stanford, CA 94305-5513

Dear Laurie,

You have sent me a number of pieces of correspondence regarding approving the agreement and access issues. As I have previously explained to you, Local 715 has a service agreement with SEIU-UHW to handle all representational matters at Stanford and Lucille Packard Hospitals. They have authority from us to approve the contract language and to deal with any matters regarding access, database lists, grievances, etc.

Rachel Deutsch is the lead organizer for the hospitals. Ella Hereth and Jocelyn Olick are also assigned. Please direct your correspondence to them. Please cooperate with them on questions about list matters and contract production.

Thank you for your cooperation.

Sincerely,

Greg Pullman
Staff Director

cc.   Rachel Deutsch, Ella Hereth, Jocelyn Olick- SEIU- United Healthcare Workers
1338 Mission St, San Francisco, CA 94103

GP:jb opeiu local 29 afl-cio
© 2006 SEIU Local 715 /CLC
Stanford/Chapters/Stanford Hospital & Clinics/ USW Hosp LQuintel-UHW 050106.doc

**EXHIBIT G**

## Quintel, Laurie

| | |
|---|---|
| **From:** | Quintel, Laurie |
| **Sent:** | Wednesday, May 24, 2006 2:44 PM |
| **To:** | 'Greg Pullman' |
| **Subject:** | copy of letter previously sent by fax and US mail |
| **Attachments:** | G Pullman Information Requests.doc |

Greg:

I realized that I had sent this by both fax and U. S. mail to you but had failed to send it via e-mail as stated in the letter.

*Laurie J. Quintel*
Manager - Employee Labor Relations
✉-lquintel@stanfordmed.org
☎*Ph:* 650-725-2770
📠*Fax:* 650-723-2370
mailing address: 300 Pasteur Drive
            Stanford, CA 94305-5513
office location at 1510 Page Mill Drive

May 18, 2006


Greg Pullman, Staff Director
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

*Sent via e-mail ,FAX and certified U. S. mail*

RE:    Correspondence to SEIU Local 715

Dear Greg:

In an e-mail message sent to me March 1, 2006, you confirmed "that SEIU Local 715 represents the workers covered by our agreement at Stanford Hospital and Clinics and that they are members of Local 715, and that the contract is with Local 715."

You stated that you had "contracted with UHW to "help service the Local 715 membership at the hospital" and that "Local 715 will still have ultimate responsibility for the contractual and representational relationship."

You can designate persons to act as your representatives, but we do not recognize UHW as having any relationship with the Hospitals, and, accordingly, any correspondence that we have regarding representational issues at the hospital will be sent to either the Zanker Road Address or the P.O. Box address of SEIU Local 715 has on the University Campus.

Correspondence by fax will be sent to an SEIU Local 715 fax number. You, of course, may send it on to a representative you have authorized to act on behalf of SEIU Local 715.


Sincerely,


Laurie J. Quintel
Manager, Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

**EXHIBIT H**

Laurie J. Quintel
Director - Employee Labor Relations
*-lquintel@stanfordmed.org
*Ph: 650-725-2770
7Fax: 650-618-2246
mailing address: 300 Pasteur Drive
                          Stanford, CA 94305-5513
office location at 1530 Page Mill Drive

-----Original Message-----
From: Greg Pullman [mailto:gpullman@seiu715.org]
Sent: Monday, May 22, 2006 5:11 PM
To: Sun-Young, May; jolick@MAIL.SEIU-UHW.ORG
Cc: rdeutsch@mail.seiu-uhw.org; Quintel, Laurie
Subject: RE: Julio Andrade's grievance

May,

I have explained numerous times that Jocelyn Olick, Rachel Deutch and Ella
Hereth out of the SEIU UHW San Francisco office are handling all
representation matters for SEIU Local 715.  Local 715 has the right to
designate whomever we chose to handle representation matters.  Your
continued refusal to accept that fact appears to be a clear attempt to deny
representation to the workers we represent.  I don't know how to say this
any more clearly- please direct all correspondance on matters regarding
representation of the SEIU Local 715 unit to these three people at the
office that they work out of.

Greg Pullman
SEIU Local 715

        -----Original Message-----
        From: Sun-Young, May [mailto:MSunyoung@stanfordmed.org]
        Sent: Mon 5/22/2006 4:23 PM
        To: jolick@MAIL.SEIU-UHW.ORG
        Cc: Greg Pullman; rdeutsch@mail.seiu-uhw.org; Quintel, Laurie
        Subject: Julio Andrade's grievance


        Jocelyn,

        I'll fax a copy of a letter from Laurie Quintel to your fax number in
        San Francisco as a one-time exception. Please note that Greg Pullman
        confirmed that SEIU Local 715 has the ultimate responsibility for the
        contractual and representational relationship with SHC and LPCH.
        Therefore, we will continue to send all correspondences to Local SEIU
        715 unless we receive written authorization from SEIU Local 715
stating
        otherwise.

        Julio's former manager and I are available on Friday, June 2 from
        9:30-10:30 to meet with you and Julio Andrade.  We will be glad to
meet
        you at SEIU 715 office on campus.

May Sun-Young
Sr. Employee Labor Relations Specialist
MC 5513
ph:  650-497-8690
fax: 650-618-2259 or 723-2370


-----Original Message-----
From: Jocelyn Olick [mailto:jolick@MAIL.SEIU-UHW.ORG]
Sent: Monday, May 22, 2006 12:31 PM
To: Sun-Young, May
Cc: rdeutsch@MAIL.seiu-uhw.ORG
Subject:


Dear May,

        I am writing in response to an e-mail that you sent to Greg
Pullman, for me, on Friday May 19, 2006.  First of all I would like to
reiterate that I and Ella Hereth do not work for SEIU 715. SEIU-UHW is
doing the representation work here at Stanford Hospital; please direct
all your correspondence here.  Secondly, I am assuming none of the three
days that I proposed work for you for the grivance meeting for Julio
Andrade, since have given two new dates. Unfortunately, neither May 24,
2006 nor June 1, 2006 work for me. Here are some new proposed days:
Friday May 26, 2006 between 9:30 -12pm., Wednesday May 31, 2006 between
1pm and 4pm and Friday June 2, 2006 between 9:30-12pm. For the
formalities of the meeting, having a grievance meeting via telephone is
ridiculous and unacceptable. Since the HR department has decided to ban
the union representatives from the hospital and I am still the union
representative for Stanford, we will have to have the meeting off sight.
Please respond immediately so I can confirm Mr. Andrade's
availability.


Sincerely,

Jocelyn Olick
Union Representative/ Organizer
1338 Mission St.
San Francisco, CA 94103
Phone (510)773-7102
Fax (415)563-9914

Sent via the WebMail system at MAIL.SEIU-UHW.ORG

**EXHIBIT I**

**Quintel, Laurie**

| | |
|---|---|
| **From:** | Greg Pullman [gpullman@seiu715.org] |
| **Sent:** | Tuesday, May 30, 2006 5:58 PM |
| **To:** | Quintel, Laurie |
| **Cc:** | ehereth@MAIL.SEIU-UHW.ORG |
| **Subject:** | RE: Service Credit and Contract Printing |

Laurie,

As I've previously told you, I've designated Ella as the authority on this matter and
there is no reason for you to doubt that her communications are representative of Local
715's position.  Please proceed with the direction Ella has given you.

Greg Pullman

-----Original Message-----
From: Quintel, Laurie [mailto:LQuintel@stanfordmed.org]
Sent: Tuesday, May 30, 2006 3:17 PM
To: Greg Pullman
Subject: FW: Service Credit and Contract Printing

Greg:

As I told you in my letter to you dated May 25, 2006, Ella Hereth is not the appropriate
person to make a decision regarding any terms and conditions of the newly bargained
agreement.  I do not consider her e-mail below as authority to accept the revision to
5.3.1.

Please send me a response from one of the three sources as stated in my May 25 letter, so
that I can proceed with publishing the contract.

Laurie J. Quintel
Director - Employee Labor Relations
*-lquintel@stanfordmed.org
*Ph: 650-725-2770
7Fax: 650-723-2370
mailing address: 300 Pasteur Drive
                        Stanford, CA 94305-5513 office location at 1510 Page Mill Drive

-----Original Message-----
From: Ella Hereth [mailto:ehereth@MAIL.SEIU-UHW.ORG]
Sent: Friday, May 26, 2006 6:38 PM
To: Quintel, Laurie
Cc: jolick@seiu-uhw.org
Subject: Service Credit and Contract Printing

Laurie

In regards to the service credit language in the contract, we have discussed the changes
that you have proposed. Though not explicitly expressed in the Tentative Agreement, we
have heard your concerns and we are willing to agree to the changes that you are
suggesting.

You should be receiving the signature page shortly if you have not already received it. As
I understand it, that was the last thing we needed to settle before the contract could be
sent to the printer.

Please contact me if you have any questions.

Ella Hereth
Field Representative/Organizer
SEIU United Healthcare Workers West
1338 Mission St.

San Francisco, CA 94103
phone (415)503-5740
fax (415)563-9914

---

Sent via the WebMail system at MAIL.SEIU-UHW.ORG

**EXHIBIT J**

## SERVICE EMPLOYEES INTERNATIONAL UNION

|  |  |
|---|---|
| In re: SEIU Local Union Jurisdiction in California for Long Term Care Workers, Public Services Employees, Public Health Employees, Property Services Workers, and Private Sector Workers in Public Sector Locals | **Hearing Officers:**<br>**Alice Dale**<br>**Tom Balanoff** |

## HEARING OFFICERS' JOINT REPORT AND RECOMMENDATIONS

I.    **Introduction and Procedural Background**

This is a joint report and recommendations to the International Executive Board ("IEB") of the Service Employees International Union ("SEIU") concerning the jurisdiction of SEIU local unions in California for long term care workers, public services employees, public health employees, property services workers, and private sector workers in public sector locals. The undersigned hearing officers were appointed by the SEIU Executive Committee[1] to hear this matter and render a report and recommendations concerning SEIU local union jurisdiction in California.

This proceeding commenced when International Secretary-Treasurer Anna Burger issued a Notice of Preliminary Hearing on January 30, 2006 (Ex. 2).  On February 13, 2006, Secretary-Treasurer Burger issued a notice of the schedule of hearings and procedure proposed by the

---

1    Pursuant to Article VI, Section 1(b) and Article XI, Section 6B of the SEIU Constitution and Bylaws, the IEB has delegated the appointment of hearing officers to the Executive Committee.

International Union (Ex. 3).[2]  The notice contained six proposed rules of procedure.  On February

17, 2006, a preliminary hearing was conducted in Burlingame, California, solely on the question

of the schedule and procedures for the subsequent hearings on the substance of the jurisdictional

questions.  The purpose of that preliminary hearing was to get the views of local union leaders

concerning the schedule and procedural rules proposed by the International Union. As a result of

the preliminary hearing, modified rules of procedure were issued on March 13, 2006 (Ex. 8). The

modified rules of procedure responded to local union comments and suggestions made at the

preliminary hearing.  In particular, the number of hearing days was doubled from four to eight,

consecutive days of hearing were provided, the International Union was directed to establish a

website to inform members about the issues involved in the jurisdiction proceeding, and one day

of the hearings took the form of an audio conference with hearing locations in Sacramento,

Fresno, Riverside, and San Diego.

The hearing process was designed to afford maximum opportunity for input from local

union leaders and members on the jurisdictional questions.  Hearings on the substantive

jurisdictional issues were held on March 24 and 25 and April 27, 2006 in Los Angeles, on April

7 and 8, 2006 in Burlingame, on April 21 and 22, 2006 in San Francisco, and, via audio

conference, on April 28, 2006 in Sacramento, Fresno, Riverside and San Diego.  The hearings on

March 24-25 and April 7-8, held by Sister Dale, dealt with local union jurisdiction for public

services employees in Southern and Northern California, respectively, excluding public health

---

2  Notices were sent to the following SEIU local unions:  Locals 99, 24/7, 265, 280, 347, 415,
434B, 535, 614, 616, 620, 660, 700, 707, 715, 790, 817, 949, 998, 1000, 1280, 1292, 1877, 1983,
1997, UHW 2005, 2028, 2579, 4988, and 5000 NAGE.

employees and private sector workers represented by public sector locals. Hearings on jurisdiction for long term care employees were held on April 21 and April 27. The April 21 hearing also dealt with local union jurisdiction for California State University employees. On April 22, a hearing was held on jurisdiction for Northern California public hospital workers and private sector workers represented by public sector locals. In addition, the April 22 hearing dealt with jurisdiction for employees of the State of California, and property services workers (including cemetery workers, race track employees, private sector greens attendants, private university workers, and multi-service workers). A hearing on jurisdiction for Southern California public hospital workers and private sector workers represented by public sector locals took place on April 27. The hearings held on April 21, 22 and 27 were held by Brother Balanoff. All jurisdictional issues were addressed in the April 28 hearing by audio conference, held jointly by both hearing officers. Norm Gleichman, Deputy General Counsel of the International Union, assisted us at the hearings.

At each in-person hearing, local leaders and members were invited to submit post-hearing materials within 14 days of the close of the hearing on each jurisdictional issue. In addition, pursuant to the March 13 order on procedural questions, the International Union established a website with information concerning the jurisdictional issues covered by the hearings and the opportunities for members to participate. Members were invited to submit comments via the website, which were collected and made a part of the record.

Each affected local union that so desired was provided the opportunity to be heard during the hearing and to submit any documents that it wished us to consider. The following locals made presentations at one or more of the hearings: 24/7, 87, 121RN, 265, 280, 347, 415, 434B,

3

535, 614, 616, 620, 660, 700, 707, 715, 790, 817, 949, 998, 1000, 1280, 1877, 1983, 1997, 2028, 2579, 4988, and UHW. Many of the affected locals also responded in writing to the requests for information issued by the International Union in connection with the jurisdictional issues.

JJ Johnston, California Area Director, made presentations on the need for restructuring local union jurisdiction in California based on political and demographic developments and the need to grow the union in areas of the state where union density is low. John Tanner, Assistant Director of the Public Services Division, gave the Division's views on the need to restructure public sector jurisdiction in California, including the question whether public sector locals should have jurisdiction for public health care workers. Ian Campbell, Assistant Research Director for the Health Systems Division, gave a presentation on the Division's goals and the role of SEIU's United Healthcare Workers – West ("UHW") in the Division's plans. David Kieffer, Director of the Long Term Care Division, and Jon Barton, Deputy Director of the Division, stated the Division's views on the best way to organize ourselves to win higher standards for home care and nursing home workers. Eddie Iny, Assistant Director of the Property Services Division, gave a presentation on the opportunities and challenges facing property services local unions in California. Fifty-five exhibits were entered into the record at the hearings, a transcript of the hearings was made by the court reporters, and post-hearing submissions from a number of locals and individual members were received.

The entire record was considered in the drafting of this report. This report is the product of our collaborative efforts; however, we each concentrated on those issues covered in the respective hearings held separately by each of us.

4

II.     **The International Union's Policies on Organizing and
        Jurisdiction Established by the 2000 and 2004 Conventions**

Article XIV, Section 3 of the SEIU Constitution and Bylaws authorizes the IEB to

"consolidate or merge existing Local Unions under such terms and conditions as the [IEB] may

determine when in the opinion of the [IEB] the interests and welfare of the International Union

and the membership thereof will be better served by such action."

Delegates to the 2000 SEIU Convention adopted the New Strength Unity Plan ("NSUP")

to build power for SEIU members.  A critical part of the NSUP was a "Jurisdiction Policy and

Procedure" set forth in the "Decide Report" prepared by the President's Committee 2000.  The

Decide Report was adopted by the 2000 Convention and incorporated in the NSUP.  The

Committee concluded that "industry-based jurisdiction gives local unions the best opportunity to

be recognized by the public, elected officials, industry employers and workers as the principal

voice of workers in that industry and geographic area."  SEIU members have told the union

leadership that they want to be united with their co-workers doing similar work in the same

geographic area so that they can exert maximum power to improve their working conditions.

The policy of the International Union, as expressed at the 2000 Convention, is to combine

members employed in a particular industry in a manner that minimizes the structure of that industry,

minimizes fragmentation and, as a result, increases bargaining power.  The focus on industry-

based jurisdiction necessarily means that employees of the same employer are to be represented

by the same SEIU local union.

In his testimony at the hearings, Brother Johnston explained that SEIU's program to

refocus and restructure the Union to build an organization that is better positioned to win higher

standards for SEIU members began in 1996 with the "Bold Action" program adopted at the 1996

Convention, and continued with the 2000 Convention's NSUP and the "Seven Strengths"

program adopted by the 2004 Convention delegates. Among the elements of the Seven Strengths

program are building local union strength, political strength, and industry strength. SEIU's

Policy on Jurisdiction contributes to the enhancement of all three of these strengths by fostering

local unions with the size, capacity, resources and focus to win big for SEIU members in

bargaining, and in the state capitals and Congress.

Brother Johnston testified that, in many states across the country, SEIU has consolidated

and rationalized local union jurisdiction to create more powerful local unions. In California,

Florida, Massachusetts, Connecticut, Maryland, Michigan, Missouri, Ohio, Pennsylvania, Rhode

Island, and Washington, local unions have participated in a process similar to the one now

underway in California. The results have been astounding: SEIU grew by 820,000 between

1996 and 2004.

This achievement was also due to our relentless focus on local union organizing. As part

of the New Strength Unity program, the 2000 Convention adopted a local union organizing

mandate that became Article XV, Section 16(a) of the SEIU Constitution and Bylaws. The

organizing requirement was confirmed by the 2004 Convention. That provision states:

> Every Local Union shall continue to implement an annual local
> union organizing budget equivalent to 20 percent of the local's
> budget (after payment of all per capita tax obligations), to be spent
> consistent with the principles of the applicable industry division of
> the International Union. Each industry division shall submit its
> principles and the procedures for their enforcement for approval by
> the International Executive Board no later than January 2005.

Ex. 1, p. 31.

6

As part of the implementation of this requirement, the International Union divisions require locals to submit organizing plans on an annual basis.  In addition, local unions are expected to have full-time organizing directors who are responsible for drawing up the locals' organizing plans and overseeing their execution.

Further, the Seven Strengths program adopted at the 2004 Convention includes a commitment to building national strength.  A component of this commitment was expressed in the United Strategy for Strength resolution adopted by the Convention.  This resolution commits the International Union and local union to devoting resources, including personnel, dedicated to growing the union in areas such as the South and Southwest, where union density, and SEIU's presence, has historically been weak.  Through adoption of this resolution, the 2004 Convention mandated the International Union resources be redirected from areas of traditional strength, such as California and New York, to emerging growth regions.

III.    **Political and Demographic Trends in California**

Brother Johnston, Brother Tanner, and Dean Tipps, Executive Director of the California State Council, made the case for the need to reorganize local union jurisdiction in California.  Tr. 1056-64.  They pointed out that, notwithstanding conventional political wisdom, California is not a "safe" state for candidates who support progressive positions of importance to working men and women.  The data presented by these witnesses establishes that SEIU locals are strongest in the slower-growing coastal areas of the state such as San Francisco, Santa Clara, Los Angeles, and Alameda counties.  These counties readily support agendas for working Californians; however, they are losing influence due the demographic shift to inland counties such as the

Central Valley counties and Sacramento, San Joaquin, Kern, San Bernardino, Riverside and San Diego counties, where the political climate is much more conservative, and SEIU is much weaker. SEIU is growing in California, but we are growing in the coastal areas where population growth in stagnant.

It is vital that we hit upon a strategy to unite workers in the inland counties within the same industry. In order to be able to organize successfully on a massive scale and affect the politics of these areas in a way which benefits our members by lifting standards, we must bring to bear the resources and expertise of our successful coastal locals. Currently, the vast majority or our organizing resources are concentrated in a few coastal county locals, and are mostly absent in strategic counties where growth and political power are on the rise.

IV.     **Current SEIU Local Union Jurisdiction in California**

The evidence presented at the hearing dramatically highlighted the fragmentation of SEIU local union jurisdiction by geography, industry and employer. None of the four industry divisions (Public Services, Health Systems, Long Term Care, and Property Services) are unified under the present system of local union jurisdiction in California. The testimony revealed that many locals are quite small and therefore under-resourced. In addition, a number of locals still exercise jurisdiction across industry lines.

A.     **Current Public Services Local Unions**

For purposes of this report, the term "public services local unions" refers to SEIU local unions whose membership is made up primarily of local or state government workers (including

8

California State University system employees).  We address separately below, in a section devoted to Long Term Care Division members, home care providers considered employees of in home supportive services ("IHSS") public authorities.

### 1.    Local government employees

According to Brother Tanner's testimony, 22 California counties have multiple public services local unions.[3]  Some of these local unions have jurisdiction for workers in a single county; others exercise jurisdiction in several counties.  One public services local, Local 535, represents over 30,000 social services employees in local government statewide, and has members in many counties.  Local 535 also represents private sector health care workers and workers employed by publicly-funded social service agencies.  Other local government workers are represented by 19 local unions of vastly different sizes and resources (excluding Local 99, which represents Los Angeles area school employees).  Some public services locals represent IHSS providers, property services workers, and private health care employees.  We summarize below the jurisdiction exercised by these local unions for local government workers who are not represented by Local 535.

Los Angeles County employees are represented by Local 660, which represents over 51,000 employees of Los Angeles and Orange counties.  About 19,000 Local 660 members are in the public health field, including those at the Los Angles County Department of Public Health

---

3   These are the counties of Alameda, Contra Costa, Fresno, Kern, Los Angeles, Kings, Marin, Monterey, Napa, Orange, Riverside, Sacramento, San Diego, San Francisco, San Joaquin, San Mateo, Santa Barbara, Santa Clara, Solano, Stanislaus, Tulare, and Ventura.

Ingleside Hospital, Los Angles County – USC Medical Center, Rancho Los Amigos National

Rehabilitation Center, and the King/Drew Medical Center.  Former Locals 434 and 787

previously merged into Local 660.  Local 347 represents about 12,000 municipal workers in Los

Angeles County, most of whom work for the City of Los Angeles.   Local 2028, which was

created as a result of the consolidation of former locals 102 and 1926, represents over 8,000

employees in San Diego County, and ten cities and school districts.   Local 2028 also represents

stadium and arena employees, theater and convention center workers, and workers at Delmar

racetrack, who fall under the Property Services Division.  In addition, Local 2028 represents

employees of a Fredericka Manor, a private sector nursing home, and Edgemore, a county owned

and operated nursing home.  Employees of Riverside County, cities in the county, and special

districts are represented by Local 1997, which represents about 6,000 public workers.  Twenty-

five percent of Local 1997's members are healthcare workers.  Local 998, which is currently

under trusteeship, represents about 5,500 employees of Ventura County (including Ventura

County Medical Center) and various municipalities in that county, as well as workers for the

courts, special districts, and IHSS workers.

Santa Barbara local government workers are represented by Local 620, which also

represents public sector employees in San Luis Obispo county for a total representation of about

4,000.  County and municipal workers in Kern, Tulare and Kings counties, including public

hospital workers at Kern County Medical Center, are represented by Local 700, which represents

over 7,000 workers.  Local 700, which originally had jurisdiction limited to Kern County, is the

product of a merger with former Local 690, which had jurisdiction for Tulare and Kings counties.

Local 700 also represents employees of the San Joaquin Valley Air Pollution Control District,

which has employees who work in Bakersfield, Fresno and Stanislaus County. Local 817 represents over 5,000 workers in Monterey and San Benito counties, including city and county employees, IHSS providers, employees at Natividad Medical Center, a public hospital in Monterey County, and Hazel Hawkins Hospital, a district hospital in San Benito County.

Local government workers in Santa Clara and San Mateo counties are represented by Local 715, which represents over 26,000 employees. Some of Local 715's public sector members include employees of Santa Clara Valley Medical Center and San Mateo General Hospital. Local 715 also represents employees at El Camino Hospital, a district hospital. In addition, Local 715 has units in other SEIU divisions: private university workers at Stanford University and Santa Clara University (including Santa Clara Mission Cemetery workers), private hospital workers at Stanford and Lucile Packard Hospitals, IHSS providers, and multiservice workers employed by Bon Appetit/Compass who work at Stanford and Santa Clara universities.

Local 790 represents employees of cities, counties (including public hospitals), school districts, special districts, private non-profits, and other private sector employees (including airport service workers at San Francisco International Airport) in San Francisco, Alameda, Contra Costa, San Joaquin, and Sacramento counties. Local 790, which currently represents almost 29,000 employees, is itself the product of the mergers of former SEIU Locals 390, 400 and 22. In San Francisco, social services workers are represented by Local 535, and some public health classifications are represented by UHW. Specifically, UHW represents public health care employees at San Francisco General Hospital and the Laguna Honda public skilled nursing facility. UHW, Local 535, and Local 616 (which alone represents about 14,000 employees and

11

providers) also represent different classifications of local government workers in Alameda
County, including employees at the Alameda County Medical Center. Local 616 also represents
IHSS providers, employees of special districts, Head Start workers, and employees of one private
non-profit. Santa Cruz local government workers, including both municipal and county
employees, are represented by Local 415, which represents about 4,500 workers. Local 415 also
represents IHSS providers, and is operating under a servicing agreement with Local 715. City,
county school, court, special district, and child care workers in Marin County are represented by
Local 949, which represents under 2,000 local government and related employees. Local 707 is
an amalgamated local of about 6,000 county, special district, court, city, schools, IHSS, for-profit
and non-profit contract agencies, and private sector hospitals workers, with jurisdiction in
Sonoma, Mendocino and Lake counties.

Local 614 represents about 2,300 employees, including employees of Napa County, as
well as employees in four cities in the county, school district employees, IHSS workers, and
classified employees at Napa Community College. Local 614 has been in merger talks with
Local 1280, which represents over 3,300 local government and related employees, as well as
IHSS providers, in Solano County. Locals 1280 and 614 share an executive director. Local 1292
represents under 800 employees in cities, the courts, special districts, and publicly-funded private
agencies in Butte, Shasta, and Siskiyou counties. Local 4988 has about 1500 members, 60% of
whom work for the counties of Amador and Calaveras, cities, and special districts

12

### 2.    Education and State Employees

Employees of the Los Angeles, Lynwood, Torrance and Pleasant Valley unified school districts, Head Start workers, and Los Angeles Community College employees, are represented by Local 99, which is currently under trusteeship.  Local 99 represents over 36,000 employees in Los Angeles and Orange counties.  Local 1983, also known as California Faculty Association, represents 23,000 teaching faculty at all 23 campuses in the California State University ("CSU") system.  Non-teaching employees in bargaining units 2, 5, 7 and 9 in the system are represented by Local 2579, the California State University Employees Union, which represents over 15,000 CSU employees.  Employees of the State of California in many bargaining units are represented by Local 1000, which represents over 83,000 state employees.

### B.    Current Long Term Care Local Unions

SEIU's Long Term Care Division includes IHSS providers, homecare workers employed by private agencies, private sector nursing home workers, and employees of senior living facilities.  In California, SEIU represents over 200,000 homecare workers and approximately 20,000 nursing home workers.  SEIU's nursing home workers are currently represented by three California local unions:  Local 434B, which represents workers in 50 private nursing homes, UHW, which represents workers in 152 private nursing homes, and Local 2028, which represents workers at one private nursing home.

Homecare providers are in many different California local unions.  SEIU represents IHSS providers in four types of unions.  The bulk of the home care providers are represented by Local

13

434B, which represents almost 123,000 SEIU homecare members in Ventura,[4] Los Angeles and San Bernardino counties. In addition, the Local 434B leadership heads Local 4034, also called the California United Homecare Workers Union ("CUHW"). Local 434B and CUHW share the same president and secretary-treasurer. CUHW is a California homecare workers union jointly affiliated with SEIU and AFSCME pursuant to the Strength In Unity Agreement between the two international unions. Ex. 38. CUHW represents over 22,000 homecare workers in 25 counties.[5] Together, CUHW and Local 434B represent home care workers in 28 counties in Northern, Central, and Southern California. Local 434B and CUHW represent only long term care workers. Another AFSCME affiliate, the United Domestic Workers of America ("UDW"), represents about 60,000 IHSS providers in 10 counties.[6] Over 46,000 IHSS providers in nine counties[7] are represented by UHW, SEIU's statewide health care union. In addition, as noted above, Locals 715, 616, 614, 415, 707, 998, 1280 and 817 certified representatives of IHSS providers in their respective jurisdictions.[8]

---

4  Local 434B has represented the Ventura County IHSS workers under a servicing agreement with Local 998. This group recently voted overwhelmingly to join Local 434B.

5  CUHW represent IHSS providers in Imperial, Inyo, Tulare, Kings, Mono, Madera, Mariposa, Tuolumne, Alpine, Nevada, Sierra, Sutter, Colusa, Lake, Glenn, Butte, Plumas, Tehama, Lassen, Shasta, Trinity Humboldt, Del Norte, Siskiyou, and Modoc counties.

6  Placer, El Dorado, Stanislaus, Merced, San Luis Obispo, Kern, Santa Barbara, Riverside, Orange, and San Diego.

7  San Francisco, Fresno, Marin, Sonoma, Contra Costa, Sacramento, San Joaquin, Amador and Calaveras.

8  Locals 616, 614, 707 and 1280 operate jointly through the Joint Organizing Partnership. Local 415 is party to a servicing agreement with Local 715, and Local 998 is party to a servicing agreement with Local 434B.

### C.    Current Property Services Jurisdiction

SEIU's Property Services Division includes janitors, security guards, employees of

stadiums, arenas and convention centers, private higher education employees, subcontracted

airport workers, and racetrack workers.  The largest Property Services Division local union in

California is Local 1877, which represents janitors, stadium and arena workers, convention

center employees, subcontracted airport workers at all major California airports, grocery store

cleaners, racetrack workers, residential building workers, cemetery workers, and employees in

other allied industries.  Local 24/7 represents security officers in Northern California.  Local 265

represents cemetery workers and greens keepers.  Locals 700, 715, and 535 also represent

cemetery workers.  Local 280, also called the Pari-Mutuel Employees Guild of California,

represents pari-mutuel clerks throughout the state.  As noted above, Locals 715, 790 and 2028

also represent small numbers of Property Services Division members.[9]

### D.    Private Hospital Workers Represented by Public Services Locals

UHW, the product of a 2005 merger between former Locals 250 and 399, is a large local

of 130,000 members with statewide jurisdiction for private sector healthcare workers in

California.  At the time of the merger, Local 250 had about 94,000 members, and Local 399

represented over 30,000 workers.  Yet there are also several public sector locals that represent

---

9  In addition, Local 87 represents janitors in San Francisco.  Local 87 was not formally included
in this proceeding, but a Local 87 representative testified at the hearing on property services
jurisdiction.

private sector hospital workers.  Local 4988 represents wall-to-wall units at Catholic Healthcare

West's ("CHW's") Mark Twain hospital in Calaveras County, and the Sutter Amador acute care

facility in Amador County.  Local 707 represents employees at the Sutter Santa Rosa hospital.

Local 715 is the certified representative of employees at Stanford and Lucille Packard Hospitals.

Local 2028 represents employees at Children's Hospital in San Diego.  UHW is actually

servicing employees in these facilities represented by Locals 707, 715, and 2028 pursuant to

servicing agreements.  Finally, Local 535 represents about 3,400 registered nurses, other

professional units, and technical employees employed by Kaiser Permanente.


**E.     Representation of District Hospital Workers**

District hospitals are run by the elected boards of special healthcare districts.  UHW

represents workers at eight district hospitals.  Workers at three other district hospitals are

represented by public sector Locals 817, 715, and 5000 (NAGE).[10]


**V.     Organizing Programs and Results**

Despite the impressive growth in overall SEIU membership over the past decade, only a

relative small percentage of that growth has been due to organizing wins.  According to a

submission from the Public Services Division, during the period 1998 through 2005, California

public sector unions (include those representing state workers and school employees) organized

just 75,161 new workers.  This number includes 23,500 added in 2000 and 2004 by California

---

10   NAGE represents employees at Menifee district hospital in Riverside County.

Faculty Association, Local 1983, through an agency shop campaign and accretion of teacher aides. Among local unions whose focus is local government workers, the organizing wins for this period amounted to only 48,494 new members.

Many public sector locals are not contributing at all to our California growth, and those that are contributing are not winning at the pace needed to achieve union density in our priority services and geography. Our annual average growth per local union over the past 6 years is 368 workers. A disproportionate amount of that growth results from our current membership base: agency shop, residual and part-time worker victories. We are not organizing on pace in services that were formerly publicly-delivered and are now privately-delivered, publicly-funded such as mental health and developmental disabilities workers. Only two local unions have achieved a measure of union density in mental health services.

We are also not growing on pace in other Public Services Division priority services such as childcare. These privately-delivered, publicly-funded services are severely underfunded resulting in unreliable access and service quality and poverty level workforce wage and benefit standards.

Why are our growth numbers in the California public sector so anemic? It is true that many opportunities for growth lie in localities where existing local government local unions don't have sufficient resources to mount large-scale organizing drives. For example, the Public Services Division estimates that, in Tulare County, there are 1,800 workers, including residual public units, hospital district employees, child care centers and mental health workers, who could be organized immediately. This figure does not count an additional 1,000 developmental

disability community workers who could win the right to union representation in the near future given new political leadership in Sacramento. This fact further underscores the necessity to realign our jurisdiction to bring local union resources to bear in those localities of low union density.

But the geographic imbalance in our present local union structure does not fully explain the mediocre growth of our public sector local unions. Even in 2006, many public sector local unions are not "on program" with respect to SEIU's organizing mandates. For example, many of our public sector local unions are simply too small to be able to devote the resources required to fund full-time organizing directors. Thirteen of our California public sector locals represent less than 10,000 workers, and nine represent less than 6,000 public employees. The Public Services Division reports that eight local unions are not contributing to our growth goals due to lack of capacity and/or political will. To address this problem, some locals have banded together to jointly organize, in what amounts to a partial step toward consolidation. Specifically, Locals 707, 614, 1280, 1292 and 949 formed the Joint Organizing Partnership ("JOP") with Local 616. The JOP is led by Local 616's organizing director. Similarly, Local 4988 receives organizing services from Local 790 through their servicing agreement. But Locals 2028, 1997, 998, 700 and 817 do not have organizing directors.

Local 347 represents about 12,000 workers, yet it too lacks a full-time organizing director. According to the Public Services Division, the person listed as the organizing director is actually the local's fulltime political director. In addition, Local 347's organizing plan for 2006 does not comply with SEIU's organizing mandate. The Division reports that the three staff listed as organizers are actually representatives. The Division explains that, in 2005, the local

18

assigned responsibility for its organizing program to its General Counsel in order to recruit a fulltime organizing director and staff and to develop a viable organizing program. The Division points out that this was not done, and that, as in 2006, the three staff listed as organizers in 2005 were actually representatives.

In addition, Local 347 continues to struggle with maintaining its membership base. The Division reports that, on April 24, 2006, the local informed its members employed by the City of Commerce that it was withdrawing from the ballot rather than face a decertification election challenge from the Commerce City Employees Association. Similarly, during the hearings, a decertification challenge to Local 347 in a large unit from a public safety union affiliated with an AFL-CIO union was only averted after the local called on the International Union for assistance. The Division reports that there are 119 independently-represented cities in Los Angeles and Orange counties employing over 5,000 employees for which Local 347 has no organizing plan or dedicated resources.

Our organizing shortfalls extend beyond the Public Services Division. The goal of Health Systems Division is to build a strong national union to change the lives of RNs and hospital workers, to hold hospitals accountable to workers, patients, the underserved, and communities, to improve the quality of care delivered, and to win health care for all. Assistant Research Director Campbell testified that the biggest challenge to achieving these goals is the current low union density in the industry. Tr. 1898-1908.

Brother Campbell submitted data showing the job we have before us in the private hospital sector in California. Statewide, fully 78% of hospital beds are in private facilities, and of these, 39% are in totally non-union facilities. In the markets identified as growth markets by

19

the Health Systems Division, significant percentages of non-union facilities exist. In the Fresno County market, private hospitals make up 95% of hospital beds, and 52% of those beds are in non-union facilities. There is also a non-union district hospital in Fresno County. In Orange County, 93% of hospital beds are in private hospitals, of which 73% are in facilities where no union is present. In San Diego County, private sector hospitals have 65% of the total hospital beds in the county, and 33% of those beds are in non-union hospitals. In addition, 52% of the district hospital beds are in non-union facilities in San Diego County. In Riverside County, 68% of the hospital beds are in private sector hospitals, of which 35% are in non-union facilities. And in San Bernardino County, private acute care facilities make up 84% of the hospital beds in the county, with 59% of them located in non-union hospitals. In addition 175 of the 199 district hospital beds in that county are in non-union facilities.

Based in part on the above data, the Health Systems Division estimates that there are approximately 100,000 unorganized hospital and related workers in Southern California. The Division's plans call for organizing more than 40,000 private and healthcare district healthcare workers in California over the next four years. These are mostly professional and technical workers. The Division is targeting district hospitals, private profit and private non-profit hospitals in markets in Fresno, Orange, Riverside, San Bernardino and San Diego counties. For 2006, the Division's plans call for organizing 6,000 workers in private sector and district hospital targets in California. These include workers in hospitals and related facilities in the Kaiser, CHW, Tenet and Sutter chains and district hospitals where some of the workers are already in unions.

20

UHW is the key to the Health Systems Division's organizing plans. UHW is the only local union with jurisdiction to organize private sector healthcare workers in California. And although it currently shares jurisdiction for district hospital workers with public sector unions, UHW represents employees seven district hospitals, far more than any other SEIU local union. Yet, UHW has also failed to keep pace. Since the 2005 merger of 250 with 399, UHW has only organized about 2200 hospital workers. It is plain that UHW has much further to go in organizing its current jurisdiction.

## VI.    Discussion and Recommendations

It is stating the obvious to say that the current patchwork of SEIU local union jurisdiction in California is not designed to maximize local union strength through uniting workers by industry in the most relevant geography. Rather, the current jurisdictional patterns are in large part an outgrowth of piecemeal affiliations, mergers, and special arrangements that do not reflect the current needs of SEIU members to win significant improvement in standards, preserve gains previously won, and grow the union in areas of low union density. We emphasize that such growth in not growth for growth's sake; it is vital if we are to retain the standards we have won in areas of higher union density. We simply cannot be islands of strength in a sea of weakness; we must improve standards throughout the state so that employers cannot use lower standards in the unorganized areas of the state to attack wages and benefits in the locations where we are a significant presence. And as the testimony established, we must increase out statewide clout to promote a progressive agenda and to head off efforts to block that agenda through initiatives such as Proposition 75, which we only managed to defeat by a narrow margin. As pointed out by

21

Brother Johnston, SEIU devoted substantial resources to that campaign to just to maintain the status quo. To accomplish this, we must project our strength into the eastern part of the state, where political power is migrating in step with population growth. We must also take a hard look at what the relevant geography is for each industry division, and be prepared to match our structure to that geography, irrespective of the current jurisdictional hodgepodge.

In addition, we need to take stock of the inability of many locals in their current configuration to adhere to the organizing mandates of SEIU. We think that it will take new internal structures and locals of larger size to establish properly-resourced organizing programs geared to the 21st century. Our outdated structure in California has not produced the kind of organizing results we will need to have across the state if we are to keep standards high, grow the union, and win for our members. These principles underlie our recommendations for jurisdictional realignment in California.

The imperative of creating new local organizations that are not only self-sustaining, but that can devote resources to organizes in the growth areas, also flows from the current practice of divisions subsidizing local organizing work. Notwithstanding the United Strategy for Strength resolution adopted by the 2004 Convention, the Public Services, Property Services, and Long-Term Care Divisions are currently subsidizing organizing campaigns in California. This needs to change if we are serious about our commitment to commit resources to unionize the "red" states.

We emphasize that our California locals are already no strangers to consolidation and realignment. As detailed above, many of the local unions involved in these proceedings are themselves the products of earlier consolidations. We are recommending an intensification of

22

that process to permit SEIU to exercise the maximum leverage possible on behalf of our California members.

Because the thorniest issues we address relate to the appropriate jurisdiction for healthcare workers, we turn preliminarily to the contention made by UHW that all healthcare workers, broadly defined to include public health workers and long-term care employees, should ultimately be placed in a single local union. We do not think that the record of healthcare to date demonstrates that this is necessarily the best approach for growth. We believe that the jury is still out on the question whether, in order to raise standards and build power for our members, we need to amalgamate all of the sectors of the broadly defined healthcare world into a single entity. This has not been our uniform structure for representing members in the different sectors of the healthcare industry, and, as a matter of fact, recent jurisdictional decisions have resulted in recommendations for different structures based on different density, geography, capacity, and growth possibilities in each case. For example, although in New York all healthcare workers are in one local, it is not as a result of International Union jurisdictional decisions, but rather through voluntary mergers, except for interns and residents who are still in a separate local. Jurisdictional decisions in Illinois and Washington have resulted in sectoral structures, and there are sector-based locals in Oregon, Wisconsin, and Pennsylvania.

A.    **Jurisdiction for Local Government Employees**

    1.    **Proposals for Geographic Reorganization**

By memorandum dated March 17, 2006, prior to the opening of substantive hearings in this matter, the International Union circulated a concept for reorganizing public sector

jurisdiction in California for local government workers. Ex. 10. The proposal covered public

sector locals except Locals 99, 1000, 2579, 1983, and a future childcare local contemplated to be

jointly affiliated with AFSCME. The key element of the International Union's proposal was a

map of the state with four regions designated by ovals running from north to south. The ovals,

often referred to during the hearings as "eggs" due to their shape, represented four regional

public sector local unions that the International Union proposed be established in lieu of the

existing arrangement of 19 separate local unions. The map was more of a framework than a

precise blueprint; the four regions were generally delineated, but at the periphery of each oval

there was some ambiguity. Two counties, San Francisco and Alpine, did not appear to fall within

any of the regions, while counties at the borders of the proposed new locals, such as San Joaquin,

Kern, and Riverside, appeared in two ovals. For purposes of this decision, we refer to the four

proposed regional locals as the Northern, North Central, South Central, and Southern regional

public sector locals.

Local representatives who testified at the hearings generally recognized the need to

consolidate small local unions and reorganize public sector jurisdiction along regional lines,

although there were different views expressed about the precise makeup of regional

configurations. Locals 2028, 660, 1997, and 715 explicitly or implicitly supported the four-local

model proposed by the International Union. Local 620 proposed a fifth local to be comprised of

three coastal counties (Santa Barbara, Ventura and San Luis Obispo) plus five Central Valley

counties (Tulare, Kings, Kern, Inyo and Mono). Local 700 endorsed this proposal, but added a

ninth county, Fresno, in a post-hearing submission. At the hearing itself, Local 700 proposed an

alternative Central Valley local consisting of Kern, Kings, Tulare, Fresno, Madera, Mariposa,

24

Merced, Stanislaus, and possibly also San Joaquin. In addition, Local 700's Executive Director, Ward Wollesen, testified that Inyo and Mono counties, on the eastern side of the Sierra Nevada range, would logically fit with Local 700's jurisdiction. Brother Wollesen stated the local's preference to be in a local representing other Central Valley counties rather than a local headquartered in Los Angeles or San Francisco.

Local 715 (Santa Clara and San Mateo counties) urged that San Joaquin County be placed in the North Central regional local, while Local 790 presented testimony from San Joaquin County members who desired to remain with Local 790. Local 817 (Monterey and San Benito counties) came out in favor of a single statewide local union for public sector workers, to be achieved in phases. Under Local 817's proposal, there would be an initial consolidation of public sector local unions into two regional locals, one in the north and one in the south. The northern boundaries of San Luis Obispo, Kern, and San Bernardino counties would be the dividing line between these two proposed locals. According to the proposal, presented by Local 817 Executive Director John Vellardita, these two locals would then be merged within five to seven years to form a single statewide public sector local. Local 949 (Marin County) proposed a Northern California provisional local covering the jurisdictions currently exercised by Locals 790, 616, 707, 1280, 614, 4988, and 1292. According to Local 949 Executive Director Kris Organ, this Northern California provisional local would encompass San Francisco, Alameda, San Joaquin, Calaveras, Tuolumne, Mono, and all counties north of those counties.

Locals 535 and 616 proposed three public sector locals. Local 535 Executive Director Damita Davis-Howard's description of the proposed Northern California provisional local was similar to Local 949's proposal, and included the members serviced out of Local 535's Oakland

and Sacramento offices, including the State Bar (a statewide employer), San Andreas Regional

Center (located in the South Bay), and Valley Mountain Regional Center (located in multiple

counties including San Joaquin and Stanislaus), as well as Local 535 members serviced out of

Local 535's San Jose offices that are located in Alameda County and north of San Mateo County.

Sister Davis-Howard further testified that the Central California local include all of the

jurisdictions currently represented by Locals 415 (Santa Cruz County), 700 (Kern, Tulare and

Kings counties), 715 (Santa Clara and San Mateo counties), 817 (Monterey and San Benito

counties), plus all Local 535 members serviced out of its San Jose office, with the exceptions of

members working in Alameda County and north of San Mateo County and the regional center

employees she listed as part of the Northern California local.  Local 535's proposed Southern

California public sector local would include all of the jurisdictions currently represented by

Locals 347, 620, 660, 998, 1997, 2028, and all Local 535 members serviced out of Local 535's

Pasadena, San Diego, and Santa Barbara offices.  This would include the counties of Los

Angeles, Ventura, Santa Barbara, San Luis Obispo, Riverside, Orange, San Diego, Imperial, and

San Bernardino.  Local 2028 Executive Director Ben Monterroso, while supporting the

concept, testified that Orange County should be added to the jurisdiction of the southernmost

local.

Only one local, Local 347, opposed fundamental changes to its current structure.

Representatives of Local 347, which represents about 12,000 municipal employees employed by

the City of Los Angeles and other cities in Los Angeles and Orange counties, took the position

that city workers have unique issues and interests and that city and county workers should not be

in the same local union.

26

Locals urged that various principles be adhered to in the course of our consideration of the public sector jurisdictional questions. Local 535 presented a comprehensive list of eight additional recommendations to guide SEIU during any reorganization. These were: the creation of new local unions rather than the merger of locals into existing local unions; the creation of an advisory body to assist with transition and implementation issues; ensuring operational continuity; creation of industry councils; restructuring of other SEIU bodies that support public sector locals in California; providing full employment for staff; allowing all members to vote on the hearing officers' recommendations; and preservation of the history and culture of the current public sector locals. Ex. 12. In addition, at the hearing, Sister Davis-Howard urged that, in consolidating existing local unions to create new entities, existing locals be moved in their entirety into the new locals, rather than being divided up and assigned to different regional locals. Tr. 130, 134-35.

Many of the suggestions of Local 535 were echoed by other locals. In particular, locals and members emphasized the need for members to vote on the reorganization plan, the importance of maintaining staff and offices in local communities where existing local unions maintain a presence, the necessity of honoring staff contracts, the benefits of establishing new ("provisional") local unions instead of merging locals into existing unions, and the importance of creating a member advisory committee charged with laying out democratic governance structures, dealing with dues, staffing and office location issues, and establishing statewide industry councils to bring together SEIU members doing similar work across regional locals.

27

### 2.    Proposals for Public Healthcare Workers Jurisdiction

One focus of the hearings was the question whether jurisdiction for employees in public healthcare facilities should go to public sector locals or to UHW. By "public healthcare workers" we mean employees of public hospitals, public nursing homes, and related facilities, including healthcare workers in clinics, prisons and health departments.

UHW President Sal Rosselli and other UHW representatives and members testified that, in general, public hospital workers belong in a local union focused on healthcare. Tr. 1938-78. Brother Rosselli stated that the common healthcare industry was more important than the common employer. UHW argued that hospitals form a distinct sector, with common legal requirements, managed care contracts, technology and clinical practices. UHW stressed that the care delivered and the work performed are the same in privately run hospitals as in public hospitals. UHW emphasized that, compared with other public employees, hospital workers are distinguished by the requirement for advanced education, licensing, certification and continuing education, the highly regulated environment in which they operate, exposure to toxic substances, infectious diseases, and higher rates of injuries, unique scheduling issues and unique staffing issues.

UHW noted that the counties' portion of funding was relatively small, ranging from 21.9% in San Francisco to 2.6% in San Joaquin County. UHW made the point that public sector healthcare workers identified themselves as healthcare workers first, and county workers second. Brother Rosselli pledged to bring the same high standards UHW has won for private sector hospital workers at systems like Kaiser to public hospital workers. UHW noted that many healthcare job classifications were common across the public and private sectors. UHW

28

representatives argued that UHW's knowledge of the healthcare industry and workplace issues common to all healthcare workers would be at the service of public hospital workers if they were in the same union – UHW.

While stating its general position that public hospital workers belong in UHW's jurisdiction, UHW also acknowledged that a county-by-county analysis was warranted, with the yardstick being a determination of which local could most effectively represent the interests of public healthcare members.  Brother Rosselli testified that, because public healthcare workers form a substantial portion of the membership of Local 660, and because Local 660 has done an excellent job in winning high standards for its public hospital members, Local 660 should retain jurisdiction for its public hospital members.  In a post-hearing submission, Brother Rosselli requested that UHW be granted jurisdiction for public hospital workers in Alameda, San Francisco, and Monterey Counties.  He argued for a case-by-case approach with respect to jurisdiction for SEIU members employed by public hospitals in other counties, and for employees of all public hospitals in which SEIU currently does not have membership, including all hospitals affiliated with the University of California, in the event that AFSMCE transfers those members to SEIU at some point in the future.

Brother Vellardita, on behalf of Local 817, testified in support of UHW's position.  He stated that Local 817 was not as well positioned as UHW is to win higher standards for workers at the public hospital in Monterey County.  Brother Vellardita testified that Local 817 lacked the knowledge of the industry that UHW has acquired through its representation of private sector hospital workers.  He emphasized that medical economics trumps the single employer – single

29

union approach because relationships with county officials cannot ultimately overcome the dictates of the healthcare industry market.

For its part, the Public Services Division took the position that public sector local unions should have jurisdiction for public healthcare workers. Tr. 1908-20. Assistant Division Director Tanner testified that placement of public hospital workers in public sector unions would promote industry strength, because public health workers and other public workers in the same community share the same employer, and community strength, because public health members work shoulder to shoulder with other public services workers to build safe and healthy communities. Brother Tanner pointed out that healthcare workers represent a substantial portion of the membership of public locals. He asserted that health services are just one of many types of services provided by county workers, including social services, public safety, property services, and transportation, none of which ought to be removed from the jurisdiction of public sector locals. He stressed that, because the county is the single employer for public healthcare workers and other employees of the county, placing these members in the public sector local is the only way to uphold the principles of "One Employer – One Union" and "Speaking with One Voice." Brother Tanner emphasized that major benefits for all county workers, including health insurance, pension, retiree medical, and vacation, tend to be the same for all workers, with the exception of public safety employees. He also stated that public sector locals will have the capacity and experience to carry out the political work at the state and federal levels that impact county government expenditures on public health needs.

The Public Services Division presentation also pointed out the practical difficulties of attempting to split off representation of public health workers from other county workers.

Brother Tanner explained that bargaining units for all but one county are cross-departmental. He remarked that, in unit determination decisions, the largest possible bargaining units are favored, with the goal of avoiding fragmentation and the proliferation of smaller bargaining units. Josie Mooney, Local 790's Executive Director, and other representatives and members of Local 790, echoed this proposition. Sister Mooney presented evidence that 33 job classifications in the San Francisco Department of Public Health were located in other City of San Francisco departments. Tr. 2077-78. She noted in particular Clerks, Transcriber Typists, Account Clerks, Health Care Billing Clerks, and Senior Telephone Operators, all of whom are covered by the same contract and are in the same bargaining unit whether inside or outside of the Department of Public Health (Ex. 53).

Similar testimony was given by Kristy Sermersheim, Executive Secretary of Local 715, Brother Wollesen on behalf of Local 700, Mark Kisselburg, an executive board member of Local 1997, and Annelle Grajeda and Steve Matthews, General Manager and Director of Health Operations, respectively, of Local 660. Tr. 1929-38, 2013-34, 2092-2100. Brother Matthews testified that Los Angeles County's workforce is highly integrated with many classifications of workers working in many different county departments, including the Department of Health Services ("DHS"). For example, according to Local 660, 20 of 22 Los Angeles County departments (including DHS) employ intermediate clerks, and 16 departments (also including DHS) have Warehouse Worker Aids. Nurses work in eight county departments in addition to DHS. The collective bargaining units and contracts covering these common job classifications span departmental lines. Local 660's official positions was that public healthcare units belong in public sector unions (Ex. 54).

31

Moreover, Brothers Wollesen and Kisselburg pointed out that it was unlikely that the

union could unilaterally remove healthcare workers from common bargaining units with other

county workers.  They stressed that the counties had an interest in the makeup of the bargaining

units and were unlikely to agree to the removal of these workers from the broader county units.

Grace Corse, a Registered Nurse and chair of the combined Los Angeles County RN bargaining

units for Local 660, testified that nurses identified with their fellow county employees and did

not wish to be divided from them in a separate local union.  Tr. 2039-41.  She asserted that RNs

benefited from the public sector locals' fight for safe staffing levels.  Other health care members

of Local 660 and 790 gave similar testimony.  Sister Grajeda emphasized that health care

members contribute greatly to the local membership as a whole, and also benefit from their unity

with other county workers in the local.  Brother Wollesen pointed out that the goal of creating

larger, effective regional public sector locals would be undermined by removing public health

workers, such as those who work for Kern Medical Center, from the public sector locals.  He

added that public health workers' pay and benefits are protected by the fact that they are currently

inextricably linked to the pay and benefits for workers countywide.

Further, Sisters Davis-Howard, Mooney and Fran Jefferson, Executive Director of Local

616, testified that at Alameda County Medical Center, Laguna Honda Hospital, and San

Francisco General Hospital, where multiple SEIU local unions represent employees of the same

employer, relationships among the local unions have been difficult, and bargaining coordination

has not always gone smoothly.  Tr. 2084-86.  Sister Mooney described two occasion on which

Local 790 and UHW took opposite positions on issues being discussed with the San Francisco

Department of Public Health.  Sister Davis-Howard noted that, frequently, the locals were

32

obliged to call in assistance from the International Union to referee disputes among the locals during contract negotiations. Tr. 2001.

The Public Services Division also contended that public health systems constitute a separate sector, as evidenced by the fact that public hospitals have their own association, called the California Association of Public Hospitals, which is separate from the association for private hospitals. Along these same lines, the Division stressed that public health systems have a fundamentally different mission than do their private sector counterparts: to provide indigent care and psychiatric emergency care, and to serve the entire community, irrespective of ability to pay. For instance, Brother Tanner testified that public hospitals provide 85% of the indigent care in counties where they operate and serve a patient population that is 76% people of color, despite the fact the public hospitals make up only six percent of California hospitals.

### 3.    Proposals for District Hospital Jurisdiction

Another issue to be resolved in this proceeding is jurisdiction for district hospital employees. Healthcare districts were created after World War II in California to address the problem of a shortage of hospital beds in the state. Healthcare districts are governed by elected boards. Most health care districts in California are purely public. Some have a two-board, district-private structure. In one or more of these cases the public board retains majority control of the private board. A minority of the district hospitals are affiliated with chains or managed by management companies. Examples of this are Oak Valley Hospital, managed by the Catholic Healthcare West chain, and Marin General Hospital, managed by the Sutter hospital chain.

District hospitals serve as safety net providers, including significant care for uninsured and underinsured residents. Healthcare districts are the chief source of inpatient, outpatient and emergency care to rural residents and residents in agricultural, fishing, mining and timber areas. There are 47 district hospitals, of which 31 are rural. Fifteen districts have hospitals operated by private companies. Eighteen districts provide health services but do not operate hospitals.

Some district hospitals have changed their governance from public to private. However, recent conversions in control of district hospitals have been from private to public. Examples are the creation of a healthcare district to rescue Alameda Hospital,[11] the leasing of Doctors' Hospital Pinole to the West Contra Costa healthcare district, and the switch in control of Palo Verde Hospital in Blythe from LifePoint Hospitals to the Palo Verde healthcare district.

County governments play an indirect role in the operations of healthcare districts and their hospitals. Counties approve the formation of the healthcare districts and appoint the first district board. County treasurers may act as the district treasurers and assess, collect and distribute property taxes to the districts. However, the districts have their own bonding and taxing authority to finance both operations and capital. Under California law, district hospital workers are considered public sector employees. They are covered by the Meyers-Milias Brown Act, the collective bargaining law for local government workers, and participate in public pension systems.

Healthcare districts are one type of special district, but there are others. Examples of other types of special districts are sanitary districts, water districts, recreation and park districts,

---

11  It was explained at the hearing that Alameda County Medical Center has a unique governance structure that does not precisely fit the district hospital or public hospital models.

34

and community services districts.  Public services locals represent workers at 68 special districts (not including education).  Public services locals organized 11 new special districts in the past five years.  There are approximately 4,300 healthcare district workers unorganized in SEIU targeted counties in California.

UHW and Local 817 argued that UHW should have jurisdiction for district hospitals. UHW emphasized that district hospitals, although nominally public, behave more like private sector hospitals and are beyond the control of local government officials.  Brother Vellardita added that Local 817 did not have the expertise in representing health care workers to win the highest standards for members at the district hospital it has organized (Hazel Hawkins Hospital), and asserted that UHW would be better placed to represent those members.

The Health Systems Division did not directly address the jurisdiction issue concerning district hospitals.  However, as discussed above, the Division's presentation made clear that the Division included the organization of district hospitals as part of its plan to organize the healthcare industry in California.

The Public Services Division, Local 715, and Local 1997 urged us to recommend that public sector locals be given jurisdiction for district hospitals.  Sister Sermersheim stressed that public sector entities like district hospitals belong in public sector unions.  In urging that public sector locals have jurisdiction for district hospitals, Brother Tanner underscored the difference between district and private hospitals in terms of mission, payer mix, and governance, and likened healthcare districts to other special districts whose employees are represented by SEIU local unions.

### 4.    Proposals for Southern California Education Jurisdiction

Local 99 Deputy Trustee Bill Lloyd requested that Local 99 be granted jurisdiction for education employees in the same geographical area as that covered by the South Central regional public sector local union. In a post-hearing submission, Brother Lloyd argued that the education employers form a separate sector of public employees that justifies a separate local union. Brother Lloyd stressed that Local 99 represents the lion's share of school employees in Southern California. He asserted that, with over 30,000 members, Local 99 has sufficient size to be an effective local union with adequate resources to organize more education employees and lift standards for those already represented. Brother Lloyd pointed out that, in addition to an anticipated agency shop campaign that should add 10,000 Los Angeles Unified School District ("LAUSD") Unit G workers to the ranks of fee payers or members, Local 99 is targeting LAUSD community representatives, and will focus on early education employees and workers in public and private charter schools. Brother Lloyd noted that a June ballot proposition, if passed, will make preschool available for all 4-year olds in California, and would result in thousands of new SEIU Local 99 members filling jobs that will be created by this initiative.

Brother Lloyd stressed that, unlike other local government employees, school employees are not covered by the Meyers-Millias-Brown Act. Instead, school employees are subject to the provisions of the Education Code and the Educational Employment Relations Act of 1976, which established collective bargaining in California's public schools and community colleges. He noted as well the unique set of players that shape policy and funding in the educations arena, including the California Teachers Association and the California School Employees Association.

36

5.    **Recommendations for Local Government Jurisdiction**

a.    **General Principles**

The current fragmentation of local government jurisdiction and representation is simply inadequate to meet the needs of SEIU members in the 21st Century. We must be bold and recognize the need to change ourselves and our union if we expect to stay ahead of the curve as government and industry change all around us. Our 600,000 California members should provide us with greater clout in improving their lives than we have thus far been able to bring to bear on the employers and political bodies with whom we must deal. At the outset of this discussion of public sector jurisdiction, we state an overriding principle: we need larger, stronger local unions in the public sector that can focus on growing the worker voice for workers within the jurisdiction of the Public Services Division, including the 100,000 developmental disabilities workers and 40,000 mental health workers in California. These new local unions are also needed to grow our traditional public worker presence in cities and counties in the conservative, fastest-growing areas of the state. In short, we are convinced that the time for significant change is now.

Accordingly, we recommend the creation of four new local unions with jurisdiction for local government employees. We find the proposal to combine 19 local unions representing public sector employees into one or two local unions to be overly ambitious as a first step. The melding of 19 different local union cultures, personnel, collective bargaining responsibilities, and political orientations into four local unions will be a major undertaking. As Bill Steck, Executive Director of Local 707, stated, we must be careful to do the job right. It may be that, at some point in the future, it will make sense to further consolidate our California public sector locals

37

into two or even one local union. For now, however, we recommend adopted of the "four egg" approach.

In this connection, we note that Locals 535 and 620 questioned the viability of a San Diego based local. Tr. 132-33, 189. It is true that a San Diego public sector local, even with the Local 535 members and jurisdiction in Imperial County, might not have the size and therefore the resources necessary to assure rapid expansion into the northern and eastern portions of the two-county area. However, given that San Diego is the second largest city in California, and that Imperial County is slated for growth, we think that, as of now, the prospect of a Southern public sector local based in San Diego and with jurisdiction in Imperial County is worth pursuing. As indicated below, however, we also recommend that this jurisdictional arrangement, like the others we recommend today, be revisited in the future so that a determination may be made whether these new regional public sector locals are organizing, growing, and engaging in political action at the high level we expect.

We agree with the suggestion of Brother Steck and Sister Davis-Howard to create what they each termed "provisional locals." By this we understand them to mean that new public sector unions should be chartered, as opposed to merging existing local unions into other existing locals. We agree that this will enhance the prospects for cooperation from all members and leaders of existing locals, and will provide a real opportunity for a fresh start in terms of developing local union structures that will meet the needs of our California members now and in the future for strong, resource-rich, democratic unions with expansive reaches into all parts of California.

38

Whether or not the creation of four regional locals leads to further consolidation along the lines proposed by Local 817, we think these new locals should closely cooperate with each other and share operations where possible.  For example, the new locals may be able to realize economies of scale and improve efficient delivery of member services by jointly carrying out "back office" administrative or representational functions.

From what we have said thus far it should be clear that we do not think a stand-alone municipal workers local union such as that urged by Local 347 makes sense.  Our experience in virtually every public sector union in California is that city workers and county workers are together in the same local unions, and that each group gives strength to the other.  For example, Local 715 represents over 1,500 municipal workers and nearly 11,000 county workers, and Local 620 represents about 1,200 municipal workers and over 2,200 county workers.  Representatives of public locals emphasized the benefits of combining the strength of municipal and county employees.  Matthew Nathanson, Acting President of Local 415, testified that there are many similarities in job classifications between city and county workers.  Tr. 682.  He also noted that the person "who is on the City Council may be the person who is on the Board of Supervisors tomorrow."

Moreover, Local 347's own experience demonstrates that it has grown in part by merging formerly independent associations into the local union.  These independent associations are far smaller than Local 347, but nevertheless decided that they could unite their strength with other public workers in a much larger organization and still retain a degree of local control.  There is no reason why the same cannot be true of Local 347 itself, which will be far larger in proportion to the new South Central regional local union than the independent associations were when

39

compared with Local 347 at the time they merged into Local 347. In addition, if our recommendations are adopted, Local 347, like other public sector locals, will have a seat at the table in drawing up the structure of the new regional locals.

If our recommendations are adopted, all existing SEIU public sector local unions in California except Locals 99, 1000, 1983, 2579, and the new SEIU-AFSCME joint childcare local union, will be consolidated into new local unions. This consolidation will include a substantial portion of the members of Locals 347, 415, 535, 614, 616, 620, 700, 715, 790, 817, 949, 998, 1280, 1292, 1997, 2028, and 4988. We agree with Sister Davis-Howard that it is vital to preserve in permanent form the proud history, achievements, cultures and traditions of these SEIU local unions. Accordingly, we recommend that the International Union establish a suitable archive or similar facility whose purpose will be to memorialize this history for the benefit of current and future SEIU members and activists.

### b. Geographic Jurisdiction

With respect to the contested questions of geographic boundaries for the new locals, we recommend as follows. Jurisdiction for San Joaquin County should be awarded to the Northern regional local union. Although that county is sometimes considered a part of the Central Valley, San Joaquin County employees are currently represented by Local 790, and to move them to the North Central local would split the public sector workers currently represented by Local 790 into two regional local unions, because the bulk of the Local 790 membership will go into the Northern local union.

40

Similarly, we do not think it makes sense for Kern County to be placed in the South Central local union. To do so would divide the members currently represented by Local 700 into two regional local unions, given that Kings and Tulare counties are placed in the North Central local union. Moreover, Brother Wollesen and Chuck Waide, Local 700's Supervisor of Field Services, made a convincing case that SEIU's Kern County members have much more in common with the Central Valley counties to the north than they do with the Los Angeles basin to the south. Tr. 489-91, 504-06. Besides being geographically separated from Los Angeles by the Tehachapi range, Kern County and its workers share a common culture and political orientation with Central Valley counties like Tulare and Kings.

We also do not recommend splitting up the Tri-County area identified by Walt Hamilton, Executive Director of Local 620, and Sister Davis-Howard. The Tri-County area consists of Ventura, Santa Barbara, and San Luis Obispo counties. Tr. 134, 187. Brother Hamilton testified that there is a historical tie among these counties. The central labor council covering these counties is known as the Tri-County Central Labor Council. There are also close ties between this area and Los Angeles. Los Angeles-based Local 99 has assisted Local 998, the Ventura public local, with school district bargaining. Tr. 316. Local 998's IHSS providers are being serviced by Local 434B, also headquartered in Los Angeles, and have recently voted to join that local. In addition, Local 660, another Los Angeles-based union, assisted Local 998 by training organizers and assisting with collective bargaining. Tr. 344. On the other hand, we do not perceive a strong connection between Santa Barbara and the Central Valley counties. These are some of the factors that lead us to conclude that the coastal Tri-County area is more appropriately placed in the South Central regional local.

In addition, we are convinced that the South Central regional local should have jurisdiction for Orange County. Orange County forms an essentially unbroken greater metropolitan area with much of Los Angeles County. Except for a small strip to the south, it is surrounded by jurisdictions that will be in the South Central local (Los Angeles, San Bernardino and Riverside counties). Locals 347 and 660, both based in Los Angeles, already represent workers in Orange County. Former Orange County Local 787 merged into Local 660 and became Chapter 787 of Local 660, with an office in the county. Tr. 344. By contrast, Local 2028, which is seeking jurisdiction for Orange County, does not represent workers in the county and has no offices there.

Finally, we recommend that Regional Center employees be assigned to the regional public local where the employees work. The particular statewide concerns of these employees can be the subject of an industry council uniting similar workers across regional lines.

We therefore recommend the following geographic jurisdiction for these four local government local unions, together with the recommended mergers of public sector workers in existing locals into each new regional entity, as detailed below. The names we use here for the new locals are for purposes of this report only and we are not recommending that the IEB adopt these particular designations.

**Northern Regional Public Sector Local:** Jurisdiction for public sector workers in the counties of Del Norte, Siskiyou, Modoc, Humboldt, Trinity, Shasta, Lassen, Mendocino, Tehama, Plumas, Glenn, Butte, Sierra, Lake, Colusa, Sutter, Yuba, Nevada, Sonoma, Napa, Yolo, Sacramento, Placer, El Dorado, Amador, Marin, Solano, San Francisco, Contra Costa, Alameda, San Joaquin, and Calaveras. We recommend the merger into this new local of the

public sector units, excluding IHSS workers, of Locals 535 (Northern workers only), 614, 616, 707, 790, 949, 1280, 1292, and 4988. In addition, public employees represented by UHW and Local 790 who work for San Francisco International Airport should be merged into the Northern regional local.

**North Central Regional Public Sector Local :** Jurisdiction for public sector workers in the counties of San Mateo, Santa Cruz, Santa Clara, Santislaus, Alpine, Tuolumne, Mono, Monterey, San Benito, Merced, Mariposa, Madera, Fresno, Kings, Tulare, Inyo, and Kern. We recommend the merger into this new local of the public sector units, excluding those in district hospitals, of Locals 415 (also excluding IHSS workers), 535 (North Central workers only), 700, 715 (including IHSS workers), and 817 (also excluding IHSS workers).

**South Central Regional Public Sector Local:** Jurisdiction for public sector workers in the counties of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, San Bernardino, Riverside, and Orange. We recommend the merger into this new local of the public sector units of Locals 347, 535 (South Central workers only), 620, 660 (excluding Los Angeles Office of Education employees), 998, and 1997 (excluding district hospital workers).

**Southern Regional Public Sector Local:** Jurisdiction for public sector workers in the counties of San Diego and Imperial. We recommend the merger into this new local of the public sector units of Locals 535 (Southern workers only) and 2028.

Many public sector locals and members voiced their desires for a process to allow member and leader input concerning the structure of the regional locals. We agree with these concerns, and accordingly we recommend that the International President appoint a broad-based member advisory committee on the public sector reorganization. The committee should be

43

charged with developing a proposed structure for the regional public local unions, as well as proposed industry councils that would operate across regional lines. The committee should develop a plan for transitional continuity and governance. The committee's work should be driven by the following set of core principles:

- Regional locals should have similar structures

- Structure must facilitate growth

- Structure should dramatically increase member participation

- Structure should enable the delivery of enhanced member services

- Implementation plan should provide for new leader and staff development

We recommend that the committee's work be concluded no later than six months and that a plan be submitted to the undersigned hearing officers for review and approval prior to submission to the International President by the end of 2006.

### c.  Jurisdiction for Public Healthcare Workers

We further recommend that the new regional public sector local unions have jurisdiction for public healthcare employees, including public hospital workers and public nursing home workers. We are not persuaded that it makes sense to divide workers of a single employer into multiple local unions. Such a course would run counter to the principle we have adhered to in countless jurisdictional matters of uniting workers of a single employer in a single union to build power for our members and to enable us to speak with one voice. The mixed results we have had in San Francisco and Alameda County with multiple unions representing employees of a single public employer further suggests that we need to try another approach. By eliminating

44

fragmented local union representation of employees of the same employer, we will be able to speak with one voice on behalf of our members at these facilities.

We are not convinced that stripping out public healthcare workers from multi-department county-wide bargaining units is achievable, practicable or desirable.  In fact, legal and administrative constraints on fragmentation of bargaining units could make this a risky maneuver without clear benefits to the members.

We recognize the special mission of the public health sector.  We think that the public sector regional unions will be in the best position to deal with county employers on the issues facing county public health workers.  Many of these issues cut across departmental lines and affect other county workers as well.  We want to see a structure that permits public health care workers to fully benefit from efforts made on behalf of other county workers, and also to make their own contributions toward winning higher standards for their brothers and sisters in other departments of local government.

We are also mindful of the Herculean task the Health Systems Division has given UHW: organizing over 40,000 private sector and healthcare district employees into SEIU.  Accomplishing this far-reaching goal will require tremendous resources, focus, and dedication from UHW, and falls squarely within its core jurisdiction.  No other SEIU local union in California is attempting to nor has the capacity to organize private sector healthcare workers.  We think that UHW needs to concentrate on this primary goal, and that our recommendation regarding jurisdiction will help it do just that.

If our recommendation is adopted, new regional public sector locals will exercise jurisdiction for public healthcare workers within their respective geographies.  This includes

45

public healthcare workers currently represented by existing public sector local unions, and workers currently represented by UHW at San Francisco General Hospital, Alameda County Medical Center ("ACMC") (including the public acute and psychiatric hospital and clinics and public nursing home), and the Laguna Honda Hospital public nursing home. These units should be merged into the Northern regional public local. We suggest one exception to assignment of public health members to the regional public locals. UHW represents workers at Tuolumne General Hospital. No other SEIU local union represents workers at this hospital, and there was no testimony offered concerning this facility. The Public Services Division should gather information concerning Tuolumne to evaluate whether and how it fits in with the Division's strategic goals. For the present, these workers should remain in UHW, subject to later review.

### d.    Public Sector Registered Nurses

Based on the testimony given by public sector registered nurses, we think RNs demonstrated a strong identification with the special, public mission of the public health care populations with whom they work, as well as an appreciation for the work of other healthcare workers and an understanding of the significant role registered nurses can play in a unified healthcare local union. We recommend that the new regional public sector locals have jurisdiction for the public sector registered nurses, just as current public sector local unions like Local 790 have jurisdiction for public sector registered nurses. We also recognize that RNs play a critical role in leading the public health care team. Accordingly, we make specific recommendations on RN structures both within and outside the new regional local unions.

46

We recommend that each regional local have dedicated staff to help coordinate and lead the nurse program work within the new public locals. Each regional local should also have a designated nurse leader with responsibility for overseeing the development and implementation of the nurse program within the local. We further recommend that each regional local representing RNs have proportional representation on the steering committee/leadership group of the Nurse Alliance of California. This will enable public sector RNs to have a strong voice in matters of legislation, policy, standards and bargaining that cut across regional lines. We think such representation will promote the RN identity within the public sector regional locals, including the occupational and professional issues of public sector RNs.

To ensure that public sector RNs have a significant role in the development of statewide initiatives of interest and benefit to the profession, we also recommend that two co-chairs of the Nurse Alliance of California be created, and that one co-chair be reserved for a representative of public sector RNs, and the other for a representative of private sector RNs. Due to the high density of public sector nurses in California and the critical role that California nurses play in leading on quality, patient care issues, we also recommend strengthening the public sector RN voice at the national level by adding an additional public sector RN representative to the national Nurse Alliance leadership group.

Further, we recommend that a representative of public sector registered nurses serve on the member advisory committee referenced below, so that registered nurses will have a role in the design of the regional public sector unions that will be created if our recommendations are approved.

        e.        **Ancillary Public Sector Jurisdiction**

47

In addition to their core jurisdictions, public sector local unions also represent employees of private sector employers, such as bookstores, contracted national park employees, and non-public airport workers (other than contracted airport workers and security personnel), that don't fall into any of the SEIU industry divisions. Locals 535 and 790 are examples of public local unions with such members. We recommend that the regional public sector unions retain jurisdiction for these ancillary units.

### 6. Jurisdiction for Private Non-Profit Agency Employees

Consistent with our recommendation that the new regional public services local unions absorb the jurisdiction for public sector workers from existing public sector local unions, we also recommend that the new regional locals have jurisdiction for employees of publicly-funded private non-profit agencies. Such agencies are prevalent in the delivery of services to developmentally disabled and mental health clients. The new regional local unions should also have jurisdiction for privately-funded non-profit agencies that deliver social services, such as Planned Parenthood and the Red Cross.

### 7. Jurisdiction for District Hospital Employees

The evidence regarding district hospitals demonstrated that they are a true hybrid. Although district hospitals are clearly public entities, they often behave like private sector hospitals. County government does play a role in the establishment and operation of district hospitals, but that role is limited. Some healthcare districts hire a private company or chain to manage the district hospital; other district hospitals are directly managed by elected boards. And

48

some even have a combination of public and private governance. To make matters even less clear, several hospitals have passed from private to public governance, or vice versa. District hospital workers confront many of the same challenges as other hospital workers, but this does not further the claims of either the public sector locals or UHW, because both represent, and will continue to represent, hospital workers.

We believe that the evidence does not warrant a blanket grant of jurisdiction to either public sector locals or UHW for organizing unorganized district hospitals. Instead, we recommend that UHW and the public sector locals share jurisdiction for the unorganized district hospitals, and that a case-by-case approach govern the award of specific organizing rights, with the right to organize a particular district hospital determined by division strategic growth goals in the area. We further recommend that proposals to organize particular district hospitals be submitted to the directors of both the Public Services Division and the Health Systems Division for approval. Any disagreement between the divisions regarding a grant of organizing rights with respect to a district hospital should be resolved by the International President.

Division strategic organizing imperatives are less significant with respect to El Camino district hospital in Santa Clara County and Hazel Hawkins district hospital in San Benito County, both district hospitals that have already been organized. While the case is a close one, we recommend that, on balance, the private-sector behavior of these two district hospitals argues for UHW to represent the members at El Camino and Hazel Hawkins, and that merger with UHW would strengthen the hand of these workers given their particular circumstances. As discussed above, workers at Alameda County Medical Center should be merged into the Northern regional public local.

49

### 8.    Jurisdiction for School Employees

We agree with Local 99 and Local 535 that Local 99 is large enough to be a self-sustaining local union focused on the education sector. In addition, we recommend that Local 99 be granted jurisdiction for all education employees in the same geographic area covered by the recommended South Central regional public sector local, namely, Los Angeles, Ventura, Santa Barbara, San Luis Obispo, San Bernardino, Riverside, and Orange counties.[12]

We think that the particular statutes and policies governing education in California make a separate schools local feasible in Southern California. By "education employees," we mean Head Start, K-12, county office of education, and community college employees. With one exception (noted below), all such employees represented by current public sector local unions in the counties listed above should be merged into Local 99 as soon as feasible. These include employees of the Santa Monica school district and the Los Angeles County Office of Education currently represented by Local 660, Pleasant Valley School District workers in Local 998, and Ventura Community College members represented by Local 535. Due to legal restrictions on school employees and supervisors being in the same certified union, jurisdiction for LAUSD school supervisors represented by Local 347 should be transferred to the new South Central regional public local.

---

12  In his post-hearing submission, Brother Lloyd requested jurisdiction for Kern County education employees. However, if our recommendations are adopted by the IEB, the South Central public local will not have jurisdiction for Kern County. Accordingly, Local 99 should not have jurisdiction for Kern County school employees. Rather, these employees should be in the jurisdiction of the North Central regional local.

9.    **Jurisdiction for Employees of the State of California
and the California State University System**

In contrast to the multiplicity of local unions representing local government workers, only one SEIU local union, Local 1000, represents employees of the State of California. Accordingly, we have no occasion at this time to recommend any changes. We note that Local 1000 needs to adhere to the 20% organizing budget mandate set forth in the SEIU Constitution and Bylaws. In this connection, Local 1000 should submit an organizing plan to the Public Services Division for approval.

Local 1000 is an affiliate of the California State Employees Association ("CSEA") along with Local 2579, which represents classifications of non-faculty employees of the CSU system. The CSU system is governed by an independent Board of Trustees. Tr. 1119. At the hearing on CSU jurisdiction, Local 2579 President Pat Gantt requested jurisdiction for private sector employees of CSU foundations. Tr. 1115. Brother Gantt testified that there are nearly 35,000 employees working for 80 foundations throughout the CSU system. Half of the foundations are student-run, and those account for 7,500 employees. Fifteen hundred employees are performing work substantially similar to bargaining unit work being performed by CSU employees. Yet, only 70 foundation employees are currently represented.

We agree that it makes sense for Local 2579 to have jurisdiction for the CSU foundation employees, except for jurisdiction already granted to SWU, provided that Local 2579 develops and submits to the Public Services Division for approval a detailed plan for implementing the 20% organizing budget requirement. This plan should be submitted jointly by Local 2579 and

51

California Faculty Associates, Local 1983, the SEIU local union that represents CSU teaching faculty.

Both Local 1983 and Local 2579 represent CSU employees across the state. Some of the CSU campuses are far from urban centers. Accordingly, we recommend that these two CSU locals intensify their coordination and cooperation to the maximum extent possible. We recommend that, wherever possible, Locals 1983 and 2579 coordinate bargaining and share office space and staff. Ultimately, we think that these two locals, representing employees of the same employer, should voluntarily discuss maximizing coordination.

**B.    Jurisdiction for Long-Term Care Workers**

     **1.    Proposals for Long-Term Care Reorganization**

          **a.    The Statewide Model**

According to the testimony of Brothers Kieffer and Barton on behalf of the Long-Term Care Division, local elected leaders in the Division from across the country have concluded that long-term care is a distinct industry within healthcare uniquely dependent on state Medicaid programs for funding. Tr. 1121-36, 1979-91. Therefore, the Division believes that the most logical geographical model for organizing and collective bargaining strength in the Long-Term Care Division is a single statewide local union for long-term care workers in each state.

Brothers Kieffer and Barton stressed that it is important to concentrate members' political power at the state level because the state Medicaid program is the most important funding stream for long-term care workers. They added that uniting all employees of statewide and national nursing home chains and homecare entities is best done in a single statewide local union. The

Division representatives emphasized that large scale organizing and bargaining campaigns require large scale resources, and that overcoming wage and benefits variations within a state is best accomplished by unified statewide approaches.

Brothers Kieffer and Barton explained that, in California, there are 90,000 unorganized nursing home workers, 70,000 unorganized home health care workers, and 46,000 unorganized employees of assisted living facilities and comprehensive care campuses. Uniting these 206,000 long-term care workers into SEIU will require focus, concentration, resources, and speaking with one voice.

The Division presentation highlighted SEIU's organizing successes among long-term care workers. Over the last decade, long-term care representation in California grew from less than 10,000 members to almost 240,000.[13] Of these, Local 434B organized at least 107,000 and UHW organized at least 43,000. In 2005, SEIU organized 18,710 new long-term care workers in California. Local 434B organized 18,494 of those new members, and UHW organized 292. In 2005, Local 434B and the Division devoted considerable resources to achieve that result. Future organizing is tied to the private sector in nursing homes, homecare agencies and senior housing sectors that are still subject to state politics.

Brothers Kieffer and Barton pointed out that the nursing home industry is a national and statewide industry. There are 1185 nursing homes in California. Twenty-two firms control 450 facilities and most operate in both Northern and Southern California. Multi-facility operators run 90% of the state's nursing home facilities. Many of the largest California operators are also the

---

13  This corrected figure was supplied in a post-hearing submission from the Division.

largest national companies that bargain with other SEIU locals in other states. SEIU bargains with most statewide operators at a statewide table.

The Division believes that nursing home membership growth requires a statewide strategy. SEIU is engaging in joint political work with a majority of the large chains to help the industry win more funding to enable raising standards for industry workers. Through such statewide efforts we have won organizing rights at 120 facilities, with 50 organized to date. Our work on accountability campaigns is statewide in scope. And Medi-Cal, the California Medicaid program, pays nursing home fees for 65% of all nursing homes residents.

In homecare, county-based strategies were initially important in organizing the industry and setting standards. However, today, county-based strategies are less important in organizing and contract bargaining, based on three factors: 1) Medicaid funding decisions are made in Sacramento, 2) IHSS public authorities are now mandated, and 3) all IHSS workers are organized. Between 1999 and 2004, our political successes in Sacramento have reduced the county share of IHSS funding from 66% to 17.5%, and increased the state share from 0 to 32.5%.

The Division explained that a county-based strategy will not address IHSS wage disparity across the state. The highest paid IHSS workers earn $3.75 an hour more than the lowest paid IHSS workers for doing exactly the same work. Wage variations for nursing home CNAs is $5.83 per hour. Yet Medicaid is the biggest funder for IHSS workers and nursing home workers, and is controlled in Sacramento. And wage standards for IHSS workers cannot be explained by the alignment of county bargaining. Whether or not the same local union represents IHSS providers and county employees, wage rates are determined by the poverty rate and local labor rates.

Brothers Kieffer and Barton asserted that the collective political strength of the union statewide is what is most important in addressing current and future challenges in homecare and nursing homes. These two facets of the industry are inextricably linked, according to the Division. They are part of the continuum of long-term care and share the same Medicaid funding source which is controlled at the state and federal levels. Brothers Kieffer and Barton asserted that battles for future growth in the industry must be fought at the state level, including defending the Medicaid program from repeated assaults by politicians, influencing state contracts with managed care organizations that contract with long-term care providers, and using our political strength to increase the pace of organizing in nursing homes and senior housing. According to the Division, for a local union to efficiently and effectively manage statewide issues and strategies, long-term care members should be its sole priority, providing a single voice representing long-term care members across the state.

Local 434B supports the concept of a single local union with jurisdiction for all long-term care workers in California. Tr. 1344-94, 2102-27. Local 434B President Tyrone Freeman testified that Local 434B understands the particular needs and concerns of long-term care workers because it represents only long-term care workers in California. Brother Freeman stressed that Local 434B is already a statewide union, representing nearly 180,000 long-term care workers in every geographic area of the state. Brother Freeman agreed with the Division testimony that a statewide strategy will be necessary as we move to address the needs of long-term care workers at the bargaining table and in Sacramento. He cited a 2002 court ruling that IHSS "is a comprehensive program, comprehensively regulated by the state." He pointed out that SEIU local leaders representing homecare workers have endorsed a united strategy by signing the

55

California Homecare Council agreement providing for a unified approach to bargaining standards and legislative initiatives. Brother Freeman chairs the Council. He also detailed the many programs offered by Local 434B designed solely for long-term care workers, such as a scholarship program, a housing corporation, and various training programs.

In post-hearing submissions, Sister Jefferson, on behalf of Local 616, supported the statewide model advanced by the Long-Term Care Division and the Division's rationale for that model. Sister Jefferson concluded that only Local 434B, as the SEIU local union with the largest long-term care membership and a statewide presence, is in a position to carry out the statewide model. Local 616 stated that, in the event immediate consolidation of all long-term care members into Local 434B is not feasible, those IHSS workers in public sector local unions should be consolidated with Local 434B now, and UHW's long-term care units should be merged after a transition period. UHW and Locals 707, 817, 715, and 1280 opposed a statewide model that would unite all long-term care workers in Local 434B.

### b.    The North/South Model

On behalf of UHW, Brother Rosselli stated that, in principle, a single local union representing all healthcare workers, including long-term care employees, was the preferred model. Brother Rosselli argued that long-term care workers are healthcare workers, and therefore all California long-term care workers should be united in UHW. However, acknowledging the complexity of the issue, Brother Rosselli proposed that UHW be granted jurisdiction for all IHSS workers and nursing home workers in Northern California, and that Local 434B be granted jurisdiction for these workers in Southern California. Tr. 1256-64. UHW

further proposed that it be granted jurisdiction for all private sector homecare workers in the

state.

In proposing a partnership between UHW and Local 434B, Brother Rosselli emphasized

the successes realized by both local unions on behalf of long-term care workers. Brother Rosselli

stressed that Local 434B and UHW were already working together in the nursing home sector

with coordinated bargaining, political work, and organizing support, and in the homecare sector

in the California Homecare Council and the California United Homecare Workers Union. He

pointed out that, together, UHW and Local 434B have organized and represent the vast majority

of unionized long-term care workers in California. Brother Rosselli further asserted that UHW

and Local 434B have the resources, depth of industry knowledge and vision necessary to address

the challenges of the future. He detailed UHW's plans to organize private sector home health

workers, nursing home workers, and employees of senior living facilities. In a post-hearing

submission, Brother Rosselli presented additional materials and arguments in favor of a UHW

434B partnership in the representation of convalescent workers. The North/South model was

also endorsed by Local 817. Tr. 1184-85, 1195. Local 616 opposed the North/South model

### c.    The Public Sector Model

Several public sector locals advanced the proposition that all jurisdiction for homecare

workers should be granted to the new public sector locals. Under this scenario, homecare

workers represented by UHW and Local 434B would be assigned to the new regional locals, as

would homecare workers currently represented by existing public sector locals. In addition, the

regional public sector locals would have responsibility to organize the private sector non-hospital

owned homecare agencies. Ex. 34. In support of this approach, Sister Sermersheim, on behalf of

Local 715, testified that counties continue to play an important role in the determination of wages

and benefits for homecare workers. Tr. 1208-31. She argued that the county is the employer of

record for both traditional county employees and IHSS workers. She maintained that counties

contribute to the funding of IHSS programs, and that the county must pay 50% of the cost of

raising IHSS workers' wages beyond $10.50 per hour and healthcare benefits higher than $.60

per hour, whereas the state pays zero. Sister Sermersheim pointed to the important gains made

by public locals on behalf of homecare workers. She added that county unions have the political

clout at the county level to increase standards for IHSS workers. Local 715 Vice President

Christine Walters requested that, if the Local 715 IHSS workers could not stay in a public sector

local, they preferred to merge with UHW. Tr. 1250.

Local 1280 Executive Director Art Grubel supported the public sector model in additional

comments filed following the hearings. Brother Grubel stressed that, until the state takes over

administration of the IHSS program, a county-by-county approach will yield more results for our

IHSS members. He stated that, based on political obstacles to achieving state administration

through legislation or the initiative process, and expected opposition from advocates for the

elderly and the disabled, state administration of the homecare program is unlikely to be achieved

anytime soon. Locals 415 and 707 also support the public sector model. Tr. 1204-08, 1325-32,

1343.

As an alternative, Brother Grubel identified what he termed a "modified status quo"

approach. Under this concept, UHW and Local 434B would continue to represent homecare

workers in the counties where they already have jurisdiction. The new regional public sector

locals would absorb homecare jurisdictions from the existing public sector unions currently
representing homecare workers in each region.  UHW and Locals 434B, 616 and 817 oppose the
public sector union option.

### 2.    Recommendations for Long-Term Care Workers

There is no doubt that the long-term care sector is a distinct industry.  Institutionally,
SEIU has recognized the unique attributes and requirements of this industry and its workers
through the establishment of a Long-Term Care Division, separate from the Health Systems
Division, which encompasses acute care and related facilities.  The record persuasively
demonstrates that the long-term care industry is characterized by state and national employers
and that a statewide strategy is imperative if we are to effectively deal with the key industry
players on behalf of current and future members.  The record also establishes beyond dispute that
all facets of the industry – homecare, skilled nursing care, and senior living – are linked as part of
the continuum of supportive services for the infirm, with related workplace issues, employee skill-
sets, payer mixes and clients who go from one setting to another.  We are convinced that, to raise
standards for long-term care workers, a unified approach on the statewide level is the optimum
choice.  No other option has the prospect of successfully addressing the current county-by-county
disparities that exists among California homecare workers.  Along with the Division, Local
434B, the SEIU local union with the largest contingent of long-term care workers, agrees that
uniting long-term care workers in one union makes the most sense.  The North/South approach
not only violates this concept; but, by the logic of UHW's single healthcare union model, the
entire Southern California hospital membership of UHW would need to be moved to Local

434B.  This would essentially undo the consolidation of Locals 399 and 250 that was just completed in 2005.

The county-based model of homecare work made sense when we were organizing the IHSS public authorities, and when county funding for IHSS providers was paramount.  Now that all California IHSS workers are in unions, and state funding has become dominant, the county-by-county approach no longer meets the needs of our homecare membership.

SEIU locals have already taken steps in the direction of unifying our approach to the organization and representation of California long-term care workers.  For example, as members of the Joint Organizing Partnership, Locals 707, 614, 1280 and 616 already pool their resources. In addition, through the California Homecare Council, local unions representing homecare workers coordinate bargaining strategies, uphold standards, determine policy goals, attempt to speak with one voice to coalition partners, and jointly plan legislative strategies.  However, we need to go much further in unifying our efforts if we hope to realize our goals of organizing and lifting up all California long-term workers.

Accordingly, we think that, ideally, uniting long-term care workers in one union makes the most sense.  We also believe that, to really win for long-term care workers, that local union should focus solely on the particular needs of those workers.

In proposing a structure for representation of long-term care workers, we are mindful of the principles enunciated by Sister Davis-Howard concerning the benefits of beginning anew with newly-chartered unions that can organize themselves along the most effective lines, irrespective of the old bureaucratic structures of our existing unions.  Sister Davis-Howard's request that we recommend the creation of new local unions, rather than the merger of SEIU-

60

represented units into existing local unions, focused on the question of how we can best reorganize our public sector jurisdictions in California. However, we find her concerns equally applicable to the long-term care setting. We therefore recommend that a new local union be chartered to focus solely on our long-term care members.

We turn now to the question of the precise plan of consolidation for this new local union. Our recommendations are as follows: First, homecare workers currently represented by Local 434B and our existing public sector unions should be merged into the new long-term care local, with one exception.

The exception we recommend concerns the North Central regional local union. That proposed local has a large geography stretching from San Mateo, Santa Cruz and Monterey counties in the west to Mono and Inyo counties in the east, and from Stanislaus and Tuolumne counties in the north to Kern County in the south. The placement of all IHSS workers in this geography in a long-term care local would leave this local with the smallest membership base by far among the three regional locals with significant geographical sweep: according to the estimates of the International Union, the North Central regional local would have under 35,000 workers, compared with over 51,000 in the Northern region and 91,000 in the South Central region. The Southern region would have less than the North Central region, but the Southern region has a compact geography encompassing just two counties: San Diego and Imperial. We are concerned that, given the extensive territory to be covered and the increased number of collective bargaining agreements to be negotiated by the North Central local, the projected membership without homecare workers may not be sufficient to assure growth and representation at the levels we expect.

61

Accordingly, we recommend that, for the present, the IHSS workers currently in Local 715 be placed in the North Central regional local union, which would bring the anticipated membership in that local up to about 45,000. Based on these recommendations, the IHSS units in Locals 415, 434B, 614, 616, 707, 817, and 1280 should be merged into the new long-term care local union.

Second, the private nursing home units represented by Locals 434B and 2028 should be consolidated with this new long-term care local. Third, all private sector homecare workers represented by Local 434B should change their affiliation to the new long-term care local union. Fourth, Local 415's unit of Sunshine Villa workers should be merged into the new local. If this recommendation is adopted, we will have two local unions representing nursing home workers in the state: the new long-term care local union and UHW.

We further recommend that, for the present, UHW continue to represent its current private sector homecare workers, IHSS workers and nursing home workers. This recommendation is based on the large number of nursing home and IHSS workers currently represented by UHW and the difficulties that would be posed by removing these members from UHW.

If this recommendation is adopted, we will have three local unions representing homecare workers in the state: the North Central regional public local, the new long-term care local, and UHW. We recognize that this determination may not be the optimum solution in the long run. While three locals representing homecare workers is an improvement over the current fragmented structure, by its very nature this structure is not as compatible with the notion of speaking with one voice as a single long-term care local union would be. For this arrangement to

62

work well, the locals should closely coordinate their homecare activities within the California Homecare Council. The Long-Term Care Division should propose to the International President any changes in the structure of the Council which the Division deems advisable in light of the changed makeup of the Council resulting from our recommendations.

Our recommendation with regard to representation of private nursing home workers will, if adopted, result in two unions representing SEIU nursing home members: the new long-term care local and UHW. As with the recommended homecare representation model, this split representation approach is less conducive to speaking with one voice than would be the case with a unified structure. To address these concerns, we recommend that the Long-Term Care Division determine the appropriate vehicle to foster coordination and growth. One possible approach could be the creation of a unity council for private sector nursing home workers. Article VIII, Section 1(f) of the SEIU Constitution and Bylaws, adopted at the 2004 Convention, empowers the International President to require coordinated bargaining and contains new language authorizing industry divisions to propose to the International President structures, procedures and financing for coordinated bargaining.

The homecare council and any structure developed for coordination of our efforts on behalf of nursing home workers should take the lead in advancing coordinated bargaining, legislative, and political goals for SEIU's California long-term care members. We recommend that the locals with nursing home and long-term members be part of the appropriate council or other body and be required to abide by decisions and participate in programs of these vehicles of coordination.

63

Rather than recommending a grant of exclusive jurisdiction to the new long-term care local, UHW, or the North Central public sector local, we propose that authorization to organize long-term care facilities be determined by the Division, subject to approval by the International President. These determinations should be based on the locals' organizing strategies and the ability to win higher standards for our long-term care members in a given location. We recommend that, pending issuance of the Division's organizing plan for California long-term care workers, local unions be required to submit specific organizing proposals to the Division for approval, and that all organizing proceed in the name of the International Union.

We further recommend that the effectiveness of this reorganization be evaluated by the Division in the future to determine what changes may be warranted. The Division's analysis should focus on the success of the existing model in 1) helping to raise standards for homecare workers 2) helping to organize the long-term care industry, broadly defined, and 3) permitting UHW and the North Central regional public local to organize their core jurisdictions of private sector healthcare workers and public sector workers, respectively.

Consistent with our recommendations for public sector jurisdiction, we recommend a process for development of the structure of the new long-term care local. Accordingly, we recommend that the International President appoint a member advisory committee on long-term care reorganization. The committee should be charged with developing a proposed structure for the new long-term care local. The committee should develop a plan for transitional continuity and governance. The committee's work should be driven by the following set of core principles:

- Structure must facilitate growth

- Structure should dramatically increase member participation

64

- Structure should enable the delivery of enhanced member services

- Implementation plan should provide for new leader and staff development

We recommend that the committee's work be concluded no later than six months and that a plan be submitted to the undersigned hearing officers for review and approval prior to submission to the International President by the end of 2006.

### C.    Jurisdiction for Private Hospital Workers Represented by Public Locals

Local 4988's private hospital units are in chains whose employees elsewhere in the state are represented by UHW. UHW plainly has the expertise, leverage and chain-wide strategies to win for these workers. Local 4988 requested that its relationship with Local 790 remain unchanged. However, if our recommendations are approved, Local 790 will be merged into a new regional local union. Accordingly, we recommend that Local 4988's private sector healthcare units merge into UHW. In addition, the affiliation of private healthcare units represented by Locals 707, 715, and 2028 should be changed to UHW as soon as feasible.

Local 121RN, which represents about 7000 private sector nurses and professionals in Southern California, seeks jurisdiction for Kaiser nurses and professionals in Southern California currently represented by Local 535. Tr. 1992-96. However, not all of Local 535's Kaiser units are in Southern California, and one is a unit of technical employees. We therefore recommend that Local 535's Kaiser units be merged into UHW as soon as feasible. UHW already represents SEIU members in the Kaiser system and is the principal SEIU local union in the Kaiser bargaining council. As such, it is the logical local union to exercise jurisdiction for these Kaiser employees.

65

**D.**     <u>**Jurisdiction for Property Services Division Members**</u>

On behalf of the Property Services Division, Brother Iny described the trend across SEIU toward consolidation of smaller local unions into larger unions focused solely on property services members. In New York City, Locals 32E, 531, 54 and 2 merged into Local 32BJ in March 2001. In 2005, Local 36 (Philadelphia) merged into Local 32BJ. And in 2006, Local 82 (Washington, D.C.) united with Local 32BJ. Working together in New York City has recently led to displaced worker protection, card check and neutrality for Brooklyn waterfront redevelopment, coordinated bargaining and the maintenance of fully paid health insurance for New York City members, and growing the union by 4,000 including suburban markets like New Jersey. In Chicago, Locals 25, 73 and 236 merged into Local 1 in 1999. In 2002, Local 1 merged with Local 50 (St. Louis), Local 96 (Kansas City), and the property services part of Local 150 (Wisconsin). Working together in Chicago has recently led to health insurance for suburban and contracted public sector security, and organization and increased standards for suburban contracted school janitors, helping to raise standards for public sector cleaners. In addition, property services members in Local 79 (Detroit), Locals 508 and 585 (Pennsylvania), and Locals 47 and 85 (Cleveland) have united in Local 3, a tri-state property services local.

Mike Garcia, President of Local 1877, testified that we are not at the point yet in California of being able to unite all property services workers in a single local union. Instead, as the next step toward uniting California property services workers, Brother Garcia and the Division proposed the creation of a California Property Services Council to bring together all California property services local unions to facilitate coordinated bargaining, help plan and implement strategic organizing campaigns, and enhance communications among local unions

66

representing similar employees.  Local 265 supported this proposal.  We agree that a California

Property Services Council makes sense, and recommend that, pursuant the Division's

recommendation and the International President's authority under Article VIII, Section 1(f) of the

SEIU Constitution and Bylaws, such a Council be created with sufficient resources to carry out

these objectives.  The Council should be organized along industry sector lines so that the

concerns and needs of the different occupational and employer-based groups within the Property

Services Division can be addressed by leaders and members in those groups.

We recommend that the International President adopt the following plan recommended

by the Division.  Within six months of the IEB's decision in this matter, the locals, together with

property services units from other locals, should confer and agree to a structure and plan of

action for the Council.  This plan should be submitted to the undersigned hearing officers by the

end of 2006 for approval and submission to the International President.  We recommend that

Locals 1877, 24/7, 265, 280, the Los Angeles security local, and the private university group be

required to participate in the Council.

As noted above, Local 2028 has an amusement division that includes stadium and arena

employees, theater and convention center workers.  These workers should be in a Property

Services Division local union.  Accordingly, we recommend that these units be consolidated with

Local 1877 as soon as feasible.

In the higher education sector, the Property Services Division has members (in-house and

contracted) at dozens of colleges and universities around the country.  Examples are Harvard,

USC, Stanford, New York University, and the University of Chicago.  In California, Local 1877

also represents workers at the University of San Francisco, UC Davis, UC Berkeley, UC Irvine, Cal State Sacramento, and San Jose State.

At the hearings and in post-hearing submissions, the United Stanford Workers chapter of Local 715 proposed two alternative jurisdictional arrangements for workers at Stanford and Santa Clara universities. First, the chapter proposed that a charter be issued to a new local union covering those two universities with jurisdiction to organize university workers throughout the state. In the alternative, the chapter suggested that the Stanford workers be united with UHW, which is servicing the Stanford and Lucile Packard Hospitals and which, if this report is approved by the IEB, will soon be granted jurisdiction for the employees of those facilities. The chapter's requests were based in part on the feeling of those testifying that university workers were not part of the core jurisdiction of SEIU and did not fit into neatly into any of the division-based local unions.

Although there have been unification discussions between representatives of the Stanford chapter and Local 1877, it appears to us that an interim step toward eventual merger should be the chartering of a new local union with jurisdiction for workers employed by Stanford and Santa Clara universities. We recommend that this new local be required to participate in the Property Services Council and the development of its structure and plans, and to abide by the Council's requirements. The Council should create a higher education division that will focus resources on organizing and winning higher standards for higher education workers.

With respect to SEIU's racetrack members, testimony from Local 280 President Richard Castro made it clear that SEIU and UNITE-HERE are currently in discussions to unite SEIU's racetrack members with the gaming industry workers represented by UNITE-HERE. We agree

68

that UNITE-HERE is the logical place for SEIU's racetrack members. Until these discussions are completed and the racetrack members change their affiliation to UNITE-HERE, we recommend that they be housed in their current local unions (Locals 2028, 1877 and 280), participate in the Property Services Council, and abide by the Council's requirements. In the event that the change in affiliation to UNITE-HERE takes longer than anticipated, Local 2028's racetrack workers should be merged into Local 1877.

We recommend that Local 1877 have jurisdiction for subcontracted San Francisco International Airport ("SFO") employees and such workers represented by other locals should be merged into Local 1877. Any remaining employees located at SFO, whether employed by the airport directly or by ancillary employers located there, should be assigned to the Northern public local.

California cemetery workers in SEIU are spread among five local unions. Cemetery workers form a recognized occupational group within the Property Services Division. The current fragmentation of cemetery worker representation is antithetical to the New Strength Unity approach of uniting workers with similar jobs in single union. Consolidating the power of cemetery workers will give us the opportunity to organize the many non-union cemetery and country club operations identified by Local 265 in its extensive post-hearing submission.

The first step toward uniting cemetery workers will be to reduce the number of locals representing workers in the field. Accordingly, we recommend that all private sector cemetery workers in Locals 1877, 535 and 715 be merged into Local 265, which represents cemetery and country club workers exclusively. Local 265 should also be granted jurisdiction for unorganized private sector cemetery workers and green attendants. Jurisdiction for public sector cemetery

69

workers currently represented by Locals 700 and 715 should be awarded to the North Central regional public local.[14]    Local 265 should participate in the Property Services Division Council and abide by its requirements.


### E.    Jurisdiction for Multiservice Workers

Local 715 represents approximately 200 employees of Bon Appetit/Compass, a food service company, in two bargaining units at Stanford and Santa Clara universities.  We recommend that Service Workers United, a union of multiservice workers jointly affiliated with SEIU and UNITE-HERE, have jurisdiction for these workers.  Our recommendation is consistent with the testimony of Sister Sermersheim.


### VII.    Further Recommendations and Implementation

We believe we should reorganize ourselves to enable SEIU in California to grow, to exercise enhanced political and bargaining power, and thereby win higher standards for our members.  Accordingly, we further recommend that the jurisdictions of our California local unions be reviewed in the near future.  The yardstick for measuring the success of the jurisdictional models we are recommending today should be growth and higher standards.  As part of this review, locals should be held accountable for fulfilling SEIU's organizing mandate. In this connection, we think that the International President should immediately appoint a

---

14    Local 700 represents workers at two district cemeteries in Bakersfield, whose employees are considered public employees; Local 715 represents employees at one public sector and one private sector cemetery.

California area-wide   public sector organizing director, with responsibilities across local union lines, to work with our California public locals on their growth strategies during the implementation of the IEB's decision.  The organizing director should also work with the other division locals and the International organizing leadership to best coordinate all division growth plans in California.

If our recommendations are adopted, we will have created powerful local unions able to focus significant resources on organizing, bargaining, and politics.  Existing structures within which much of our California political work is currently done will need to be re-examined.  That re-examination should take place immediately following the submission of the public sector, property services, and long-term care structure and implementation plans, with a view to instituting a new political program structure in California as soon as possible after the submission of the plans.  Accordingly, we further recommend that, nine months from the date of the IEB's decision in this matter, the charter of the California State Council be revoked and a new State Council constitution be developed and approved by the new array of locals and the International Union.  Then, the State Council should be re-chartered.

We recognize, and we ask the California leaders of our local unions to recognize, that establishing this or any jurisdictional framework is simply a first step toward energizing our organizing programs, changing workers' lives, strengthening our political action, enhancing member mobilization, and generally unleashing the power of SEIU, its members, and coalition partners.  For our work in California to succeed the way we want it to, local leaders in the state must step up to the plate and come to agreement on a common agenda.  We hope that, by leaving

behind the local structures and jurisdictions of the past, California's SEIU leaders will have a clear path to forging common ground, unencumbered by past disagreements.

We also agree with the many statements made during the hearings that the reorganization should include a process for membership voting. We recommend that a vote take place on proposed changes in members' affiliation. Although a membership vote on jurisdictional changes is not required by the SEIU Constitution and Bylaws, which vests the International Executive Board with the authority to determine jurisdiction, we think a vote on member movement into new local unions would be appropriate. We recommend that such a vote take place after the IEB's decision in this matter. We further recommend that the International Union implement a program of education and outreach to members concerning all facets of the reorganization plan. This program should allow members the opportunity to learn about the reorganization plan, make comments, ask questions, and register concerns.

We recommend that the International President issue a timetable and rules governing the vote at the appropriate time. Those rules should deal with the voting method, eligibility issues, approval requirements, and related matters. While we think it would be inappropriate for the hearing officers to attempt to settle all of those details in this report, we do recommend that, based on the comprehensive scope of the reorganization we propose today, a pooled vote among affected members is needed of locals. By "affected members," we mean members whose local union affiliation will change if our recommendations are adopted. We have attached a list of membership groups by local eligible to vote under this proposal. A piecemeal approach, either unit by unit or local by local, would be incompatible with our interrelated jurisdictional recommendations. For example, with respect to the proposed regional locals, the approval or

disapproval by a single local or series of units could alter the relative balance among the locals that we seek to achieve with these recommendations. Similarly, inconsistent outcomes among locals could leave members outside of all existing or proposed local unions.

In addition, we recommend two additional voting processes for members who change their affiliation to newly-chartered locals. We believe these members should vote on any new permanent constitutions and bylaws for their locals that may be developed and proposed. Members should also vote on regular officers of new locals once the provisional periods for these locals have concluded. The International President should determine the appropriate schedule for such votes.

As we noted above, our phenomenal growth over the past decade has been no accident. Rather, we think it is in part the result of the decisions made by SEIU Conventions to reorganize our union to maximize opportunities for growth and raising standards for members. Our Policy on Jurisdiction was approved by the 2000 Convention to guide that reorganization, and has been implemented in a number of reorganizations across the nation. Our recommendations today flow directly from that Policy. We believe that our recommendations are the right approach for our members and for SEIU in California. It is vital that our California local unions fully cooperate in the implementation of any IEB decision on California jurisdiction. Accordingly, we recommend that, in implementing the IEB's decision in this matter, the International President be guided by policies adopted for implementing previous IEB decisions concerning local union jurisdiction.

We further recommend that the Secretary-Treasurer or her designee oversee the implementation of the IEB's decision in this matter. Finally, we recommend that the undersigned hearing officers retain jurisdiction in these proceedings to resolve disputes arising from this

report and recommendations, to review and approve structures and plans presented by the member advisory committees for the new regional public locals, the new statewide long-term care local, and the property services council, and to review the California jurisdictional arrangements in the near future.

## IX.    Summary and Conclusion

In the public sector, we recommend the chartering of four new public sector local unions with jurisdiction for public services members in the state on a geographic basis. Existing public sector local unions should be merged into the new locals, based on geography, as detailed herein. The International Union should create an archive to preserve the history and achievements of our current California public sector locals. A broad-based member advisory committee should be established to propose a structure for the new local unions and a plan for continuity during the transition. The member advisory committee proposals should be submitted to the hearing officers for approval and submission to the International President by December 31, 2006. The new regional public locals should have jurisdiction for public sector healthcare workers. Public healthcare units currently represented by UHW should be merged into the appropriate regional public sector local, except for UHW's unit at Tuolumne General Hospital. The regional public locals should also assume the jurisdiction for private non-profit agencies, and for ancillary units that the current public sector units already represent.

The regional public sector locals should also have jurisdiction for public sector RNs. Each regional local should have dedicated staff for the RN program and proportional representation on the steering committee of the Nurse Alliance of California. In addition, public

74

and private sector RN co-chair positions should be created to head the Nurse Alliance of California. Further, a public RN representative position should be added in the national Nurse Alliance leadership group. Public RNs should have representation on the membership advisory committee for the public sector locals.

Jurisdiction for unorganized district hospitals should be shared by the new regional public sector locals and UHW. Authority to organize a specific facility should be granted based on the importance of the hospital to the division's strategic organizing plan. Organized units at El Camino and Hazel Hawkins district hospitals should be merged into UHW.

Local 99 should be awarded jurisdiction for all school employees in the same geographical area as that assigned to South Central regional local union. School employee units in existing public sector locals in this territory should be merged into Local 99. Jurisdiction for LAUSD school supervisors should be granted to the South Central regional public sector local.

A new statewide long-term care local union should be chartered. Local 434B and IHSS units in Locals 415, 614, 616, 707, 817, and 1280 should be merged into this new local. IHSS workers currently represented by Local 715 should be assigned to the North Central regional public local. UHW should retain the IHSS workers it currently represents.

The private nursing home unit represented by Local 2028 should be merged into the new long-term care local. UHW should retain the private sector homecare workers and private sector nursing home workers it currently represents. The Long-Term Care Division should recommend the appropriate vehicle for achieving coordination and growth in the private nursing home sector. The Division should grant authority to organize long-term care facilities based on local union strategic objectives and opportunities to raise standards for long-term care workers. In the future,

the Division should review the current long-term care representational arrangements and propose changes if warranted. A broad-based member advisory committee should be established. The committee's report should be submitted to the hearing officers by December 31, 2006.

Private sector hospital units currently represented by Locals 535, 707, 715, and 2028 should be merged into UHW.

The International President should adopt the recommendation of the Property Services Division to create a California Property Services Council, and a member advisory committee should make a proposal to the hearing officers on the Council's structure and activities by December 31, 2006. Local 2028's amusement division should be merged into Local 1877. A new local union should be granted jurisdiction for the private university units at Stanford and Santa Clara universities. This new local should be required to participate in the Property Services Council and abide by its decisions. A higher education division should be created within the Council to promote the interests of our higher education members. Racetrack workers should continue to be housed in their current local unions until arrangements for their change of affiliation to UNITE-HERE can be completed. Private sector cemetery workers should be merged into Local 265, which should be granted jurisdiction for all such workers and greens attendants in California. Jurisdiction for public sector cemetery workers should be awarded to the North Central public local. Local 715's unit of multiservice workers should be merged into Service Workers United.

California public sector jurisdiction should be reviewed in the near future based on growth and standards. The charter of the California State Council should be revoked within nine months of the date of the IEB's decision so that a new structure based on the reorganized local

76

union jurisdictions can be established and a new charter issued. A pooled vote of affected members should take place regarding members' changes of local union affiliations, pursuant to a timetable and rules issued by the International President. The hearing officers should retain jurisdiction to resolve disputes and review and approve structures and plans proposed by member advisory committees. A statewide public sector organizing director position should be established during the transitional period. Finally, the Secretary-Treasurer or her designee should oversee implementation of the IEB's decision.

Respectfully submitted,

_____
Alice Dale
Hearing Officer

_____
Tom Balanoff
Hearing Officer

Dated: June 9, 2006

## VOTER ELIGIBILITY

## CALIFORNIA MEMBERSHIP AFFILIATION CHANGES

**Members in units whose local union affiliation will change pursuant to the IEB decision may vote.**

**ELIGIBLE:**

- All members of Locals 347, 415, 434B, 535, 614, 616, 620, 660, 700, 707, 715, 790, 817, 949, 998, 1280, 1292, 1997, 2028, and 4988

- All public hospital members and other public sector members of UHW, except UHW members at Tuolumne General Hospital

- All cemetery worker members of Local 1877

**EXHIBIT K**



**SEIU.**®

**Stronger Together**

# Memorandum

To:     Affected SEIU Local Unions in California

From:  Andrew L. Stern, International President  *Andrew L. Stern*

Re:     IEB Decision on California Jurisdiction

Date:  June 11, 2006

I'm pleased to announce that yesterday the SEIU International Executive Board (IEB) made a historic decision by approving a new jurisdictional plan for California local unions that will strengthen our union and help members win a better future. The decision culminated months of work by SEIU members and leaders to develop and shape the plan, which will significantly enhance the ability of our 600,000 members in California to:

- Build greater unity by creating stronger regional and statewide local unions and industry councils, which will help focus our resources and strategies on winning better contracts and improving services in our communities.

- Develop greater political strength to elect public officials and hold them accountable on issues important to SEIU members and their families.

- Unite more workers into our union to give everyone more strength to negotiate good contracts and stand up for quality services.

- Benefit from increased and improved communications so members stay informed and can participate in building a stronger union that consistently wins for our families and our future.

- Strengthen members' voices in the workplace to solve problems, raise workplace standards, and improve their working lives.

The decision to build greater power for members in California is a positive result of The New Strength Unity Plan, adopted by delegates to the 2000 SEIU International Convention. The plan in part called for creating local union structures designed to build industry and geographic strength for members. That new strength is especially important in times like these when the pressures to hold down wages and diminish important benefits – like health care and retirement – are as great as any time in memory. Jurisdictional improvements like these have been implemented successfully in many other parts of the country – in Illinois,

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION, CLC

1313 L Street, N.W.
Washington, D.C. 20005

202.898.3200
TDD: 202.898.3481
www.SEIU.org

Massachusetts, Rhode Island, Pennsylvania, Ohio, Washington State, Florida, Michigan, Missouri, New York, and even previously in California in some instances.  These changes have helped our union pull even farther ahead of the pack in terms of our ability to make a difference in members' lives.

Eight days of hearings were conducted all across California by Hearing Officers Alice Dale and Tom Balanoff.  The hearings gave local unions and members the opportunity to present testimony and evidence on the jurisdictional questions for public service, long-term care, and property services workers, and private sector workers represented by public sector locals.  Many members and leaders participated in the hearings and offered their perspectives on these important questions.  Based on the hearings, the Hearing Officers submitted their report and recommendations to the IEB, which overwhelmingly approved the plan to strengthen the voice of members in California by consolidating local union jurisdictions.

The SEIU Constitution and Bylaws do not require a membership election to approve such jurisdictional changes.  However, because these changes will result in SEIU members uniting with members in other local unions, the IEB has called for a statewide vote of affected members changing local union affiliation.  Affected members are those whose local unions would change as a result of the IEB's decision.  The IEB has called for one statewide vote because the changes are interrelated and designed to build new strength for all SEIU members directly affected by the decision.  The vote will be held once members have had enough time to digest and fully understand the changes.

**Here is a brief summary of the recommended changes:**

**In the Public Services Division**, the IEB has called for the chartering of four new regional public sector locals for local government and related workers:  a Northern local, North Central local, a South Central local, and a Southern local. These new regional public sector locals will have jurisdiction for public sector workers, public healthcare workers, including registered nurses in public facilities and private non-profits, and related workers.  Existing local government public sector locals will be merged into these new regional locals.  UHW will continue to represent workers in its unit at Tuolumne General Hospital.

**The Northern Regional Public Sector Local** will have jurisdiction for public sector workers in the counties of Del Norte, Siskiyou, Modoc, Humboldt, Trinity, Shasta, Lassen, Mendocino, Tehama, Plumas, Glenn, Butte, Sierra, Lake, Colusa, Sutter, Yuba, Nevada, Sonoma, Napa, Yolo, Sacramento, Placer, El Dorado, Amador, Marin, Solano, San Francisco, Contra Costa, Alameda, San Joaquin, and Calaveras.  The IEB approved the merger into this new local of the public sector units, excluding IHSS workers, of Locals 535 (Northern workers only), 614, 616, 707, 790, 949, 1280, 1292, and 4988.  In addition, the public employees represented by UHW and Local 790 who work for San Francisco International Airport should be merged into the Northern regional local.

The **North Central Regional Public Sector Local** will have jurisdiction for public sector workers in the counties of San Mateo, Santa Cruz, Santa Clara, Santislaus, Alpine, Tuolumne, Mono, Monterey, San Benito, Merced, Mariposa, Madera, Fresno, Kings, Tulare, Inyo, and Kern. The IEB has approved the merger into this new local of the public sector units, excluding those in district hospitals, of Locals 415 (also excluding IHSS workers), 535 (North Central workers only), 700, 715 (including IHSS workers), and 817 (also excluding IHSS workers).

The **South Central Regional Public Sector Local** will have jurisdiction for public sector workers in the counties of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, San Bernardino, Riverside, and Orange. The IEB has approved the merger into this new local of the public sector units of Locals 347, 535 (South Central workers only), 620, 660 (excluding Los Angeles Office of Education employees), 998, and 1997 (excluding district hospital workers).

The Southern Regional Public Sector Local will have jurisdiction for public sector workers in the counties of San Diego and Imperial. The IEB has approved the merger into this new local of the public sector units of Locals 535 (Southern workers only) and 2028.

For **Public Sector RNs**, the IEB decisions calls on each new regional local to have dedicated staff to help coordinate and lead the nurse program work within the new public locals. Each regional local will also have a designated nurse leader with responsibility for overseeing the development and implementation of the nurse program within the local. In addition, each regional local representing RNs will have proportional representation on the steering committee/leadership group of the Nurse Alliance of California. Further, two co-chairs of the Nurse Alliance of California will be created; one co-chair reserved for a representative of public sector RNs, and the other for a representative of private sector RNs. The IEB decision strengthens the public sector RN voice at the national level by adding an additional public sector RN representative to the national Nurse Alliance of SEIU leadership group. Finally, a representative of public sector registered nurses will serve on the member advisory committee that will propose structures for the new regional public locals.

Jurisdiction for unorganized **district hospitals** will be shared by the new regional public sector locals and UHW. Authority to organize a specific facility will be submitted to the Public Services and Health Systems Divisions and will be granted based on the importance of the hospital to the division's strategic organizing plan. Organized units at district hospitals currently represented by Locals 715 and 817 will be merged into UHW.

The IEB decision grants jurisdiction to Local 99 for school **employees in the South Central region** noted above. School employees in Locals 660 and 998 will be merged into Local 99, with the exception of Los Angeles Unified School District supervisors, who will be merged into the South Central regional public local.

3

The IEB decision also calls for the creation of a member advisory committee to propose a structure for the new public sector locals and provide for continuity during the transition. The committee will offer its proposals to the Hearing Officers for approval before submission to me by the end of 2006. In addition, the IEB approved the creation of an archive to preserve the proud history, heritage and achievements of our existing California public sector unions.

In the **Long-Term Care Division,** a new statewide long-term care local union will be chartered. Local 434B and IHSS units in Locals 415, 614, 616, 707, 817, and 1280 will be merged into this new local. IHSS workers currently represented by Local 715 will be assigned to the North Central regional public local. UHW will retain the IHSS workers it currently represents.

The private nursing home unit represented by Local 2028 will be merged into the new long-term care local. UHW will retain the private sector homecare workers and private sector nursing home workers it currently represents. The Long-Term Care Division should recommend the appropriate vehicle for achieving coordination and growth in the private nursing home sector. The Division should grant authority to organize long-term care facilities based on local union strategic objectives and opportunities to raise standards for long-term care workers. In the future, the Division should review the current long-term care representational arrangements and propose changes in jurisdiction to me, for determination by the International Executive Board, if warranted. A broad-based member advisory committee should be established. The committee's report should be submitted to the hearing officers by December 31, 2006.

**Private Sector Hospital units** currently represented by Locals 535, 707, 715, 2028 and 4988 will merge into UHW.

In the **Property Services Division,** I shall adopt the recommendation of the Property Services Division to create a California Property Services Council, and a member advisory committee will make a proposal to the Hearing Officers on the Council's structure and activities by December 31, 2006. Local 2028's amusement division will merge into Local 1877. A new local union will be granted jurisdiction for the private university units at Stanford and Santa Clara universities. This new local will be required to participate in the Property Services Council and abide by its decisions. A higher education division will be created within the Council to promote the interests of our higher education members. Racetrack workers will continue to be housed in their current local unions until arrangements for their change of affiliation to UNITE-HERE can be completed. Private sector cemetery workers will be merged into Local 265, which should be granted jurisdiction for all such workers and greens attendants in California. Jurisdiction for public sector cemetery workers should be awarded to the North Central public local.

**Voting Process:** Pursuant to the order of the IEB that I establish a procedure for promptly presenting the realignment of local union jurisdiction to affected local unions for a vote of the affected membership, I direct that a vote take place at such time as to

insure that members receive the necessary information and have an adequate opportunity to review and discuss these changes. I will appoint an independent third party to administer and oversee the vote. Pursuant to the IEB's decision, necessary steps will be carried out to provide ample notice to members and an education period so that affected members can be fully informed about the issues they will be asked to vote on, and so that all affected members will have an opportunity to participate.

**Implementation Team:** As determined by the IEB, I have appointed Secretary-Treasurer Anna Burger to oversee implementation of the IEB's decisions in this matter. Questions concerning the IEB's decision and its implementation should be directed to J.J. Johnston, California Area Director, at 213-368-7400. The Hearings Officers will retain jurisdiction to resolve disputes over the IEB's decision.

In addition, I have appointed the following SEIU local union leaders as my Personal Representatives to the new entities listed below that will be created pursuant to the IEB's decision. These Personal Representatives are charged with overseeing the process of creating the new entities and assisting with member education and outreach concerning the IEB's decision.

Mike Garcia – California Property Services Council
Tyrone Freeman – New Long-Term Care Local Union
Damita Davis-Howard – Northern Regional Public Local Union
Kristy Sermersheim - North Central Regional Public Local Union
Annelle Grajeda   South Central Regional Public Local Union
Ben Monterroso – Southern Regional Public Local Union

# **Official Policy on Implementation**

All Local Unions are bound to comply with the decision of the IEB, which is the highest decision-making body in the SEIU between conventions. Accordingly:

- All local unions, union officers, and assigned staff must fully cooperate in the implementation and transition process to assure that this decision is carried out in an orderly fashion that safeguards the interests of the members.

- No union funds, resources or staff may be used to oppose, interfere or undermine in any way the IEB's determination in this matter.

- No local unions whose members are voting may enter into new benefit arrangements or any contracts covering the local union, its officers and/or staff, extending beyond December 31, 2006, including but not limited to staff contracts, personal employment contracts, staff and/or officer severance, pensions or compensation, and leases, without prior notice to and review by my Personal Representative for the applicable regional local union and his or her approval that the arrangement, contract and/or lease does not undermine the IEB's decision.

**EXHIBIT L**



# LOCAL 715

**SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO/CLC**

www.seiu715.org

TO: Laurie Quintel

FR: Greg P.

SEIU servicing agreement

4 pages

Any questions, please call (415) 740-4461

**San Jose Office:** 2302 Zanker Road, San Jose, CA 95131-1115 • (408) 954-8715 • Fax (408) 954-1538
**Redwood City Office:** 891 Marshall Street, Redwood City, CA 94063 • (650) 365-8715 • Fax (650) 365-1538
**Stanford Office:** P.O. Box 19152, Stanford, CA 94309 • (650) 723-3680 • Fax (650) 723-3650
affiliated SEIU 1972

AUG-15-2006  10:33    FROM-LOCAL 250 SAN FRANCISCO                415-563-9914        T-060  P.002/004  F-155

# SERVICING AGREEMENT

This SERVICING AGREEMENT is entered into between Local 715 ("Local 715") and SEIU UHW ("UHW").

WHEREAS, Local 715 and UHW recognize that the core jurisdiction represented by Local 715 includes public sector employees and that the core jurisdiction of UHW includes health care employees; and

WHEREAS, Local 715 and UHW recognize that the professional services provided by each organization are most highly developed in regard to their core jurisdictions; and

WHEREAS, Local 715 is the sole and exclusive collective bargaining representative for a unit of employees at the Stanford Hospital facility ("Stanford facility"); and

WHEREAS, Local 715 wishes to obtain for its members at the Stanford facility the professional services available through UHW, and UHW is willing to make its professional services available to Local 715's members at the Stanford facility; now,

THEREFORE, it is AGREED as FOLLOWS:

1.    **Effective Date**

The terms of this Servicing Agreement shall become effective on March 1, 2006.

2.    **Cost of Services**

For a period running concurrently with the existing collective bargaining agreement between Local 715 and the Stanford facility, UHW shall provide the professional services outlined herein at no cost to Local 715. Thereafter, if this Agreement is extended, Local 715 shall reimburse UHW for the costs of the services outlined herein from the dues and agency fees collected by UHW for each Local 715 member affected by this Agreement.

3.    **Duration of Agreement**

This Servicing Agreement shall be effective on March 1, 2006 and shall remain in full force and effect until the end of the current collective bargaining agreement between Local 715 and the Stanford facility. The duration of this Servicing Agreement may be mutually extended by the parties. Additionally, this Agreement can be altered, amended, or rescinded by the mutual agreement of the parties. Either party may unilaterally terminate this Agreement by giving three months notice to the other party.

{W-12000\001\01\06000478.DOC} ]

4.    **Services Provided By UHW**

For the duration of this Servicing Agreement, UHW's staff, acting as designated agents of Local 715, shall provide the following professional services to Local 715 for its members at the Stanford facility:

Representation in the grievance procedure and at arbitration hearings

Representation at labor-management meetings

Assistance to members appearing before the National Labor Relations Board on behalf of the Local 715 Chapter at the Stanford facility.

5.    **Oversight By Local 715**

The UHW staff member assigned to the day-to-day servicing of the Stanford facility unit will meet on a regular basis with an officer of Local 715 to review the status of representation matters within the unit. In addition, UHW will provide Local 715 with advance notice of all membership meetings and site visits and clear all correspondence with Local 715. The parties acknowledge that Local 715 has the ultimate responsibility for collective bargaining matters on behalf of the Stanford facility unit.

6.    **Services Provided By Local 715**

For the duration of this Agreement, Local 715 shall continue to administer the collection of membership dues, and shall have access to, and may assist with, all membership meetings, and shall have access to all records associated with the bargaining unit.

7.    **Designation of Agency Status**

Local 715 shall notify the Employer in writing of its designation of the appropriate employees of UHW to serve as the agents of Local 715 in providing services to Local 715's membership at the Stanford facility.

Should the Employer challenge or refuse to accept the legitimacy of this Servicing Agreement, the parties will cooperate in processing the legal actions necessary to its enforcement. (This may include filing an unfair labor practice charge under the name of Local 715). UHW will provide professional assistance in this process. During the pendency of this process, Local 715 will continue to provide representation and the administration of all aspects of the collective bargaining agreement through its own staff until such matter is resolved.

8.    **Chapter Structure and Members' Rights**

a)    Following the implementation of this Servicing Agreement, Local 715's unit at the Stanford facility shall maintain the same officers and other employee-representatives, under the same internal Chapter structure that existed prior to implementation of this Agreement;

b)     Following implementation of this Servicing Agreement, Local 715 members at the Stanford facility will continue to be full members of Local 715, with the right to vote in Local 715 elections and otherwise participate in Local 715's affairs. Employees in the bargaining unit will be offered Associate Member status with UHW but shall keep whatever membership rights are accorded them under the Local 715 by-laws and the Service Employees International Union constitution;

c)     Nothing herein shall prohibit UHW from permitting Local 715's Chapter leaders or members from the Stanford facility to participate in UHW educational functions, or appearing as guests at other UHW functions.

9.     **Severability**

The parties hereto believe that all provisions of this Servicing Agreement comply with applicable law. However, should any position of this Agreement be found illegal by any tribunal of competent jurisdiction, this shall not affect the remainder of the Agreement. Rather, the parties shall promptly meet to negotiate an acceptable, lawful substitute to the stricken provisions.

_____          _____
Sal Roselli, President, UHW               Kristy Sermersheim, Executive Secretary,
                                          Local 715

                                          2/20/2006

_____          _____
Date                                      Date

**EXHIBIT M**

SEP. 25. 2006  8:46AM    FOOD SERVICE                                      NO. 9921  P. 1

# SEIU CALIFORNIA UNITE TO WIN REORGANIZATION PLAN VOTE

Հայերեն տարբերակի համար խնդրում ենք զանգահարել 800-832-7307

索取中文選舉材料，請在九月二十九日前來電，電話號碼如下：800-832-7331

## BALLOT VOTING & MAILING INSTRUCTIONS

**To:**     California SEIU Members

**From:**   Bruce Boyens, Independent Election Officer

### MAIL BALLOT VOTING

Enclosed you will find a ballot, a secret ballot envelope and a return envelope for your use in this important vote. After marking your ballot, please insert the ballot into the envelope labeled "Secret Ballot Envelope" and seal. This envelope protects the confidentiality of your vote. Then place the secret ballot envelope into the business reply, pre-addressed return envelope and seal. Please mail this envelope  No additional postage is necessary.

**Do not remove the label with your name on it from the return envelope.** If this label is not present on the return envelope your vote will not be counted. The information on the label identifies you as a member of SEIU and will only be used to determine your eligibility to vote on the day of the election. *The label cannot be used to reveal how you voted, since the secret ballot envelope containing your ballot will be separated from the return envelope and mixed with the other secret ballot envelope before it is opened.* This process assures the secrecy of your vote.

---

## THE DEADLINE FOR RECEIVING BALLOTS IS:
## 10:00 A.M. ON FRIDAY OCTOBER 6, 2006
## BALLOTS RECEIVED AT THE POST OFFICE AFTER
## THAT DATE AND TIME WILL NOT BE COUNTED

---

Members with protests or problems with any aspect of this election, or with any actions or issues between now and the end of the election period must reduce those protests or problems to writing and send to me both in hard copy and fax/email within twenty four hours of your knowledge of the occurrence or the event giving rise to your problem or protest.

Also, any general questions to me about the election, or to request a duplicate ballot, can be directed to me at the toll-free voicemail number, toll-free fax number, or email address listed below.

### Bruce Boyens, Independent Election Officer
c/o Merriman River
4111 South Via Marina    Marina del Rey, CA 90292
Email: vote@merrimanriver.com    Tel: 800-485-9056    Fax: 888-224-3391    

# Summary of SEIU California

# UNITE TO WIN REORGANIZATION PLAN

Under the SEIU California UNITE TO WIN REORGANIZATION PLAN, many members who do the same kind of work will be brought together in the same local unions. These members will be united in one of several ways: through the formation of four new regional public local unions, through the formation of one new statewide long-term care local union, through the formation of one new private university union, or through remaining in and/or joining an existing local union.

This means that many SEIU public sector workers and private non-profit workers will be joining one of the four new regional public local unions. These locals will bring together local government workers, including employees of counties, cities, special districts, public healthcare workers, and schools (in most regions), private non-profit agencies, and smaller groups of workers who are based within the new regional local's jurisdiction. The four new regional public locals are currently known as the North public local ("North"), the Central North public local ("Cent. North"), the Central South public local ("Cent. South"), and the South public local ("South").

The new North public local will unite the members of current locals 614, 616, 707 (excluding Sutter Santa Rosa) Hospital), 790 (excluding contracted employees at the San Francisco Airport who will join Local 1877), 949, 1280, 1292, and 4988 (excluding workers at Sutter Amador and CHW Mark Twain hospitals). Also excluded from the North local are long-term care workers who are homecare workers, nursing home workers, and assisted living workers. Local 1877 members employed by the public housing authorities in San Francisco and Oakland and Local 535 members (excluding those employed by Kaiser) who work within the counties of Del Norte, Siskiyou, Modoc, Humboldt, Trinity, Shasta, Lassen, Mendocino, Tehama, Plumas, Glenn, Butte, Sierra, Lake, Colusa, Sutter, Yuba, Nevada, Sonoma, Napa, Yolo, Sacramento, Placer, El Dorado, Amador, Marin, Solano, San Francisco, Contra Costa, Alameda, San Joaquin, and Calaveras will join these current locals in the new North public local. Additionally, current members of United Healthcare Workers – West ("UHW") employed by the city and county of San Francisco, including San Francisco General Hospital, San Francisco International Airport, and Laguna Honda Hospital, and the Alameda County Medical Center will join the North public local.

The new Central North public local will unite the members of current locals 415, 715 (excluding workers at Stanford/Lucille Packard Hospital, Stanford University, Santa Clara University, Santa Clara Mission Cemetery, and Bon Appetit/Compass), 700, 817, and 535 members (excluding those employed by Kaiser) who are employed within the counties of San Mateo, Santa Cruz, Santa Clara, Stanislaus, Alpine, Tuolumne, Mono, Monterey, San Benito, Merced, Mariposa, Madera, Fresno, Kings, Tulare, Inyo, and Kern. This includes public sector cemetery workers. Assisted living and long-term care workers from Locals 415, 817 and UHW are excluded from the new Central North public local. Also excluded are the workers from Local 715's El Camino Hospital and Local 817's Hazel Hawkins hospital.

The new Central South public local will unite the members of current locals 347, 620, 660, 700, 998, 1997, 2028, and local 535 members (excluding those employed by Kaiser) who are employed within the counties of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, San Bernardino, Riverside, and Orange. Excluded from the new Central South public local are any schools employees within Locals 347 (excluding supervisory employees), 620, 660, and 998; these employees will join the already established schools local within the region, SEIU Local 99.

The new South public union will unite local 535 members (excluding those employed by Kaiser) and 2028 members employed within the counties of San Diego and Imperial. Any private nursing home unit represented by local 2028 will merge into the new long-term care local and is excluded from the new South public local. Local 2028 members who are part of its Amusement Division (except racetrack workers) will merge with Local 1877.

The new statewide long-term care local ("New LTC") will unite private homecare and In Home Supportive Services ("IHSS") public homecare workers, nursing home workers and assisted living workers throughout the state of California from the following current local unions: local 415, 434B, 614, 616, 707, 817, 1280, and 2028.

Private sector cemetery workers will merge with Local 265. A new university local will unite the workers from Local 715 who are employed by Stanford University (not Stanford Hospital) and Santa Clara University. Bon Appetit/Compass workers will unite with Service Workers United ("SWU"). Hospital workers at Kaiser facilities, El Camino district hospital, Hazel Hawkins district hospital, Stanford/Lucille Packard Hospital, Sutter Amador hospital, Sutter Santa Rosa hospital, CHW Mark Twain hospital, and Children's Hospital in San Diego, will change their affiliation to United Healthcare Workers – West ("UHW").

... will be assigned to. Local union affiliation changes include those contained on

SEP. 25. 2006  8:46AM    FOOD SERVICE

# LOCAL UNION ASSIGNMENT CHART

| Original Local | New Local | Exceptions |
|---|---|---|
| 347 | Cent. South | Compton Unified School Dist. workers to Local 99<br>Hacienda La Puente School Dist. workers to Local 99 |
| 415 | Cent. North | Santa Cruz County homecare workers to New LTC<br>Sunshine Villa workers to New LTC |
| 434B | New LTC | |
| 535 | Multiple | |
| 535 members in these counties:<br>Alameda, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Glenn, Humboldt, Lake, Lassen, Marin, Mendocino, Modoc, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, Shasta, Sierra, Siskiyou, Solano, Sonoma, Sutter, Tehama, Trinity, Yolo, and Yuba | North | Kaiser workers to IJHW |
| 535 members in these counties:<br>Alpine, Fresno, Kern, Kings, Inyo, Madera, Mariposa, Merced, Mono, Monterey, San Benito, San Mateo, Santa Clara, Santa Cruz, Stanislaus, Tulare, and Tuolumne, including Yosemite workers | Cent. North | Kaiser workers to UHW |
| 535 members in these counties:<br>Los Angeles, Orange, Riverside, San Luis Obispo, San Bernardino, Santa Barbara, and Ventura | Cent. South | Kaiser workers to UHW<br>Ventura Community College workers to Local 99 |
| 535 members in these counties:<br>San Diego and Imperial | South | Kaiser workers to UHW |
| 614 | North | Napa County homecare workers to New LTC |
| 616 | North | Alameda County homecare workers to New LTC |
| 620 | Cent. South | School Employees to Local 99 |
| 660 | Cent. South | L.A. County Office of Education workers to Local 99<br>Santa Monica-Malibu Unified School Dist. workers to Local 99 |
| 700 | Cent. North | City of Palm Springs workers to Cent. South<br>Las Virgenes Water District workers to Cent. South |
| 707 | North | Mendocino County homecare workers to New LTC<br>Sutter Santa Rosa workers to UHW |
| 715 | Cent. North | Santa Clara University and Stanford University workers to University<br>El Camino Hospital workers and Stanford/Lucille Packard Hospitals workers to UHW<br>Bon Appetit/Compass workers to SWU<br>Santa Clara Mission Cemetery workers to Local 265 |
| 790 | North | Subcontracted San Francisco Int'l Airport workers to Local 1877 |
| 817 | Cent. North | Monterey & San Benito County homecare workers to New LTC<br>Hazel Hawkins Hospital workers to UHW |
| 949 | North | |
| 998 | Cent. South | Pleasant Valley School District workers to Local 99 |
| 1280 | North | Solano County homecare workers to New LTC |
| 1292 | North | |
| 1877 private cemetery workers | 265 | |
| 1877 public housing authority workers | North | |
| 1997 | Cent. South | |
| 2028 | South | Fredericka Manor workers to New LTC<br>City of Riverside workers to Cent. South<br>Children's Hospital workers to UHW<br>Amusement division members (except racetrack workers) to Local 1877 |
| 4988 | North | Sutter Amador hospital workers to UHW<br>CHW Mark Twain Hospital workers to UHW |
| UHW workers employed at Alameda County Medical Center, and by City and County of San Francisco (including at San Francisco General Hospital, San Francisco International Airport, and Laguna Honda Hospital) | North | |

New Locals are: North Regional Public Sector ("North"), Central North Regional Public Sector ("Cent. North"), Central South Regional Public Sector ("Cent. South"), South Regional Public Sector ("South"), New Long Term Care ("New LTC"), Stanford and Santa Clara University Workers ("University").

Other Abbreviations: "UHW" (United Healthcare Workers – West); "SWU" (Service Workers United)



**Official Ballot**

*Boleta Oficial*

Do you approve the SEIU California Unity to Win Reorganization Plan which will set forth the accompanying Local Union Assignment Charts?

Yes ○      No ○

*Aprueba Ud. el plan de reorganización "Unidos para Ganar" de SEIU de California, el cual sus Designa en la tabla adjunta asignamientos de sindicatos locales?*

*Sí ○      No ○*

SEIU California

**EXHIBIT N**

# California Unite to Win Plan

**Stronger Together**

## We're Uniting to Win!

# Unite to Win Plan wins by 88% margin

California SEIU members overwhelmingly approved a bold plan that will allow us to build new strength so we can not only protect our jobs but also **win better contracts** and improve the services we provide. By voting to unify more workers who do the same kinds of work, we are taking a giant step toward making our voices louder and stronger in the workplace and in the state house.

Home
Frequent Questions
Report from Hearings
Pres. Stern's Msg

**Vote Result**

**Yes: 3**
**No: 42**

Building New Strength & Unity for SEIU Members

Home | Frequent Questions | Report from Hearings | Pres. Stern's Msg

powered by AdvocateOffice.com

**EXHIBIT O**

**Quintel, Laurie**

| | |
|---|---|
| **From:** | Robert W. Rutledge [crabycat@sbcglobal.net] |
| **Sent:** | Wednesday, January 31, 2007 5:29 PM |
| **To:** | Jeffries, Valerie |
| **Cc:** | Kassenbrock, Amy; Jocelyn Olick; Quintel, Laurie; Kim Tavaglione |
| **Subject:** | Layoff meeting |

Dear Valerie,
        This is a follow-up to my phone earlier today.
As I mentioned in my phone message,  I sincerely regret not getting back to you in a more
expedient manner. I have a couple suggestions that I hope will be benificial.  First,  let
me give you my weekly schedule in my hope that this information will move things along.
Mondays, Wednesdays and Fridays I attend classes from 08:00-12:00, followed by an hour or
so of homework, During this time I do not answer phone calls however I check my messages
and return calls when I am able.  We have a son who is profoundly handicapped and
obviously time consuming and on Tuesdays Thursdays and Fridays I work as a Unit Clerk in
the Float Department at LPCH.  I give you this information not as an excuse but to
allieviate the frustration I sense in your E-mails and voice messages.  Another obvious
solution would be to contact our UHW Representative, Jocelyn Olick directly, at
510-773-7102.  SEIU 715 no longer exists and a service agreement between the former 715
and UHW
has been in place since March first of 2006.  With
respect to our current layoff bargaining sessions, Myself, Chuck Fonseca, Linda Eskridge,
have been the principle agents of these meetings from the beginning.
 A situation approved by the Director of Labor Relations and illustrated in Laurie
Quintels letter of January 25th 2007 where she asked me to coordinate this impending
meeting with Chuck and Linda to find
mutually agreeable time.  Moreover,  I recall that
Chuck, Linda and I were gracious and accomodating when yourself and May appeared without
prior notification acting as primary agents for the hospital after Laurie excused herself
shortly after the beginning of our last meeting.
        Finally, as I said on the phone, if you maintain your position of refusing the
admission of all the bargaining team members, I can only interpret this action as Stanford
Hospitals and Clinics is bargaining in bad faith. The Union Insists that change your
positon and allow the bagaining access so we can move forward.  Thank you Valerie, and all
concerned, for your attention to this matter.  Very truly yours, Rob Rutledge, SEIU Chief
Steward, LPCH

EXHIBIT P

**Quintel, Laurie**

| | |
|---|---|
| **From:** | Quintel, Laurie |
| **Sent:** | Monday, February 12, 2007 7:21 AM |
| **To:** | Curry, Lori; Taylor, David; Yarbrough, Mary; Coffman, Brian; Jeffries, Valerie; Mckenzie, Arthur; Sun-Young, May |
| **Subject:** | Emailing: www.seiu715.org.htm |



# SEIU LOCAL 715
United for Good Jobs & Reliable Public Services

- On The Job
- Benefits
- Our Local
- Action Center
- Around SEIU
- Join SEIU
- Events Calendar

We are in the process of transitioning to our new Local 521. This web site will be taken down on Feb. 28. On March 1, our new local's web site www.seiu521.org will have your chapter pages and other information.

**★ Apply today for a 2007 SEIU Scholarship! ★**

**Santa Clara County Contract is Ready!**

Pick up Places and Times

Find Your Ch
Page

SEIU 715 Cau
and Commit

**2006 Stewa
Training On
Sign-Up Fo**

*Moved Recen*

Online
Name/Addr
Change Fo

Facing a Jo
Layoff?

Check out e
Chapters' J
Listings

04/21/2008



SEIU Announces
Major Health Care
Campaign >>



**Celebrate our
history.**
Learn more about
Black Labor
History >>



**Join SEIU in Celebrating Black History Month
on Monday, Feb. 19.**

Localwide

October 20

Links:

SEIU Internat

SEIU Califo
State Coun

# POLITICAL *Speed Dating*
## IN SILICON VALLEY
## COOL, FUN AND EXCITING

How would you like to get up
close and personal with your state
assemblymembers and senators?
Give your elected officials, a
quick-fire quizzing.

Find out more how you can join
political speed dating on
Saturday, Feb. 24 in Silicon
Valley.

---

**SEIU Local 715 in the News**



**News**

**Palo Alto Weekly: Unions protect quality of
city services (January 24, 2007)**

SEIU Members Overwhelmingly Vote by 88 Percent

04/21/2008

Margin for California Unite to Win Plan



Read Our New Local's Newsletter

Visit Our New Local's Website

Read about the Reorganization Plan for Our New Local

Questions and Answers about Our New Local

---



SEIU's Response to Governor's Proposal on Healthcare

---

**County Workers Fight Back Against County's Plan to Slash Funds from Critical Healthcare Programs**

**Read the latest Buffalo.**



Members Fight Back Against Palo Alto's Attack on City Workers and Services at City Council Meeting



Update on Palo Alto's Attack on City Workers and Services

Listen to KPFA's Story about Protest Against City's Attack on Workers

Palo Alto Daily News: City Gets an Earful Over Plans

Visit the Palo Alto Chapter Website

www.pachapterseiu715.org

Page 5 of 6

---

**<u>Sign Up for SEIU Local 715 Email Alerts</u>**

---

**Our Annual Report to Membership** ⚙

<u>English</u>   <u>EspaÃ±ol</u>   <u>Chinese</u>   <u>Vietnamese</u>

---

[✗] ChangetoWin

The six million members of the unions of the new Change to Win labor federation have united to renew hope, opportunity, and prosperity for American workers and their families.

Only by uniting millions more workers in a strong and innovative union movement can we ensure that work is valued and rewarded in America and create hope for a better future for our children and grandchildren. <u>Read more</u>

---

**Help the Survivors of Hurricane Katrina**

**Donate a Cell Phone or Transistor Radio**

**<u>Click here</u> to find out how you can help.** ⚙

---

*News You Can Use*

<u>*Media Center*</u>
    [□] *information on upcoming meetings, actions, and events*
       [□] *press releases regarding completed events*

⚙ Contracts a
many other
documents on
site are in PDF
format and req
the free Adobe

*Events Calendar*
☐ **dates of upcoming meetings, events, actions, and steward trainings**

Acrobat Reader




 **Email this Page**    **Print this Page**

Home | On The Job | Benefits | Our Local | Action Center | Around S]
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLI
Copyright © SEIU Local 715 2007. All rights reserved.

04/21/2008

**EXHIBIT Q**



**STANFORD**
UNIVERSITY
MEDICAL CENTER

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

COPY

HUMAN RESOURCES

February 19, 2007

Kristy Sormersheim
SEIU Local 715
2302 Zanker Road
San Jose, CA  95131-1115

<u>Sent by facsimile and U.S. mail</u>

Ms. Sermersheim:

On January 31, 2007, Robert Rutledge, SEIU 715 Chief Steward for LPCH
stated in an e-mail to Valerie Jeffries "SEIU 715 no longer exists..."
He later repeated the same statement in a meeting on February 2, 2007
in the presence of witnesses including me.

We also note that your website indicates that as of March 1, 2007, as
part of transitioning, you will become part of a "Local 521."

Mr. Rutledge's statements and the statement on your website raise
questions concerning the representation going forward of the bargaining
unit employees which Stanford Hospital and Clinics and Lucile Packard
Children's Hospital require clarification. Please advise us immediately
concerning SEIU Local 715's status going forward with respect to
representation of the bargaining unit at Stanford Hospital & Clinics
and Lucile Packard Children's Hospital.

Sincerely,

Laurie J. Quintel
Director - Employee & Labor Relations

## Message Confirmation Report

## FEB-19-2007 02:38 PM MON

Fax Number  :  16507232370
Name        :

| | | |
|---|---|---|
| Name/Number | : | 914089541538-7190022 |
| Page | : | 1 |
| Start Time | : | FEB-19-2007 02:38PM MON |
| Elapsed Time | : | 00'17" |
| Mode | : | STD ECM |
| Results | : | [O.K] |



### STANFORD
UNIVERSITY
MEDICAL CENTER
Stanford Hospital & Clinics
Lucile Salter Packard Children's Hospital

HUMAN RESOURCES

February 19, 2007

Kristy Sermersheim
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

Sent by facsimile and U.S. mail

Ms. Sermersheim:

On January 31, 2007, Robert Rutledge, SEIU 715 Chief Steward for LPCH stated in an e-mail to Valerie Jeffries "SEIU 715 no longer exists..." He later repeated the same statement in a meeting on February 2, 2007 in the presence of witnesses including me.

We also note that your website indicates that as of March 1, 2007, as part of transitioning, you will become part of a "Local 521."

Mr. Rutledge's statements and the statement on your website raise questions concerning the representation going forward of the bargaining unit employees which Stanford Hospital and Clinics and Lucile Packard Children's Hospital require clarification. Please advise us immediately concerning SEIU Local 715's status going forward with respect to representation of the bargaining unit at Stanford Hospital & Clinics and Lucile Packard Children's Hospital.

Sincerely,

Laurie J. Quintel
Director - Employee & Labor Relations

300 Pasteur Drive    MC 5813 · Stanford, CA 94305 5813

**EXHIBIT R**



# SEIU LOCAL 521

**United for Quality Jobs and Quality Public Services**

home

## Search SEIU Local 521:

Stanford Hospital        **search**

## Site Map

Double click on the purple arrows to expand and collapse the outline for each section.

▼ Home
  • Home Index
  • address
  • afram
  • Articles
  • Bakersfield Meeting
  • Bakersfield Pictures
  • Bulletin Boards County Kern
  • Caucuses
  • CCAPE Benefits
  • CCAPE Gym
  • Cemetaries
  • Chapter Page
  • Cities
  • committees
  • Community Colleges
  • Contact Us
  • Counties
  • Courts
  • dentists
  • Feedback
  • Former 415 Members
  • Former 535 Members
  • Former 700 Members
  • Former 817 Members
  • Head Start
  • health.cfm
  • Homecare workers
  • Housing Authorities and Other Housing Employers
  • KernCountyStewards
  • Latino
  • New Local's Views
  • nonprofits
  • Officers
  • Other
  • Parks
  • regional

**ON THE JOB**

**BENEFITS**

**OUR LOCAL**

**ACTION CENTER**

**AROUND SEIU**

**JOIN SEIU**

**EVENTS CALENDAR**

▶ **CONTACT US**

▶ **VISIT THE PRESS CENTER**



MAR-06-2007 09:44 From:                    16507232370              To:914154344507              P.3/14

SEIU Local 521                                                                        Page 2 of 2

- retired700
- Save the Date
- save700building
- Schools
- Stewards
- Stewards SJ
- Transit
- Water
- ▶ Action Center
- ▶ Around SEIU
- ▶ Benefits
- ▶ Chapters
- ▶ Events Calendar
- ▶ Join SEIU
- ▶ On the Job
- ▶ Our Local

 Email this Page     Print this P





Home | On The Job | Benefits | Our Local | Action Center | Around SEIU
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLICY
Copyright © SEIU Local 521 2007. All rights reserved.

http://www.seiu521.org/siteguide.cfm                                        03/02/2007



# SEIU LOCAL 521

*United for Quality Jobs and Quality Public Services*

**SEIU** *Stronger Together*

home

Sorry, no records matched your search criteria.

New Search

Email this Page    Print this P

- ON THE JOB
- BENEFITS
- OUR LOCAL
- ACTION CENTER
- AROUND SEIU
- JOIN SEIU
- EVENTS CALENDAR

» CONTACT US

» VISIT THE PRESS CENTER





Home | On The Job | Benefits | Our Local | Action Center | Around SEIU
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLICY
Copyright © SEIU Local 521 2007. All rights reserved.



# SEIU LOCAL 521

**United for Quality Jobs and Quality Public Services**

home | our local

## Local 521 Chartered on January 2, 2007

On January 2, 2007, our new local SEIU Local 521 received its charter. Five lo
415, 535, 700, 715 and 817 have come together to cover the North Central reg
by forming one larger, more-powerful local.

Our new local will represent more than 45,600 workers. We will specialize in
homecare in San Mateo and Santa Clara counties and public sector services fr
Silicon Valley to Santa Cruz, and Monterey to the Central Valley.

ON THE JOB

BENEFITS

OUR LOCAL

ACTION CENTER

AROUND SEIU

JOIN SEIU

EVENTS CALENDAR









 **Email this Page**  **Print this P**

**Home | On The Job | Benefits | Our Local | Action Center | Around SEIU
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLICY**

Copyright © SEIU Local 521 2007. All rights reserved.

MAR-06-2007 09:44 From:                16507232370           To:914154344507        P.6/14

SEIU Local 521                                                                  Page 1 of 2



# SEIU LOCAL 521

**United for Quality Jobs and Quality Public Services**

home | benefits

## Benefits for former SEIU Local 715 members

Our Members Only Benefits continue to grow!

## <u>Our Members Only Benefits Brochure</u>  PDF icon

We will continue to add to and improve these programs and will get the changes to you throu
our website and printed material.

**The newest programs are:**

**Camden Auto Body is offering special benefits to SEIU members who use
their services. Click here for more information.**

**Paul Mousalam & Associates is offering a Free Consultation and 20% off
Legal Fees for SEIU Local 715 Members in need of a divorce lawyer. Click
here for more information.**

<u>Stanford University Athletic Department</u> **is offering Local 715 members
season tickets to its football games for 50% off the regular price!  See a
whole season of Stanford football for just $90!**

Moving? <u>All American Moving and Storage</u> is offering discounts exclusively for Local 715



members and their families!  Click here for more information on their services . PDF ic

- **Courtesy Chevrolet** is offering cars and trucks at $100 under invoice to our
  members!  Click here for details. PDF icon
- **AAA** is pleased to offer special savings for employees of SEIU Local 715.  Employee
  who wish to join AAA will have their enrollment fee waived - that's a $17 savings. Yo
  pay only $49 to join (usually $66).
- **Union Plus Mortgage Program** specifically for Union Members, their parents, and
  children. Lender fees limited to $100.

For more details, please contact the Member Benefits Coordinator at SEIU San Jose Office
408-954-8715.

PDF icon  **Note:**

   Email this Page   Print this P

Home | On The Job | Benefits | Our Local | Action Center | Around SEIU
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLICY

SEIU Local 521                                                    Page 2 of 2



Copyright © SEIU Local 521 2007. All rights reserved.

Case 5:08-cv-00215-JF    Document 43-19    Filed 07/18/2008    Page 8 of 13
MAR-06-2007 09:44 From:                16507232370        To:914154344507        P.8/14

SEIU Local 521                                                    Page 1 of 2



# SEIU LOCAL 521
*United for Quality Jobs and Quality Public Services*

home | benefits

## SEIU Member Benefits

Below are general member benefits for our new local. You also may be entitled to other member benefits during our transition period for our new local. Please visit our forme five locals' web pages for more information.

- **Former Local 415**
- **Former Local 535**
- **Former Local 700**
- **Former Local 715**
- **Former Local 817**

ON THE JOB
BENEFITS
OUR LOCAL
ACTION CENTER
AROUND SEIU
JOIN SEIU
EVENTS CALENDAR





## SEIU Benefits for You and Your Family

Because you are a member or retiree of SEIU, you have access to a variety of services and discounts through Union Plus. These benefits supplement what you may receive through your union-negotiated contract. With these SEIU-Union Plus benefits, you can save on life insurance, health savings, mortgages, legal services, and more.

Need assistance?
Call 1-800-452-9425.
Or visit www.unionplus.or

¿Tiene preguntas? Tenem
informacion en Español

### *Money and Credit*

- **Credit Card** with great value and service
- **Secured Credit Card** for members who have poor credit or little or no credit history
- **Loans**—personal loans, lines of credit, and home equity loans
- **Credit Counseling** to help eliminate debt
- **Your Credit Score** for a 15% discount

### *House and Home*

- **Mortgage and Real Estate**—low down payments and reduced closing costs
- **Home Heating Oil**

### *Family Services*

- **Find a Lawyer**—Union Plus legal services for your Local
- **Immigration Legal Services** including free initial consultations and discounts on hourly rates
- **Planning for College**—resources on applying, paying, and more
- **Paying for College**—resources include loans, financial aid, and savings plans
- **Pet Health**—savings on veterinary services for all animals

### *Health and Well-Being*

- **Health Savings** reduces out-of-pocket expenses for prescriptions, vision, and other services
- **Health Club Discounts** at

Discounts—save on service contracts and fuel oil purchases
- **Moving Van Discounts**— Save on interstate moves, truck rentals, and storage

more than 1,500 locations

## Insurance Protection

- **Life Insurance** protection regardless of job or health conditions
- **Accident Insurance** including insurance for accidental death in the workplace
- **Auto Insurance** with competitive rates, multi-vehicle discounts, and 24-hour service
- **Professional Liability Insurance** for medical professionals
- **Pet Insurance**—accident and illness insurance for your dog or cat

## Union Marketplace

- **Cingular Wireless Discounts** on monthly service for union members
- **Auto Buying Service** to help you find the right vehicle for the right price
- **Goodyear Discounts** on tires and service
- **Powell's Bookstore**—a union-organized online bookstore
- **Union-Made Clothing**— support good jobs at good pay with a discount
- **Union-Made Checks** with your union's logo
- **Music Discount Club**— choose from 15,000 music titles

## SEIU Scholarships

- **SEIU Scholarship Program**
- **Jesse Jackson Scholarship**
- **John Gegan Scholarship**
- **Moe Foner Scholarship**
- **Nora Piore Scholarship**
- **Union Plus Scholarship Program**

## Travel and Recreation

- Union **Hotel Discounts** in selected states
- **Vacation Tours** with a discount
- **Grand Bahama Island Vacations**—savings at a union-organized resort
- **Car Rentals** for up to 25% off

## Computers

- **IBM Computers** for a 10% discount
- **Dell Computers** for a 5-10% discount

## Gift Shop

- **Flowers**—delivery service with a discount

 **Email this Page**  **Print this P**



Home | On The Job | Benefits | Our Local | Action Center | Around SEIU
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLICY
Copyright © SEIU Local 521 2007. All rights reserved.



# SEIU LOCAL 521

**United for Quality Jobs and Quality Public Services**

home | worksiteprofiles

## Worksite Profile Pages

abc | def | ghi | jkl | mno | pqr | stu | vwxyz | view all

**ON THE JOB**

**BENEFITS**

**OUR LOCAL**

**ACTION CENTER**

**AROUND SEIU**

**JOIN SEIU**

**EVENTS CALENDAR**





Achieve Kids

Addus Healthcare, Inc.

Albert Schultz Jewish Community Center

Alliance for Community Care

American Red Cross -San Jose

Arvin Edison

Ashton Dental

Bears Valley Springs Community Service District

Cabrillo College

Campbell Union High School District

Catholic Cemetary

Central California Legal Services

Chamberlain's Children Center

Children Services International

CHISPA Housing Management

City of Arvin

City of Bakersfield

City of Coalinga

City of Corcoran

City of Delano

City of East Palo Alto

City of Exeter

City of Hanford

City of Hollister

City of Lindsay

City of Menlo Park

City of Mountain View

City of Palo Alto

City of Redwood City

City of Salinas

City of San Mateo

City of San Mateo Blue Collar Unit

City of San Mateo General Unit

City of San Mateo Library Unit

City of San Mateo Per Diem Unit

City of Santa Cruz

City of Santa Cruz Temps

City of Shafter

City of Sunnyvale

City of Taft

City of Tulare

City of Wasco

City of Watsonville

Community Bridges

Community Solutions

Cope Centro Familiar

Cupertino Union School District

Edison School District

Foothill-DeAnza Community College District

Fresno Area Substitute Teachers

Fresno County - Unit 2 Correctional Officers Association

Fresno County Courts

Fresno County Housing Authority

Fresno County Supervisors

Fresno County Unit 12

Fresno County Unit 22

Fresno County Unit 2-Child Support

Fresno County Unit 2-Juvenile Hall

Fresno County Unit 31 -Public Defenders

Fresno County Unit 3-Social Worker Association

Fresno County Unit 4- Job Specialists

Fresno County Unit 4-Eligiblity Workers

Fresno Unified School District

Gardner Family Center

Golden Valley Health Centers

Gonzales Unified School District

Head Start Kern County

Head Start Kings County

Head Start Madera County

Head Start Santa Cruz County

Hope Rehabilitation

Housing Authority of Monterey County

Housing Authority of Santa Clara County

Humane Society of Santa Clara Valley

Institute on Aging

Kern County

Kern County Water Agency

King City

King County Courts

Kings County

Laidlaw Transit

Law Foundation of Silicon Valley
Lindsay, Strathmore Irrigation District
Los Gatos-Saratoga High School District
Madera County (COMPA)
Madera County (SEMC)
Marina Coast Water District
Mariposa County
Mariposa County Courts
Mexican American Community Service Agency
Monterey Bay Unified Air Population Control District
Monterey County (Formerly 535)
Monterey County (Formerly 817)
Monterey Regional Waste Management District
Morgan Hill Unified School District
MV Transportation
North Kern Cemetery District
North of the River Sanitation District
Orchard School District
Pathways Continous Care Services
Peninsula Dental Center
Peninsula Jewish Community Center
Public Cemetery District Number One
Rebekah Children's Services
Regional Center Kern
Riverdale School District
Salida Head Start
Salud Para La Gente, Inc.
San Andreas Regional Center
San Benito County
San Benito County Courts
San Benito County Water District
San Joaquin Valley
San Lorenzo Valley Unified School District
San Mateo County
San Mateo County IHSS
San Mateo County Office of Education
San Mateo County Superior Court
Santa Clara County (Formerly 535)
Santa Clara County (Formerly 715)
Santa Clara County IHSS
Santa Clara County Office of Education
Santa Clara County Supervisors
Santa Cruz Community Counseling Center (Head Start)
Santa Cruz County
Santa Cruz Metropolitian Transit District
Scotts Valley

Soquel Creek Water District

South San Joaquin Municipal Utility District

Stallion Springs Community Service District

Standard School District

Stanislaus County

Starlight Adolescent Center

Student Transportation

Sunshine Villa

Superior Court: Santa Clara County

Superior Courts-Santa Cruz County

Taft Union High School District

Tulare County (Formerly 535)

Tulare County (Formerly 700)

Tulare County Superior Court

Valley Transportation Authority

Watsonville Temps

West Valley-Mission Community College District

Women's Crisis Support/Defensa de Mujeres

Yosemite National Park

  Email this Page    Print this P



Home | On The Job | Benefits | Our Local | Action Center | Around SEIU
Join SEIU | Events Calendar | Search | Contact Us | PRIVACY POLICY
Copyright © SEIU Local 521 2007. All rights reserved.

**EXHIBIT S**



Results for Your Search

Facility Name                    City State
Stanford University Medical Center

Facilities Homepage

leaders
staff
facilities
offices
jobs

Enter the name of your facility
(or your county, for IHSS workers)

Sign up for updates

First Name:

Last Name:

Email:

I work at a:
Clinic

contact us   offices   facilities   jobs   search   privacy policy

SEIU United Healthcare Workers - West · 560 Thomas L. Berkley Way · Oakland, CA 94612 · ph 510-251-1250 · fax 510-76
info@seiu-uhw.org ·  © Copyright 2006 SEIU United Healthcare Workers - West

EXHIBIT T

**SEIU LOCAL 715 - STANFORD HOSPITAL & CLINICS CHAPTER
WORKER AUTHORIZATION FOR PAYROLL DEDUCTION
OF UNION MEMBERSHIP OR SERVICE FEES**

☐ Mr.          ☐ Mrs.          ☐ Miss          ☐ Ms.

Name of Employee:_____ __ _____

Employee Number:__ _ _ _____

## PLEASE READ THIS NOTICE

Pursuant to the terms of the Agreement between Stanford Hospital and Clinics and Lucile Packard Children's Hospital and SEIU Local 715, employees covered thereby are required during the life of the Agreement to: (1) join and maintain membership in the Union; or (2) to pay a service fee to the Union equivalent to his/her share of the cost incurred by the Union related to collective bargaining, contract administration and grievance adjustment; or if the employee holds a good faith personal religious belief which opposes membership in and contributions to a labor organization, to contribute an amount equal to the monthly Union dues to one of three charitable nonprofit tax-exempt organizations to be agreed upon by Stanford Hospital and Clinics and Lucile Packard Children's Hospital and SEIU Local 715.

Payment of the Union dues or service fee can be made directly or by payroll deduction. Payment of the charitable contribution must be made directly and verified to the Union.

**I AUTHORIZE PAYROLL DEDUCTION OF THE FOLLOWING:**

☐  **UNION MEMBERSHIP:** Entitles the employee to Union membership in his/her employment relationship with the Employer. Entitles the worker to full membership rights including the right to attend all meetings, hold office, and vote.

☐  **SERVICE FEE:** Pays for Union representation in the employee's employment relationship with the Employer.

Dues, contributions or gifts to Local 715 are not deductable as charitable contributions for federal income tax purposes. Dues paid, however, may qualify as business expenses, and may be deductable in limited circumstances subject to various restrictions imposed by the Internal Revenue Code.

**AUTHORIZATION OF PAYROLL DEDUCTION OF
MEMBERSHIP OR SERVICE FEES PAYABLE TO:**
Service Employees International Union, Local 715
2302 Zanker Road, San Jose, CA 95131-1115

**DUES/FEES**

I have read the foregoing and pursuant to the Agreement between my Employer and SEIU Local 715, I hereby authorize the Employer to deduct the appropriate sums as described above from my wages in payment of membership or service fees and to pay over such fee to Local 715. I consent to the adjustment of such fees to reflect any changes as may hereafter be established by SEIU Local 715.

EMPLOYEE'S SIGNATURE:__         _____  DATE: _____

**WHITE** - Payroll     **CANARY** - Union     **PINK** - Worker

100-1094 (7/06)

EXHIBIT U

# STANFORD
## UNIVERSITY
### MEDICAL CENTER

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

COPY

HUMAN RESOURCE

Kristy Sermersheim
Executive Secretary
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

*Sent via FAX, U.S. Mail and certified U. S. Mail*

RE:    Local 715 Status

Dear Ms. Sermersheim:

I write to you again to request that you advise Stanford Hospital and Clinics and Lucile Packard Children's Hospital as to the status of the SEIU Local 715. Despite repeated requests, you have failed to provide a response.

When we attempt to go to Local 715's website we are directed instead to a Local 521 website. Various web pages reflect that Local's "charter" was issued to you, reference benefits available to "former Local 715 members," that Local 521 comprises, among others, Local 715, etc. When you search the website for Stanford Hospital, Stanford or Lucile Packard Children's Hospital the response is "Sorry, no records matched your search criteria." When the Local 715 website did still exist, it stated the Local 715 would cease to exist as of March 1, 2007.

Our contract provides that we will deduct dues from employees who have authorized payroll deductions and remit them to Local 715. Similarly, the dues deduction authorizations forms, by their express terms, authorize the deduction and payment of dues to Local 715 and to no other entity.

In view of all of the information indicating that Local 715 no longer exists, we cannot make further remittance of dues, absent information from you concerning the status of Local 715, and what entity, if any, you contend now represents Stanford Hospital and Clinics and Lucile Packard Children's Hospital employees. If you contend that the representation rights have been transferred to another entity, please provide specific information concerning the process and steps by which the alleged transfer took place.

While we will remit the dues deducted for the most recent February pay period, unless and until we receive a satisfactory response, no further remittance of dues will be made. We request the response on or before March 12th, 2007.

Sincerely,

*Laurie J. Quintel*

Laurie J. Quintel
Director, Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

300 Pasteur Drive • M/C 5513 • Stanford, CA 94305-5513

Message Confirmation Report

MAR-02-2007 04:59 PM FRI

Fax Number     :  16507232370
Name           :

| | | |
|---|---|---|
| Name/Number | : | 914089541538-7190022 |
| Page | : | 1 |
| Start Time | : | MAR-02-2007 04:59PM FRI |
| Elapsed Time | : | 00'18" |
| Mode | : | STD ECM |
| Results | : | [O.K] |

---

**STANFORD**
UNIVERSITY
MEDICAL CENTER

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

HUMAN RESOURCES



Post-It® Fax Note   7671   Date 3/2   pages 1
To Kristy Sermersheim    From Laurie Quintel
Co./Dept.                  Co.
Phone #                     Phone #
Fax # 1 (408) 954-1538     Fax #

Kristy Sermersheim
Executive Secretary
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

Sent via FAX, U.S. Mail and certified U. S. Mail

RE:   Local 715 Status

Dear Ms. Sermersheim:

I write to you again to request that you advise Stanford Hospital and Clinics and Lucile Packard Children's Hospital as to the status of the SEIU Local 715. Despite repeated requests, you have failed to provide a response.

When we attempt to go to Local 715's website we are directed instead to a Local 521 website. Various web pages reflect that Local's "charter" was issued to you, reference benefits available to "former Local 715 members," that Local 521 comprises Local 521, Local 715, etc. When you search the website for Stanford Hospital, Stanford or Lucile Packard Children's Hospital the response is "Sorry, no records matched your search criteria." When the Local 715 website did still exist, it stated the Local 715 would cease to exist as of March 1, 2007.

Our contract provides that we will deduct dues from employees who have authorized payroll deductions and remit them to Local 715. Similarly, the dues deduction authorizations forms, by their express terms, authorize the deduction and payment of dues to Local 715 and to no other entity.

In view of all of the information indicating that Local 715 no longer exists, we cannot make further remittance of dues, absent information from you concerning the status of Local 715, and what entity, if any, you contend now represents Stanford Hospital and Clinics and Lucile Packard Children's Hospital employees. If you contend that the representation rights have been transferred to another entity, please provide specific information concerning the process and steps by which the alleged transfer took place.

While we will remit the dues deducted for the most recent February pay period, unless and until we receive a satisfactory response, no further remittance of dues will be made. We request the response on or before March 12th, 2007.

Sincerely,

*Laurie J Quintel*

Laurie J. Quintel
Director, Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

300 Pasteur Drive · MC 5513 · Stanford, CA 94305-5513

**EXHIBIT V**



Bank of America — Higher Standards

Bank of America Direct

Home    Admin    Tools    Help    Sign Of

| Payments | Receipts | Treasury | Trade | Images | Notifications |

# Payments Inquiry Results

Stanford Hospital and Clinics
Mei Lu
*03/08/2007 12:37 CST*

New Inquiry

Click on PI Reference to view payment details.

Select Query: None Selected

Displaying 1-8 of 8 Records.

---

**PI Reference: 13940452**                              Payment 1 of 8.
**Payment Type:**    USD Wire            **Beneficiary ID:**       180121167365
**Value Date:**      03/08/2007          **Beneficiary:**
**Debit Account:**   ▓▓▓▓▓▓▓             **Beneficiary Bank ID:**  ▓▓▓▓▓▓▓
**Payment Amount:**  ▓▓▓▓▓▓ USD          **Status:**               Payment Completed
**Service Conf:**    20070308B6B7HU4R002255

---

**PI Reference: 13940509**                              Payment 2 of 8.
**Payment Type:**    USD Wire            **Beneficiary ID:**       110192581
**Value Date:**      03/08/2007          **Beneficiary:**
**Debit Account:**   ▓▓▓▓▓▓▓             **Beneficiary Bank ID:**  104000016
**Payment Amount:**  ▓▓▓▓▓▓ USD          **Status:**               Payment Completed
**Service Conf:**    20070308B6B7HU6R002269

---

**PI Reference: 13940541**                              Payment 3 of 8.
**Payment Type:**    USD Wire            **Beneficiary ID:**       10004762
                                                                   SERVICE EMPLOYEES
**Value Date:**      03/08/2007          **Beneficiary:**          INFORMATION UNION
**Debit Account:**   1499109880          **Beneficiary Bank ID:**  121100782
**Payment Amount:**  21,949.35  USD      **Status:**               Payment Completed
**Service Conf:**    20070308B6B7HU3R002207

---

**PI Reference: 13940575**                              Payment 4 of 8.
**Payment Type:**    USD Wire            **Beneficiary ID:**       ▓▓▓▓▓▓▓
**Value Date:**      03/08/2007          **Beneficiary:**          ▓▓▓▓▓▓▓
**Debit Account:**   ▓▓▓▓▓▓▓             **Beneficiary Bank ID:**  321081669
**Payment Amount:**  ▓▓▓▓▓▓ USD          **Status:**               Payment Completed
**Service Conf:**    20070308B6B7HU4R002281

---

**PI Reference: 13940614**                              Payment 5 of 8.
**Payment Type:**    USD Wire            **Beneficiary ID:**       ▓▓▓▓▓▓▓
**Value Date:**      03/08/2007          **Beneficiary:**          ▓▓▓▓▓▓▓
**Debit Account:**   ▓▓▓▓▓▓▓             **Beneficiary Bank ID:**  021001033
**Payment Amount:**  ▓▓▓▓▓▓ USD          **Status:**               Payment Completed
**Service Conf:**    20070308B6B7HU1R002431

---

**PI Reference: 13940649**                              Payment 6 of 8.
**Payment Type:**    USD Wire            **Beneficiary ID:**       ▓▓▓▓▓▓▓
**Value Date:**      03/08/2007          **Beneficiary:**          ▓▓▓▓▓▓▓
**Debit Account:**   ▓▓▓▓▓▓▓             **Beneficiary Bank ID:**  021001033
**Payment Amount:**                      **Status:**               Payment Completed

---

**EXHIBIT W**

*file*

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL,
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MCGELSON
BARRY E. HINKLE
JAMES RUTKOWSKI
SANDRA RAE BENSON
CHRISTIAN L. RAISNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
J. FELIX DE LA TORRE
KRISTINA L. HILLMAN
ANDREA LANDONA
EMILY P. RICH

# WEINBERG, ROGER & ROSENFELD
A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX  510.337.1023

LORI K. AQUAIO
ANNE L YEN
NICOLE M. PHILLIPS
BROOKE D. PIERMAN
BRUCE A. HARLAND
CONCEPCION E. LOZANO-BATISTA
CAREN P. SENCER
LINELLE S. MOGADO
MANJARI CHAWLA
KRISTINA M. ZINNEN

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel
JOHN PLOTZ, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada

March 5, 2007

VIA FACSIMILE & U.S. MAIL

Laurie Quintel
Stanford Hospital & Clinics
300 Pasteur Drive
Stanford, CA  94305-5250

Re:     Local 715 Status

Dear Ms. Quintel:

I am writing in response to a letter you addressed to Kristy Sermersheim, the Executive Secretary of SEIU Local 715, regarding "Local 715 Status," of which I just received today, and which appears to have been sent by you on March 2, 2007.

Please rest assured that SEIU Local 715 continues to exist, continues to represent a collective bargaining unit of employees at the Stanford University Medical Center and the Lucile Packard Children's Hospital, and will continue to do so for the indefinite future. There has been no change in Local 715's status, and therefore, you should continue to remit dues to Local 715, which represents the employees at your institutions.

If you have any questions, please do not hesitate to contact me.

Sincerely,

*William A. Sokol*

[Dictated but not read]

WAS/rfb
opeiu 3 afl-cio(1)
cc:     Kristy Sermersheim

1/450501

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA  90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA  95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI  95813-4500
TEL 808.528.8880 FAX 808.528.8881

**EXHIBIT X**



# SEIU LOCAL 521

**United for Quality Jobs and Quality Public Services**

SEIU
Stronger Together

- ON THE JOB
- BENEFITS
- OUR LOCAL
- ACTION CENTER
- AROUND SEIU
- JOIN SEIU
- EVENTS CALENDAR



- SIGN UP TO RECEIVE EMAIL UPDATES
- CONTACT US
- FIND OUT ABOUT SEIU JOBS
- VISIT THE PRESS CENTER
- SEIU STORE





**(Can't see movie, download flashplayer.)**

## SEIU Local 521

## Stronger Together

Five locals (415, 535, 700, 715 and 817) have come together to cover the North Central region by forming one larger, more powerful local.

On January 2, 2007, our new local received its charter. On March 1, 2007, the resources of all five locals were transferred to Local 521.

This marks a new beginning for workers. We will be stronger together. Our new local represents more than 45,600 workers. We specialize in homecare in San Mateo and Santa Clara counties and public sector services from Silicon Valley to Santa Cruz, and Monterey to the Central Valley.

**Read Local 521's Charter**

**Meet the Officers for Local 521**

**Provisional Bylaws for Local 521**

**What Members Think About Our New Local**



"It's a plan lo
overdue. It's
good opportu
to work with
new comrade
appreciate th
the new local
be membe
driven."

**Henry
Ildefonzo**,
Golden Vall
Health Cente
(Merced)

# 521

**Find You
Chapte
Page**

**Local 52'
Caucuses**

**Steward
Training**

**Moved**

**Member Committees in Our New Local**

**Members Fight to Save Bakersfield Building**

## Save the Date for Our New Local's Celebration



**May 21, 2007**

**For more information, click here.**



**SEIU's Response to Governor's Proposal on Healthcare**

**Make Your Voice Heard on Healthcare**

**Healthcare for All Event in Santa Cruz**

**Recently'**
**Online**
**Name**
**Address**
**Change**
**Form**

**Give You**
**Feedbacl**
**on Our Ne**
**Local's**
**Web Site**

**Sign Up f**
**Email**
**Updates**

**SEIU Job**

Links:

**SEIU**
**Internatior**

**SEIU**
**Californi**
**State Coun**

 **Email this Page**   **Print this P**

Copyright © SEIU Local 521 2007. All rights reserved.

home | our local

# Local 521 Chartered on January 2, 2007

On January 2, 2007, our new local SEIU Local 521 received its charter. Five locals 415, 535, 700, 715 and 817 have come together to cover the North Central region by forming one larger, more-powerful local.

Our new local will represent more than 45,600 workers. We will specialize in homecare in San Mateo and Santa Clara counties and public sector services from Silicon Valley to Santa Cruz, and Monterey to the Central Valley.





**EXHIBIT Y**



**STANFORD**
U N I V E R S I T Y
M E D I C A L   C E N T E R

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

HUMAN RESOURCES

COPY

March 6, 2007

William A. Sokol
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

*Via Facsimile and U.S. Mail*

Re:    Local 715 Status

Dear Mr. Sokol:

I have received your letter of March 5, 2007, purporting to respond to the inquiry made to Kristy Sermersheim by letter on March 2, 2007. While we appreciate the promptness of the reply, I am afraid that your assurance is not sufficient. Information has been published stating that Local 715 and four other locals (Locals 415, 535, 700 and 817) "have come together to cover the North Central region by forming one larger, more powerful local," and that "on March 1, 2007, the resources of all five locals were transferred to Local 521." Ms. Sermersheim has also been announced as the interim president of the new Local 521. The address at which Local 715 used to be located is also listed as the address of an office of Local 521. We are also aware, of course, of the International's plan developed last year which mandated a reorganization of the California local structure, and that the result of that reorganization does not include a Local 715, but rather provided for the transfer of several of its bargaining units to other locals. Your response fails to explain, in light of these public announcements, how and in what form, Local 715 continues in a separate existence.

Please provide, by the date specified in my original letter, specific information regarding the status of this reorganization as it relates to Local 715, and specific information or documentation to support the claim that, despite the announcements and statements to the contrary, Local 715 continues to exist.

Sincerely,

*Laurie J. Quintel*

Laurie Quintel
Director of Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

## Message Confirmation Report                    MAR-07-2007 10:49 AM WED

Fax Number  :  16507232370
Name        :

Name/Number  :  915103371023-7190022
Page         :  1
Start Time   :  MAR-07-2007 10:49AM WED
Elapsed Time :  00'19"
Mode         :  STD ECM
Results      :  [O.K]

---

## STANFORD
### UNIVERSITY
### MEDICAL CENTER

*Stanford Hospital & Clinics*
*Lucile Packard Children's Hospital*

HUMAN RESOURCES

March 6, 2007

Post-it® Fax Note    7671   Date 3/7/07  pages▸ 1
To William Sokol              From Laurie Quintel
Co./Dept.                     Co.
Phone #                       Phone #
Fax# (510) 337-1023           Fax #

William A. Sokol
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

*Via Facsimile and U.S. Mail*

Re:  Local 715 Status

Dear Mr. Sokol:

I have received your letter of March 5, 2007, purporting to respond to the inquiry made to Kristy Sermersheim by letter on March 2, 2007. While we appreciate the promptness of the reply, I am afraid that your assurance is not sufficient. Information has been published stating that Local 715 and four other locals (Locals 415, 535, 700 and 817) "have come together to cover the North Central region by forming one larger, more powerful local," and that "on March 1, 2007, the resources of all five locals were transferred to Local 521." Ms. Sermersheim has also been announced as the interim president of the now Local 521. The address at which Local 715 used to be located is also listed as the address of an office of Local 521. We are also aware, of course, of the International's plan developed last year which mandated a reorganization of the California local structure, and that the result of that reorganization does not include a Local 715, but rather provided for the transfer of several of its bargaining units to other locals. Your response fails to explain, in light of these public announcements, how and in what form, Local 715 continues in a separate existence.

Please provide, by the date specified in my original letter, specific information regarding the status of this organization as it relates to Local 715, and specific information or documentation to support the claim that, despite the announcements and statements to the contrary, Local 715 continues to exist.

Sincerely,

*Laurie J. Quintel*

Laurie Quintel
Director of Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

**EXHIBIT Z**

MAR-21-2007 10:33 From:                    16507232370            ⌐..914154344507-7190022 P.2/2

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MICKELSON
BARRY E. HINKLE
JAMES RUTKOWSKI
SANDRA RAE BENSON
CHRISTIAN L. RABNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
J FELIX DE LA TORRE
KRISTINA L. HILLMAN
ANDREA LAAKUMA
EMILY P. RICH

## WEINBERG, ROGER & ROSENFELD
A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

LORI A. ADUANO
ANNE I. YEN
NICOLE M. PHILLIPS
BROOKE D. PIERMAN
BRUCE A. HARLAND
CONCEPCION E. LOZANO-BATISTA
CAREN P. SENGER
LINELLI R. MODADO
MANUEL CHAVILA
KRISTINA M. ZINNEN

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel
JOHN PLOTZ, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada

March 14, 2007

*Via Facsimile & U.S. Mail*

Laurie Quintel
Stanford Hospital & Clinics
300 Pasteur Drive
Stanford, CA  94305-5250

Re:    Local 715 Status

Dear Ms. Quintel:

Thank you for your letter of March 6, 2007.

As I stated in my prior letter, Local 715 continues to exist, it continues to have assets, and it continues to operate as a labor organization, notwithstanding the reorganization you have read about in the media and on the Internet.

Precisely because there are some recalcitrant, if not anti-union, employers, like Stanford University Medical Center, who do not wish to recognize the new entity as a successor to Local 715, Local 715 has chosen to go on existing, with separate assets, etc.

Until such time as employees may decide to the contrary, in a lawful manner, Local 715 will continue to represent the employees in your collective bargaining units, will continue to be bound by the collective bargaining agreement with your organization, and will continue to abide by it and enforce it.

As always, the Union would welcome any attempts you may wish to make to build a cooperative partnership, as opposed to a contentious attack-mode, employer versus worker mode, as you presently seem to be engaged in.

Sincerely,

*William A. Sokol*

*William A. Sokol*
[Dictated but not read]

WAS/rfb
opeiu 3 afl-cio(1)
1/451405

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA 90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA 95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI 96813-4500
TEL 808.528.8880 FAX 808.528.8881

**EXHIBIT AA**

# STANFORD
## UNIVERSITY
### MEDICAL CENTER

**HUMAN RESOURCES**

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*



March 29, 2007

Kristy Sermersheim
Executive Secretary
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

*Sent via FAX and U. S. mail*

    RE:   Request for Information Change in Local 715 Affiliation

Dear Ms. Sermersheim:

In light of the recent published announcements of changes regarding SEIU Local 715, Stanford Hospital & Clinics and Lucile Packard Children's Hospital require information regarding the current status of Local 715 and the extent its employees, officers, assets, and corporate structure have changed in its new affiliation with Local 521. Accordingly, we request the following information by April 9, 2007:

1.  Identity of officers, directors, executives, and managerial employees of SEIU Local 715;
2.  Identity of officers, directors, executives, and managerial employees of SEIU Local 521;
3.  Identity of Local 715's employees;
4.  Identity of all individuals authorized to act on behalf of Local715;
5.  Identity of all individuals who receive paychecks reflecting the name and address of the legal entity of the employer as Local 715, pursuant to California Labor Code 226(a)(8);
6.  The current organization chart of SEIU Local 715;
7.  The organization chart of SEIU Local 521;
8.  SEIU Local 715's current bylaws;
9.  SEIU Local 521's current bylaws;
10. A description of Local 715's current assets;
11. A description of SEIU Local 521's current assets;
12. Any documents filed with the state of California or the U. S. Department of Labor regarding any change in the status of SEIU Local 715.

Please contact me if you have questions about the above-referenced information.

Sincerely,

Laurie J. Quintel

Laurie J. Quintel
Director, Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

cc:   Jesus Andrade
      Rob Rutledge

Message Confirmation Report                    MAR-29-2007 08:58 AM THU

                                               Fax Number   :   16507232370
                                               Name         :

Name/Number   :   914089541538-7190022
Page          :   1
Start Time    :   MAR-29-2007 08:57AM THU
Elapsed Time  :   00'19"
Mode          :   STD ECM
Results       :      [O.K]

---

**STANFORD**
U N I V E R S I T Y
M E D I C A L   C E N T E R

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

HUMAN RESOURCES



March 29, 2007

Kristy Sermersheim
Executive Secretary
SEIU Local 715
2302 Zanker Road
San Jose, CA 95131-1115

Sent via FAX and U. S. mail

RE:   Request for Information Change in Local 715 Affiliation

Dear Ms. Sermersheim:

In light of the recent published announcements of changes regarding SEIU Local 715,
Stanford Hospital & Clinics and Lucile Packard Children's Hospital require information
regarding the current status of Local 715 and the extent its employees, officers,
assets, and corporate structure have changed in its new affiliation with Local 521.
Accordingly, we request the following information by April 9, 2007:

        1.    Identity of officers, directors, executives, and managerial
              employees of SEIU Local 715;
        2.    Identity of officers, directors, executives, and managerial
              employees of SEIU Local 521;
        3.    Identity of Local 715's employees;
        4.    Identity of all individuals authorized to act on behalf of Local715;
        5.    Identity of all individuals who receive paychecks reflecting the name
              and address of the legal entity of the employer as Local 715, pursuant
              to California Labor Code 226(a)(8);
        6.    The current organization chart of SEIU Local 715;
        7.    The organization chart of SEIU Local 521;
        8.    SEIU Local 715's current bylaws;
        9.    SEIU Local 521's current bylaws;
        10.   A description of Local 715's current assets;
        11.   A description of SEIU Local 521's current assets;
        12.   Any documents filed with the state of California or the U. S.
              Department of Labor regarding any change in the status of SEIU Local 715.

Please contact me if you have questions about the above-referenced information.

Sincerely,

Laurie J. Quintel
Director, Employee and Labor Relations
Stanford Hospital and Clinics
Lucile Packard Children's Hospital

cc:   Jesus Andrade
      Rob Rutledge

300 Pasteur Drive · M/C 5555 · Stanford, CA 94305-5513

EXHIBIT BB

# WEINBERG, ROGER & ROSENFELD

A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

April 9, 2007

<u>VIA FACSIMILE & U.S. MAIL</u>

Laurie Quintel
Stanford Hospital & Clinics
300 Pasteur Drive
Stanford, CA 94305-5250

Re:    <u>Request for Information Change in Local 715 Affiliating</u>

Dear Ms. Quintel:

Your letter dated March 29, 2007, regarding a "request for information change in Local 715 affiliating," has been forwarded to me Local 715 for a response. All of the information that you have requested is irrelevant to the parties bargaining process, is equally available to Stanford Hospital, and/or involves information of another Local Union that does not have any collective bargaining relationship with Stanford Hospital. Therefore, the Union has no duty to provide you with any of the information requested in your letter. I will, however, address each of your information requests one-by-one so that you know exactly what the Union's position is.

First, you request the "identity of officers, directors, executives, and managerial employees of SEIU Local 715." This request is not relevant to the collective bargaining process, and is equally available to Stanford Hospital. In addition, this information is protected from disclosure by the National Labor Relations Act, the First Amendment of the United States Constitution, as well as on public policy grounds.

Second, you request the "identity of officers, directors, executives, and managerial employees of SEIU Local 521." This request is not relevant to the collective bargaining process, is equally available to Stanford Hospital, and involves a completely different Local than 715. I do not know of any legal basis for you to demand that Local 715 provide information regarding a completely different Local Union that Stanford Hospital does not have a collective bargaining relationship with.

Third, you request the "identity of Local 715's employees." This request is not relevant to the collective bargaining process, and is equally available to Stanford Hospital. In addition, this information is protected from disclosure by the National Labor Relations Act, the First Amendment of the United States Constitution, as well as on public policy grounds.

April 9, 2007
Laurie Quintel
Page 2

Fourth, you request the "identity of all individuals authorized to act on behalf of Local 715." This request is not relevant to the collective bargaining process, and is equally available to Stanford Hospital. Moreover, it is vague and ambiguous, as well as overbroad.

Fifth, you request the "identity of all individuals who receive paychecks reflecting the name and address of the legal entity of the employer as Local 715, pursuant to California Labor Code 226(a)(8)." This request is not relevant to the collective bargaining process. Nor is the Union obligated to provide Stanford Hospital information regarding the Union's operating expenses. *See Serv. Employees Local 535 (No. Bay Reg'l Ctr.)*, 287 NLRB 1223 (1998). In addition, this information is protected from disclosure by the National Labor Relations Act, the First Amendment of the United States Constitution, as well as on public policy grounds.

Sixth, you request "the current organization chart of Local 715." This request is not relevant to the collective bargaining process. In addition, this information is protected from disclosure by the National Labor Relations Act, the First Amendment of the United States Constitution, as well as on public policy grounds.

Seventh, you request "the current organization chart of Local 521." This request is not relevant to the collective bargaining process. I do not know of any legal basis for you to demand that Local 715 provide information regarding a completely different Local Union that Stanford Hospital does not have a collective bargaining relationship with.

Eighth, you request "SEIU Local 715's current bylaws." This request is not relevant to the collective bargaining process.

Ninth, you request "SEIU Local 521's current bylaws." I do not know of any legal basis for you to demand that Local 715 provide information regarding a completely different Local Union that Stanford Hospital does not have a collective bargaining relationship with.

Tenth, you request "a description of Local 715's current assets." This request is not relevant to the collective bargaining process. Nor is the Union obligated to provide Stanford Hospital information regarding the Union's operating expenses. *See Serv. Employees Local 535 (No. Bay Reg'l Ctr.)*, 287 NLRB 1223 (1998). In addition, this information is protected from disclosure by the National Labor Relations Act, the First Amendment of the United States Constitution, as well as on public policy grounds.

Eleventh, you request "a description of Local 521's current assets." I do not know of any legal basis for you to demand that Local 715 provide information regarding a completely different Local Union that Stanford Hospital does not have a collective bargaining relationship with.

Twelve, you request "any documents filed with the sate of California or the U.S. Department of Labor regarding any change in the status of SEIU Local 715. This request is not relevant to the collective bargaining process, and is equally available to Stanford Hospital.

Finally, I note that the information requested in your letter appears to be the same type of information that Stanford Hospital is attempting to obtain through the discovery process in the

APR-09-2007 13:48 From:                    16507232370                :914154344507          P.5/5

04-09-2007  02:18pm   From-Weinberg, Roger & Rosenfeld          3371023           T-763  P.004/004  F-033

April 9, 2007
Laurie Quintel
Page 3

pending lawsuit between Stanford Hospital and Local 715. Most importantly, you sent your
letter just days after Stanford Hospital attempted to obtain this irrelevant information through the
deposition of Local 715's person most knowledgeable. In any event, your letter appears to be an
illegitimate attempt to bypass the discovery process. If you have any questions, please do not
hesitate to contact me.

Sincerely,

Bruce A. Harland

Bruce A. Harland

BAH/not
cc:    Client
113889/454054

EXHIBIT CC







## Local 521 Honors Social Worker Appreciation Month

"I take honor and pride in being a social worker and helping to keep families and communities healthy."
**Wanda Wallace Supervising Social Worker (Kern County)**

**Kern County Members: Fill out your Bargaining Surveys today!**

Kern County Bargaining Survey

Kern County Shop Steward Survey

Negotiations Update - March 23, 2007

Kern County Negotiating Team



(Can't see movie, download flashplayer.)

## SEIU Local 521

## Stronger Together



"It's a plan long overdue. It's a good opportunity to work with our new comrades. I appreciate that the new local will be member driven."

**Henry Ildefonzo, Golden Valley Health Centers (Merced)**

Local 521

Five locals (415, 535, 700, 715 and 817) have come together to cover the North Central region by forming one larger, more powerful local.

On January 2, 2007, our new local received its charter. On March 1, 2007, the resources of all five locals were transferred to Local 521.

This marks a new beginning for workers. We will be stronger together. Our new local represents more than 45,600 workers. We specialize in homecare in San Mateo and Santa Clara counties and public sector services from Silicon Valley to Santa Cruz, and Monterey to the Central Valley.



**Save the Date for Our New Local's Celebration**



**Monday, May 21, 2007**

For more information, click here.



| Read Local 521's Charter | Meet the Officers for Local 521 | Member Committees in Our New Local |
|---|---|---|
| Provisional Bylaws for Local 521 | What Members Think About Our New Local | Members Fight to Save Bakersfield Building |

**»SEIU Local 521 in the News«**



Channel 2: Santa Clara County Public Nurses Fight to Save Healthcare Services

Channel 5: Santa Clara County Healthcare Workers Protest Budget Cuts



Celebrate Cesar Chavez's Birthday in San Jose

**Caucuses**

**Steward Trainings**

**Moved Recently? Online Name Address Change Form**

**Give Your Feedback on Our New Local's Web Site**

**Facing a Job Layoff in Silicon Valley?**

**Check out Chapters' Job Listings**

Links:

**SEIU International**

**SEIU California State Council**




CHANGE to WIN



**EXHIBIT DD**

INTERNET
FORM NLRB-508
(6-90)

FORM EXEMPT UNDER 44 U S C. 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST LABOR ORGANIZATION
OR ITS AGENTS**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 32–CB–6237 | 4–16–2007 |

**INSTRUCTIONS:** File an original and 4 copies of this charge and an additional copy for each organization, each local, and each individual named in item 1 with the NLRB Regional Director of the region in which the alleged unfair labor practice occurred or is occurring.

**1  LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

| a  Name | b  Union Representative to contact |
|---|---|
| Service Employees International Union, Local 715 | Kristy Sermersheim (?) |

| c  Telephone No | d  Address (street, city, state and ZIP code) |
|---|---|
| 408.954.8715 | 2302 Zanker Road, San Jose, CA 95131 |

e.  The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) **(3)** _____ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act

2.  Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Despite repeated requests, the Union refuses to provide the Employer with sufficient information to permit the Employer to determine whether the Union continues to exist as an active labor organization within the meaning of the Act.

Repeated calls to the telephone number for the Union yield the response that it no longer exists. The Union's website, SEIU715.org, transfers the visitor to a website for SEIU521, which advises that SEIU Local 715 is now part of that local, and that the resources of Local 715 and four (4) other locals have been transferred to Local 521.

| 3  Name of Employer | | 4  Telephone No |
|---|---|---|
| Stanford Hospital & Clinics/Lucile Packard Children's Hospital | | |

| 5. Location of plant involved (street, city, state and ZIP code) | 6  Employer representative to contact |
|---|---|
| 300 Pasteur Drive, Stanford, CA 94305-5513 | Laurence R. Arnold<br>415.984.9819 |

| 7  Type of establishment (factory, mine, wholesaler, etc ) | 8  Identify principal product or service | 9  Number of workers employed |
|---|---|---|
| Acute care hospital | Healthcare | ~1400 (in unit) |

| 10  Full name of party filing charge |
|---|
| Laurie Quintel |

| 11  Address of party filing charge (street, city, state and ZIP code) | 12  Telephone No |
|---|---|
| 300 Pasteur Drive, Stanford, CA 94305-5513 | 650.725-2770 |

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief

By _____Laurie J. Quintel_____
(signature of representative or person making charge)

Address  300 Pasteur Drive, Stanford, CA 94305-5513

Director - Employee Labor Relations
(title or office, if any)

650.725.2770
(Telephone No )                    (date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U. S. CODE, TITLE 18, SECTION 1001)**

SFCA  424638.1

COPY SENT NLRB
Date 4-17-07 By  BS

U S GPO: 2000-464-640/29074

**EXHIBIT EE**

MAY-15-2007 15:33 From:                                      To:'  154344507-5176964 P.1/2


# STANFORD
HOSPITAL & CLINICS

*Stanford University Medical Center*


**Lucile Packard
Children's Hospital**
AT STANFORD

May 15, 2007

Mr. Harland
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

Dear Mr. Harland:

This letter is in reference to your letter of April 9, 2007 refusing to provide the information concerning Local 715's status and information concerning Local 521 which I requested by letter dated March 28, 2007. I want to reaffirm our request for the information specified in my earlier letter. The basis for the Local 521 requests, in case you could not ascertain it from the original letter, is that Local 521 is maintaining that it comprises the former Local 715 and other former Locals. Whether Local 521 and Local 715 are separate entities, or Local 715 has been combined with other Locals into Local 521, is one of the things we are trying to determine. Information concerning Local 521 is, therefore, necessary for us to assess the issue of continuity, since presumably, in the absence of any claim to representation by any other organization, the representational rights would purportedly be passed to Local 521. The information requested regarding Local 715 is necessary to assess that same continuity issue, and/or to assess the current status of Local 715, if any, as an ongoing operational entity. We have received no other claims of representation, and to our knowledge, Local 521 has not disclaimed interest in representing the Hospitals' bargaining unit employees.

As for the claims that the information is equally available to us, and that it is also not subject to disclosure, not only are those claims contradictory, but they are not correct. We do not have access to the information requested in items 4, 5, 6, 7, or 12 of my March 28, 2007 letter at all. We also do not have access, much less equal access, to the current information we are requesting in 1, 2, 3, 8, 9, 10, and 11. You have not indicated the basis for you claim that information is not subject to disclosure and we are not aware of any basis for claiming confidentiality for any of the information requested. Moreover, since the information requested in requests 1, 2, 3, 10 and 11 is of the same type which both locals must file with the DOL, it is clearly subject to disclosure. Because LM-2 forms are filed with a considerable time after the period covered by the information in them, however, requesting those forms does not provide anything close to current information.

Please provide the requested information promptly.

Sincerely,

*Laurie J. Quintel*

Laurie Quintel
Director, Employee and Labor Relations

MAY-15-2007 15:33 From:                                    To:9: 154344507-5176964 P.2/2

## Message Confirmation Report                    MAY-15-2007 03:30 PM TUE

Fax Number    :
Name          :

| | | |
|---|---|---|
| Name/Number | : | 915103371023-5176964 |
| Page | : | 1 |
| Start Time | : | MAY-15-2007 03:30PM TUE |
| Elapsed Time | : | 00'23" |
| Mode | : | STD ECM |
| Results | : | [O.K] |

**STANFORD**
HOSPITAL & CLINICS
*Stanford University Medical Center*

**Lucile Packard**
**Children's Hospital**
**AT STANFORD**

May 15, 2007

Mr. Harland
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091



Post-It® Fax Note   7871  Date 5·15·07  # of pages ►
To BRUCE HARLAND   From LAURIE QUINTEL
Co./Dept.   Co. STANFORD HOSPITAL
Phone #   Phone # 650·725·2770
Fax # 510·337·1023   Fax # 650·723·2370

Dear Mr Harland:

This letter is in reference to your letter of April 9, 2007 refusing to provide the information concerning Local 715's status and information concerning Local 521 which I requested by letter dated March 28, 2007. I want to reaffirm our request for the information specified in my earlier letter. The basis for the Local 521 requests, in case you could not ascertain it from the original letter, is that Local 521 is maintaining that it comprises the former Local 715 and other former Locals. Whether Local 521 and Local 715 are separate entities, or Local 715 has been combined with other Locals into Local 521, is one of the things we are trying to determine. Information concerning t Local 521 is, therefore, necessary for us to assess the issue of continuity, since presumably, in the absence of any claim to representation by any other organization, the representational rights would purportedly be passed to Local 521. The information requested regarding Local 715 is necessary to assess that same continuity issue, and/or to assess the current status of Local 715, if any, as an ongoing operational entity. We have received no other claims of representation, and to our knowledge, Local 521 has not disclaimed interest in representing the Hospitals' bargaining unit employees.

As for the claims that the information is equally available to us, and that it is also not subject to disclosure, not only are these claims contradictory, but they are not correct. We do not have access to the information requested in items 4, 5, 6, 7, or 12 of my March 28, 2007 letter at all. We also do not have access, much less equal access, to the current information we are requesting in 1, 2, 3, 8, 9, 10, and 11. You have not indicated the basis for you claim that information is not subject to disclosure and we are not aware of any basis for claiming confidentiality for any of the information requested. Moreover, since the information requested in requests 1, 2, 3, 10 and 11 is of the same type which both locals must file with the DOL, it is clearly subject to disclosure. Because LM-2 forms are filed with a considerable time after the period covered by the information in them, however, requesting those forms does not provide anything close to current information.

Please provide the requested information promptly.

Sincerely,

Laurie J. Quintel

Laurie Quintel
Director, Employee and Labor Relations



**STANFORD**
HOSPITAL & CLINICS

*Stanford University Medical Center*



**Lucile Packard
Children's Hospital**
AT STANFORD

May 16, 2007
*(Revised from May 15, 2007 letter with typing corrections only-see attached original letter)*


Mr. Harland
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091


Dear Mr. Harland:

This letter is in reference to your letter of April 9, 2007 refusing to provide the information concerning Local 715's status and information concerning Local 521 which I requested by letter dated March 28, 2007. I want to reaffirm our request for the information specified in my earlier letter. The basis for the Local 521 requests, in case you could not ascertain it from the original letter, is that Local 521 is maintaining that it comprises the former Local 715 and other former Locals. Whether Local 521 and Local 715 are separate entities, or Local 715 has been combined with other Locals into Local 521, is one of the things we are trying to determine. Information concerning Local 521 is, therefore, necessary for us to assess the issue of continuity, since presumably, in the absence of any claim to representation by any other organization, the representational rights would purportedly be passed to Local 521. The information requested regarding Local 715 is necessary to assess that same continuity issue, and/or to assess the current status of Local 715, if any, as an ongoing operational entity. We have received no other claims of representation, and to our knowledge, Local 521 has not disclaimed interest in representing the Hospitals' bargaining unit employees.

As for the claims that the information is equally available to us, and that it is also not subject to disclosure, not only are those claims contradictory, but they are not correct. We do not have access to the information requested in items 4, 5, 6, 7, or 12 of my March 28, 2007 letter at all. We also do not have access, much less equal access, to the current information we are requesting in 1, 2, 3, 8, 9, 10, and 11. You have not indicated the basis for your claim that information is not subject to disclosure and we are not aware of any basis for claiming confidentiality for any of the information requested. Moreover, since the information requested in requests 1, 2, 3, 10 and 11 is of the same type which both locals must file with the DOL, it is clearly subject to disclosure. Because LM-2 forms are filed with a considerable time after the period covered by the information in them, however, requesting those forms does not provide anything close to current information.

Please provide the requested information promptly.


Sincerely,



Laurie Quintel
Director, Employee and Labor Relations

**EXHIBIT FF**

08/14/2007 16:13 FAX 408 954 1       SEIU 521                        ☑001/003



**LOCAL 715**

**SEIU**
*Stronger Together*



**FACSIMILE**

DATE: _6/14/07_

TO: _Laurie Qunitcl_

C/O: _____

FROM: _Rusty Smith_

Cover Page + _2_ page(s)

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Message: _____

_____

_____

_____

_____

_____

C: _____

_____

## NOTE: IF FACSIMILE IS MISREDIRECTED

The page(s) comprising this facsimile transmission contain confidential information from SEIU Local 715. This information is intended solely for use by the individual or entity named as the recipient hereof. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this transmission is prohibited. If you have received this transmission in error, please notify us by telephone immediately.

**SAN JOSE OFFICE**
2302 ZANKER ROAD, SAN JOSE, CA 95131 ■ 408-954-8715 ■ Fax: 408-954-1538
**REDWOOD CITY OFFICE**
891 MARSHALL STREET, REDWOOD CITY, CA 94036 ■ 650-365-8715 ■ Fax: 650-365-7956
**STANFORD OFFICE**
P.O. BOX 19152, STANFORD, CA 94309 ■ 650-723-3680 ■ Fax: 650-723-3650

© 2003 LOCAL 715, SEIU, AFL-CIO/CLC  Ban opseiu 29/afl-cio/clc  (Office_Forms Fax_Cover Sheet.pdf) REV. 10-03

June 14, 2007

*Via Facsimile and U.S. Mail*

Laurie J. Qunitel, Director – Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Dive · M/C 5513
Stanford, CA  94305-5513

Dear Ms. Qunitel:

On June 8, 2007, the International President of the Service Employees International Union ("SEIU"), CtW, CLC, Andrew L. Stern, acting pursuant to Article VIII, Section 7 of the International Union's Constitution and Bylaws and applicable federal law, took control of all operations of SEIU Local 715 ("Local 715"). A copy of the official Trusteeship Order is attached hereto.

All officers of Local 715 have been removed. President Stern appointed me as the Trustee with full authority to act on behalf of Local 715.

Effective June 8, 2007, all matters relating to the representation of the employees of your organization under the Local 715 collective bargaining agreement will be handled under my direction. We intend to fulfill all of our collective bargaining obligations, and expect no interruption in the provision of services to our members.

All servicing agreements to which Local 715 is a party will remain in full force and effect in every respect, without any change whatsoever. Accordingly, Kim Tavaglione, Joceyln Olick, and Ella Hereth will continue to be the representative responsible for servicing your facility.

If you have any questions, please feel free to call me at 408-316-4460. Thank you.

Sincerely yours,

B. W. Smith

Bruce W. ("Rusty") Smith
International Trustee

Attachment

Pg. 2

06/14/2007 16:13 FAX 408 954 1 ` ` ``    SEIU 521    Ø003/003



**Stronger Together**

June 8, 2007

### TO WHOM IT MAY CONCERN:

In accordance with the powers vested in me by the Constitution and Bylaws of the Service Employees International Union, CtW, CLC, I have appointed Bruce W. Smith as Trustee over the affairs of SEIU Local 715, effective immediately.

The Trustee will have charge of the affairs of the Local Union until relieved of responsibility by me.

The Trustee will be governed by the provisions of the Service Employees International Union Constitution and Bylaws and the provisions of applicable law.

Sincerely,



Andrew L. Stern
International President

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

800 Massachusetts Ave NW
Washington DC 20036

202.730.7000
TDD: 202.730.7481
www.SEIU.org

EXHIBIT GG



**LOCAL 715**

# *LOCAL 715*

www.seiu715.org                *SERVICE EMPLOYEES INTERNATIONAL UNION*

Via Facsimile

June 18, 2007

Laurie J. Quintel, Director
Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Dive – M/C 5513
Stanford, CA 94305-5513

Dear Ms. Quintel:

On June 8, 2007, the International President of the Service Employees International Union ("SEIU"), CTW, CLC, Andrew L. Stern, acting pursuant to Article VIII, Section 7 of the International Union's Constitution and Bylaws and applicable federal law, took control of all operations of SEIU Local 715 ("Local 715"). A copy of the official Trusteeship Order is attached hereto.

All officers of Local 715 have been removed. President Stern appointed me as the Trustee with full authority to act on behalf of Local 715.

Effective June 8, 2007, all matters relating to the representation of the employees of your organization under the Local 715 collective bargaining agreement will be handled under my direction. We intend to fulfill all of our collective bargaining obligations, and expect no interruption in the provision of services to our members.

All servicing agreements to which Local 715 is a party will remain in full force and effect in every respect, without any change whatsoever. Accordingly, Kim Tavaglione, Jocelyn Olick, and Ella Hereth will continue to be the representative responsible for servicing your facility.

If you have any questions, please feel free to call me at 408-316-4460. Thank you.

Sincerely yours,

Bruce W. ("Rusty") Smith
International Trustee

Enclosure



**Stronger Together**

June 8, 2007

## TO WHOM IT MAY CONCERN:

In accordance with the powers vested in me by the Constitution and Bylaws of the Service Employees International Union, CtW, CLC, I have appointed Bruce W. Smith as Trustee over the affairs of SEIU Local 715, effective immediately.

The Trustee will have charge of the affairs of the Local Union until relieved of responsibility by me.

The Trustee will be governed by the provisions of the Service Employees International Union Constitution and Bylaws and the provisions of applicable law.

Sincerely,

Andrew L. Stern
International President

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1800 Massachusetts Ave NW
Washington DC 20036

202.730.7000
TDD 202.730.7481
www.SEIU.org



EXHIBIT HH

ALTSHULER BERZON LLP

ATTORNEYS AT LAW

177 POST STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94108

(415) 421-7151

FAX (415) 362-8064

www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBEKAH B. EVENSON
JAMES M. FINBERG
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
PETER E. LECKMAN
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
KATHERINE M. POLLOCK
CLAIRE P. PRESTEL
DANIEL T. PURTELL
MICHAEL RUBIN
PEDER J. THOREEN
JONATHAN WEISSGLASS

STUART C. NAIFEH
FELLOW

June 18, 2007

*Via Facsimile & U.S. Mail*

Laurie J. Quintel
Director, Employee and Labor Relations
Stanford Hospital and Clinics, Lucile Packard Children's Hospital
300 Pasteur Drive
Stanford, CA 94305-5513

Re:    Request for Information related to Local 715

Dear Ms. Quintel:

As you are aware, pursuant to an order by Service Employees International Union ("SEIU") President Andrew L. Stern, SEIU Local 715 ("Union" or "Local 715") has been placed in trusteeship and Rusty Smith has been appointed Trustee of Local 715. I have been retained to represent the Trustee, and write in response to your information request dated March 29, 2007.

Pursuant to the Constitution and Bylaws of SEIU and the trusteeship order, the officers and directors of Local 715 have been removed, and Trustee Smith has sole authority to manage and direct the affairs of the Local. Local 715's bylaws have also been suspended during the period of the trusteeship. I trust that this information responds to your requests Nos. 1 and 8.

Several of your information requests seek information about Local 521, purportedly because the employer is concerned that Local 521 might seek representational rights with respect to the bargaining unit at Stanford Hospital & Clinics/Lucile Packard Children's Hospital ("Stanford Hospital"). However, as Mr. Harland previously made clear, and as I will reiterate, Local 715 – not Local 521 – represents the Stanford Hospital bargaining unit. Local 715 has not

08/18/2007 18:00 FAX 415 7889 `^`    ALTSHULER BERZON

Laurie J. Quintel
June 18, 2007
Page 2

asked Stanford Hospital to have any dealings whatsoever with Local 521. Accordingly, none of
the information sought regarding Local 521 is relevant to the collective bargaining relationship
between Stanford Hospital and Local 715.

Local 715 responds to your remaining information requests as follows. With respect to
information requests 3 and 5, the Union notes that the question of whether it has paid employees
is irrelevant to its ability to carry out its collective bargaining responsibilities, and thus the
Employer has no legitimate right to this information. Subject to this objection, the Trustee
responds that there are not currently any paid employees of Local 715.

With respect to information request 4, I reiterate Mr. Harland's complaint that the request
is vague and ambiguous. To the extent the request seeks the identities of individuals authorized
to engage in collective bargaining activities on behalf of Local 715, Trustee Smith wrote to you
on June 14, 2007, and informed you that he had been appointed Trustee and that "all matters
relating to the representation of the employees" under Stanford Hospital's collective bargaining
agreement with Local 715 "will be handled under [his] direction." Trustee Smith's letter further
informed you that Kim Tavaglione, Joceyln Olick, and Ella Hereth would continue to be the
representatives responsible for the Stanford Hospital unit. Moreover, Stanford Hospital is
already aware of the servicing agreement between Local 715 and UHW, an agreement Trustee
Smith informed you would be unaffected by the trusteeship. Accordingly, Stanford Hospital
possesses the only responsive information to which it is entitled.

With respect to information request 7, which requests an "organization chart" of Local
715, I am unclear what specific information is sought. An employer is not entitled to information
that would reflect internal union communications, or that would intrude on a union's
associational privacy rights. Subject to these objections, Local 715 responds that it does not
possess a chart reflecting the organization's current internal structure.

Finally, with respect to information request 12, the Trustee is currently unaware of any
responsive document in the possession of Local 715.

Thank you for your attention to this matter.

Sincerely,

Barbara J. Chisholm
Attorney for Trustee of SEIU Local 715

cc:    B.W. ("Rusty") Smith
       Laurence R. Arnold, Esq.

**EXHIBIT II**



**LOCAL 715**

www.seiu715.org

# LOCAL 715

*SERVICE EMPLOYEES INTERNATIONAL UNION*

July 26, 2007                    CERTIFIED MAIL 7007 0220 0001 4286 9248

Laurie J. Quintel, Director
Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive – M/C 5513
Stanford, CA 94305-5513

Dear Ms. Quintel:

In my letter of June 18, 2007, received in your office on June 20, 2007, I informed you that SEIU President Andrew Stern has placed Local 715 into trusteeship and has appointed me trustee and that, "all matters relating to the representation of the employees or your organization under the Local 715 collective bargaining agreement will be handled under my direction."

I further informed you that the representatives assigned to represent Local 715 members and Stanford and Lucille Packard Hospitals and Clinics were Kim Tavaglione, Jocelyn Olick, and Ella Hareth.

At this time, please add Michelle (Chelli) Guzman to the list of authorized representatives of Local 715 pursuant to the servicing agreement with United Healthcare Workers – West.

If you have any questions, please feel free to call me at 408-316-4460.

Sincerely yours,

B. W. (Rusty) Smith
International Trustee

C:    Kim Tavaglione
      JJ Johnston
      Bill Sokol
      BJ Chisholm

BW:ch ^2007SEIULocal715-Trusteeship-Stanford-LQuintelltrerepresent-072607

**EXHIBIT JJ**



August 1st, 2007

Bruce W. Smith
2302 Zanker Road
San Jose, CA. 95131

Re: Your letters of June 14th, 2007 and July 26th, 2007

Dear Mr. Smith:

I am in receipt of your letters stating that you have been appointed as a Trustee of SEIU, Local 715. As we have previously indicated, based upon information we have received, Local 715 ceased to exist as a separate ongoing operational entity on March 1, 2007, and despite the very belated provision of a partial response to our requests for information received from your legal counsel, we do not have information that would warrant a different conclusion. Accordingly, we are unable to assess the legitimacy of your appointment, or determine precisely what it is that you, as a Trustee, would preside over in that capacity.

In any event, with regard to your statement in your June 14th letter that "[a]ll servicing agreements to which Local 715 is a party will remain in full force and effect without change whatsoever," almost eleven (11) months ago we confirmed, by letter to SEIU Local 715 dated August 29, 2006, that we did not and "do not recognize the purported service agreement; nor do [we] recognize as representatives of SEIU Local 715 any personnel from SEIU-UHW." Thus, we do not recognize Ms. Guzman, or any of the other individuals you name, who were long ago rejected along with the service agreement. Whether or not the "appointment" of a Trustee is legitimate, that appointment in no way affects our earlier rejection of that service agreement, which occurred prior to the merger of Local 715, by direction of the International, into the new regional local, Local 521.

Sincerely,

Laurie J. Quintel
Director, Employee & Labor Relations

**EXHIBIT KK**

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MICKELSON
BARRY E. HINKLE
JAMES RUTKOWSKI •
SANDRA RAE BENSON
CHRISTIAN L. RAISNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA ••
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
J. FELIX DE LA TORRE
KRISTINA L. HILLMAN •••
ANDREA LAIACONA
EMILY P. RICH

# WEINBERG, ROGER & ROSENFELD
A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

LORI K. AQUINO ••
ANNE I. YEN
NICOLE M. PHILLIPS
BRUCE A. HARLAND
CONCEPCION E. LOZANO-BATISTA
CAREN P. SENCER
LINELLE S. MOGADO
MANJARI CHAWLA
KRISTINA M. ZINNEN
JANNAH V. MANANSALA
MANUEL A. BOIGUES •••

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada
•••• Also admitted in Illinois

August 22, 2007

<u>**VIA FACSIMILE & U.S. MAIL**</u>

Laurie Quintel
Director-Employee and Labor Relations
Stanford Hospital & Clinics
300 Pasteur Drive
Stanford, CA 94305-5250

Re:     Your August 16, 2007 Memorandum to
        Jesus Andrade and Robert Rutledge, SEIU Local 715
        <u>"Revised Substance Abuse Free Workplace Policy"</u>

Dear Ms. Quintel:

This office represents SEIU Local 715. I am writing in response to your August 16, 2007 memorandum.

Local 715 demands that the employer cease and desist from implementing any modified or new policy applicable to bargaining unit employees as described in your memorandum, and its attachment. The establishment or modification of substance abuse policies, and work rules associated with it are mandatory subjects of bargaining, and Local 715 does not consent to the employer's implementation of any such policies until or unless the bargaining obligation imposed upon the employer by the National Labor Relations Act is fully met.

Please provide me, as representative of Local 715, with copies of any existing policies concerned with "substance abuse," a "substance abuse-free workplace," or drug or alcohol use/abuse applicable to any employee of Stanford Hospital and Clinics, or Lucile Packard Children's Hospital, at any time since June 1, 2004. Please provide me with the material at the above-referenced Alameda office address.

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA 90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA 95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI 96813-4500
TEL 808.528.8880 FAX 808.528.8881

August 22, 2007
Laurie Quintel
Page 2


In the meantime, we are available to meet and bargain with you concerning this proposed policy, or amendment to the policy, on August 29 or August 30, 2007.  Please advise me of your availability.

Sincerely,

Vincent A. Harrington, Jr.


VAH/map
opeiu 3 afl-cio(1)
1/467391

**EXHIBIT LL**

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MICKELSON
BARRY E. HINKLE
JAMES RUTKOWSKI •
SANDRA RAE BENSON
CHRISTIAN L. RAISNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA ••
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
J. FELIX DE LA TORRE
KRISTINA L. HILLMAN •••
ANDREA LAIACONA
EMILY P. RICH

# WEINBERG, ROGER & ROSENFELD

A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

LORI K. AQUINO ••
ANNE I. YEN
NICOLE M. PHILLIPS
BRUCE A. HARLAND
CONCEPCION E. LOZANO-BATISTA
CAREN P. SENCER
LINELLE S. MOGADO
MANJARI CHAWLA
KRISTINA M. ZINNEN
JANNAH V. MANANSALA
MANUEL A. BOIGUES ••••

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada
•••• Also admitted in Illinois

November 1, 2007

RECEIVED

NOV 5 2007

VP, HUMAN RESOURCES

Laurie Quintel
Director-Employee and Labor Relations
Stanford Hospital & Clinics
300 Pasteur Drive
Stanford, CA 94305-5250

Re:    SEIU Local 715 and Stanford Hospital

Dear Ms. Quintel:

I am not sure whether to address this letter to you, or to Larry Arnold, since it is unclear to me which issues Mr. Arnold is representing you on and which you are handling on your own. I am in receipt of a letter to the Chief Shop Steward of Local 715, explaining that even though you are taking dues out of the checks for workers, you are not sending the money to the Union.

I am concerned that this may be the equivalent of embezzling and theft, since you are taking the money from the workers and simply keeping it for your own institution.

I would appreciate an immediate response from either you or Mr. Arnold, since it appears that Local 715, and its Trustee, Rusty Smith, may have no choice but to report this to the proper authorities for criminal investigation.

Thank you for your immediate response, or the response of Mr. Arnold.

Sincerely,

William A. Sokol

WAS/rfb
opeiu 3 afl-cio(1)
cc:    Larry Arnold

1/474316

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA 90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA 95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI 96813-4500
TEL 808.528.8880 FAX 808.528.8881

**EXHIBIT MM**



**LOCAL 715**

www.seiu715.org

*SERVICE EMPLOYEES INTERNATIONAL UNION*

**Certified**

December 14, 2007

Laurie Quintel, Director
Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive – M/C 5513
Stanford, CA  94305-5513

Dear Ms. Quintel:

Stanford Hospital and Clinics and Lucile Packard Children's Hospital and Clinics and Lucile Packard Children's Hospital and SEIU, Local 715 are parties to a collective bargaining agreement, effective January 20, 2006 through November 4, 2008.  I am the authorized Trustee of SEIU, Local 715 officially appointed by the Service Employees International Union.

As the Trustee of SEIU, Local 715, I confirm that SEIU, Local 715 authorizes the law firm of Weinberg, Roger & Rosenfeld to represent the Union all aspects of the arbitration process.  This includes, but is not limited to, the selection of arbitrators, the selection of times, dates, and locations of arbitration hearings, and the advocacy and presentation of Union grievances at the arbitration hearings.

Only Weinberg, Roger and Rosenfeld has been authorized to represent SEIU, Local 715 for all arbitrations conducted in 2007, and going forward, and for all pending grievances.  Please instruct your attorneys not to communicate with any law firm on these matters other than Weinberg, Roger and Rosenfeld.

Sincerely,

B.W. (Rusty) Smith
International Trustee, SEIU Local 715

c:    Myriam Escamilla
      Bruce Harland
RS:w:©2007-SEIU521/CTW-CLC Laurie Quintel Ltr 12-14-07

---

**San Jose Office:** 2302 Zanker Road, San Jose, CA 95131-1115 • (408) 954-8715 • Fax (408) 954-1538
**Redwood City Office:** 891 Marshall Street, Redwood City, CA 94063 • (650) 365-8715 • Fax (650) 365-7956
**Stanford Office:** P.O. Box 19152, Stanford, CA 94309 • (650) 723-3680 • Fax (650) 723-3650
*-Affiliated SEIU 1972-*

**EXHIBIT NN**

## Palo Alto City Council Meeting Transcript
### November 26, 2007

[Beginning of recorded material.]

Mayor Yoriko Kishimoto:                So with that, we move on to the main item of
the evening. So before we start, Council Member Cordell.

Council Member Cordell:                Thank you. I will not be participating in this
item because I am employed by Stanford University and therefore
have a conflict.

Mayor Yoriko Kishimoto:                Thank you, and Council Member Mossar?

Council Member Mossar:                Yes. I will not be participating in this item
because my husband works for Stanford University.

Mayor Yoriko Kishimoto:                And Vice-Mayor Klein?

Vice-Mayor Klein:        Oh, same speech. My wife is employed by Stanford University.

Mayor Yoriko Kishimoto:                Oh, okay. Okay. And, actually, before we go on,
the city clerk reminded me that we do need to read some items into the
record for the consent calendar. Would you proceed?

City Clerk:        Adoption of an ordinance repealing and reenacting Title 15 of the Palo
Alto Municipal Code to adopt the California Fire Code 2007 Edition
and local amendments thereto, and chapters 3, 4, 5, and 25, and
chapter 1 appendix of the international fire code. Adoption of five
ordinances. One, repealing chapter 16.04 of the Palo Alto Municipal
Code and amending Title 16 to adopt a new chapter 16.04 California

Building Code, California Historical Building Code, and California Existing Building Code 2007 Editions and local amendments. Number two, amending Title 16 of the Palo Alto Municipal Code to adopt a new chapter 16.05 California Mechanical Code and appendix chapters A and D 2007 Edition. Number three, repealing chapter 16.08 of the Palo Alto Municipal Code and amending Title 16 to adopt a new chapter 16.08 California Plumbing Code 2007 Edition and local amendments. Four, repealing chapter 16.16 of the Palo Alto Municipal Code and amending Title 16 to adopt a new chapter 16.16 California Electrical Code 2007 Edition and local amendments. Five, amending Title 16 of the Palo Alto Municipal Code to adopt a new chapter 16.17 California Energy Code 2005 Edition.

Mayor Yoriko Kishimoto:    Okay. Thank you very much. So with this, we start --

Male Voice:    You don't have a quorum. You just stop until Judy comes back.

Mayor Yoriko Kishimoto:    Okay, we have to wait until Judy comes back. Can I make my announcements?

Male Voice:    Sure. They're just not official.

Mayor Yoriko Kishimoto:    Yes. Well, basically, I just wanted to share that we will be hearing items 7A and 7B together in terms of the public input. So if you speak, you're welcome to speak on both items. But we will take separate motions when it comes to it. Okay, so we're back to

a quorum. Let's see. So I will turn it over to our city manager to kick this off.

Frank Benest:     Thank you. I have the pleasure, tonight, of introducing this item. Tonight our focus is a framework for upcoming discussions and negotiations regarding the Stanford Medical Center and Stanford Shopping Center expansion projects. We will share with the council a little later in the presentation a comprehensive list of issues, mitigations, and community benefits regarding the two projects. This list has been developed with input from the community, the Planning and Transportation Commission, and the City Council in a number of previous meetings.

We look forward to a set of good faith negotiations with both the Stanford Medical Center and the Simon Group regarding these two projects. Like any good faith negotiations, there will be give and take during our discussions and our negotiations. As the draft environmental impact report analysis is underway, and it's currently underway, we have begun preliminary discussions with the medical center and the shopping center. We can get into specific negotiations once the EIR studies have been conducted, specific data, regarding the impacts of the two projects. I want to emphasize that our goal with both entities is to arrive at a package of mitigations and benefits that we can all embrace as we approve the two projects, which will have great benefit for the Palo Alto community and the region.

Let me quickly go over what we're going to be doing tonight. First slide, Curtis. I'm going to provide an update of our phase II efforts.

We're in phase II, and I'll explain that in a few moments. We will then have a presentation by Marlene Berkoff, our hospital peer review consultant regarding preliminary findings. In the packet is a full copy of her report, as well as an executive summary. Steve Emsley, our planning director, will then present a list of issues, mitigations, and community benefits that we will introduce as part of our negotiations, as a framework for our discussions and negotiations. Steve will also identify several zone changes to be studied as part of the EIR. We will then have comments by the Simon Property Group and Stanford Medical Center executives and the dean of the School of Medicine. And then I'll end up by talking and describing about our next steps. Next slide.

Phase I was the development as you recall of the area hospital plan and a preliminary identification of issues. That was sort of phase I, when we came to the council with the area hospital plan and that list of preliminary issues. We are now in phase II. We're well on our way in respect to phase II, which is the EIR and the entitlement phase. We did receive project applications in August of '07. The EIR -- environmental impact report -- was initiated in August. The planning transportation commission held a public scoping meeting and a project update in September and then in November.

The City Council conducted a public scoping meeting for the environmental impact report in September. There have been subsequently three community meetings regarding specific issues. Land use, transportation, housing, and sustainability. We have hired an urban design peer reviewer. And the draft hotel study related to the

Stanford Shopping Center project has been submitted and is under review by staff. So, as you can see, we keep moving along in this process, and we're in phase II. I would now like to introduce Marlene Berkoff, who will give a summary of her peer review. Marlene?

Marlene Berkoff:    Thank you. As many of you know, there have been a lot of issues looked at in the course of the peer review. The major questions that I was addressing were, first of all, why do these projects have to happen in the first place? The two projects being the essential replacement of the adult Stanford University Hospital and the expansion of the Lucille Packard Children's Hospital. And the second question was, assuming that they do have to happen, why do they have to be as big as they are proposed to be?

And briefly -- and it's not on the slide -- there are three essential drivers for the projects. The first are code compliance issues that I think you know quite well, particularly for the Stanford Adult Hospital and Clinics. Noncompliance with the seismic codes and the need to upgrade the hospital. The second issue is space. And that has some subsets. One is the right-sizing of current spaces that are no longer meeting standards for good healthcare hospital practice. And the second issue relating to space is not just the size, for example, of patient bedrooms, but the number of patient beds. The third category of issues driving this is the need to improve the infrastructure of the hospital, and that's everything from the structure itself to the mechanical systems, electrical systems, et cetera. The findings and conclusions that I've reached can be looked at in five categories. And you can read those very easily. The need for increase in patient beds,

then the issue about the beds -- both the private rooms and the size of
the rooms. Other key spaces. The building heights and the building
configuration.

Let's look, first, at the bed needs. In the process of determining how
many beds each of these hospitals need, Stanford did analysis at many,
many different levels. They did this internally, with each department,
and also with independent consultants at a couple of different levels.
They have done this as thoroughly as any institution I have seen and
with major reputable, independent companies. In addition, they
referenced population studies that have been done for the Bay Area,
and in particular a recent study done by the New Century Healthcare
Institute for bed demand specifically in Santa Clara and San Mateo
Counties. The conclusion is that approximately a 35 percent increase
in the number of beds is justifiable as far as I can determine and as far
as all their studies have determined.

Let's move on. And, again, as you know, I mean, I will answer any
questions about the details of this, um, at -- at the end. With regard to
the patient rooms, there are two issues. The first one, which is really a
major driver for the amount of space that's needed is that both
hospitals will be converting existing patient bedrooms that are doubles
into single private patient rooms. And all new patient rooms that are
added will also be single patient bedrooms. So there will be almost --
not quite, but I think it's about 90 percent, roughly, single patient
rooms. Whereas currently, between the two hospitals, there's only
something in the order of 35 percent single patient rooms. This has --
this issue of private patient rooms is really important. It has become a

standard nationally, not just for university teaching hospitals, but for
Kaiser, for myriad other institutions. No colleague and no reference
that I researched is proposing anything other than single patient rooms
for new construction. It would be, indeed, unreasonable for Stanford to
propose otherwise.

With regard to the size of the patient rooms, they are indeed all bigger
than they are now, partly because they're private and they should have
a toilet room attached and so forth, but also because healthcare
standards have changed. There's more equipment having to be in
rooms, families are included in the care of patients, which is not just a
nicety. It actually improves recovery and speeds healing. So the size of
the rooms -- I looked at many, many peer institutions, are very
comparable to others. By the way, in the peer research, of peer
institutions, I looked at UCSF at Mission Bay, which is in the planning
process, UCLA, which is already built. I got a lot of information from
Kaiser, some from Sutter, CPMC in the city. Many California
hospitals, and I also looked at university hospitals across the nation.
And, again, these numbers -- the numbers Stanford is proposing for the
size of rooms is very consistent with their peers across the nation.

I looked at other categories of spaces in addition to patient rooms. I
focused, in particular, on three kinds of spaces that are big consumers
of area. One is the operating suite and all the attendant equipment and
space that is needed to support those. And secondly I looked at the
emergency department, which is another very major area for Stanford.
As you know, it's a level-one trauma center, so this is a major user of
space and a place where a lot of improvement is needed. And finally I

looked at the most rapidly growing department in pretty much any hospital and that's the imaging department -- we used to call it radiology. The proliferation of equipment, of technologies, of computerized pieces of equipment, of robotics, all of these things have led to major increases in space without even considering the addition of additional ORs for example. Again, all of these rooms, on a room-by-room basis, compare consistently with those of peer institutions.

Let's move on to the next one, please. Okay. With regard to building height, this starts moving into the area of talking about the volume, the mass and size of the building. One of the key driving factors is how high each floor is. And when you look at a building, you look at floor-to-floor heights, structure to structure, not the ceiling that you see. Building heights have risen in the past 10 to 15 years perhaps two to three feet, so that they're getting very tall. Much higher than what you would normally assume in any kind of other structure. The reasons for this have to do with, again seismic structure. In the State of California, this is, you know, a bigger structure than in other states.

Equipment that has to be ceiling mounted, and, again, because of seismic regulations, it isn't just mounted. It has to be structurally, soundly attached, which takes more structure, more steel, more space. Standard heights for nursing units -- nowadays -- are 16 feet, floor to the next slab -- slab to slab. And for the diagnostic and treatment areas like the operating rooms, the emergency department, the imaging department, those heavy duty high-tech areas, the standard heights are now 20 feet, give or take a few inches. Again, this is consistent with peer institutions. But if you think about it, what this means is if you

stack up three floors, you're pretty much at a 50-foot height limit and, depending on what those floors are, if they're diagnostic floors, you're over 50 feet with even three stories of space. And this is very standard for contemporary hospital construction.

So where does that leave us with regard to the building configurations for the hospitals? What this look at the building height -- the floor-to-floor height -- tells us is that there's not much latitude there for minimizing the height. What really is going to determine the building configuration is the way the buildings are stacked up. How many floors are stacked up on top of how many other floors. Two things are really driving the ultimate configurations that are being proposed by Stanford. The first one is the limited site area. The medical center campus may look big, but it isn't that big when you start trying to put a whole new hospital on it and -- which brings us to the second point -- keep all the existing operations going during that transition. You can't close something down, and this is not just the patient beds. It's parking, it's access, it's ambulance access, drives, service, deliveries, and so forth.

So that there's going to be a transition period where everything has to be kept in motion throughout construction, so that while functional planning is certainly a major consideration in the configuration of these hospitals, what's driving the proposals that Stanford is making are these two really severe limitations. And the only way that that could change is if there were more site areas so that things could be spread out more horizontally or if Stanford were to reduce the number of beds and/or some of the program contents in the building, the

healthcare services. So at this point, those configurations represent the
most reasonable response, given these restrictions and the amount of
space that is being proposed. And I think we'll be happy to answer any
questions that you may have. I think.

Mayor Yoriko Kishimoto:            Yes, Council Member Drekmeier?

Council Member Drekmeier:          Well, thank you very much for the report. It was
very helpful.

Frank Benest:    We have a few more slides to go over.

Marlene Berkoff:    Oh, I basically -- oh, from other people? Yes. Okay. Yeah, so you
don't want questions for this now?

Mayor Yoriko Kishimoto:            Is that okay?

Steve Emsley:    Thank you. I just wanted to finish up briefly with some of the
documents that would be considered by the Planning and
Transportation Commission and the City Council as the project went
through its review process over the course of next year. The first
document is essentially the development agreement, which is a
contract between a private property that has generally a long-term
interest in developing a project over a longer period of time. It's
negotiated between the city and the applicant, and it vests the approval
at the time of the adoption over 20 to 25 years is a typical period of
time. And that is given the certainty given to the developer or
applicant in exchange for certain agreements that would give benefits

in addition to required mitigations or project conditions that would offset potential impacts.

It would also enable the city to go beyond those conditions of approval and allow for and require a range of community benefits that normally would not be able to be obtained. Next slide, please. The driving resource document that would be used to inform the development agreement and the ultimate project approval is the environmental impact report. And as the council knows, we are doing an environmental impact report for the combined project of the Stanford University Medical Center and the Stanford Shopping Center. This enables us to look at both projects at the same time and to better catalogue and identify the communicative impacts from both of those.

And it helps the city staff and the policymakers to identify the significant impacts that, by state law, must be reduced to less than significant levels unless they are overridden by action of the City Council. It helps identify feasible mitigation measures. For example, looks at traffic-reducing measures such as TDM and other nonvehicular forms of mitigation. In addition, any mitigation measure would also, if it did have intended impacts, would also have to be analyzed and discussed, and those impacts identified as well. And lastly the environmental impact report identifies project alternatives that serve to reduce the impacts.

Some impacts cannot be reduced to less than significant levels unless a different form of the project is considered, so therefore project alternatives is required to be a part of the environmental impact report.

One of these alternatives, and it is also required by state law, is the no project alternative or not moving forward with the project, but also an alterative of reduced size is being considered, and what we're calling the village alternative, which introduces a mixed-use concept of hospital and other uses.

The issues, mitigation, and community benefits, which is shown in your city manager's report as Attachment A really represents a list of items that, in a broad basis, would be considered during the development agreement negotiations as well as the preparation of the environmental impact report. These refer back to the area plan objectives that the council considered last summer and accepted on a preliminary basis, so they do relate back to general land use policies and objectives that were identified and studied in the phase I analysis of the project.

The project applicability is identified for either the shopping center or the medical center or both, in some cases, so it is a combined list that deals with both the combined projects. This evening, we're seeking the council and the public input on further direction for the framework for these negotiations. The Planning Commission has provided you with its analysis and comments, and they're contained in attachment B. As mentioned earlier, the Planning Commission hosted numerous public sessions where comments were invited on the broad issue areas.

To summarize, and Commissioner Garber will be going over this in greater detail in just a moment, many of the comments provide clarifications. New items were added, and modified some of the

applicability for the project. However, in staff's analysis, the suggestions and comments and recommendations of the planning commission fit well within the framework that we've identified. And the broad basis of framework provides the policy nesting place for each of the ideas and suggestions that the Planning Commission has given. [Next, please.]

Just to briefly go over the framework, they're broken down into six categories, starting with land use and open space. This is probably the most significant area in discussion. Housing and employment generation. How the increased housing demand and employment demand would be addressed within the project or in nearby areas. Transportation and linkages. This deals not just with vehicular transportation but alternative forms of transportation. This is where TDM measures would be discussed and analyzed and negotiated. And linkages, which would improve pedestrian and bicycle access to the shopping center and medical center from our other areas of interest in Palo Alto, such as from our intermodal transit station in downtown.

Sustainability, where the green building measures would be incorporated and how the project would reduce its carbon footprint. Utilities and city services looks at the potential impacts on future loads and demands that are provided by the city through its own utility department. And, lastly fiscal areas. And that looks at both the additional demand for services as well as potential revenue-generating aspects of the project. The initiation of the zoning changes would enable the project to -- the zoning changes to be included as a part of

the EIR. The project applicants for each project have requested specific zoning changes to accommodate their respective project.

Palo Alto is a bit unique in that zoning amendments may only move forward when they are initiated by action of the City Council or the Planning and Transportation Commission as described in a noted municipal code section. Because a project initiated does not imply that the specific request would be granted, it simply moves the project forward. It must be done before public hearings ensue, before the Planning Commission and City council, and it does not imply a specific approval for a particular zoning action. It really would follow -- intensive staff analysis would follow as well as extensive public input and final recommendations would come back to the City Council.

And in this case, because a development agreement is being considered, would be considered as a part of that final agreement, that contract would address the final zone changes for each project. Specifically, the Stanford University Medical Center is asking for the establishment of a new zoning district, which would have the accompanying development standards such as set back, building height, FAR -- floor/area ratio -- parking, all the typical standards that are specific to any zone in the City of Palo Alto. Secondly, the zoning requested provides a regulatory framework for the project to move forward through its current design, but also would address the need for future minor amendments, including potential future expansion of the project.

The zoning changes for the shopping center are a bit more specific. The shopping center is currently at its full build out as the existing development agreement and shopping center zone stipulate. There is no additional development potential at the shopping center, so any expansion of the shopping center would require a tax to remove the development cap and increase that amount. So that just gives you in a nutshell the actions the are before the council this evening as well as those that are anticipated through the course of the next year. Right now I would like to introduce, representing the Simon Property Group, Art Spelmeyer, the senior vice-president representing Simon. And I'd also like to point out that in addition to the two CEOs of the Stanford Hospital and the Packard Children's Hospital, Martha Marsh and Christopher Daws, we will be hearing from Dr. Phillip Pizo, the dean of the School of Medicine.

Art Spelmeyer:    Good evening. Nice to see you all again. I got here in the West from the East, where the weather is turning. I always feel like I have to give a weather report for you all so you appreciate what you have out here. I want to thank Frank and his staff for the work that they've done to date. As you certainly can see from Steve's presentation, there's a lot of work in front of us, and we look forward to working with the City Council for the final EIR development agreement and all the approvals that will be necessary to get the shopping center expanded, which will allow us, of course, to stay competitive. There are a couple things that I do want to comment on, relative to the issues list that's in front of you tonight for your consideration.

First of all, the issues list is presented in sections corresponding to the text of the Stanford University Medical Center Area Plan. This may make it appear that the area plan applies to the shopping center, and as you know, it does not. We raise this so as not to falsely raise any expectations that the stated area plan policies relate to or govern the shopping center itself. Many of the items that are on the list correspond to the topics that will be studied in detail in the EIR. If significant impacts are identified in the EIR, such as traffic of course, the EIR will, as required, identify feasible mitigation measures. So a good number of these items listed will be dealt with through the EIR process.

There are several other items on the list that are related to the shopping center's plans to expand. Quite frankly, it's difficult for us to imagine how they could be a part of any deal that would allow us to successfully expand the center. A few examples include constructing traffic improvements remote from the shopping center, somehow securing land from Stanford University at no cost to the city, or doing anything in the way of providing land for housing or building affordable housing units, particularly since we are already obligated to pay housing fees for expansion space.

As I said at the beginning, we want to continue our great relationship with the city, but I do have to point out that as a publicly owned company, we do have a fiduciary responsibility to our shareholders. And we will make decisions that are economically sound for ourselves and our shareholders. And I know that you, too, have a similar responsibility to the citizens here in Palo Alto. Finally, I would point

out that while the issues list is aimed at securing community benefits, we think that our proposed project represents, on its own, a substantial community benefit. The project will enable the shopping center to stay vital and thrive, not only providing goods and services to the city residents, but also bolstering the physical health of the city itself. We look forward to moving on to the second phase of our work, and bringing it to conclusion. Thank you.

Mayor Yoriko Kishimoto:                    Thank you. [Are we going to hear from them? Yes, the CEOs and our dean.] Thank you, welcome.

Martha Marsh:        Good evening. Mayor Kishimoto and council members, thank you so much for inviting us here this evening. And we would also like to thank Frank and the staff who have really worked hard to continue working on a resolution on the project so that we can move forward the healthcare for this community. As you heard earlier, the peer review really validates what we are proposing within the norms of new hospital design. And although we obviously believed that that's what we were doing, it was great to have an outside person validate that what we are proposing is consistent with standards that are moving forward in the healthcare industry.

We have a tremendous opportunity in working together to really create some exciting healthcare and new opportunities for care for the people that live in this area. The recent earthquake was a reminder of how important this project is, that we all like to think that it's not going to happen or have a problem in the hospitals, and we did not have a

problem with this earthquake, but it is a reminder of the importance of rebuilding the Stanford Hospital.

I'd like to start for a second and talk about the reality that we're facing today. Imagine that you are having cardiac problems and that you have heart failure problems. You can't walk down the hall without stopping because you have shortness of breath. You've got cardiac surgery scheduled, your spouse is taking time off from work, your family members have flown in from other parts of the country, you're ready for the surgery, the morning of the surgery, the phone rings. I'm very sorry, we have to delay your surgery because we have no beds. And you say, well, when can I have my surgery? And you say we'll get back to you as soon as we can find one.

This is happening. This is happening as recently as the last few weeks. I was talking to someone today about the situation, and he said I know that happens, that happened to me. So this is not the way we want to provide healthcare for people in this community. In addition to that, our emergency room is overcrowded. It was built for 70 patients a day. We're now seeing between 125 and 150 patients a day. If any of you have unfortunately had to be a patient or have a family member there, you know how crowded it is. And it is not adequate for the kind of care that you all deserve. In addition to that, last November 16, just a few weeks ago, we had 18 patients waiting in the emergency room for up to 44 hours because we had no beds. Ambulances were on diversion. They couldn't come to Stanford Hospital. So if someone living in Palo Alto called an ambulance, they had a stroke -- we all

know that when you have a stroke, there's a time sensitivity to being treated -- you would not have been able to come to Stanford Hospital.

That we want to be here for the community, we need to be here for the community, but the current size of the hospital and the configuration that we're facing does not always allow us to do that. The good news is -- many of you may have read -- we've recently received a significant gift of over $20 million to help us rebuild our emergency department. This we hope is really an exciting gift for us that will get others to donate and help us build. We are going to raise hundreds of millions of dollars from this community to help rebuild our hospital. Our dollars need to be focused on healthcare.

We're very excited about working with you to address mitigations, but we really want the mitigations to be related to the needs of the hospital and how they directly affect the community. I urge you to focus on the healthcare benefits of the hospital and the community benefits that both of these hospitals brings. What this is really about is you, your family, your neighbors, your friends, when you call an ambulance at 2 a.m., people that want the latest cancer treatments. We need to be there. Others travel from great distances to get the kind of care that we provide in this community, and we want to be there for the community. So we really appreciate your considerations in working with us on this, and I'd like to introduce Chris Daws, the CEO at Lucile Packard's Children's Hospital.

Chris Daws:    Thank you, Martha, and thank you, Mayor Kishimoto and Frank and the entire staff. I thought I would just take just two or three minutes to

talk a little bit about capacity. That's one of the issues that has come up during the last few weeks and months that we've been going through this process. Why do these hospitals have to be the size they are? What kinds of issues are we trying to deal with? Well, as you've already heard from the peer review, both hospitals went through an extensive process to determine how many beds we would need, what those beds would be used for. We took a lot of issues into consideration when doing that.

To give an example of some of those issues, we not only looked at obvious ones, which is like demographics and so forth, but we looked extensively in terms of the advances in medicine. We looked at areas in terms of the aging population and so forth. And through those analyses is how we began to determine what kind of bed we needed. We also wanted to make sure that we understood the acuity of our patients. At the Children's Hospital, we had a lot of success in pediatrics over the last -- across the country and across the world. And more and more children, thank god, are being saved, and therefore, children who quite honestly would not have survived more than two or three years, are now living 15, 20, 30, some well into their adult years. Unfortunately, many of those children that become adults bring with them ongoing chronic illness. And if you look across the state or across the whole country, you'll see that what we're seeing in hospitals is actually an increase in the demand in pediatric facilities and in adult facilities to take care of chronically ill -- that were chronically ill children and now, in some cases, chronically ill adults.

So now let's bring this back to the present. You've already heard from
Martha about some of the capacity concerns. To put some numbers to
it, we're running -- both hospitals run well over 80 percent occupancy
right now. National norms is to run about 75 percent, both hospitals
have periods of 100 percent, which is what's happening to both of us
today. I received three emails while sitting in the back about how
capacity constraint is occurring as we speak. But let me give you just
one kind of example of something that happened earlier this week.
This is actually -- I'm going to be quoting an email that I got from our
chief of pediatric neurosurgery that he sent me in frustration last
Wednesday, of last week. He says I will not repeat my dismay and
frustration -- his cases had already been delayed because of a lack of
beds. I have just turned away two more children requiring
neurosurgical care.

The first child was turned away at 9:15 p.m. from Washington
Hospital in Fremont. The emergency physician requested transfer of a
10-month-old who fell backwards, striking his head, and had a
posttraumatic seizure. He was taken to the emergency room at
Washington Hospital. And he was irritable, and his CT scan shows
that he has a right subdural hematoma. Unfortunately, I could give
advice, but I could not admit this child. Just 35 minutes later, I
received a second call from Nintividad Medical Center in Salinas. The
emergency physician requested transfer of a 9-year-old child that fell
from a ladder approximately 10 feet. He was vomiting, was feeling ill,
and was taken to the emergency department. His CT scan revealed a
left epidural hematoma and a skull fracture. This is a far more critical

patient and needs admission immediately. Unfortunately, again, I had to give advice and then tell them to go elsewhere.

So I think this is the kind of issue that we're dealing with every day. Now, the good news is that we are in the process of building 39 additional beds, and by the fall, we will have 39 additional beds, including intensive care beds. Those will be the last additional beds that we'll be able to build until this project that we are currently discussing with you. I think it is important that we understand that we shouldn't have children of the peninsula and the South Bay have to travel miles and miles away to go to other facilities. Now, you might say, there must be lots of other facilities that could take care of these children. In the Bay Area, there are only three that could take care of these children, maybe four. One's at Oakland Children's, one's at UCSF. Coincidentally, both of those facilities having bad situations themselves at the time. I don't know where these two children ended up, but they may have ended up going to Sacramento or possibly Southern California.

As we planned for the future, we considered many factors that determined the number of beds and so forth. First, we looked at the projections and demographics, as I mentioned before. And that's how we determined how many beds we need. It is important to note that we also see a large number of patients who are sponsored by government programs. And I know questions have been raised, well, how many underserved patients do we serve, how many MediCal patients do we serve? I think it will surprise some that 40 percent of the patients at

Lucile Packard's Children's Hospital are covered by MediCal insurance.

MediCal insurance, for those of you not familiar with it, is a Medicaid program, which is a federal program, administered and partially funded by the State of California. Since the State of California does not pay our costs, unfortunately the contracts we have to negotiate with the State of California are such that they do not pay our full costs. In fiscal year 2006 the gap between what it costs us -- not what we charge, but what it costs the Lucile Packard's Children's Hospital to provide service to these patients and what the State of California paid us was $104 million. That was one hospital in California, and the gap between what it costs us to provide care and what we were paid by the government. So we certainly do take care of the underserved population.

Let me conclude by saying that 16 years ago, we opened up Lucile Packard's Children's Hospital. Within two years of opening, we had outgrown our capacity, and we started leasing beds from other hospitals, and we've been doing that ever since. What I'm hoping is that as we move through this process, it will hopefully gain approval that we will have the capacity to open additional beds and meet the needs of this community. Not 5 years from now, not 10 years from now, but 20 years from now. So we have the ability to do so. Thank you very much.

Dean Phillip Pizo:    Mayor Kishimoto and council members. By virtually any metric, Stanford University Medical Center is one of the finest in the nation.

But we can almost take this for granted from time to time. I'm reminded that on December 24, just a few weeks from now, at the Stanford Theatre, crowds will line up to see It's a Wonderful Life, an annual event that takes place here and elsewhere. And as we reflect on the 1946 Frank Capra movie, we all remember that it was George Bailey who, at the end of the movie, comes to the recognition of what it would have been like if his life had never existed. Reminds us to think about what our community would be like in the absence of Stanford University Medical Center. Let me reflect backwards and forwards in terms of where we've been and where we're going in terms of one of the things that makes the medical center most unique, which is the intersection between the ability to deliver state of the art patient care coupled with innovations and insights in science and technology that transform the face of medicine.

It·was hear at Stanford that the first in vitro synthesis of DNA took place, which led directly to the evolution and revolution in genetic engineering that spawned the entire biotechnology area. It was here at Stanford that the arrays -- micro arrays, genes on a chip, were discovered by some of our investigators that are now changing the way we think about the diagnosis and staging and transformation of disease states. It was here at Stanford that the foundations for the complete sequencing of the human genome was conducted. And, in fact, more than 10 percent was done in our laboratories here at Stanford. And, going forward, in just a handful of years, we'll be able to carry out human genome sequencing on individuals for less than $1,000 per patient, leading to the whole revolution of personalized medicine. It was here at Stanford that the foundations for magnetic resonance was

determined, that led to the imaging technologies that we almost take for granted today. And many of the evolutions and revolutions of 3D imaging were founded here at Stanford.

It was here at Stanford that the work has gone on in the derivations of molecular imaging that will allow us to be able to determine whether or not a patient has cancer down to the hundreds of cells as compared to millions of cells that are required today. It is here at Stanford that the fundamental underpinnings of cancer treatment and biology were identified. The linear accelerator was discovered here at Stanford that has transformed radiation oncology. It is here at Stanford that some of the first understandings of tumor immunology were delineated, leading to the derivation of monoclonal antibodies that have opened up vast new vistas about the immunity -- immunological approaches to cancer as we know them today and envision them for tomorrow. It was here at Stanford that the understanding between cancer stem cells and stem cells was delineated that will change the way we think about cancer diagnostics as well as treatments in the future.

It was hear at Stanford that the first heart transplant was performed. Here at Stanford that the stents that lead to changes in how we approach the treatment of heart attacks and disease were first delineated. And it was here at Stanford that interventions were carried out using new technologies that minimize invasive surgery, both in adults and in children. It is here at Stanford that some of the very first concepts in the way we think about neurobiology were delineated and the approaches to strokes and stroke management were really defined here at Stanford in unique and important ways. And it will be here at

Stanford that the way we think about human consciousness, behavior, and the intersections between engineering and the brain will be delineated in the years ahead. It was here at Stanford that the very first stem cells were identified in humans in the homeopoetic or blood-forming system, both in mice and in men.

And it was here at Stanford that the origins and ability to think about regenerative medicine have really been delineated in pioneering and important ways. It's been here at Stanford that some of the most important transplant procedures were conducted, that will be further advanced by stem cell biology as we move into the future. And that the intersections between immunity and infectious diseases are being understood in rational and newly important ways.

So when we think about what George Bailey meant to it's a wonderful life, it's important to think about what Stanford has meant to this community during the last 50 years. Not only has it pioneered new innovations, new treatments, new diagnostic approaches, but it has set the stage for the revolutions that will take place during the next 10 to 20 to 30, 40, to 50 years. It has trained many of the leaders as medical students and graduate students, residents and fellows, and it has shaped this community and will shape others in the future. I think it's incumbent upon all of us to not only think about the needs for bed capacity, to think about the urgency of treating patients, but to think about the unique and important underpinnings of science and knowledge that will change the way we think about medicine in the future. That, too, will be here at Stanford. Thank you very much.

Mayor Yoriko Kishimoto:                    Thank you very much for coming to speak to us.

Frank Benest:            I'd like to conclude the staff presentation and then we'll go to the
                        representative for the vice chair of our Planning and Transportation
                        Commission. But just to give you a sense of next steps. First of all,
                        we're underway already in preparing a number of technical studies as
                        well as a draft EIR. And those technical studies include a traffic
                        analysis, housing demand study, as well as an economic impact study.
                        And so that will all inform our discussions and our negotiations. There
                        will also be preliminary architectural [views] happening in December
                        through March 2008 on both projects. There will be obviously the
                        negotiations regarding the development agreement throughout 2008.

                        Those will be informed, particularly the negotiations, by the data from
                        the draft environmental impact report. We'll have project updates at
                        the commission level and the council level in spring 2008. The draft
                        EIR will be released for public review in July and June of 2008. We
                        are proposing to have public hearings regarding the draft EIR to
                        discuss the data and its adequacy. And that will happen at the
                        commission ARB and the council in the summer of 2008. And then as
                        our negotiations continue and there's a final EIR and a development
                        agreement to be considered by the commission and the counsel, that
                        will be happening at the end of 2008, beginning of 2009. So as you can
                        see, it's quite a process. Now I'd like to turn it over and introduce Dan
                        Garber, the vice-chair of the Planning and Transportation Commission,
                        if I may.

Dan Garber:            Good evening. First, a couple of brief clarifications, and then a couple
                       of broader themes. First, subject to the recommendations that each of
                       the CMRs have, there are two in each one of the CMRs -- the first
                       portion asks the council for identification of issues, just a clarification
                       that the actual focus of the commission's work has been slightly
                       narrower, which is on the benefits and mitigations. The second part of
                       the CMRs that the council has asked to look at this evening deals with
                       initiation of various zoning actions. It's important to note that the
                       commission has not addressed those. Those haven't been before the
                       commission yet, and therefore, it has not taken in any action or
                       recommendations, not has it looked at the attachment A to the CMR
                       7B, the shopping center [kind of language there].

                       The commission understands that staff intends to put together a
                       subcommittee that will look at the language of that zoning more
                       specifically, later. Other clarifications relate to attachment B, which
                       are the commission comments that were in addition to the public
                       forums that were held earlier, which are in your packet under
                       attachment G. Item number E10 under urban design, there's an add to
                       add the phrase "versus FAR." The context of that was possible FAR
                       and/or density transfers in order to free up Stanford land for potential
                       parks, schools, et cetera. Item number H18, which deals with housing
                       needs, and there's an add in the first bullet that says add intermodal
                       housing site.

                       The clarification there is that it was added because that was not being
                       recommended as a potential site by that particular commissioner and
                       actually several of the other commissioners. And then, finally, the last

comment, T59, hotel location/placement of hotel at Hoover Pavilion Site. There's a comment by several of the commissioners. The hotel market study evaluated only two of the locations that were identified by the Simon Group. The comment here is that several of the commissioners have commented that a third site, the Hoover Pavilion, should be considered and evaluated as a possible hotel site as well.

Finally, some broad themes that relate to the overall discussions of the commission. The first being, uh, matching, uh, Stanford goals, uh, project goals to the cities. Uh, the commissioners recognize that the city's hospital consultant, uh, work auditing Stanford's development program and occupancy requirements has been thorough and complete. However, the work of truly matching the city's goals to Stanford's is far from being done. The commissioners' comments, as you read through them, addresses this in a variety of ways. But in large part, the goals of the city have yet to truly be identified and will be as the EIR is pursued.

So the actual follow-through of how many beds the community actually needs, how high the buildings are, how much open space there should be, how much and what type of traffic [mitigations there are, are just four of the many, and much longer list of issues] the commission will be looking to the staff and their various consultants -- including the hospital and the urban design consultant that's coming onboard, and potentially the architectural consultant that the commission has raised as a possibility. In a technical study, the commission will be looking for them to address these issues more directly.

Regional impacts, regional responses. Commissioners, numerous times, have discussed the potential for the project to have larger impacts regionally than just Palo Alto. The commissioners recognize the need to engage surrounding communities and get them involved in the process and eventual solutions; however, it is typically outside the scope of the commission to actually engage in those sorts of conversations. And this represents potentially an opportunity for the council to give direction and/or create those opportunities.

Sustainability. This has been a very large theme of the commission for all of its meetings. There are a variety of things that have been discussed. I'll mention a number of them. That the project should plan to meet the ANYBODY 32 greenhouse mandates through 2050. The project should become a role model for sustainable design in our community. That it can aim higher than a silver lead certification. That it should consider storm water collection and gray water collection in use. That issues of fill and soil management should be addressed. Construction green management practices should be included, and energy generation should be considered as well.

Fourth large theme here is a fairness theme that commissioners have brought and the public have brought. That the commission recognizes how important this project is and the opportunities and benefits that it can bring to the community in and of itself. And I'm using the word "benefit" here in terms of its implicit benefits, as opposed to mitigations and benefits. However, that shouldn't be used to overlook the obligations that both the city and Stanford have to mitigate the

impacts that it will have on the community. And among the things
there are how Palo Alto's infrastructure and utilities are allocated and
how housing is allocated between those two.

Finally, in recent meetings, both the public and some of the
commissioners have spoken about the issue of the schedule and the
development agreement between the city and Stanford going on in
parallel with the development of the EIR study. When the initial
schedule was created, that parallel structure was put into place,
although there is some confusion about how that actually works. And
that needs to be clarified to the public, either, on one hand, recognizing
the risks that the applicant has when those two processes come to the
same point, in that one cannot come before the other, ultimately, in
terms of approvals, or to separate them so that it becomes more clear
to the public how that process actually works.

Those are the general themes. If there are other questions, I'm happy to
respond.

Mayor Yoriko Kishimoto:                Okay. Thank you and I want to thank the
Planning Commission for the excellent work that you did in reviewing
that. So appreciate the presentations. We could do preliminary
questions, or we have many speakers. Shall we go to the speakers
first? Okay.

There are almost 40 speakers and I'm glad you all came and are
interested in this. So because this is such an important item, I am going
to allow up to three minutes, but obviously the more succinct you can

be, the more time you'll leave for the Council to deliberate. So, shorter is definitely welcomed as well. Let me see, I guess we don't need to take a break. All right, possibly halfway through. All right, let's start with [Lee Weeder], to be followed by [Tina Peak].

Lee Weeder:      Good evening, Mayor, members of the City Council. I'm Lee Weeder, representing the Palo Alto Chamber of Commerce.

The Chamber's Board of Directors supports, in concept, the proposed Stanford University Medical Center Renewal and Replacement program. We feel it's important to weigh in early on the business of health. We'll address the shopping center later in the public process, not tonight.

You know, an underlying theme to our remarks and the letter you have in the part of the record is that be there for Stanford, so Stanford can be there for you and your loved ones. That underlying theme, you've heard it tonight, you've heard it before, and appropriately, it should continue to be heard.

I'm not going to go into all the reasons the Chamber supports conceptually the Medical Center's expansion at this time, except to mention a couple, or a few. Of course the upgrade, as you know, is mandatory in terms of the seismic upgrades that have to be done by 2013. And with that, there is an expense. And of course, sustainable strategies and practices, this could be very much a part of it. That's important to the Chamber, as it is to you and this community.

The upgrades will provide a number of things, none the least of which is a high caliber of practitioners. And one thing that's not been mentioned so far tonight in the reports, but I know all of you are very mindful of that, is that the hospital is the only Level One Trauma Center between San Francisco and San Jose. And this means a major participant in emergency preparedness and disaster planning for Palo Alto and the Silicon Valley.

The Chamber will continue to monitor all steps of the approval process, including but not limited to the EIR. We look forward to a constructive, community-wide dialog by residences and businesses resulting in a reasonable, workable mitigation measures that will adequately address such issues as height, traffic, and of course, housing. Our city is extremely fortunate to have in its midst two world-class hospitals providing cutting-edge medical services, research, and professional training. These two hospitals, when complete, will likely be the best of their kind in the world.

Be there for Stanford so that Stanford can be there for you and your loved ones.

Mayor Yoriko Kishimoto:            Thank you. Next is Tina Peak, to be followed by [Carol Harrington].

Tina Peak:            Good evening, City Council. I'd like to start off by stating my opposition to the massive Stanford expansion that's currently being considered. A lot of people that I talk to say, "Oh, well, it's Stanford.

It's a done deal." And maybe it is, but I'm hoping you'll consider all of the ramifications of this project.

The hospital expansion, as you know, involves 1.3 million square feet, which is half again the size of the hospital that's currently there. They claim that they need this massive expansion -- by 35 percent they want to increase the number of beds, and they claim increased population. Well, I did a little census study of Palo Alto from 1980 to 2000 and our population's only increased 6 percent. So I wonder why they need 35 percent.

They also want to increase the emergency beds by 33 percent. Are we really having that many more emergencies? I don't think so. I think what Stanford wants to do is they want to increase the size because they see themselves as this large, regional hospital. They compare, in a peer report, their 130-foot high-rise to UCLA and UCSF. I would propose that if the market they want to compete in is the regional hospital market, then they should look at places that mirror the density of UCLA in Century City or UCSF in San Francisco. They should be looking to build in a place like San Jose, not in Palo Alto, because this is not an appropriate venue for a large regional hospital.

Palo Alto's a poor choice for a regional hospital. As we all know, vehicle access to Stanford Hospital, for both patients and workers, is not easy. They're not near either the 280 freeway or the 101 freeway. Adding another 2,000 workers for the hospital and 3,000-plus workers for the hospital and the shopping center, most of them are going to commute off of highway 101. I live in downtown north. I know they

come down Willow Road and they trickle through the northern part of Palo Alto to get to Stanford. I don't think Stanford is going to pay to extend Willow Road to El Camino; that's never going to happen.

You'll also notice in the peer review report that the room sizes at the hospital are bigger than the most common size. Although they're within the range, they're much bigger. They also claim they need more space for new technologies. I would also like to state that a lot of technologies are getting smaller. Ultrasound machines have gotten smaller, digital radiology has gotten smaller. There's every chance to assume that robotics, MRIs, CT scans will also get smaller, so maybe they don't need all that space they claim that they will need.

I think many residents, like myself, in Palo Alto want Palo Alto to stay a local community and not be a regional center. We don't want our children biking on overcrowded streets to get to school, dodging workers that are rushing to Stanford. We don't want them in overfilled schools. We want a community that's sustainable. Sustainability is a big thing here and if you keep adding more and more people, more and more buildings, it's a self-fulfilling prophecy that we will need more housing. Thank you.

Mayor Yoriko Kishimoto:                    Thank you. Carol Harrington will be followed by [Edward Holland]. Okay, then Edward Holland is next, to be followed by [Chuck Fonseca].

Edward Holland:      Hi, I'm Edward Holland. Next spring, my wife and I will have been residents of Palo Alto for 50 years. There are many things about Palo

Alto that have caused us to stay here and raise our family here. But one of the ones that's always let me sleep well at night was knowing that there was a state-of-the-art hospital over on Stanford should we need it. That is a wonderful contribution to the advantages of the city and we should do the best job we can to continue to use it.

Fortunately, I've never spent a night in the hospital, although I've used the emergency room a couple of times. And some of the finest doctors that I have in the clinics there have given me the ability to walk down here and be able to see to get to this microphone. And I encourage you to do everything that we can to make sure that we maintain this fantastic facility. Thank you.

Mayor Yoriko Kishimoto:    Thank you. So I'm going to call three names. And if you wouldn't mind coming closer, that would help speed this up a little bit. So Chuck Fonseca will be followed by [Arden Anderson] and then [CJ Wilson].

Chuck Fonseca:    Madam Mayor, Council members. My name is Chuck Fonseca and I'm a nursing assistant at Stanford Hospital. About 1,500 workers like me are represented by SEIU. With our work we contribute daily to this community, even though many of us cannot afford to live in the area. Yet we are a vita presence and this is why it is important for us to be here tonight.

We want to share with you our perspective. The proposed building projects for the Medical Center and Stanford Shopping Center would have a direct impact upon the lives of many of our members. The

hospitals have refused to deal with our union. We are concerned that Stanford and Lucile Packard Hospital dismisses our voices, and we want to ensure community leaders, like you, hear these concerns.

Beyond this, the projects would also have an important impact on the lives of thousands and thousands of our members here in Palo Alto and in surrounding communities and counties. These projects will have a tremendous impact on housing, transportation, and the environment, and will affect the quality of life [of many of the] community residents we proudly serve. Now this will also have an impact on affordability and quality of care we want to provide.

The Mayor was right when she suggested that we need to draw on the best thinking in our community in addressing these proposals. We would like to suggest that we also draw on the experiences and best practice of other communities as well in defining the type of community benefits that it would be important to see as a result of a project of this magnitude.

We also want to ensure that Stanford is a good neighbor and also a good employer. Among our concerns and priorities we'd like to see addressed in the agreements are the availability of affordable housing; the impact of development on transportation; environmental consequences; protection of parks and open spaces; local hiring and job training; promoting family-supporting wages and benefits, job security, and the right to organize; ensuring that health care services meet community needs.

We know that these concerns and priorities are shared by many here
tonight and many on the City Council, so we think it is essential to
take a hard look at what has worked and what hasn't in meeting these
priorities in other developmental projects in our area and around the
country.

The Stanford Lucile Packard Hospital employees, represented by
SEIU UHW, look forward to working with you in the months ahead in
examining these projects and drawing on the best thinking and
experience that we can all draw on to ensure the types of community
benefits that we would all hope to see if the project moves ahead.
Thank you.

Mayor Yoriko Kishimoto:                    Thank you. Arden Anderson, to be followed by
CJ Wilson, and then [Thomas Taylor].

Arden Anderson:        Arden Anderson, 807 Oregon Avenue. I would like to address my
comments from three perspectives. First, as a resident.

My wife and I moved here 33 years ago and raised our family here.
Now we have two of our daughters [who] have moved back here, so
seven of our ten grandchildren live here. What drew us here were the
many benefits of this community and we've enjoyed every minute of
it. But certainly on the list of all the assets that this community has, the
Medical Center is high on that list.

Next, I'd like to address from the perspective of a grateful grandfather.
On July 1, 1994, my five-year-old grandson Jeffrey Kristofferson, fell

and had a serious head injury. Just an innocent fall on a hardwood floor. Within minutes, we had him at the emergency room, and within minutes again, he was in surgery to repair a subdural hematoma. And in 1994, we didn't have any delays or lack of beds. And we were very fortunate, because we came very close to losing him. Within a few months, then, our six-month-old granddaughter, living in Saratoga, needed a liver transplant because she had biliary atresia. There are only three places in the United States that we could go -- Pittsburgh, Pennsylvania, UCLA, or Stanford Lucile Packard Hospital. So on May 25 of 1995, she had a liver transplant at Stanford and now she's a bustling 13-year-old seventh grader in Saratoga. And we're eternally gratefully to the hospital that we had these medical facilities for us.

My final perspective is that since I retired, I've begun volunteering at the Children's Hospital. I volunteer in the intensive care unit. I help families -- I'm a family care navigator. I help families work through the intricacy and the stressful area of the intensive care. One of my greatest joys is being able to go out into the waiting room when the nurse says I can, get a set of parents and take them to the bedside of a heart transplant, a liver transplant, kidney transplant, trauma, whatever, and introduce them to the nurse. The miracles that are going on in that hospital are just -- words cannot express that. But on the other hand, in the pre-op area, I also witness the anguish of parents who are told that their surgery had to be delayed because there simply isn't a bed. Happens every day.

So thank you very much. I urge you to support this.

Mayor Yoriko Kishimoto:                Thank you. CJ Wilson, to be followed by
                Thomas Taylor and then [Michael Anderson].

CJ Wilson:          Good evening, Mayor and Council members. My name is CJ Wilson.
                I'm the organizing director at the South Bay AFL/CIO Labor Council.
                And for those of you that don't know, we represent over 100 different
                unions and 110,000 working families here in the South Bay and Santa
                Clara and San Benito Counties.

                And at the Labor Council, we not only look at how do we improve the
                quality of jobs, but we also look at strengthening the communities in
                which we live. And that's why it's important for us to be here tonight.

                The proposed building projects for the Medical Center and the
                shopping center would have a direct and immediate impact on the lives
                of the folks that we represent. The 1,400 people who work at Stanford
                Hospital and Clinics and at the Children's Hospital, the workers who'd
                be involved in the construction of the new facilities over the next two
                decades, and those who would work at the expanded hospitals, at the
                expanded shopping center -- the janitors who clean that shopping
                center are our members -- and future members, the bus drivers who
                take folks to the hospital. Those folks are important to think about.
                How is this going to impact people as employees?

                And beyond this, the projects are going to have an important impact on
                our members here in Palo Alto and in the surrounding communities
                simply because of their scale as the development of projects and their
                impact on our community. We really need to be thinking about what

are the impacts on housing? What are the impacts on transportation? What are the impacts on job quality, and what are the impacts on environment? And I think you guys are beginning to take a really hard look at this, and I commend the work that you've already done.

One thing that's interesting is that we've heard a lot about the increase in the quality of the care that's going to be happening at Stanford, which is fascinating. I'm really glad that they're going to be doing it, but we really need to be looking at how is that going to increase the cost of the care? And are we going to continue to have an accessible and affordable hospital in our community?

And so as you move forward, I really want to encourage the Council to be taking a look at some questions that need to be answered. Continue to be looking at how is this going to impact transportation, how is it going to impact the availability of housing, how is it going to impact the environment. And we need to look at how is this going to be impacting family-supporting wages and benefits, the job security and the right to organize? And particularly at Stanford, how is this going to be affecting affordable and accessible quality health care in our community.

And so with that, I just want to let you know that we're really looking forward to the expansion, to the upgrade in the facilities, and to the increased accessibility of the project. And we really look forward to working with you to help try to figure out the answers to these questions and figure out how we can make as good a project as possible. Thank you.

Mayor Yoriko Kishimoto:            Thank you. Next is Thomas Taylor, to be
followed by Michael Anderson and then [John Stern].

Thomas Taylor:      Good evening, Madam Mayor, Council members. I'm a 58-year
resident of Palo Alto. I don't feel any disagreement exists among
people about the benefits the hospitals provide. I appreciate them from
my own experience, that of my mother's cure from ovarian cancer at
the [Huber] Pavilion when I was nine and our family's sharing of her
life for another 30 years; the birth of my daughter in 1981, who is a
teacher now; and the recovery of my wife from death's door following
a sub-arachnoid [hemroid] vasospasm and hydrocephalus. My
neighbor, a retired pediatric cardiologist from the Children's Hospital,
has told me as well of the many children from all over the globe whose
lives were given a second chance at these hospitals.

All I ask of the Council is not to impede, but to ally themselves
alongside the hospital's project objectives so the hospital's project
potential is optimized and the benefits spread to the many lives their
services will enrich. Thank you.

Mayor Yoriko Kishimoto:            Michael Anderson, to be followed by John Stern
and then [Tommy Fairnbach].

Michael Anderson:    My name is Michael Anderson, I live in Menlo Park. I started my
married live in Palo Alto, but was demoted to Menlo Park -- but we're
still part of the region. [Laughter] And in the next few minutes, I'd like
to share with you a cross-section of perceptions and questions, which I

have after conversation with many members of my homeowners association, my golfing group at Shoreline Golf Course, my alumni group, my church group, and personal friends living in the area, so that some of you may consider, as you build a consensus and a priority list of possible actions that might be taken to enhance the region that we all value highly.

Perception number one. The Stanford Medical Center expansion project, triggered by the state requirement to retrofit is being met with wide acceptance and affirmation and acceptance by this region. A recent $27 million gift for an emergency center is a dramatic case. Interestingly, few have as much enthusiasm or care about a bigger shopping center or adding a hotel in a relatively small area that's a home for the Four Seasons, the Garden Court, the Cardinal, the Westin, the Sheraton, the Stanford Court, and the new one at Sandhill and 280. But it possibly is because of the tourists that are coming through to line our beaches and the bay and [unintelligible] the links of Palo Alto Municipal Golf Course. [Laughter]

The perception may be that one of the few reasons is the additional money that flows to the coffers of Palo Alto through tax dollars, but that is very understandable and needed.

The major problems, as articulated in the Op Ed section of the Palo Alto Daily News by yourself, Mayor Kishimoto, on how to deal with traffic and housing is right on the issue. There is no disagreement with that view. The Mayor goes on to say, "The positive role model is Stanford's academic campus," and later asks the big question, "Can we

in Palo Alto work with Stanford to make room for a larger medical center?" The people I've talked to are very positive about that subject.

Perception five, obviously there is a need for creating more affordable housing for the lower-wage workforce. It's common knowledge that Stanford has pledged, under the terms of its general use permit, to build 3,000 additional units. The unanswered question, what will Palo Alto do? And recently, a person opined a couple of months ago in this room that Palo Alto has a love/hate relationship with affordable housing. The concept is good, but they don't necessarily like it in their neighborhood.

Perception six. The perception is that there'll be effective negotiation and determination of requirements that will be fair and focused for Palo Alto and Stanford. If that negotiation will be an attempt to leverage the medical center expansion and demand permanent open space protection, there could be well a problem.

In conclusion, this is a great opportunity for fair-minded people looking at things from the other person's perspective to come up with a great good health care. Thanks for your attention and God bless the Palo Alto process. [Laughter]

Mayor Yoriko Kishimoto:            Thank you. John Stern, to be followed by Tommy Fairnbach and then [Sandra Lonquist].

John Stern:            Good evening. Previous City Councils have made many very difficult decisions telling -- pardon me. Previous City Councils have made

many very difficult decisions that required great foresight and courage. None was more difficult and challenging than that that transferred the Palo Alto half of the Palo Alto Stanford Hospital to Stanford. There were very strong objections from both the local doctors and most citizens. There were even firm plans to build a second hospital in Palo Alto.

I believe that all will now agree that as a result of these bold and forward-looking decisions, the citizens of Palo Alto have available much better medical care and Stanford became a great medical center.

I urge the Council to again show great foresight, as the past Councils have done, and place as few limitations and guidelines on the center's design as possible, so that the leaders and planners of the new Stanford Medical Center can construct a world-class medical center that not only meets the California earthquake requirements, but also the future needs of the residents of Palo Alto, as well as being very efficient and patient-friendly. Thank you very much.

Mayor Yoriko Kishimoto:                    Thank you very much. Tommy Fairnbach, to be followed by Sandra Lonquist and then [Mark Sayer].

Tommy Fairnbach:    Good evening, Madam Mayor, members of the Council. On behalf of the Chamber, I'd just like to echo Lee Weeder's statements. And I will defer my further comments to Sandra Lonquist, except to say the following, that we are very confident that the City and Stanford can come to the table in good faith towards a solution that best fits our dynamic community.

And on behalf of Carol Harrington, I'd like to say the following. Heath care and sustainability are two major concerns in society today. Palo Alto is, indeed, fortunate to have Stanford Medical Center and Lucile Packard Children's Hospital located here.

I think that the sustainability design features of the proposed new facilities are very exciting and visionary. These include environmental siting of buildings, use of recycled and sustainable materials from local resources, reuse of existing facilities as appropriate, native plants for landscaping, energy-producing and energy-efficient building systems.

Stanford is a leading center for environmental research with its Woods Institute for the Environment and its ever-expanding programs and centers. The opportunity for Palo Alto to be involved with this project can bring benefits not just to the Palo Alto area, but the Bay Area, California, and throughout the world. Let's be visionary, just as this city was in 1896 when it voted for a $40,000 bond issue that led to municipally owned utilities, when Bill and Dave worked in a garage three blocks away to build the first oscilloscope, and when Russell Lee pioneered the first group medical practice. And just to point out, that Dr. Lee's group met active opposition from members of the Palo Alto community. Thank you.

Mayor Yoriko Kishimoto:              Okay, thank you. Sandra Lonquist, to be followed by Mark Sabin and then [Kathleen Much].

Sandra Lonquist:       Good evening, Mayor and Council members. My name is Sandra
                        Lonquist. I'm CEO for the Palo Alto Chamber of Commerce. And
                        again, I'm going to echo what Lee said and Carol and Tommy.

                        The Chamber of Commerce has had a long and positive relationship
                        with the University, as has the City. And I think it's important for us to
                        continue that relationship in order to meet the mission of the Chamber,
                        which is economic vitality and quality of life. And I think that the
                        University Hospital and Clinics, which is what we're here to talk about
                        -- and Lucile Packard -- provide that for us in a number of ways.

                        Today we are here to support this project in concept. As you saw with
                        Frank's presentation, we are at the beginning of a very long process at
                        the City of Palo Alto, so we are not going to talk about the specific
                        details. We have seen three presentations from the hospital and clinic
                        to date. We have attended the community forums, and we find that
                        there a number of issues -- all six of them that you have identified here
                        in today's report -- that we will be following throughout the next
                        couple of years.

                        We would like to point out the fact that we feel that this is one of the
                        key employers in our community. As a supporter of business in this
                        community, that is an obvious reason for us to support this project. We
                        are hoping for, as Lee mentioned earlier, a constructive dialog. We
                        realize that housing, that parks and recreation, that transportation and
                        all of these things, are huge issues and we are hoping for a constructive

dialog so that we can meet the needs of everyone. And we thank you for your attention.

Mayor Yoriko Kishimoto:          Thank you. Mark Sabin, to be followed by Kathleen Much, then [Stanley Peters].

Mark Sabin:          Mayor, Council members. I fully support this project. I think it is a tremendous public benefit to the community. And certainly there will be mitigations. It's my hope that those mitigations don't imperil the development itself.

Now, one of the things that Stanford has talked about is the burden of housing if they have to build extensive, affordable housing. Quite frankly, while there is going to be a need for affordable housing, or subsidized housing, the much larger need is for non-subsidized housing. Frankly, only about a single-digit percentage of the occupations that will be working at Stanford could qualify for a loan big enough for a medium-priced home. Along the line, only about a third of the occupations could qualify for a low-market rate housing. So you have a substantial majority of the workers who are going to be needing what I would call attainable housing. That is, market rate housing that is below the median in Palo Alto.

To me, that signifies, while not a substantial profit there, there is a profit involved implicit in that. It just needs to have a will to build an [ability] for Stanford to build it. Granted, there are substantial number of houses, housing units that have already qualified for Stanford to build. And that certainly needs to be factored into any equation. But,

if, not building housing is basically, there are new realities here. We're no longer buying oil at $10 a barrel. More likely than not, in about a year or so gasoline is going to cost 4.58 a gallon.

And as that attainable housing gets moved to the periphery of the county or the south end or the east where there's no east-west corridor for transit, it's going to be difficult for institutions like Stanford to hold on to good people. There is a nursing shortage. And if nurses or whoever is going to be looking at a substantial transportation cost and have the ability to work closer to home, I don't think it's going to be a no-brainer to see what they're going to be doing. So I really think that it really is important not to negatively impact Stanford, but for its own good and for the community's good to take a serious look at housing and see how it can be worked out and not have a negative impact upon this marvelous opportunity to upgrade the facility. Thank you.

Mayor Yoriko Kishimoto:                    Thank you. Kathleen? To be followed by --

Kathleen Much:        I'm Kathleen [Much] --

Mayor Yoriko Kishimoto:                    Okay. Sorry.

Kathleen Much:        From Menlo Park. I used to live in Palo Alto, but I'm now your neighbor. I hope that you will let this project continue and go forward as it has been proposed and as your own consultants have said is appropriate. This does seem to me to be a good hospital plan. I used to work in the Texas Medical Center, so I have some familiarity with the requirements and the needs for hospitals. One of the things about this

community that that makes it so desirable is its incredibly good health care. You don't want to mess with that. And please keep in mind, as you go through your deliberations, that every new requirement you pile on to the hospitals is going to cost money for the people who use the hospitals. It's going to be the poor sick people who have to pay the bills. And so don't think of Stanford Hospital or the Lucille Packard Children's Hospital as being money pots that you can dip into for your own personal wish lists. I think a lot of the things you would like to do are lovely. But I do not think they are appropriate to require for hospitals that ought to be in business of providing health care for the rest of us, and especially for the people who use them and have to pay the bills.

Mayor Yoriko Kishimoto::    Next is Stanley Peters, to be followed by [Brian Schmidt].

Stanley Peters:    Madam Mayor and council members. I'm a 25-year resident of first Palo Alto and now Menlo Park, and I also work at Stanford, although I'm here tonight to speak as a member of the community and not as a Stanford employee. And I do favor this concept. Like a lot of my fellow speakers, think that the proposal for the improvement of the medical facility at Stanford is a wonderful opportunity for this community, for Palo Alto, Menlo Park, and the wider Bay Area community, union members and nonunion members alike.

The consultant whom you've hired as part of the peer review process took a look at the proposal and found that it was precisely as needed. It's a lean, mean proposal. It's not something that is a Christmas list,

wish list of add-ons that somebody or another might like to have. It
seems to me as a member of the community, that the goals of Stanford
here are exactly aligned with the goals of our community, which is that
we should have available the best possible health care that we can
have, the standard that we have gotten used to and that it should be not
be allowed to slide. And with that in mind I would urge us not to think
about trying to lard up this project with items from some wish list, but
rather to let it go forward as what it is. As a well-conceived and very
effective project to continue to provide top-level medical care to our
communities. If it can't, then in fact it's we who will suffer, not the
hospitals primarily. Certainly not Stanford University. It's we who
would be the beneficiaries of the medical care that won't get provided
if Stanford Hospital can't continue to be the tops. Thank you.

Mayor Yoriko Kishimoto:            Thank you. Next is Brian [Schmidt], to be
                          followed by Bob Moss.

Brian Schmidt:       Thank you. Brian Schmidt for Committee for [Green Foothills]. The
                     Committee for Green Foothills has no opinion on whether the basic
                     permissions sought by Stanford are appropriate and necessary. These
                     are medical issues that go beyond our expertise.

                     What is within the expertise of the committee for green foothills are
                     the environmental issues have been raised. And any good agreement is
                     going to have to address and mitigate those environmental concerns.

                     The best agreement would embody a symbiotic relationship between
                     Stanford and the broader community. Stanford gets the facilities it

needs without harming the environment and Palo Alto supports a high
quality of life and a wonderful environment that attracts people to
come use Stanford facilities. It is a two-way street, not just benefits
from Stanford to the community but the other way around as well.
Supporting a good environment is necessary.

To attain this best agreement we support Mayor Kishimoto's op-ed in
the November 7th Palo Alto Weekly. The three main issues, dealing
with climate change through no net increase in emissions and traffic,
dealing with the housing impacts from the project so the housing
impacts are fully mitigated for all affordability levels, and then dealing
with open space problems.

Stanford is basically asking for a trade-off. The university wants a
significant increase in the density and height of development in places
that benefit Stanford's plans and the community should in return get a
benefit in terms of reduction of unwanted development in places that
should be open spaces. It's entirely appropriate to do that.

And then what I would maybe emphasize as well is not quite so much
what should be asked for and negotiated in negotiations, but how to
ask or how to do the negotiations. And an important aspect of that is
taking what Stanford has requested at face value. There's not
necessarily a problem with that. And what Stanford says it needs. And
then we can tell Stanford what we think we need. And it's when
Stanford starts questioning our needs, then it's time to start looking at
what they say they need.

An example would be medical office space, which the consultant didn't address earlier today. Do they really need that much extra additional office space? I didn't quite understand why that wasn't addressed. The speaker before me said that it was, the consultant said that Stanford asked for precisely what is done in other places. Actually, that's not the case. The consultant said it was comparable. So there's a range, in other words, that's been done in other places. So if Stanford is saying that we're asking for too much in return for what it's doing, maybe the rooms can be five or 10 percent smaller, as the consultant said in her comments to the planning commission. I think the planning commission's comments and suggestions are actually fully appropriate.

Finally, I'd also mention that the consultant said they were constrained by the necessity for a full-scale operations during construction period. So in other words, you're having permanent impacts, permanent design based on those temporary problems and those should be addressed, possibly differently and reduce the operations. Thank you.

Mayor Yoriko Kishimoto:                    Thank you. Bob Moss, to be followed by Bruce
                                           Feldstein.

Bob Moss:          Thank you Mayor Kishimoto and council members. I want to begin by
                   reminding everybody that these hospitals are regional facilities. And
                   region is not just the Bay Area or California or even just the United
                   States. It's international as well.

Let me give you an example. I got a brochure from the Children's Hospital today and the feature was a child that had been to Stanford when she was very young and had come back a second time from Georgia. And they have people coming to Stanford from basically all over the country. So, the city of Palo Alto is being asked to accept a regional facility with huge environmental impacts and you heard a number of people tonight say that Stanford shouldn't be required to pay for those environmental impacts. That's absolutely wrong.

It's inappropriate for the citizens of Palo Alto and the taxpayers of Palo Alto to bear the burden of the environmental impacts that are going to be imposed by this development. Each and every impact, transportation, housing, jobs, every one of them which is imposed upon the community by Stanford and by the Children's Hospital must be paid for entirely by Stanford and by the Children's Hospital.

Furthermore, I think it's inappropriate to be talking about having a development agreement or a specific plan at this point in the process. Stanford came up with their own example of what the development agreement should say. They want to change the comprehensive plan and the zoning ordinance, as an example, to allow buildings which are 130 feet tall instead of 50 feet which is in the ordinance now. You have heard testimony that this has a significant negative environmental impact. Buildings that large with that much bulk can have a real problem in the lighting and on what it could impact on adjacent residential properties. And several areas near the hospital and near the Hoover Pavilion are being proposed for residential.

So they are asking that we give them in advance a development project a scale which very likely is going to have significant negative impacts. That's a violation of [Sequel]. It's a violation of the law. You don't give somebody an approval and then run down the road afterwards and say this is what the [EIR] says. Only after the EIR has been issued and we've had an opportunity to review it should we even consider any modifications which include a specific plan or development agreement. So I suggest that be tabled until the EIR has been approved or at least significantly reviewed because I don't think it's a good idea for you to violate [Sequel] again.

Mayor Yoriko Kishimoto:            Okay. Thank you. Bruce Feldstein, to be followed by Crystal [Gamige].

Bruce Feldstein:        Madam Mayor and council members. I want to join my colleagues from Stanford Medical Center and also friends of the community in favor and on behalf of the proposal for the expansion. I'd like to speak briefly on and offer two perspectives.

First as a resident of the city for the past 12 years, raising my two boys. I remember shortly after we moved here, my son developed severe respiratory distress. At the time I was an emergency physician working at Kaiser and I can't tell you the feeling of helplessness to see him gasping for air and knowing he just had moments that something needed to be done. We called the ambulance. It seemed forever until they got there. And where they went to was to Stanford emergency department. Thank God they were open at the time, where he was

resuscitated and spent the next overnight at the Children's Hospital and thank God for that.

I'd also like to speak on behalf of patients at the hospital. I'm a chaplain now, a hospital chaplain, also a faculty member at the School of Medicine and I'd like to speak on behalf of a few patients who couldn't be here, some of their families. I'm thinking of Janice, who received a bone marrow transplant. She lives in Ohio. And she came to Palo Alto, she and her family, and this became her home away from home for a year. That was eight years ago. Sadie, who's from Arizona was born two weeks later, had a hole in her heart. Came to the Children's Hospital and was here for several months and Palo Alto was their home away from home and will continue to be on several future trips. Carol is here also from out of state. She has a lung transplant and Palo Alto is now their home away from home. Also Hanna, who came from Jerusalem at 10 months old, needed a kidney transplant. Their choice was the Mayo Clinic and Stanford and they came here to the Children's Hospital and Palo Alto for three years was their home away from home. I'm very proud when I travel now and see these people to know that Palo Alto was their home away from home. And as we think about and move ahead, it's my hope that you'll keep in mind how we could make Palo Alto a welcoming home away from home for all these people. Thank you very much.

Mayor Yoriko Kishimoto:                    Thank you. Crystal Gamige is next, to be followed by Dr. Bruce Baker.

Crystal Gamige:      Good evening everybody. Crystal Gamige. Palo Alto resident. I was
pleased to read in the preliminary peer report and the conclusions that
the expanded hospital plan falls within good planning practices and
beats industry standards. Besides being a teaching hospital, Stanford is
Palo Alto's community hospital. Palo Alto doctors and doctors from
neighboring cities are considered adjunct medical staff and may admit
their patients to Stanford Hospital. This arrangement will continue in
the new hospital.

It is possible that a majority of Palo Alto residents, I'm not sure, I'm
guessing, use Stanford Hospital. So it is critical that this health facility
is fully appreciated and maintained in Palo Alto. Palo Alto no longer
has the benefit of owning its own hospitals.

In looking over the long list of statements and issues generated to date
and especially this evening, I'm wondering if people are really serious
about a new safe and modernized hospital. I feel strongly that any
proposed mitigation for environmental impact should not delay,
redesign, or block the completion of the hospital plan before you.
Please remember, our hospital care is at stake. The vertical architecture
is welcome and acceptable and refreshingly new. After all, form
follows function. And the function in this case is modern hospital care.
Thank you.

Mayor Yoriko Kishimoto:             Thank you. Dr. Bruce Baker, to be followed by
Barbara Newton.

Dr. Bruce Baker:    I am a resident of Palo Alto and serve on the community resource group, appointed by [Liz Niz] to monitor progress on the Stanford general use permit. My comments tonight are personal comments.

First, I would like to recommend some reading for all the principal stakeholders in these projects. It isn't very heavy reading. In fact, it's a children's book. It's called The Giving Tree by Shel Silverstein. The book is loaded with symbolism pertinent to the relationships between Stanford and Palo Alto. Stanford the tree and Palo Alto the boy in the story. Making the boy happy makes the tree happy. But with time, it becomes more challenging for the generous tree to meet his needs. When he asks for money, she suggests that he sell her apples. When he asks a house, she offers her branches for lumber. When the boy is old, too old and sad to play in the tree, he asks the tree for a boat. She suggests that he cut her down to a stump so he can craft a boat out of her trunk. He unthinkingly does it. At this point in the story, the double-page spread shows a pathetic solitary stump poignantly cut down to the heart the boy once carved into the tree as a child that said M-E plus T. When there's nothing left to left of her, the boy returns again as an old man needing a quiet place to sit and rest. The stump offers up her services and he sits on it. I think this book should be mandatory reading for many of us.

Second, I respectfully request this council to cease the constant syndrome of what have you done for us lately, Stanford, with respect to the mitigation factors on these projects. Stanford is a crown jewel of the Palo Alto area and the entire northern California area. Stanford has given much more than its share to the space needs of Palo Alto and

neighboring communities. Much more than its share of the social, cultural, technical, medical, and economic needs of Northern California including many traffic solutions in this area. I respectfully request the council to share in the celebration of the many successes of Stanford by enthusiastically supporting Stanford in both attitudinal and intangible ways. Last, I can personally attest to the immediate need for medical complex to be examined as I was a patient there a few weeks ago with a heart attack. Thank you.

Mayor Yoriko Kishimoto:    Thank you. Next is Barbara Newton, to be followed by Jose [Arzate].

Barbara Newton:    Good evening. My name is Barbara Newton. I live in Menlo Park, but I lived in Palo Alto for over 20 years. My two sons were born at Stanford Hospital. This past summer I had surgery there and my husband had a cardiac procedure that saved his life. Needless to say, the hospital means a great deal to us.

I also know firsthand the Palo Alto process. 10 years ago, my husband and I asked for permission to make a simple correction to our home on Everett Avenue. We wanted to enclose an existing balcony with glass to keep out debris from city trees. The application process cost us a lot of money, it took two years time and we were still denied the permit. I urge you not to subject the Stanford Medical Center project to similar and needless aggravation. Granted, this expansion will definitely have an impact on your community. But this new hospital will serve many of us in surrounding communities as well and will bring us an

important to state-of-the-art facility. Please expedite this process is promptly as possible. Thank you.

Mayor Yoriko Kishimoto:          Thank you. Jose, next to be followed by [Tracy Falaker].

Jose Arzante:          Good evening. My name is Jose [Arzante] and my partner and I are proud Palo Alto homeowners in mid-town on David Avenue. I am very fortunate to be one of the Stanford Hospital and Clinics employees that does have a short commute to work, five miles each way. I am, however, here to speak to you as a Palo Alton. I love being a Palo Alto homeowner and especially appreciates the forward thinking and environmentally conscious community. I always am happy to support initiatives that improve and sustain quality of life in Palo Alto.

I am very concerned the council is losing sight and focus on the importance of having an updated and structurally safe medical center in our community. Instead of focusing on details that are irrelevant to the hospital renewal project, I would like to ask that you refocus your priorities to ensure the new hospital is built as soon as possible. As a Palo Alton, I believe it is in the best interests of our community to keep the only Level 1 trauma center between San Francisco and San Jose in our backyard. Thank you.

Mayor Yoriko Kishimoto:          Thank you. Next is Tracy Falaker, to be followed by Susy [Tom].

Tracy Falaker:    Good evening. My name is Tracy Falaker and I've been a nurse for 12 years. I've had a chance to work at 21 different hospitals and health-care institutions across the country and I know that there are many concerns regarding the construction of our new hospital. But I urge everybody to please focus on patient care and how the design will greatly impact it.

Working as a nurse or physician can be extremely challenging, not only in providing the physical care to patients, but also being able to address the impact of that illness with the patient and family. Size, safety, and privacy are very important issues in order to provide the best medicine. And caring for people is very personal. And no matter what you do in your life, whether you're a CEO, a businessman, pilot, or politician, when you come to the hospital to be admitted, you are a patient. And you will experience a loss of control and be exposed to an environment. And what unfortunately is the norm in a lot of these old hospitals are shared rooms and a campus design.

Imagine feeling ill, being in pain, and you're lying in a room that is not yours and you get to listen to the entire conversation of the patient who gets to lie a few feet from you. And then you get to be transported across the campus just to get to the x-ray. You will get to hear your roommate to 24/7, whether you want to or not. You will get to hear their machinery beeping and every request that they have. And when the doctor comes in to speak to you or to them, there will be no privacy. And it is just inappropriate.

Hospitals around the country have realized the inadequacy of this design and are planning for all private rooms in building their new hospitals. Palo Alto needs to adopt and embrace a hospital with private rooms and appropriately sized rooms in a vertical design.

Patients are presenting with higher acuities and they require complicated and large monitoring equipment. And the last thing that we as health-care provider should have to worry about is if there's enough physical space in the room in which our patient is lying.

And the bottom line with any hospital is patient care. And everyone in this room needs to understand how extremely important design is and how it does have a huge impact on how we are able to deliver care at the bedside. I am very impressed with the medicine and the research that is done here at Stanford Hospital and Clinics in providing for patients in this community. Patients travel to Stanford from all over the globe and across the country to receive the specialized and high-tech medicine that we provide.

This growing community needs and deserves a state-of-the-art facility in which we can care for you in the safest environment possible. I urge all of you that when you prioritize the concerns regarding the building of our new hospital, that you please make patient care the top priority. Thank you.

Mayor Yoriko Kishimoto:               Thank you. [Suzy Tom] is next, to be followed
                              by Craig Barney.

Suzy Tom:              Good evening. Suzy Tom, 753 Maplewood Place. The expansion and modernization of the Stanford University Medical Center offers an opportunity to reasonably balanced Palo Alto community desires with the hospital's project goals. The overall goal we must all keep in mind is providing health care to our community in much-needed up-to-date facilities that are designed to serve us 25 to 30 years into the future. As a community whose 55 and older population percentage is projected to double to 50 percent by the year 2030, this is a critical resource to our community.

There are some ways this project reminds me of our public safety emergency control center which is also sorely inadequate. We don't think of it until we need it. Likewise, with critical medical care, we don't think about it until we need it. As we continue to move through this process, I hope all of us will commit to working together in a spirit of cooperation and partnership, working together on how to best mitigate any impacts outlined in the EIR so an expanded and up-to-date medical facility is therefore each of us when we need it. Thank you.

Mayor Yoriko Kishimoto:              Thank you. Craig Barney to be followed by Ellen [Wyman].

Craig Barney:          Madam Mayor, council and staff. My name's Craig Barney. I live on Maddox Avenue in Palo Alto for the last 16 years. I'm here to speak in support of the project. I'm also here to speak in support of the SQA process, my background is as an environmental manager. In fact, I do that work at Stanford. My two sons' maternal grandfather had life-

saving surgery at Stanford on two occasions over the last 20 years. Sadly, he's gone now. But my kids know firsthand how world-class medical care can improve the quality of life. One of my sons was born at Lucille Packard and the other visited the ER, thankfully only once. He did have to wait awhile, primarily because his skateboard injury was actually kind of minor.

I'm also aware that the additional facilities in this area are needed and I believe that Stanford is the right place to build these facilities, as it's centrally located to the cities of Palo Alto and the surrounding communities.

I've attended several community forums, planning commissions and city council meetings on this project. I think it's up to five so far, many far less better attended than this one. And I certainly appreciate all the diligent work that this staff, the consultants and the city council and Stanford have done and that resulted in the varied reports that explain the project. I also believe that significant progress has been made to-date. And I encourage you to maintain this high level of commitment and keep moving the project along expeditiously, given the need for the new facilities.

The size of the expansion is one issue voiced by several members of the community. I'm not qualified to judge the data used to determine the number of beds needed, but I do applaud the council for conducting an outside peer review. However, through my professional expertise in hazardous materials response, I do know that disaster search planning is critical. I also understand that if we were to have a

**EXHIBIT NN**

major disaster, like an earthquake or a pandemic right now, that all of
our hospitals would be overtaxed.

I understand that the city and the council will be negotiating the
development agreement and that this will include some concessions. I
believe you must respect the fact that hospitals provide important
community benefits while you're going through these negotiations. I've
also heard many of the ideas that have come up on mitigations. I
frankly think some are a bit whimsical. But I think some are very well
thought out as well. And I hope as you go through the process, you
discern the two. For instance, I would certainly appreciate
improvements to Palo Alto's transit center, especially on Giant's game
day. But I don't see how that is actually tied to healthcare.

Due to the high cost of building healthcare facilities, we need to make
sure that all the resources that we have are used for building the
hospital and that dollars used for mitigating resources are actually
those that fit the impacts. That's it. Thank you.

Mayor Yoriko Kishimoto:                Thank you very much. Ellen Wyman will be
followed by Gordon Newell.

Ellen Wyman:          Like most people here this evening, I am very grateful we have a local
hospital, especially grateful that it's a world-class facility. We need to
watch how we address this, very carefully. I would like to recommend
-- like to urge that you not approve the recommended rezoning tonight.
In the first place, it's my understanding that zoning like this, according
to your own procedures goes first to the planning commission for their

consideration, for public input, and then comes back as a council. So if I understand this right, we aren't even following our own process. This is a problem.

I think it's also a problem that you have a key meeting like this on the most important -- what's the biggest project with the greatest impacts in the last 30, 40, 50 years. It will really have a major impact on this community, and yet this meeting is on Monday, following a holiday weekend. The packet was not available Thursday. It was Thanksgiving. It wasn't available Friday. City Hall was closed. I couldn't get it at main library until almost 5:00 on Saturday. The public isn't up with you on this issue. I know there have been three focus meetings with an average attendance of 10 or 15 people. That's not enough. The community has to wake up to the issue and really get involved.

Bob Moss kind of stole my thunder. I agree with him totally on the fact that this is a regional, if not a worldwide facility, and it is imperative that you establish the fact. Because it's regional, the impacts need to be shared regionally. It makes no sense, whatsoever, for Palo Alto to absorb all of the impacts.

And I think it's really important that you do this right. We're finding a problem right now in that you don't have the public support you would wish for the police building -- public safety building, pardon me. But I think there are two major reasons in the people I've talked to. A lot of people really don't respect the process by which we developed the

plans for it. But they also really unfortunately, don't trust the city in the way they're handling money these days.

If you want public support for this hospital, you have to do it right. You have to really work at involving the community, of following the rules, of making the whole process very transparent. So I hope you will slow down and do that, see that the impacts are shared regionally. That is absolutely key. We'd like to be with you on this decision.

Mayor Yoriko Kishimoto:                Okay. Thank you. Next was Gordon Newell, to be followed by Sally [Probst].

Gordon Newell:        Good evening. Madam Mayor and members of the council, it's good to be back. I have been, over the past -- for over 50 years, a resident of Palo Alto. But in the beginning of last year my wife passed away. And so I moved further away. I'm telling you this because I've always believed that the quality of medical care that, as an individual, you can receive is inversely related to the distance of the care from a medical center. And here we have an outstanding center in Palo Alto.

Today, I live some 12, 15 miles from the hospital. But I prefer, and have used the hospital since I've moved the other place. I think many people may not realize that we are very fortunate to have an emergency room available to us in the hospital here. It's sort of taken for granted. But many hospitals have closed their emergency rooms. And being a regional center as we are here, they accept everyone that comes through in an ambulance.

Now I've had the opportunity to be a patient there in the ER and they're outstanding physicians and staff and nurses and assistants. But it's inadequate. Some of you have probably been in the emergency room. And the only way you separate most of the people is by sheets that are between the different beds. And it needs to be expanded. Fortunately, there is some money that's been made available. But that's going to be required more than ever. In addition, the capacity is limited.

In the most recent time when I had to go to the hospital this year, I had to wait for eight hours from the time the doctor said, "Yes, you need to be admitted," and when they could find a room for me. And it was rather late in the evening before we could get in. So it's important that the expansion, which indeed will be part of this enlargement and so-forth, takes place. And so I urge your support and consideration. We are very fortunate to have both the facilities and staff available to us.

Mayor Yoriko Kishimoto:                Thank you. Let's see. Before I call up Sally Probst, I'm just doing a time check. I have another 17 cards. It's probably another 50 minutes. Shall we take a short break now? And we'll be committed to hopefully completing the item tonight.

Sally Probst:        Are you going to take --

Mayor Yoriko Kishimoto:                It will be after 11:00, yeah. Well at least we'll definitely complete the testimony.

Sally Probst:        Are you taking a break before my turn?

Mayor Yoriko Kishimoto:                    Is that all right?

Sally Probst:        Well I would love it if you let me speak first.

Mayor Yoriko Kishimoto:                    Yes, okay. Sally, come on up.

Sally Probst:        Thank you so much. Mayor and council members, when we bought
our house in Palo Alto some 20 years ago, one of the criteria was, is
there good medical care? And we were pleased to find there is
excellent medical care in Palo Alto. This is a city that likes to have
top-of-the-line services. And one of the services that is most important
is healthcare.

Also, I want to congratulate the council and the staff and Stanford on
the great number of public meetings that they have held on this. I think
this is the sixth meeting on this topic that I have attended in this room,
in addition to public meetings in other public facilities in the city, so
that there has been an outreach to the community. It is extremely
important that you continue to move expeditiously on this, that we're
lucky that we don't have to go up to Rochester, to the Mayo Clinic,
that we have top-of-the-line healthcare available to us.

My family, my husband and I, both have spent time in that crowded
emergency room and realize that it lacks a great deal at this moment.
But we know that there is cutting-edge health and training for
physicians in Stanford Hospital and in Lucille Packard Children's
Hospital. And we urge you to consider to move as expeditiously as

possible so that this expansion can occur as quickly as possible. Thank you very much.

Mayor Yoriko Kishimoto:                 Okay. Thank you very much. So we'll take a five minute break.

[Interruption: break]

Mayor Yoriko Kishimoto:                 Resuming the public testimony. And the first speaker this round is going to be Dr. Joe Hopkins, to be followed by Jean Kennedy.

Dr. Joe Hopkins:        Madame Mayor, council members, thank you for the opportunity to speak. I'm a family physician. I've been a physician at Stanford for 18 years, and prior to that was a physician practicing in the community here for 12 years. I've lived in Palo Alto for 30 years. I raised four children here and have a great love for this city, which is a great place. One of the reasons is it has a great hospital.

I also am certified in geriatrics and wanted to just provide the perspective of my older patients, as I've seen them experience Stanford through the years as healthcare over that 30-year period has changed enormously in ways that we've heard about only in science fiction when I was a medical student. The place basically does not serve older patients optimally at the present time.

The issues vary, all the way from when you go into the place, the hallways are long enough that some older patients can't see the end of

the hall, let alone walk it to get to the different aspects, and would be much better served by elevators going to a taller building instead of a flatter building, where they could get to things more conveniently; to issues of private rooms, which are not only important for privacy, but also infection control; and the number of disruptions that go on at night, which add to sleep deprivation and delirium; to safety in situations where the way things are structured, arranged and designed, not only make working there easier, but actually contribute to how safe it is to be in that environment; to things like, can you find a quiet place to sit down with a patient to talk about how their surgery went, or the fact that they aren't going to survive this particular illness?

Many older people have been here tonight speaking about how important it is to live in a community where they have the reassurance that they have that kind of medical center available to you when the fact is, it's not because a fair amount of the time, you can't get in. And I would urge the council to consider this carefully with not placing unreasonable requirements for other mitigations, that the principal value of this project is in the care that it will provide the citizens of this community and, particularly, the older people who depend on it greatly. Thank you.

Mayor Yoriko Kishimoto:                Thank you. Next is Jean Kennedy, to be followed by John King.

Jean Kennedy:        Madame Mayor, and members of the council, I'm Jean Kennedy. And I worked for over 25 years at the hospital as the director of community and patient relations. And I just keep thinking of the first time I came

before you, because I had to come to prove that our massage therapy program was a real massage therapy program and the hospital was not running a house of ill repute.

[Laughter]

Jean Kennedy:    Quite seriously. My main focus of my job was patient advocacy. And in that, I saw firsthand all the time how much what the new hospital is planning to do will mean to our patients. It's very important. I've been a Palo Altan for almost 50 years. And for that whole time I've also been affiliated with Stanford. These are two communities that I love. I've worked for them. I work with them. I've been part of them and I love them. And where those two communities touch is the hospital -- the hospitals, I should say.

We, all of us, have had experience, either us, ourselves, our families, our friends. Stanford Hospital and Packard Hospital have been in all our lives and they will be. So part of what I want to say is how desperately important the medical care is to all of us. And what we need to do, is we need to be not the two communities of Stanford and Palo Alto, but here we're really one community working together because we're all community members and we're all patients. Thank you.

Mayor Yoriko Kishimoto:          Thank you. Next is John King, to be followed by Steve Player.

John King:               Good evening, council. My name is John King. I am a resident of Palo
                         Alto, also a former past chair of the Chamber of Commerce. And when
                         I started seeing some of the plans that were being shown around at
                         some of the public meetings, I could really just hardly contain my
                         enthusiasm for what I was seeing because as many of us, we've all had
                         personal experiences at Stanford. And I've always kind of commented
                         to myself going through the hospital corridors at how a major
                         international medical center like Stanford could really maintain what
                         it's doing in its current shell and that I think something needs to
                         happen there. And I'm just glad to see that these things are coming on
                         the books for us to all look at. Long hallways, not easy to get around
                         from one place to another. Going to visit a friend and hardly finding
                         the place before visiting hours were over. So I'm really thrilled.

                         I think we have a great opportunity as a city and as a responsibility to
                         ourselves and our community and the bordering areas to allow this
                         project to move forward to its next phase, and preparing a draft EIR
                         identifying the impacts. We know there are going to be impacts, so
                         let's identify them and see how we are going to mitigate them. It needs
                         to be started right away. In fact, I have personal issues with having not
                         had a room after surgery one time. I think I was the last patient in the
                         Hoover Pavilion back in 1986. And it kind of reminds me of the Tower
                         of Terror at Disneyland. So I'm glad something is going in that side, as
                         well.

                         So just as we are considering supporting our police officers by
                         providing them with a state-of-the-art facility, I think we can also
                         support -- and I was really glad to hear one of the nurses comment

about having a facility which really is modern and works well for patient care -- that we can help support the nurses and staff by providing them a state-of-the-art facility in which to work. And we also need a safe facility. We need a facility that will be there in the impact of a major earthquake or another disaster. We need it to be there for us. So let's get something that will be around for us to be able to have our healthcare taken care of.

And finally, I think as we all perceive that something does need to be done, this is a necessary step that we need to take as we are going through the very beginning stages of this new century. And this should be a new century state-of-the-art facility. Thank you.

Mayor Yoriko Kishimoto:                Thank you. Next is Steven Player, to be followed by Dr. Daniel Bernstein.

Steven Player:        I'm Steve Player. I live at 1874 [Gwynda] Street and I'm an employee of Stanford, but I'm here talking as a private citizen, one who happened to be in the emergency room on the famous November 15 and November 16. I had a friend who was admitted to the emergency room. He spent 12 hours there before he was able to get a room. He was one of the lucky ones. Several had been there two or three days trying to get a room to get into the hospital. And it really brought home the importance of this whole action we are going through here, the importance of really working with Stanford, Stanford working with Palo Alto.

I think Jean Kennedy said it best. Working together is a partnership at this point, to come up with a very reasonable, balanced solution for the development of the hospital to better serve our community. You only need to stand by a bed in the emergency room next to a curtain when you're being in the way of residents and interns and aides coming by, because there was no other place to stay, or where the family has no place to sit and no place to wait except for the very dark, depressing waiting room at the emergency room to know that we are not serving our patients and our community the way we should.

We talk about we're a regional center. Yes we are. We're regional, yet we really are community-based. The people that are served the most are the people in our community and it only happens when it really happens to you. I'd like to say on the record how fortunate we are in this city for our fire department and our police department. We did have to put in a 911 call on Thursday morning, and how quickly the fire department responded, professionally, sympathetically, reassuringly helping this family -- help us get this individual to the emergency room. And on the record, I want to tell you how pleased I was and how fortunate we are to have that type of response team in this community.

Needless to say, it's all been said. Everyone here that I've heard tonight all have very good reasons why we want to go forward. I'm very confident that between this council, between the representatives of Stanford, we can come together in this community to really provide something that we can all be proud of, and that we can do it on the schedule that has been set forth.

We don't always go by that schedule, but I would urge us at this time to really sit down and say, "Let's get this job done. Let's go forward so that we can all understand that when we go to sleep at night and we need to make that 911 call, we're going to be the ones that are going to go there, get that service, get into that hospital and get the kind of aid that we need." So thank you very much. Good luck.

Mayor Yoriko Kishimoto:                     Thank you. Dr. Daniel Bernstein, to be followed by [Sunny Dyquil].

Dr. Daniel Bernstein:  Thank you, Mayor Kishimoto and council members for this extended session on this important issue. I'm a Palo Alto resident, have been for 21 years. I've raised two kids. Both graduated from Palo Alto high school. And I pride myself on living in a community where I can bicycle to work in about the same amount of time it takes me to drive, in fact, sometimes faster.

I'm also a pediatric cardiologist. And I work at Packard Children's. And I'm the co-director of the Children's Heart Center. Why a children's heart center? Aren't heart diseases something that affects mostly adults? Well, heart disease affects one out of every hundred children. It's one of the most common congenital malformations and the leading cause of death due to birth defects. I'm very proud that we've recruited a team of over 25 doctors, cardiologists, surgeons, anesthesiologists, radiologists whose specialty care is for kids.

It's not just for kids from out of the community and other states that we
care for. I've taken care of kids in the emergency room who I have not
had to transfer down to other medical centers because we offer the
state-of-the-art care that they can receive here at Packard Children's.
Two teachers' little boy who spent six months in our intensive care
unit before receiving a heart transplant, live in Menlo Park, one of our
local communities. They would not have been able to receive that kind
of treatment if we did not have Lucille Packard Children's Hospital
right in our backyard.

But we have a critical issue here. Right now as I'm speaking, I have
several of my faculty who are in the hospital right now, finishing up a
surgery on a child that couldn't be started earlier today because we
didn't have enough beds. Last week I had seven infants in the neonatal
intensive care unit, all awaiting surgery. And earlier, Martha Marsh
gave you an idea of what it's like to be an adult patient and at home
and receive a phone call saying your elective surgery has been
postponed. But imagine for a moment that you're the parent of one of
those children. You are going to hand your newborn baby over to a
team of doctors who are going to whisk that baby away into an
operating room for an operation that's going to last maybe 10 or 12
hours. Imagine the amount of trust that you have to put in those
people. And then I, as the doctor, have to look that family in the eye
two or three days in a row and say, "I'm sorry, folks. The surgery has
been postponed because we have a full ICU. We, in fact, have 15 kids
in a 12-bed ICU and I cannot get your child in for surgery today."

This is a problem that affects us and the physicians who work at Packard every single day of the week. We have physicians who are working 80 to 100-hour weeks where we're spending a third of our time fielding phone calls and managing kids in other emergency rooms because we don't have enough beds here at Packard Children's Hospital. This is an acute emergency from our standpoint and for the care of the children in our community.

Now as a Palo Alto resident, I understand all the mitigation issues. I understand the need for keeping this community great. However, just two years ago, this community prided ourselves in our university community. We built a new football stadium in six months. Wasn't that wonderful? We all got to go to opening day. We should be working here today to say that it's not going to take us six to eight years to build these new hospitals, but we're going to put them on the fast-track and get them done two years ahead of schedule. Thank you.

Mayor Yoriko Kishimoto:                    Thank you very much. [Sunny Dyquil], to be followed by [Twila] Harrison.

Sunny Dyquil:              Good evening, Mayor Kishimoto, members of the council and staff. My name is Sunny Dyquil. I'm a mid-town homeowner and resident, and a chamber board member. Thank you for this opportunity. My comments have been made by many of the others before me. I didn't realize it was going to be this late for me here, but nevertheless, I still would like to speak. As a member of the chamber, I agree with its support for these projects. As a member of the community, I wish to express my support and my desire that these projects proceed in a

timely and thoughtful manner to ensure that the benefits they provide can be realized sooner rather than later by our residents at large.

We are extremely fortunate to have an opportunity as a city to embrace a future that will include a world-class hospital and teaching and resource facility that will attract patients and practitioners from far and wide. Palo Alto has a reputation for looking beyond its doors and welcoming those from the increasingly shrinking world, to share their knowledge, creativity and [ingenuity] just as we share our hospitality and resources.

The upgraded facilities will guarantee Stanford's ability to provide the best medical services, attract the brightest minds to its research and teaching hospital, and continue to pioneer innovative techniques and remedies that will benefit all of us. Concurrently, the expansion plans for the shopping center will provide badly needed revenue to the city. I also encourage you to negotiate a larger hotel and convention center with the additional rooms that will provide increased TOT to the city.

Together, the renewal and replacement of our hospitals and the expansion center, when weighed against the mitigation of impacts, will provide a balanced solution for Palo Alto, the hospitals and the shopping center. The benefits are obvious. I urge you to proceed expeditiously with these projects. Let's move forward. Thank you very much.

Mayor Yoriko Kishimoto:                Thank you. [Twila] Harrison -- I don't know if I've got that name right -- to be followed by Hal Nicholson.

Twila Harrison:    Good evening, Mayor Kishimoto and council members. It is Twila
                   Harrison and my husband, Reverend John Harrison and I will only
                   take the three minutes together to give our comments. I, being a
                   member of the University Church in Palo Alto for the past 37 years,
                   have had the privilege of sharing our worship time, our faith, with five
                   generations within our congregation. And often, within a congregation
                   of our size, there are many people that need to have their healthcare
                   needs met. Often, it is Stanford that this congregation is depending on
                   to provide or attend to their medical care needs.

                   As the committee, Andy [Coe] and Kay Wilson did come to our
                   congregation recently, it was an overwhelming excitement within our
                   congregation to hear of the plans of Stanford, that they were going to
                   expand or were working to expand the medical center.

                   We want you to know, as a congregation, we are excited about this
                   expansion plan. And we'll do all that we can to support the plan.

Reverend John Harrison:              In 2000, as the pastor of the University Church,
                   we went to Stanford with about 15 members to volunteer in the
                   spiritual care department. I long knew Stanford to be a place of
                   healing. When I arrived, I found out that it was also a place of life-
                   changing opportunity and hope.

                   While a volunteer, I enrolled in the Clinical Pastoral Education
                   program to learn how to be an effective presence for people who were
                   going through times of crisis. Today, I'm the coordinator -- the director

of that program. And I'm a staff chaplain at Stanford. I have the
opportunity to share with others of the appropriate way to reach out, to
be a hand.

As a cancer survivor, I can't tell you what it meant for me, after
receiving a devastating diagnosis, to be able to turn to Dr. [Fisher] and
the tumor board and have them give to me their perspective of what
was happening with my health. Today, I am going to go sit down -- to
give a Methodist preacher a microphone and put a time on it.

[Laughter]

Mayor Yoriko Kishimoto:                Thank you so much.

[Laughter]

Mayor Yoriko Kishimoto:                Okay. Hal Nicholson, to be followed by Joel
                    [Spolen].

Hal Nicholson:        Madam Mayor and council members, first of all, thank you. Thank you
                    for all the time you spend on things like this and all the time you spend
                    getting things done for us. We appreciate it.

                    I'm Hal Nicholson. I'm a 40-year resident of Palo Alto. I live in the
                    Green Meadow Way neighborhood. I am a strong supporter of these
                    projects. I was talking with Art [Stowford] during the break and we
                    were saying, "If we had to start from scratch and attract these hospitals
                    to Palo Alto, what would we give up to attract them? What kind of a

bargain would we strike?" And my answer is, I'm not sure we could do it. I'm not sure, if we were starting from scratch, competing with other communities, other places in the world, that we could successfully attract a Stanford Hospital or a Lucille Salter Packard Children's Hospital to come here.

So this is what I would add. This is a once in a decade opportunity for the City of Palo Alto to do something that is less complicated than it otherwise might be, less costly than it otherwise might be because it relates to the important goal of healthcare. We --

F

F

SDMHCxxxx125573_TRN10

Palo Alto City Council_November 26, 2007

[Beginning of recorded material]

Mayor [Kishimoto]:   Okay, Hal [Michelson], to be followed by Joel [Spollen].

Hal Michelson:   Madam Mayor and Council Members, first of all, thank you. Thank you for all the time you spend on things like this and all the time you spend getting things done for us. We appreciate it. I'm a 49 year resident of Palo Alto. I live in the Green Meadow Way neighborhood. I am a strong supporter of these projects. I was talking with Art [Stauffer] during the break and we were saying, you know, if we had to start from scratch and attract these hospitals to Palo Alto, what

would we give up to attract them? What kind of a bargain would we strike?

And my answer is, I'm not sure we could do it. I'm not sure if we were starting from scratch, competing with other communities, other places in the world, that we could successfully attract a Stanford Hospital or a Lucille Salter Packard Children's Hospital to come here. So this is what I would add. This is a once in a decade opportunity for the City of Palo Alto to do something that it is less complicated than it otherwise might be, less costly than it otherwise might be, because it relates to the important goal of health care.

We have a once in a decade chance to do something faster than it might otherwise get done because we resist the temptation to hand on to it, every decorative demand for something extra that can be asked in the name of mitigation. With all due respect to what a couple of early speakers have said, this is not about the need for more meetings, and this is certainly not contrary to what one speaker said about the needs of the bus drivers' union. This is the need to expand and maintain a world class facility that will only stay world class if it grows.

I can say it no better than Sally [Probst] said it earlier: It is the need of this community to have this moved ahead expeditiously. I am confident the City Council can show the leadership to do that.

Mayor Yoriko Kishimoto:                Thank you. Next is Joe Spollen, to be followed by John [Stuman].

Joe Spollen:          Good evening, Honorable Mayor and Council Members. I come here to speak tonight in three roles. One is my role as a resident. Second is my role as a small business owner. Third is my role on the board of the Palo Alto Chamber of Commerce. I do support the Stanford and Packard expansion for three main reasons. The first is my family. I have four children. We've had five surgeries, one open heart surgery that we had to go up to UCSF to have because we couldn't have it here. We've had three births at Stanford Hospital. I've recently moved elderly in-laws here who are fighting memory loss issues. My family needs this new hospital.

The second is my community. I've been involved in the last ten years in AYSO soccer and the new Jewish Community Center, which is going to have hundreds of new senior citizens moving in there, at Gunn High School, Palo Alto Children's Theater and the Palo Alto Commons currently live, all these communities need this new hospital.

My third role is as a small business owner. We have 23 employees. We've been in business for 15 years, and we've been to the emergency room -- my employees have been -- four times over that 15 year period. Most recently, I spent seven hours waiting with one of my employees to be seen because she was low on the triage list. We need facilities for my family, for my community and for our business.

I would urge you to approve and move forward state of the art medical facilities to support our families, our community and our businesses. Please support the Stanford and Packard Hospital expansion as

proposed and please approve the rezoning to allow that to move
forward. Thank you.

Mayor Yoriko Kishimoto:                    John Sturman, to be followed by Robert Norris.

John Sturman:          As a green architect, I support the development of the Stanford
                       Hospital, as it will contribute to the sustainability of Palo Alto and
                       surrounding areas. It meets many of the green building goals set forth
                       by our Green Ribbon Taskforce without asking, and as a matter of the
                       philosophy of the project. It will be an example for other projects
                       throughout the community and the world. This community will benefit
                       from the smooth and collaborative entitlement process.

                       Housing and traffic issues need to be viewed as community issues, not
                       just Stanford ones. If Palo Alto were serious about solving some of
                       these problems, they might do so by developing a master plan by
                       world leading planners such as [Calatrava] and the Rocky Mountain
                       Institute. Alternative public transit linkages could be designed to
                       reduce traffic and allow for non-car related transit and access to
                       housing located throughout the community.

                       Hospital design is among the most complex of architectural projects.
                       Too many hurdles place in the path of this project will discourage
                       innovation and make an integrated vision more difficult to achieve.
                       Stanford has already build many examples of green and efficient
                       buildings. This project will go further, and due to the phasing, it will
                       allow greater efficiency as new technologies become available.
                       Stanford Hospital expansion is going vertical with their development

due to interstitial space requirements for systems, but going up is green and it uses less material and leaves more site open space.

The Stanford campus is a huge carbon sink and open space for this community. Therefore they should be able to build the hospital as their architects need it to be, even if denser or higher than expected. Housing needs will be met by the marketplace and should not be a hospital problem to solve. Let them keep us healthy and spend their precious resources on this facility. Thank you.

Mayor Yoriko Kishimoto:             Thank you. Dr. Robert Norris, to be followed by Emily [Renzo].

Dr. Robert Morris:     Mayor Kishimoto and Council Members, first of all, I want to think you for your time tonight. I have to start off by saying that, as the chief of the Stanford Emergency Room, I have to applaud you for your stamina tonight. You would have made very fine ER doctors.

I'm here to speak very briefly on the environmental impact that this project will have that resonates with me most, and that's the impact on the human beings that need and seek care at Stanford University Medical Center. Last year, we saw in the emergency room over 44,000 patients. That's more than twice what we were built to handle over 30 years ago. About a quarter of those patients were children. Our volume is growing by an average of about 4 percent per year over the last several years, and continues to grow this year, as well.

I don't have to convince anybody here, I know, that we are a vital resource to the community. You've already heard many times that we're the only level one trauma center between San Francisco and San Jose. We're also a designated stroke center. We're a critical cardiovascular and intervention center and we're a pediatric critical care center. As the volume of patients increases in both hospitals, that impacts the emergency department very significantly, as you've heard many times tonight.

More and more often, patients are being boarded in the emergency department for many hours, and even most recently, for days as they wait for inpatient beds. What this does is it has a domino effect on the patients that need to come in and be seen that are arriving by ambulances and walking through our doors with heart attacks and strokes and all sorts of medical problems.

Currently, we've squeezed all of the efficiency that we really can from the current space and facility that we have. We're seeing our diversion hours go up, the number of hours that we're closed to ambulance traffic. That creates great distress in our staff because we know that there are people out there in the community that need our care and can't come to us because our doors are closed to ambulance traffic. Those people may be our families, they may be your families. We take this very personally.

You've heard many times about the curtains and the sheets hanging between beds. About 10 percent of our patients now are having to be seen in the hallways because we just don't have the bed capacity in our

current facility. Most importantly right now, we have zero surge
capacity. What that means is that when -- not if, but when -- the next
big earthquake hits or we finally have that big flu pandemic, or we
have a bioterrorism event, we will be absolutely unable to handle the
influx of patients.

Palo Alto desperately needs a new Stanford Medical Center, and along
with that, a new Stanford Emergency Room. Even if this project
proceeds on the current timeline, we are gambling that nothing major
is going to happen between now and 2015. So we are the only health
care facility available 24/7, 365 days a year, and we want to be
available to provide the best possible care we can to the community
when it needs us. Thank you.

Mayor Yoriko Kishimoto:                Emily Renzo, to be followed by Tom Jordon.

Emily Renzo:        I'm Emily Renzo, 1056 Forest Avenue. I sent you an email today and
it's sort of a reworking of my comments to the Planning Commission.
You've heard lots of eloquent testimony about wonders of medical
care and how desperate we need this and we need that. Very few of
those people spoke to the actual impacts of what providing these
massive new structures and substantial increases in employees are
going to have on the overall nature of our community.

I was struck when Dr. Brown -- I think was his name -- was talking
about his book that everybody should read, the children's book about
the boy and the tree. I thought Palo Alto was the tree. I think you have
to think of it that way, that Palo Alto is being nibbled away for this,

that and the other thing. Without mitigation, this town will also suffer badly. So I think the framework of your decision tonight is that you're supposed to be looking at Attachment A and determining if those are things that you wish to pursue.

You have been asked, albeit only one week after the Planning Commission could have had it on their agenda, to initiate a rezoning. I suggest that you just let that matter go back to the Planning Commission and let them initiate the rezoning, as it should be done, where you have the people who are expert in planning doing it.

On the capacity question, I'm old enough and have been round long enough that I've been through several expansions of the Stanford Hospital, not to mention the proposed Palo Alto Medical Research Foundation Hospital on Channing, Addition, Waverly and Bryant. All these same arguments, you know, there are little babies dying every day and there's this and that, it's not to diminish the fact that there are serious medical issues, but that's not your purview. Your purview is land use decisions and how it impacts your community.

At what point do we say no? You can't ever go -- I'm not saying, say no now, but I'm saying we see this over and over again and there's always another iteration. The shopping center has expanded three times in my purview here and, of course, the Sand Hill Road was not supposed to be growth inducing, but it's already doing that. I think we have a certain egocentricity about Palo Alto and having a world class medical center. We have one, but other communities don't have them. Somebody from Arizona is sending their baby here.

So I think it's a very narrow view to think that we are the ones that are the deserving ones for this world class center and that there shouldn't be some spreading around of world class centers in other places.  I think that we jut have to ask ourselves, where does it end. I think you need to be very thorough in investigating mitigations. Thank you.

Mayor Yoriko Kishimoto:           Thank you. Next is Tom Jordan, to be followed by Nancy Alexander.

Tom Jordan:           Tom Jordon, 474 Churchill, Palo Alto. I'd like to address the item on the agenda. Very simple, there is no special category for Stanford or for hospitals. They are an applicant. You are the government charged with carrying out [SEQUA], and that's what you're doing. There are a lot of things that have been said that can be responded to later, not now.

I'd like to address the worksheet at the end and make three or four comments. One is that on page 54 of the verbatim Planning Commission minutes, there's a reference to a Physical Impact Report. Until I read that, I was unaware that it was taking place. That's probably the most important thing, because that will put a dollar figure on every impact. Some of them may be estimates. Some of them may be difficult to come by, but there will be a dollar figure on every impact in the EIR. That is what the people of Palo Alto want to see.

Yet, that is not in this flow of work. It's vitally important that it be plugged in and that the people who are doing it get the work done in

time so that their physical impact report can be available to the people at the same time that the draft DIR is, because you want public comment. Now, that's going to be difficult to do, but it can be done and so it should be done.

Similarly, this lesser thing is this zoning thing that you're asked to do is not plugged into this list of work. It should be plugged in. if it's important enough to have in the heading, to ask you to initiate it, then the process should be plugged in here.

Finally, related to that and the development agreement and everything that comes out of here, it should be made clear when does the public get the work product? For instance, the development agreement looks like they stopped talking in May. Does that mean the public sees it in May or do they sit on it? As soon as they stop talking, the public should see it.

So in all of this, for the public to fully have confidence that you have done your job well -- and really, Stanford should have the same interest because you are not the last say in this. Really, everything that you're asked to do is subject to referendum. If the people do not believe that a good job has been done and that this is going to cost them a great deal of money and it's not laid in front of them, there's going to be great consternation. The fact that a lot of people have not shown up tonight is because the data isn't out. The impacts aren't out; the costs aren't out.

But it's your job to make sure they are out. If at the end, you want to say Palo Alto will pay a whole bunch of it, you can say it, but give us the data. Thank you.

Mayor Yoriko Kishimoto:    Okay, thank you. Next, Nancy Alexander, to be followed by Michael Griffin.

Nancy Alexander:    Mayor Kishimoto and Members of the Council, I want to focus my comments on responsible planning and the two items that are on the agenda, the development agreement and the zone change. Entering into a development agreement at this time is premature, because the environmental impacts and the fiscal impacts and their magnitude are unknown at this time. The impacts of the hospital, the shopping center and the proposed housing need to be identified and quantified before a development agreement is written.

The Council needs to know the impact before they commit to the 20 year agreement which will freeze today's development regulations and many of the impact fees. That's for two decades. That's a long period of time.

The second point has to do with the zone change. The proposed projects, obviously, are very complex. What's going on with the environmental review of the zoning amendment? In the packet today, these maps, this is the first time I've seen what's intended by the zoning amendment. On September 24th for the scoping session for the EIR for the projects, I brought up the fact that also part of the projects are the amendments to the zoning ordinance and the amendments to

the comprehensive plan, but they were not included in the Notice of Preparation.

The whole purpose of SEQUA is to notify the public what's going on, and yet these were not in the Notice of Preparation. Maybe they were in some other Notice of Preparation and another EIR that I'm not aware of. Actually, that's one of my questions tonight: Have these maps that show the proposed amendment to the zoning ordinance been circulated in any Notice of Preparation for an environmental impact report. These attachments I'm referring to are D and F. F looks like it consists of figures 1-3A and 1-3B.

So, it's really premature tonight to initiate an amendment to the zoning ordinance. I'd like you to pay particular attention to the environmental review and its formality. It really needs to be done right. Thank you.

Mayor Yoriko Kishimoto:        Thank you. Next is Michael Griffin, to be followed by Jennifer [Varnal].

Michael Griffin:        Michael Griffin, 344 Poe Street. Good evening. We normally think of multitasking as a good thing. It sounds efficient and fast. So, as it happens, we're doing that. As we learned from the November 14th Planning Commission minutes, tree important functions related to the Stanford projects are being parallel tracked: Writing of the DEIR, negotiating a development agreement and crafting a new PC-like zoning ordinance to accommodate the huge increase in building density.

On the surface, this sounds good. Maybe. Then, we learn from the Palo Alto Weekly that the 1.3 million square feet of new construction is so big that it defies the public's ability to grasp it all, that it even overwhelms public officials with its sheer volume of detail. Hm, maybe this multitasking of the process isn't such a good thing as it first appears.

I certainly can see why it appeals to Stanford as a way to hurry their plans through the dreaded Palo Alto process, but maybe it doesn't make sense for Palo Alto citizens and taxpayers to be negotiating a humongous PC project before we even fully understand what the impacts of the project are going to be. Seems like we're playing "Texas hold 'em" and placing our big bets before the flop, before the cards are turned up.

Why would we do that, placing our bet before we see the cards, especially when it's the single most complex development proposal ever to come before the City, says the Weekly, ever. These impacts, who is going to be paying for them? Traffic through the neighborhoods, gridlock at the train tracks, new schools. Are Palo Alto taxpayers paying for these Stanford-induced impacts?

The Planning Department, during the September 24th Council meeting, told us that a physical impacts report was in the works. I could find no mention of such a report in tonight's CMR, but I'm hoping staff might soon provide feedback to Council that will dollarize the costs of impact. If we don't have detailed knowledge of the project

impacts, nor a good grip on the costs of these impacts, it seems reasonable for Council to request that City Manager and his executive staff put a hold on their negotiations with Stanford until we get more light on the subject.

Not that we're negotiating in the dark, but it does seem we're not getting a clear picture of the game as we might. So there it is. Please ask staff to stop, stop now. When the DEIR results are available and we've got a clear view ahead, we can recommence negotiations. Thanks.

Mayor Yoriko Kishimoto:                    Thank you. Next is Jennifer Varnal, to be followed by the last speaker, [Andy Douty].

Jennifer Varnal:    Thank you, first, for being here and toughing it out. I can't believe I finally got called to come up and speak. Mayor, Council Members, I'm actually standing in for [Geri Yearalt], she's the CEO of [Litton] Gardens. I work with Litton and have done so for the past three years.

As you may know, Litton Gardens is home to more than 580 of our community's seniors. That's 1 percent of Palo Alto. The pressure to provide quality health care for our aging seniors is growing fast, much faster than we can all imagine. This past summer, an overview of the Stanford University Medical Center Renewal and Replacement Project was presented to our senior residents. Our residents are keenly aware of the need for quality health care, which directly impacts their quality of life.

Our residents fully support the renewal and replacement project as the pressing issue of capacity for caring for the health of our aging population continues to grow. The Litton staff and our seniors realize now is the time to approach these issues before the situation gets worse. Pushing this project through with minimal delays will help accomplish relieving the pressure on the already taxed facilities. As the baby boomer generation is moving into view, it is very important that we deal with these things in a timely manner.

We all know that paying attention to the environmental impact of the project is important to all of us, and often very complex. I have been a Palo Alto resident since 1995 and I have no doubt we can pull together to make the expansion project successful, both for the medical needs of our community, but also for the sensitivities to the environmental impact. As one of our residents said during the presentation over the summer -- she's 95 years old -- "I won't see this project through to completion, but it is of the utmost importance for the next generation and beyond." Not is the time to put the right technologies and medical facilities in place. Thank you.

Mayor Yoriko Kishimoto:               Okay, we're on the final speaker, Andy Douty.

Andy Doherty:    Madam Chair and remnants of the Council, good evening. I'm Andy Douty, a long time resident of Palo Alto, at 4072 Scripps Avenue. I also served as Director of Community Relations at Stanford for 20-some years and saw innumerable proposals come before this body. I've come out of the shadows of retirement tonight to add my voice to the

many that you're hearing in support of the Medical Center's important effort to renew and replace its facilities and services.

The Center, as you know, is an incredible asset to the community and to the entire region. It can become an even finer resource with your help. Someone has aptly observed in the newspaper the other day that the Medical Center, itself, is a mitigation in its own right. It eases our diseases and injuries on a 24 hour basis and it lies within easy reach. We are highly fortunate to have such a fine resource so close at hand. But how does a community mitigate a mitigation?

Obviously, there will be direct and obvious and clear impacts from the Center's expansion that must be addressed, but at the same time, I hope that you will not saddle this project with costly and tangential wish lists of local needs. The temptation to do so will be very great, but the hundreds of thousands of dollars diverted to matters not directly related to the enhancement of the medical center itself ultimately will lessen the facilities and programs provided.

Just as churches and schools and other nonprofit entities are exempted from taxes because the value of the work they perform outweighs the revenues lost, so should the burdens placed on this medical center proposal be minimized because of its value to society at large and to Palo Alto, particularly. You and your successor Council Members will be approving a precious community resource in the coming years. I urge you to treat it fairly, equitably and even, now and then, with some smiles of satisfaction and appreciation. Thank you all.

Mayor Yoriko Kishimoto:                    Okay. Well, thank you all for coming to speak
to us. It is, indeed, an important project, so I appreciate everyone's
time in coming to speak to us. I'm going to bring you back to Council.
I don't know whether we should do questions first. I don't know how
many questions there are, but let me start with Council Member
[Druck Meyer]. He's been waiting for a few hours.

Council Member Druck Meyer:                Well, I also appreciate all the words from the
audience. Obviously, this is a major project and we really all want to
do it right. Going back to the very beginning, we had the presentation
on the peer review by Ms. [Berkhoff]. The first question asked was
why the project needs to happen in the first place. The answer, as we
all know, is requirement for seismic upgrades.

I got an email from a community member today which raised some
questions and I wanted to ask them. I'm not sure, Ms. Berkhoff, if
you're the one who would be able to answer them, but perhaps. It
basically pointed out that the Medical Center, independent of Lucille
Packard, is made up of 22 buildings. I can't imagine where those 22
buildings are, but assuming that is the case, it says that eight are SP1
rated, which is structural performance category. Those are the ones
that are required to meet standards by 2008 or 2013.

Let's see, another four are SP2, which would require meeting
compliance by 2030, and the other 10 are in good enough shape that
they wouldn't need to meet any standards until 2030 or beyond. I'm
wondering, is this something that was looked at? Can we get some
confirmation about these numbers? I think it might not change the

project at all, but it is important to know. I've been under the
impression that the entire hospital was noncompliant.

Ms. Berkhoff:     It's a very complicated matter. Just to sort of answer the last part first:
There were two structural analyses done for both the Stanford hospital
and clinics and for the Packard Hospital by two very reputable San
Francisco structural engineers, Rutherford and Chekene analyzed the
nonstructural components, and I'll talk about that in a second. And
Degenkolb analyzed the structural components. The SPC ratings that
you're talking about are the structural components. People can be
damaged or hurt, as well as a building can be made nonoperational by
either structural failure or by nonstructural failure, pieces of
equipment, bookcases falling over, et cetera. So you have to have both
sets of ratings. The 22 buildings you're talking about -- it's really a
whole lot of interconnected buildings. When you look at it, you don't
really realize, but when you see the structural analysis, it has the lines
showing where all the different additions have been put together over
many years, and the different years of construction. The bulk of the
Stanford Hospital and Clinics -- not Packard -- does not meet -- the
bulk of the are where the beds are -- let me rephrase that -- where the
beds are in Stanford Hospital and Clinics does not meet SPC1. That's
the part that needs to be , you know, replaced or renovated by 2013,
and as we talked about earlier, they can't renovate it without emptying
it out, and there's nowhere for the patients to go, which has led to the
replacement. Uh, the Packard Hospital has a number of noncompliant
areas in the nonstructural category, and those would not be possible to
renovate while keeping the rooms operational, like keeping people in
them. So it's a combination of those two factors, of not being able to

do the renovations, you know, if it were renovatable, while keeping people in them, and the fact that a lot of the older parts of the older parts of the hospital, in fact, almost all of the older parts of the hospital, for the adult hospital, are going to have to be replaced, just from the seismic structural perspective. I don't know -- does that answer it?

Male Voice:    Yeah, that's very helpful, and I guess I'd like to ask staff if we might be able to get some sort of map that shows the different structures that are in highest need of seismic upgrades. And, you know, my sense is it's -- hearing what you have to say, is -- it's probably not going to change the project, but it might be the case where, you know, we were discussing earlier in the night, or maybe it was this morning, about AB32 and greenhouse gases, and there was a question about the impact of, you know, creating a new structure, and it might be that there are some structures there that are fully usable and don't need to be torn down and rebuilt. I just think it's good information to have, so I'd like to request that.

Female Voice:    By the way, Stanford does have -- from the structural analyses -- they do have plans that show those demarcations of buildings, and that is, you know, it's their prerogative whether they share them or not, but yes, they do, they do exist.

Male Voice:    Right. Thank you. Uh, a couple more questions, and then I'll come back later for comments. I was wondering -- it was mentioned that we look at different alternatives with the EIR, from the full project to the no project. Is one of the alternatives looking at expanding by 400,000

square feet to meet the current needs, but not necessarily expanding the operation?

Male Voice:        Yes, one of the reduced-size alternatives will be essentially right-sizing the existing facility but not adding beds, which is approximately 400,000 square feet.

Male Voice:        Okay. Thank you. And, uh, let's see -- a question that came to mind when Nancy Alexander spoke, and it relates to the map about potential housing sites -- in Area B, which is shown as No. 5 on the map here, as part of the Sand Hill Agreement, that was not to be -- was to remain open space, and I guess now it's a driving range -- for 25 years, and I would assume that's from '97. And that area is, it's outside of Palo Alto; it's in the county jurisdiction, and I'm wondering if, when we look at zoning changes for the area, if we might consider annexation of that area and incorporate that into the zoning, because it's much-needed land close to, you know, the medical center, and kind of a related question is, at what point does the school district weigh in on concerns people have about population growth and the growth in school-age children, and does that get worked into that bigger discussion of zoning?

Male Voice:        Okay. A number of items here. Number one -- correct me if I'm wrong -- but the development agreement indicates that will be open space, but it does allow for housing in that area to be built within the 25 years. That was an exception to the general commitment to open space for the 25 years.

Male Voice:          I'd forgotten that, but . . .

Male Voice:          Yeah, we did check that. The issue of, uh, annexing, that's a difficult
                     issue, and I really can't address that right now. If you like, at some
                     point we can look at that and what it would entail, including, of course,
                     talking to the property owners, which is Stanford, the jurisdiction that
                     now governs that area, which is the county, as well as looking at any
                     desires that we have. The final issue that you raise was about the
                     school district. We are going to share the demographic data, the
                     employment data, and what that will produce in terms of students. Of
                     course, we use the same demographer as the school district, so we'll
                     share that, and as part of the process we'll see what kind of comments
                     the school district has and what kind of issues, and then that'll inform
                     what issues we need to bring up in our discussions with the applicants.

Male Voice:          Thank you very much, and I'll hold off on my comments for now.

Mayor Yoriko Kishimoto:                 Uh, let's see -- Council member Beecham,
                     questions?

Council Member Beecham:                 I don't have questions at this point, but, given
                     the lateness of the hour, I'd like to make a motion.

Mayor Yoriko Kishimoto:                 Uh, okay.

Council Member Beecham:                 And that motion is to move staff
                     recommendation for Item 7A.

Male Voice:            Second.

Mayor Yoriko Kishimoto:                    Okay, would you like to speak to your motion.

Male Voice:            Thank you. Uh, as we have these discussions on the proposed
                       expansion at Stanford Hospital, to some degree what happens here is a
                       popularity forum. We have, certainly, a number of people who have
                       heartwarming stories about their personal experiences at Stanford and
                       their firm desire to have an expansion. We have others who work at
                       Stanford and know of the need directly. We have others who see more
                       clearly, perhaps, the impact on the community. We have a few who
                       would simply reject the expansion as not being needed. For the
                       Council tonight, we don't have any option to summarily approve the
                       project, nor, certainly, to summarily reject the project. We are in fact
                       on a long process that will take several years overall to complete, uh,
                       and we're going through it in a very stepwise fashion. One of the
                       issues that's come up tonight is why are we doing a development
                       agreement? And as one person maybe put it, why are we entering into
                       a development agreement? That is not the case. This is a long and
                       complicated process. We are doing, in fact, a number of things in
                       parallel, as must be done here. One of those things is beginning to talk
                       between the parties involved on what the development agreement
                       should consider, how it may be laid out. But it is not possible to decide
                       at this point what the City's objectives must be or will be or shall be in
                       that development agreement. We've got a list of items that staff has
                       asked us to comment on, or provide input on, I guess, is how staff put
                       it. That list as we have in our packet is an uncritical listing of items
                       that people would like to either have considered as issues or

mitigations they would like to have imposed. As staff clarifies in the report to us, those lists represent -- and I'll read it -- "represent a record of a broad spectrum of thoughts about what should be considered in the review and evaluation of these projects and during the development agreement negotiations and EIR preparation. The list can be used as tools to help organize the discussion of topics for negotiation of the development agreement, but they do not represent a final comprehensive list of the issues." As I look at the list, some certainly are reasonable, some are necessary, and some, in my opinion, are impossible. As the Planning & Transportation Commission went through this, as I look at their report, they had a process that I think we would have here, where if we have issues we'd like to add, we may add it to the list. I think at the Commission there is no debate on what was appropriate or necessary, or which were inappropriate. I think at this Council level, that is not the way we would go either, given how this is presented to us. We are not asked tonight to approve the list. It is not agendized as such, to approve the list. The formal action we would take tonight, and the staff recommendation, is to initiate a zoning change. There have been comments made that the Planning & Transportation Commission did not consider that, and that is in fact consistent with our code and charter, where the Planning Commission is not the one who initiates zoning changes. It's done either by an applicant or, in fact, by this Council. And it's necessary to do that in this case so that the impacts of that potential change can be evaluated in the EIR, but we are not tonight, as one speaker mentioned, taking action to rezone. We are initiating that action, and that is appropriate. Uh, the development agreement will not be done, certainly, until some time after the EIR is complete. The draft EIR is due out in June, I

believe, according to the chart. This Council will fully see that EIR. It will go again to the Planning Commission; they'll come here to this Council. The community will fully comment on it, and only after that part will the community and the Council have the information necessary through the EIR, which is an informational document, to understand the impacts and have the wherewithal to negotiate, and in cases require, mitigations. So that's the basis for my motion tonight, and I hope my colleagues can support it.

Mayor Yoriko Kishimoto:                 Actually, before I go to the second here, can I have clarification, uh -- I mean, it is titled "Identification of Issues." I mean, is it not -- did staff not expect us to accept the list -- Attachment A?

Male Voice:          You can do -- first of all, the list provides, again, a framework. If you want to modify that list, or modify the framework, let us know. But basically, if you move forward tonight without changing that list, that's sort of the framework we're going to be working on with all the provisos that we've made about this is structuring our initial discussions with Stanford, and once we have the EIR data, then entering into the negotiations of the development agreement.

Mayor Yoriko Kishimoto:                 Sounds like you're assuming that acceptance of the issues is part of the motion. Okay. I'm sorry, back to the seconder.

Male Voice:          I think Council member Beecham put it very well. I would just add a few thoughts. I think that listening to the public testimony over the last couple hours, there's been a notion that somehow we need to be

convinced that this is an important project. It is an important project; I think we all recognize that. What I think is at question is not its importance or its relevance or the need for the project, under any measure. Rather, the question is, what is the impact on the community, and how do we go about evaluating that impact and developing the mitigations? And there are certainly elements of this project which are self-mitigating. But I don't think either the -- under the discretionary components of the rezone, or certainly under law, under CEQA law, it is fully self-mitigating, and how we go about developing the mitigation strategies for both discretionary and the CEQA components. It's important, and I think staff has laid out a reasonable time line and a reasonable roadmap for doing so. Uh, I'm comfortable with the way the motion is stated relative to the issues list here, and that's partly a philosophical point on my part, which is I'm very uncomfortable with us spending a lot of time adding, tweaking, adding, subtracting, prioritizing, because in effect we would begin to negotiate in public, and I think that would be an unwise way to begin this project. I think that passively even suggesting that this list, which has been developed through a series of public meetings and a series of collaborative discussions, is a starting point, and acknowledging that the DEIR process will add to this element and help to develop priorities within this I think is the reasonable way to go. I share with Council member Beecham the notion that personally, some of these elements have more validity than others, and we may disagree on that, but I think sending staff off with this as a basic template is the way to go, and not to spend a tremendous amount of time tweaking it, particularly since so much is going to be developed through the DEIR process. So I'm happy to support the motion.

Mayor Yoriko Kishimoto:                    Council member Drekmeier?

Male Voice:              Well, my apologies to Council member Barton, but I do have one item
                        I would like to add to that list. And 42 is flood control improvements
                        for San Francisquito Creek. I would love there to be some discussion
                        about storm water retention basins, or basin, on Stanford land. That is
                        one community benefit that only Stanford can provide. You know,
                        some of these other ones we might be able to work out in other ways,
                        but I think that's quite critical to flooding problems lower down on San
                        Francisquito Creek, and I'd love to have that discussed. I don't know if
                        I can just verbally mention that, or --

Mayor Yoriko Kishimoto:                    Would that be an amendment?

Male Voice:              I don't know. Would that be a friendly amendment?

Mayor Yoriko Kishimoto:                    Well, I'm looking to staff on their response to
                        how the want to add comments by Council tonight on items to add to
                        the list.

Male Voice:              In our mind, that comes under Item 42, which would be discussing
                        flood control protections in a variety of ways that the City and
                        Stanford can deal with flood control issues, including the issue you
                        brought up, which has been brought up by a number of people.

Male Voice:              Mm-hmm. Okay. I'd love to see it listed as well as Hopkins, but I see
                        it's flexible in the wording here. And then I have a question. I have

received comments from community members wondering about this initiation of zoning change. And I can agree with the fact that we're initiating, and there's no done deal here, but what is the role of the Planning & Transportation Commission in that process?

Male Voice:    Well, just to clarify some of the procedural issues, it's either the Council or the Planning & Transportation Commission may initiate a zone change. Those are the two bodies that can do that. And then the application may not initiate just by making application. What they do is, they request initiation of the Planning Commission, and then the Commission decides whether or not to initiate. So that's the procedural steps. Once the Council initiates a zone, then that basically sets in motion the analytical work that the Planning Commission would do. It would hold hearings; it would take input; it would develop an outline or bullet points for staff. Then the language would be worked out in detail. It would come back to the Planning Commission; they wordsmith it generally in two or three meetings, if a zoning code update was an indication that the amount of time that the Planning Commission would spend, and then that would come to the Council for your final approval, and you would have the final approval on the final text amendments. That's in a nutshell what would happen.

Male Voice:    Thank you. And so would the order be certification of the EIR, then development agreement, and then zoning change.

Male Voice:    Well, yeah, the EIR will have to be certified before the zoning amendments can be considered, and most likely that would happen before the Planning Commission. Ultimately it's the Council that has

to have a final EIR that analyzes specific zoning. And before you can
move forward, that would have to be done before the action on the
zoning.

Male Voice:        Okay. Thank you very much.

Female Voice:      Okay. I mean, I do have a number of questions which I want to go
                   into. I guess one is regarding the development agreement, and you
                   indicated in response to one of my questions that the process doesn't
                   end in May. I guess it's in -- can you clarify in the schedule -- so
                   basically that's kind of a preliminary negotiation phase that ends, and
                   then you enter kind of a little bit more detail?

Male Voice:        Well, the -- we're having some preliminary discussions just to get our
                   arms around certain kinds of issues, like transportation demand
                   management, like the housing issue, like sustainability. The -- and
                   that's helping us set the stage for negotiations, which has to be
                   informed by the EIR data. And so the draft EIR is out in the summer,
                   and that will ramp up those discussions and move into negotiations.
                   But we need the data to do that. Both Stanford and the City need that
                   data. And then we're hopeful that those negotiations will, you know,
                   be concluded by the end of the year so we can bring -- and of course
                   that would be included in the development agreement and in all --
                   there's a whole number of things that have to then come back to the
                   Planning Commission and come back to the City Council.

Female Voice:      Okay. So at what point -- I mean, I'm just trying to avoid this scenario
                   where a very, very complicated development agreement is negotiated,

and it comes to the Council in an up-and-down vote. I mean, that has happened in the past, and so what process does staff envision to bring aspects of the development agreement to the Council and the community to get some timely feedback before we enter a 20-year binding agreement?

Male Voice:    Well, we're -- first of all, there's checkpoints along the way, like we're having on in the spring, which is a project update.

Female Voice:    Are you going to bring a -- that includes a draft of the development agreement?

Male Voice:    No, when we get -- that'll be before the draft is available. When the draft is available, then we are proposing that the Commission, ARB and the Council -- three hearings -- so that the Council can provide, can comment on the EIR impacts, the adequacy of the draft Environmental Impact Report, and as well as implications, obviously, for the staff in moving forward.

Female Voice:    And to avoid the situation where they say, well, this is such a complicated deal, you can't fool around with it, a number of choices will be brought?

Male Voice:    Well, I have never known a Council not to fool around with something as complicated as this, so I mean, it -- but you cannot negotiate a development of -- I'll be very forthright here -- you cannot negotiate every provision of a development agreement in public. Now -- you pay me to be forthright; I'm being forthright -- you need to be informed

with Council direction; you need to be informed by the mitigation data in the EIR, we're trying to, we'll be bringing back, where appropriate, you know, information to the Council, but you cannot negotiate each provision of a development agreement in public; it will not work.

Female Voice:        But there's a big difference between negotiating every provision in public and providing a very detailed development agreement at the very end. So, I mean, I do want something meaningful to come back to the Council in terms of tradeoffs and choices for the community, okay?

Female Voice:        If I could also add the -- there is a resolution governing the process of developing -- of adopting development agreements, and it requires a public hearing in front of the Planning & Transportation Commission as well as the City Council, so there will be two public hearings on the development agreement terms.

Female Voice:        Right, but, you know, sometimes --

Female Voice:        I mean additional ones.

Female Voice:        Right. I mean, it's just -- you know, I just don't want the, you know, staff to get so far down the road that you get locked in, that meaningful choices do come to both the community and the Council. You know, a 20-year lock-in period for extremely significant impacts is just so, just very, very, very important. Let's see, one -- another question has to do with the initiation of the zoning change, and I saw the responses to your -- to my questions about that. I mean, as you know, I mean, your

response said that it's not necessary to start now, that we could start it
in March. And presumably you were planning to do a check-in with
the Council at that time. And the reason I would feel more comfortable
with a direction which says, you know, direct staff to work with
Planning Commission to draft a hospital zoning, and then, you know,
and then you can initiate the zoning amendment at that time, because
there is no amendment at all. I mean, we only have the applicant's
wording. We've had absolutely no discussion of what that district
might look like, so it doesn't, it doesn't, just doesn't seem right. And so,
I mean, I would prefer wording that says to direct staff to draft a
hospital amendment and then initiate the zoning. So that's, uh, that's
my friendly amendment, and if not, I would like to make that
amendment if somebody will support me.

Male Voice:           I'll second.

Mayor Yoriko Kishimoto:            And would you like to speak to your second?

Male Voice:           I'll pass.

Female Voice:        Okay. That's [unintelligible] amendment.

Female Voice:        And it fails on a two-to-three with Council member Drekmeier and
                     Mayor Kishimoto voting yes.

Female Voice:        Okay. Let me see. I have a couple other questions. I guess on the --
                     well, these are more comments, and -- sorry, I have a number of
                     comments since this is a big project. You know, one is that -- I mean

my overall comment is one that you've heard me make before, which is that, you know, the benefits of having a first-class medical center is one. Yes, we don't need to hear. I mean, it is part of what makes Palo Alto, Palo Alto. And earlier this evening we just had the presentation of Climate Action Plan, and I know that Stanford is also a major leader in taking aggressive climate action, as is Palo Alto.

So it really is a beautiful -- I mean this expansion plan is the classic double-edged sword where, if it's not done right, if I play out this worst case, the worst case is something on the order of when the Stanford Research Park went into Palo Alto, and that was about 10 million square feet. And a few years later, Oregon Avenue, a two-lane road, did -- was torn out. Hundreds of houses were taken down, and there was an Oregon Expressway. And that was an act that split the community politically and physically. It split North Palo Alto from South Palo Alto. It led to a recall of the entire Council. It was really the defining, uh, political action, and it really shaped and impacted South Palo Alto for ever. So as I said in my op-ed, the mistake we want to avoid is having another automobile-oriented community right smack in the middle of Palo Alto. And that is why -- and the other reason is that people say sometimes, well, why should we insist on 100 percent mitigation, or hold Stanford to high standards?

Besides my knowing that Stanford does hold itself up to very, very high environmental standards, the fact is that 100 percent of the expansion is above what zoning today allows, and above what the Comp Plan allows. So I mean, that is why we are holding the expansion to higher standards, and I mean I won't repeat everything I

wrote in my op-ed, but -- and I believe that Stanford will agree with us that we just don't want to increase greenhouse gas emissions or overall traffic, which of course leads to greenhouse gas emissions.

I wanted to expand a little bit on this concept of no net new traffic increase, which, on the face of it, some people interpreted it as, well, does that mean patients can't drive there, or ambulances get there, or, you know, how is this going to work? And the way I explained it is, it's basically paying for an expansion through overall community efficiency. So if we add, you know, five percent more trips or demand for more trips, it means the entire community needs to become, you know, five or six percent more efficient. So, I mean, that's what I meant when I said, can Palo Alto, working with Stanford make the room to accommodate the hospital? Because none of us want to have a worse community. None of us want to have -- we know that our streets operate at capacity today. We can't really add thousands of peak-hour trips or even daily trips, to protect our quality of life. So as Palo Alto and Stanford do, we're trying for the best. I mean, we want the best of both. We want the great medical care, and then we want to keep the quality of life that attracts the doctors to live here, as well as our great medical center.

Some people have been asking why are we kind of bringing up all these other issues, and why are we talking about jobs and housing, when medical center is going to have a hard time kind of even raising the money to pay for the hospitals? And the answer is that -- I mean, I've been on the council now six years -- the city council is where everything comes together. We have to balance all the demands.

Tonight, the council was filled with people interested in the medical center, but we sat through many, many other nights where the council was filled with people who were concerned about affordable housing. Everyone has to leave Palo Alto because they can't afford the rent or the council's been filled with people who are concerned about traffic, that they've been held up, or the ambulances can't get through. And so it's our job to really try to balance this very, very large project so that we prevent the problems. I guess on the shopping center, I do want to also make the comment that it's true, we tend to focus so much of our attention on the medical center and not the shopping center. The shopping center we do -- I mean, we are supporting because we do want the revenues. On the other hand, if we cannot mitigate the impacts -- I mean, I do want to see a reduced-size alternative. Is one of the alternatives being considered -- if, in fact, we just can't mitigate it. That is something that I'm going to be looking for. One question, I guess, on the community hospital issue, which is -- I mean, my understanding is about 80 percent of the hospital is for the university and 20 percent for the community. I don't know if that's -- I forget where I heard that. But is that something that would be part of the community benefit that might be -- I don't know how it would be negotiated. But, you know, obviously, I mean, if Stanford chooses to, it could fill 100 percent of the beds with noncommunity patients. I know it wouldn't do that. But is there any constraint or rule about that?

Frank Benest:    The expansion of the capacity at the hospital -- at both hospitals is to deal with those patients who come directly to the hospital as well as those that are referred by the community practitioners that are -- most of them are associated or affiliated. A lot of them are affiliated with

Stanford. And so I don't believe there's been any discussion about -- you know, that's the reason that the expansion is seen because these patients who are referred are seen as Stanford patients, even though they may not come directly from the hospital. They may come from a community practitioner.

Mayor Kishimoto:    But, as you know, patients come from all over the world.

Frank Benest:    Right.

Mayor Kishimoto:    Right. So it's that kind of ratio I'm looking at. But that's all right, you don't have to --

Male Voice:    We have not had that discussion.

Mayor Kishimoto:    Okay. All right. I do also want to make a comment about the Hoover Pavilion. There were some comments made by the Planning Commission that they wanted to -- well, number one, just looking at the drawings, as a nonexpert, to see a number of 50-foot buildings right adjacent to it, I can't quite imagine how that wouldn't impact the historic importance of it. But, yeah, so I'm just going a little bit skeptical. And then there was also a suggestion made by several people that it be looked at as a hotel site. Is that something that staff is going to be looking at?

Male Voice:    The property owner has no interest in using that as a hotel site. That's not their priority at all. We're looking at hotel sites on the Stanford Shopping Center property, and we're looking at several locations.

Mayor Kishimoto:    Okay. I appreciate your patience. How about regional outreach? I
know we've had the NOP letters from Menlo Park and such, but is
there anything more proactive we can do in terms of kind of working
regionally with our --

Male Voice:    I've made a commitment to the city manager of Menlo Park that we
will engage their staff in any and all issues that are of concern. We've
had a preliminary meeting among our staff people. We're planning to
have another one. There is a letter, I believe, from their mayor to you
about these projects. So we see their involvement as we move forward.

Mayor Kishimoto:    Okay. And then just finally, I guess you've asked for feedback on the
list of issues, and although you don't want us to set priorities, per se,
I've already stated [them for -- in my] article. So I'll just say that, I
mean, I see the top issues as traffic, housing, open space, kind of urban
design. Those are probably the big items, at least for me. Okay. Yes? I
see a light from Council Member Kleinberg.

Councilmember Kleinberg:         Thank you. I have a preliminary question about
the legal relationship between Stanford University and the Stanford
University Medical Center. In other words, are we asking all of the
mitigations to be made by and paid for by Stanford University Medical
Center or are we talking about Stanford University as whatever it is, a
charter, a land trust, whatever it is at this point?

Female Voice:    Right. Uh, the application was submitted by both entities, and so
presumably the mitigation measures would be imposed on both.

Councilmember Kleinberg:                 So either can be asked. Okay. That's good
                    information. It's 11:20. Like some of us, I have to be back at work
                    tomorrow morning, and so I'm sorry that it's so late. Everybody's sorry,
                    I'm sure. But I had some questions about the list -- The List, it's
                    become known as The List. I would like to eliminate some of the items
                    that are on the list. Councilmember Bechum said that they were
                    probably impossible, and I hate to send off our staff playing games
                    with impossible requests. So let me, without saying shall we delete
                    them tonight, because I don't want to start doing that at this hour, but
                    let me just say that I think there are some very obvious irrelevant items
                    on the list that don't belong there and diminish the credibility of other
                    items on the list. Such as completion of the Charleston Estarado
                    improvements.

Male Voice:         [Could you say the number?]

Councilmember Kleinberg:                 Oh, okay. That's 24. Twenty-five is the ballpark
                    right of way. I can't even see how that's . . . Number 30 is residential
                    arterial neighborhood traffic improvements. I don't know -- unless
                    you're talking about closing off North Palo Alto downtown streets
                    again, I don't know exactly what you're talking about there. I did agree
                    with CMD's question about retention basins, and I'm glad that you
                    said, for the record, that that's part of what you're thinking of talking
                    about. Number 45, no-cost leases for substation sites within the
                    research park. It seems to me that's -- if you were talking about the
                    substation that's going to be near the shopping center, that one I could
                    have understood. I don't understand why we're bringing the research

park into this. I had a whole bunch of questions about ones that came from the Planning Commission, but I understand that you've taken the ones from the Planning Commission that you thought were relevant and put them into this list, this, uh, exhibit, so I -- I won't go through the whole -- I was going to ask Mr. Garber for some explanations, but I'll let him enjoy the rest of the meeting without a lot of questions. So those were the ones that I was concerned about. Also number 48, the housing fee -- hospital's currently exempt. I recall we took a vote on that. Can you remind me what our vote was?

Frank Benest:    The staff recommended that the current exemption be done away with. The council did not agree.

Councilmember Kleinberg:    And so how did it end up on this list?

Frank Benest:    Because it is the staff's view that we have to address the housing demand generated by the new employment at the hospitals. Now, how we do that is open to all kinds of strategies.

Councilmember Kleinberg:    I understand asking for housing sites. I understand asking for them to do some kind of mitigation for the housing impacts. I'm not saying we will. I'm just saying I understand that's negotiable. But to put the housing fee on the list after the council took a vote seems inappropriate to me.

Female Voice:    To clarify, it's my understanding that the rationale for the council's vote at that time was that it was connected to this project, and they wanted to see the housing impacts analyzed in the EIR before making

a decision on whether to impose a fee, whether to require onsite housing, or some combination.

Councilmember Kleinberg: That's correct, but it is sitting here on the list as something that we agree ought to be discussed. We haven't agreed that it should be discussed.

Frank Benest: Our intention -- and we'll take that as good feedback -- is to identify the housing demand in one of the studies, the technical studies, [housing demand], and then as part of our negotiations with Stanford, discuss how that housing demand would be mitigated, period. There are all kinds of strategies.

Councilmember Kleinberg: Okay, but at the moment, there is an exemption.

Frank Benest: Yes, there is.

Councilmember Kleinberg: I just have trouble with it even being listed since it's not our policy at this point. That would have to come back to the council for a change -- well, it would be a change in the exemption. And then also number 54 says potential impacts on downtown retail. I almost see that as a reverse situation, that there can be potential benefits on downtown retail, given all the interconnectivity of the transportation that we're asking for, the pedestrian rights of way, the bicycles, the shuttles, all of that that we're asking for in the staff report. It seems to me the potential impact might be a benefit, which brings me to, I think, one of my final comments about this list. Which is that it was supposed to be benefits and mitigation list. And I don't see too

many benefits listed. And I think there are many benefits, not the least of which of course are all the benefits people have testified to tonight, none of which do we disagree with. Everybody agrees that high-quality medical care is important. So I'm wondering where the staff would have put a list of the benefits instead of just only the impacts. If this list was just an impact and mitigating list, I would have understood the title better. I hope that's a fair comment.

I just want to comment on a couple things that were said tonight. One was a comment about labor relations, and our responsibility to workers at the hospital. And I think that's a fairly complicated issue for us to tackle, and certainly this council and this community has been very sensitive and caring about conditions for workers. The one thing that I thought the labor union officials might have mentioned was job creation. There are many communities that would be hungry for an opportunity to create jobs, particularly when I read in the Wall Street Journal this weekend that we probably are heading into a recession. I hope not. Also the speaker from the Committee for Green Foothills, of which I'm totally fond, as you might know from my background, but I was a little concern with the mention of the way it was discussed in terms of not recognizing that infill density was really actually the primary motivation of the Committee for Green Foothills in terms of saving open space, was to focus on smart infill development, to take the pressure off of the foothills.

And so I just want to make that note, that if you're going to have some density, it belongs down in the urban setting to protect spilling over into open space preservation -- spilling over into open space. So just a

few more comments, and I'll be quick, if I can. With all due respect to
the mayor and her comments about which patients ought to be seen by
hospital staff, I don't think we want to get into a triage of patients by
zip code. That feels completely inappropriate for me in terms of what
we ought to be talking to a hospital about, about who they see and
what ratio they see. I think they should see whoever the doctors think
need to be seen, wherever they're from. Also the reason for the
hospital renovation and expansion -- the seismic compliance was one
thing that was mentioned.

But there were a couple dozen other reasons for the hospital
expansion, so the seismic compliance obviously triggered, I think, or
at least was in parallel with triggering looking at what would be done
if you had to redo the seismic construction. If you had to do the
seismic upgrade, what else might you do that would also be cost
benefit at the time. And so I think there were lots of other reasons, and
dozens were mentioned tonight. A couple of myths that I don't want to
become -- urban legends that hold some water. And this is my opinion
-- I don't think we can ask for 100 percent mitigation. This is a very,
very complex project between the shopping center and the hospitals.

And then, of course, Ronald McDonald House has some ideas about
their expansion. I think that sometimes we have to weigh which
impacts can be mitigated in a reasonable and effective way, and what
other impacts are balanced out by the benefit of the hospitals and the
shopping center expansion? And those are mitigations in themselves,
and I think we have acknowledge that they can be looked at that way,
in terms of their benefits. The other thing that I want to mention

because I'm not going to be on the council much longer, and I want to make sure I say it before I don't have another opportunity, which is that we don't have a city policy of no new net trips. That might be an idea. That might be a goal. That might be a vision. But it is not a city policy.

Should we ever want it to be a city policy, we'd have to discuss it. It might be a preference that's stated by some of us, and we might all dream that we could have that result, but that isn't a city-voted-on policy. So I just want to make sure that's noted. Lastly, I probably won't get a chance to comment on this project much more, and I guess I want to take just one last moment to say that I think this is an exciting and fabulous opportunity for our community. And unlike a couple of the speakers, I do think it is outstanding that we have a regional hospital that is a world-class hospital that ought to be a world-class hospital. And actually I think there's some people who think it isn't quite a world-class hospital right now.

And I think it is -- I'm not sure that if we were presented with an opportunity to create a university across El Camino from us, if that was just farmland, and someone came to us, some great philanthropist and said I want to start a university, I'm not sure we would be so inclined to do that either. I think we have a balance to strike. I don't know if the balance needs to be 50/50. But I think that we have a tremendous opportunity to help make this university hospital system absolutely one of the best in the world.

And I think that hopefully we will work towards that in a very collaborative, open-minded, reasonable way, and do it with some amount of speed, and not be completely bogged down. I won't be here to help speed it up, but I will hoping that the next council will show the leadership to do the right thing, not just give away the kitchen sink, but do the right thing, and do it in a way that moves this project forward with some speed, both for our community and for Stanford. So I wish you all well on dealing with that.

Mayor Yoriko Kishimoto:                Actually, I have just one more comment that I forgot, which was -- and I don't know if this would be in addition or whether staff wants to just consider it included in the list, but just under traffic -- I guess when I went to one of the focus groups on traffic, one thing that got raised over and over again was the park and ride concept. And it's mentioned in the comprehensive plan as well when it talks about the medical center expansion. So can staff just include that as one concept, too? And I see a nod there? Yes. Okay. Thank you. So with that, I think we're ready to vote on 7A. So we have a motion and second. And it's time to vote.

City Clerk:                And that motion passed 5-0 with Council Member Morton absent and Council Member Mossar, Cordell, and Klein not participating.

Mayor Yoriko Kishimoto:                Okay. So do I have a motion on 7B?

Male Voice:        I move the staff recommendations.

Mayor Yoriko Kishimoto:                Okay. We have a motion and second on 7B. Okay, I think we're ready to vote on it. Yes, Council Member Drekmeier?

Councilmember Drekmeier:                Well, I'm hesitant to vote on this because I think it's basically the whole crux of the shopping center issue is do we allow more square footage, and it seems to me that that is very much in line with the decision of whether we move forward or not. And I don't see the value of initiating the zone change at this point. And I could be convinced otherwise, but to me, it's something that is a quick change that happens at the time we determine or maybe don't whether we want to do the expansion.

Frank Benest:          Again, the only comment I would make is that we are going to be studying the impact of the zoning and the way to do that through the EIRs to initiate the change. Again, we will be going back through the Planning Commission. So, in our view, if you want to analyze the impacts of the proposal, the way to do it is through the staff recommendations.

Councilmember Drekmeier:                Isn't it through the EIR?

Frank Benest:          We're proposing that you initiate the zoning proposal so that we can study it through the EIR.

Councilmember Drekmeier:                And it can't be studied unless --

| | |
|---|---|
| Frank Benest: | There has been a suggestion that you come back in March and initiate it in March, at the latest, but in our mind, we're in the middle right now of the environmental analysis. So in our view, this is the time to do that. |
| Councilmember Drekmeier: | And a question for the city attorney. Does this take five votes to move forward? |
| City Attorney: | The initiation does not. But a zone amendment takes place in three steps, and so adoption of the formal ordinance would require five votes. |
| Councilmember Drekmeier: | So initiation just takes three out of five at this point? Okay, thank you. |
| Mayor Yoriko Kishimoto: | Okay, so, again, this is just an initiation, not -- |
| Councilmember Drekmeier: | [Unintelligible.] |
| Mayor Yoriko Kishimoto: | Yeah, I mean, I feel the same way as Council Member Drekmeier, but I suspect the votes are going to go the same way as the other one. All right, I think we're ready to vote on 7B. |
| City Clerk: | And the motion is carried on a 5-0 with council members Cordell, Klein, and Mossar not participating and Council Member Morton absent. |

Mayor Yoriko Kishimoto:              Thanks again for all the hard work by our staff
and the Planning Commission, as well as the members of the public.
Okay, any council comments, announcements, or reports? Yes,
Council Member Drekmeier?

Councilmember Drekmeier:              Well, for the past year I've been the liaison to
neighbors abroad, and last week, at the meeting, they raised an issue
that a little while ago -- I think it was in September -- some visitors
from Nskiday came. And we entered into an agreement to have more
economic relations. And it seemed very symbolic to me, but they had
some concerns that they weren't really involved in that process and
weren't listed as one of the collaborators. So they requested that when
sister cities come to the city, that they be included. So I'm just passing
that along. But no hard feelings, they are having their annual party,
and everyone's invited. And that's going to be on Saturday, December
15, from 4 to 7 p.m. in Atherton, and I'm sure you can get the
information on their website.

Mayor Yoriko Kishimoto:              I don't think -- I don't see any other lights, so the
meeting is adjourned.

[End of recorded material.]

EXHIBIT OO

JAN-02-08     17:01     FROM-SEIU UHW                              415 563 9914                    T-468    P.002/002    F-705



**SEIU**
**UHW**
United Healthcare Workers
**WEST**

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

January 2, 2008                                    Via Fax 650-724-3537 / U.S. Mail

Ms. Laurie Quintel
Director of Employee Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive
HG016, MC 5203
Stanford, CA 94305

Ms. Quintel

On December 11, 2007 we held a labor management joint committee. You agreed to meet with Mary Garcia and I to follow up on our concerns for in Materials Distribution, Supply processing and Emergency Room departments.

Both Mary and I can meet with you at your earliest convenience.  With the exception of January 7, January 21 and February 4th, Mary is available to meet any day during the morning.

Please provide us with your availability to meet with us.

Sincerely

Linda Cornell
Assistant Chief Steward

CC: Mary Garcia
     Myriam Escamilla
     Rusty Smith

Sal Rosselli, *President*          Jorge Rodriguez, *Executive Vice President*          Joan Emslie, *Secretary-Treasurer*

AN-02-08   17:01   FROM-SEIU UHW                    415 563 9914        T-468   P.001/002   F-705



 **SEIU** HEALTHCARE
**United Healthcare Workers WEST**

1338 Mission Street
San Francisco, CA 94103

# FAX COVER SHEET

Date: **January 2, 2008**

## TO:

Name: **Laurie Quintel**

Office: **Stanford Hosp. & Clinics**

Fax Number: **650·724·3537**

Telephone Number: _____

## FROM:

Name: **Linda Cornell/CH**

Office: **San Francisco Office**

Fax Number:     **415-563-9914**

Main Number:   **415-441-2500**

Direct Number: _____

**Number of Pages (Including Cover Sheet):** **2**

**Remarks:** _____

JAN-03-08   13:28    FROM-SEIU UHW                    415 563 9914           T-475  P.002/002  F-715



# LOCAL 715

www.seiu715.org

*SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO/CLC*

January 2, 2008                          Via Fax 650-724-3537 / U.S. Mail

Ms. Laurie Quintel
Director of Employee Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive
HG016, MC 5203
Stanford, CA 94305

Ms. Quintel

On December 11, 2007 we held a labor management joint committee. You agreed to meet with Mary Garcia and I to follow up on our concerns for in Materials Distribution, Supply processing and Emergency Room departments.

Both Mary and I can meet with you at your earliest convenience. With the exception of January 7, January 21 and February 4th, Mary is available to meet any day during the morning.

Please provide us with your availability to meet with us.

Sincerely

Linda Cornell
Assistant Chief Steward

CC: Mary Garcia
    Myriam Escamilla
    Rusty Smith

ME/ch/LMeeting Request 3/opeiu 29 afl-cio (12)

**San Jose Office:** 2302 Zanker Road, San Jose, CA 95131-1115 • (408) 954-8715 • Fax  (408) 954-1538
**Redwood City Office:** 891 Marshall Street, Redwood City, CA 94063 • (650) 365-8715 • Fax (650) 365-1538
**Stanford Office:** P.O.Box 19152, Stanford, CA 94309 • (650) 723-3680 • Fax (650) 723-3650
-Affiliated SEIU 1972-

AN-03-08     13:28     FROM-SEIU UHW                    415 563 9914          T-475   P.001/002   F-715



 **FAX COVER SHEET**

1338 Mission Street
San Francisco, CA 94103

Date: _Jan. 3, 2007_

## TO:

Name: _Laurie Quintel_

Office: _Stanford Hospital_

Fax Number: _650·724·3537_

Telephone Number: _____

## FROM:

Name: _Linda Cornell /cH_

Office: **San Francisco Office**

Fax Number:     **415-563-9914**

Main Number:     **415-441-2500**

Direct Number: _____

**Number of Pages (Including Cover Sheet):** _2_

**Remarks:** _____

_____

_____

_____

LC/hex.s820v10cpam 3 ml-201121

**LOCAL 715**

**LOCAL 715**

SEIU
Stronger Together
www.seiu715.org

SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO/CLC

January 2, 2008                                      Via Fax 650-723-2370 & U.S. Mail

Mr. Brian Coffman
Sr. Employee and Labor Relations Specialist
Stanford Hospital and Clinics
300 Pasteur Drive
Palo Alto, CA 94305

Re: Pending Grievances: housekeeping changes, Portillo and Pulido

Mr. Coffman:

We are writing to notify you that we have not been able to secure dates to address the Portillo and Pulido grievances. As you know, on January 2, 2008 Chuck had a family emergency and had to cancel the meeting for Mr. Pulido's case. However, we are still interested in trying to resolve this issue and would like to set up another meeting.

For Mr. Portillo's case, we have not been able to secure a date that would be convenient for Mr. Portillo.

For both of these cases, please provide us with new dates that we can meet with you.

As for the housekeeping changes, in response to your letter, we are interested to resolve this issue through the labor management committee; however we have not heard from Ms. Quintel as to when we can begin discussions with the subcommittee. We sent this letter in mid December and have not received an answer. In the meantime, the grievance will remain in place until it is clear that a potential solution is imminent.

Sincerely,

*Chuck Fonseca*                                      *Linda Cornell*
Chuck Fonseca                                        Linda Cornell
Shop Steward                                         Assistant Chief Steward

cc:    Myriam Escamilla
       Rusty Smith

ME/ch/LMeeting Request 4opeiu 29 afl-cio (12)

*San Jose Office:* 2302 Zanker Road, San Jose, CA 95131-1115 • (408) 954-8715 • Fax (408) 954-1538
*Redwood City Office:* 891 Marshall Street, Redwood City, CA 94063 • (650) 365-8715 • Fax (650) 365-1538
*Stanford Office:* P.O. Box 19152, Stanford, CA 94309 • (650) 723-3680 • Fax (650) 723-3650
Affiliated SEIU 1972-



# FAX COVER SHEET

1338 Mission Street,
San Francisco, CA 94103

Date: **Jan. 3, 2008**

## TO:

Name: **Brian Coffman**

Office: **Stanford Hosp. & Clinics**

Fax Number: **650·723·2370**

Telephone Number: _____

## FROM:

Name: **Chuck Fonseca/Linda Cornell**

Office: **San Francisco Office**

Fax Number:    **415-563-9914**

Main Number:    **415-441-2500**

Direct Number: _____

**Number of Pages (Including Cover Sheet):** **2**

**Remarks:** _____

_____

_____

_____

**EXHIBIT PP**



# LOCAL 715

**SERVICE EMPLOYEES INTERNATIONAL UNION, CLC**

www.seiu715.org

December 19, 2007

CERTIFIED MAIL 7007 0220 0001 4285 0758

Laurie Quintel, Director
Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive – M/C 5513
Stanford, CA  94305-5513

**RECEIVED**

DEC 2 7 2007

VP, HUMAN RESOURCES

Dear Ms. Quintel:

As you know, I was appointed as the Trustee of SEIU, Local 715 by the International Union.  As Trustee of SEIU, Local 715, I am appointing Myriam Escamilla, as of this date, as an Assistant to the Trustee of Local 715 with the authority to represent bargaining unit members at Stanford Hospital and Lucile Packard's Children's Hospital.

Sincerely

*B.W. Smith*

B.W. (Rusty) Smith
International Trustee, SEIU Local 715

cc:    Myriam Escamilla
       Bruce Harland
       Norm Gleichman

RS:ch ©2007SEIU521/CTW-CLC-Stanford Hospital-LQuinteltreMEscamillaAssistrust-121907

**EXHIBIT QQ**

JUN-05-2007  10:30     FROM-LOCAL 250  FRANCISCO          415-563-9914          T-502  P.004/027  F-774

 # SEIU GRIEVANCE FORM

<u>Instructions:</u> This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU. Please attach additional sheets to the form if needed.

Grievant's Name: James Satuito

Home Address: 126 Sierrawood Avenue, Hayward, CA 95125

Home Phone: 408-246-4756                    Work Phone:

Employer (County, School District, City, etc): Stanford Hospital

Department: Sterile Processing          Job Classification: Sterile Processing Tech II

Dept. Mgr.:                              Immediate Supervisor: Eric Ortiz and Chris Cooley

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): Unjust termination.

1.  **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** The contract as a whole including but not limited to Article 20, Article 23 and Just Cause.

2.  **WHO IS THE GRIEVANCE BROUGHT AGAINST?** The Employer.

3.  **WHEN DID THE INCIDENT OCCUR? (date and, if appropriate, time or if ongoing):** Termination on March 6, 2007.

4.  **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION:**

5.  **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:**

6.  **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make whole, return employee to work with back pay.

7.  **ADDITIONAL COMMENTS:**

| | |
|---|---|
| GRIEVANT: James Satuito | |
| STEWARD: Mary Garcia, Lillbeth Naniola | DATE: 3/9/07 |
| CHIEF STEWARD: | DATE: |
| EMPLOYER SIGNATURE: | DATE: |

Please send this completed form and any supporting documentation to Employee/Labor Relations (Room HG005), 300 Pasteur ᵛe, Stanford, CA 94305.

tuito 1/opciu 3 afl-clo (12)

EXHIBIT RR

APR-14-2007  17:33    FROM-LOCAL 250 SAN FRANCISCO         415-563-9914        T-445  P 004/006  F-682

 # SEIU GRIEVANCE FORM

**Instructions:** This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU. Please attach additional sheets to the form if needed.

Grievant's Name: Victor Acosta

Home Address: 450 Vera Ave Apt 7, Redwood City, CA 94061

Home Phone: 650 839-1438                    Work Phone:         Ext.

Employer (County, School District, City, etc): Stanford

Department: Dietary                    Job Classification:

Dept. Mgr.: __Bob Figy                    Immediate Supervisor

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): Unjust Termination

1. **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** The contract as a whole including: Just Cause

2. **WHO IS THE GRIEVANCE BROUGHT AGAINST?** The Employer

3. **WHEN DID THE INCIDENT OCCUR?** (date and, if appropriate, time or if ongoing): 3/14/07

4. **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION:** Unjust termination

5. **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:** n/a

6. **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make whole.

7. **ADDITIONAL COMMENTS:**

GRIEVANT: Victor Acosta

STEWARD:   Jesus Andrade                    DATE: 3/17/06

WORKSITE ORGANIZER:                    DATE:

EMPLOYER SIGNATURE:                    DATE:

Please send and fax one copy of this form to HR and give a second copy to the union representative.

**EXHIBIT SS**



**LOCAL 715**

SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO/CLC

www.seiu715.org

April 16, 2007                                    Via Fax 650-723-2370 & Certified Mail

Ms. Laurie Quintel
Employee/Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive
Palo Alto, CA 94305

Dear Mrs. Quintel:

Please be advised that we are moving the Victor Acosta termination grievance to
binding arbitration.

Sincerely,

*Jesus Andrade*

Jesus Andrade

Cc:   Victor Acosta
      Ella Hereth
      Jocelyn Olick
      Kim Tavaglione

EJ4ca/LV Acosta 4/opeiu 29

EXHIBIT TT



# SEIU GRIEVANCE FORM

**Instructions:** This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU.  Please attach additional sheets to the form if needed.

**Grievant's Name:** John Simien

**Home Address:** P.O. Box 51285, East Palo Alto, CA 94303

**Home Phone:** 650-322-1548          **Work Phone:**

**Employer (County, School District, City, etc):** Stanford Hospital

**Department:** Sterile Processing          **Job Classification:**

**Dept. Mgr.:** _____          **Immediate Supervisor:** Francis Ignacio

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): Unjust written warning and an unjust involuntary forced shift change.

1. **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** The contract as a whole including but not limited to Article 4, Article 7 and Article 11.

2. **WHO IS THE GRIEVANCE BROUGHT AGAINST?** The Employer.

3. **WHEN DID THE INCIDENT OCCUR?** (date and, if appropriate, time or if ongoing): March 29, 2007.

4. **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION:**

5. **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:**

6. **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make whole, remove warning and return to original shift on nights.

7. **ADDITIONAL COMMENTS:**

**GRIEVANT:** John Simien

**STEWARD:** Mary Garcia          **DATE:** 4/2/07

**CHIEF STEWARD:**          **DATE:**

**EMPLOYER SIGNATURE:**          **DATE:**

Please send this completed form and any supporting documentation to Employee/Labor Relations (Room HG005), 300 Pasteur Drive, Stanford, CA  94305.

MC/lc/CjSimien 1/opeiu 3 afl-cio (12)

**EXHIBIT UU**



# SEIU GRIEVANCE FORM

**Instructions:** This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU. Please attach additional sheets to the form if needed.

Grievant's Name: <u>All affected</u>

Home Address: _____

Home Phone: _____  Work Phone: _____ Ext. _____

Employer (County, School District, City, etc): <u>Stanford Medical Center and LPCH</u>

Department: <u>all</u> _____ Job Classification: _____

Dept. Mgr.: _____ Immediate Supervisor _____

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): Withholding of Dues money   Local 715 accounting has not received any dues March

1. **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** The contract as a whole including:   Article 3

2. **WHO IS THE GRIEVANCE BROUGHT AGAINST?** The Employer

3. **WHEN DID THE INCIDENT OCCUR? (date and, if appropriate, time or if ongoing):** March 2, 2007

4. **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION:** Members dues are being deducted and not passed to the union.   Members intend their dues to go to the union and not unjustly withheld by management.   Members want to be in good standing however management is unilaterally preventing members from being in good standing.

5. **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:** This is the appropriate steps to file this grievance.

6. **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make all employees whole.

7. **ADDITIONAL COMMENTS:**

GRIEVANT: <u>Jesus Andrade</u>

STEWARD: ____ <u>Jesus Andrade</u> _____  DATE: <u>5/22/07</u>

WORKSITE ORGANIZER: _____  DATE: _____

EMPLOYER SIGNATURE: _____  DATE: _____

Please send and fax one copy of this form to HR and give a second copy to the union representative.
eh\u.sw\seiu-uhw\claw!

**EXHIBIT VV**

JA copy



HUMAN RESOURCES

**STANFORD**
U N I V E R S I T Y ·
MEDICAL CENTER

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

# FILE COPY

May 30, 2007

*Via Fax & U.S. Mail*

Mr. Jesus Andrade
Chief Steward
SEIU Local 715
2302 Zanker Rd.
San Jose, CA 95131

        RE:    <u>Access Provisions and Dues Remittance</u>

Dear Jesus:

This letter is in response to your communications regarding purported grievances over the access provisions and dues remittance issues.

As to the dues remittance issue, I previously communicated to the purported head of Local 715 the Hospital's intention to cease remitting dues until it can assure itself that Local 715 actually exists, if it does in fact exist, prior to the cessation of such remittances. Local 715, if it exists, chose not to provide the information necessary to obtain a resumption of the dues remittance, nor did it file a grievance within the thirty days after dues remittances were ceased. However, because the remittance of dues by the Hospitals is an issue that turns on the question of the continued representative status of Local 715, it is not an appropriate subject for a grievance. The underlying issue of Local 715's existence and status as the bargaining representative is not one covered by the Agreement or its grievance and arbitration procedures, but rather is appropriately raised and decided in another forum.

The same is true with respect to access by the UHW personnel. The underlying questions with respect to access by UHW personnel are (1) whether Local 715 exists, and (2) if it does, whether the UHW personnel are properly acting pursuant to a service agreement with Local 715. Neither is a question to be decided under the grievance and arbitration procedure. Indeed, when Local 715 was advised that UHW personnel would no longer be recognized (over nine months ago) Local 715's response was that the refusal represented an unfair labor practice, yet it never filed a charge to that effect with the NLRB.

Since that time, repeated requests for information that might resolve the issues you attempt to raise have been consistently ignored by the Union, to the point that the Hospitals have filed their own unfair labor practice charges in order to obtain the requested information.

In any event, we do not intend to process these grievances.

Sincerely,

*Laurie J. Quintel*

Laurie J. Quintel
Director, Employee & Labor Relations

300 Pasteur Drive · M/C 5513 · Stanford, CA 94305-5513

**EXHIBIT WW**

**LOCAL 715**

# LOCAL 715

**SEIU**
Stronger Together

www.seiu715.org

**SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO/CLC**

November 6, 2007                                                    Via Fax 650-723-2370 & U.S. Mail

Ms. Laurie Quintel
Director of Employee and Labor Relations
Stanford Hospital and Clinics
300 Pasteur Drive
Palo Alto, CA 94305

Re:    Jesus Andrade Grievance – Unjust Termination

Dear Ms. Quintel:

Enclosed please find a grievance filed on behalf of Mr. Andrade.

Please contact me to set up a mutually acceptable date and time to meet.

We also are requesting that you provide us with the following information:

1.  Mr. Andrade's personnel file.

2.  The reason for his discharge.

3.  All information considered in making the decision to terminate.

4.  A description of any counseling of Mr. Andrade regarding previous incidents of gross misconduct.

5.  Gross misconduct records for all bargaining unit employees in the dietary department within the past two years.

6.  All personnel manuals, notices, or other documents that set forth the company's gross misconduct policies and punishments for violations and said policies.

I will need all this information by Tuesday, November 20, 2007.

Sincerely,

*Chuck Fonseca*

Chuck Fonseca
Shop Steward

cc:    Jesus Andrade
       Myriam Escamilla
       Cheli Guzman
       Jocelyn Olick
       Kim Tavaglione
       Rusty Smith

CF/ac/LJ Andrade 3-opein 3 afl-cio (12)



# SEIU GRIEVANCE FORM

**Instructions:** This form is to be used by an individual SEIU employee, a group of SEIU employees, and the Union to file a formal grievance for an alleged violation of a specific provision in the Agreement with SEIU. Please attach additional sheets to the form if needed.

Grievant's Name: Jesus Andrade

Home Address: 2041 Terilyn Avenue, San Jose, CA 95122

Home Phone: 408-258-2858 _____ Work Phone: _____

Employer (County, School District, City, etc): Stanford Hospital and Clinics/LPCH

Department: Dietary _____ Job Classification: Lead Food Service

Dept. Mgr.: Bob Figy _____ Immediate Supervisor: _____

**STATEMENT OF GRIEVANCE:** Please describe what was the action you believe to be improper and describe specifically, what took place, how it happened, who was involved (please attach additional written documentation if needed): The employer violated just cause clause as well as discriminated against union activist. Employer also did not follow progressive discipline.

1.  **PLEASE DESCRIBE THE SPECIFIC ARTICLE(S) & SECTION(S) OF THE AGREEMENT WITH SEIU THAT HAS BEEN VIOLATED:** Contract as a whole including Article 4 and Article 20.

2.  **WHO IS THE GRIEVANCE BROUGHT AGAINST?** Bob Figy, Stanford Hospital and Clinics.

3.  **WHEN DID THE INCIDENT OCCUR? (date and, if appropriate, time or if ongoing):** November 1, 2007.

4.  **PLEASE DESCRIBE WHAT WAS THE CONSEQUENCE OR ADVERSE EFFECT ON YOU AS A RESULT OF THE IMPROPER ACTION:** Mr. Andrade was terminated creating a financial and emotional hardship. Mr. Andrade also discriminated due to his intense and well documented union activity. As the Chief Shop Steward, he has been targeted for a period of time due to his union activity.

5.  **PLEASE DESCRIBE INFORMAL ATTEMPTS MADE BY YOU TO RESOLVE THIS GRIEVANE AS COVERED BY STEP 1. (Informal Review) OF THE GRIEVANCE AND ARBITRATION PROCEDURE:** Investigation meetings and on November 1, 2007 employer terminated Mr. Andrade.

6.  **THE REMEDY OR ACTION THAT YOU ARE REQUESTING TO RESOLVE THE GRIEVANCE:** Make Mr. Andrade whole and reinstate him to his position with all benefits.

7.  **ADDITIONAL COMMENTS:**

GRIEVANT: Jesus Andrade

STEWARD: Chuck Fonseca _____ DATE: 11/6/07

CHIEF STEWARD Jesus Andrade _____ DATE: 11/6/07

EMPLOYER SIGNATURE: _____

Please send this completed form and any supporting documentation to Employee/Labor Relations (Room HG005), 300 Pasteur Drive, Stanford, CA 94305.

SEIU/CJAndrade 1/oop-u 3 afl-cio (12)